**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JAMES HAYS, on behalf of himself and all other similarly situated shareholders of Walgreen Co., | Civ. A. No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **ECF CASE** |
| JANICE M. BABIAK, DAVID J. BRAILER, STEVEN A. DAVIS, WILLIAM C. FOOTE, MARK P. FRISSORA, GINGER L. GRAHAM, ALAN G. MCNALLY, DOMINIC MURPHY, STEFANO PESSINA, BARRY ROSENSTEIN, NANCY M. SCHLICHTING, ALEJANDRO SILVA, JAMES A. SKINNER, GREGORY D. WASSON, WALGREEN CO. and WALGREENS BOOTS ALLIANCE, INC., | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff James Hays ("Plaintiff"), on behalf of himself and all other similarly situated shareholders of Walgreen Co. ("Walgreen" or the "Company"), brings the following Class Action Complaint (the "Complaint") against Walgreen, Walgreens Boots Alliance, Inc. ("WBA"), and the members of the board of directors of Walgreen (the "Board" or the "Walgreen Board"). The allegations of the Complaint are based on the knowledge of Plaintiff as to himself, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

## INTRODUCTION

1.     This action is brought on behalf of the shareholders of Walgreen and arises from material misstatements and omissions in proxy communications with respect to (a) a proposed share issuance by Walgreen to Alliance Boots GmbH ("Alliance Boots") shareholders and (b) a corporate reorganization of Walgreen.  This action asserts claims under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), which claims seek redress on the basis of negligence and do not sound in fraud.   This action also asserts separate claims under Section 20(a) of the Exchange Act.  Additionally, this action asserts claims relating to state law fiduciary duty violations.

2.     In August 2012, U.S. drugstore chain Walgreen acquired a 45% equity stake in European pharmacy company Alliance Boots (the "First Step Acquisition") and obtained an option to purchase the remainder of Alliance Boots commencing February 2, 2015.  At the time of the First Step Acquisition, Alliance Boots was owned by Italian billionaire Stefano Pessina ("Pessina") and global private equity firm Kohlberg Kravis Roberts ("KKR").   Upon consummation of the First Step Acquisition, Pessina and Dominic Murphy ("Murphy"), a KKR partner, joined the Walgreen Board.

3.     On August 6, 2014, Walgreen publicly announced several significant developments at the Company.  Walgreen announced that it had entered into an agreement with Alliance Boots to accelerate the exercise of Walgreen's option to acquire the remainder of Alliance Boots that Walgreen does not already own (the "Second Step Acquisition").  Additionally, the Company announced that it would undergo a corporate reorganization (the "Reorganization") in connection with the Second Step Acquisition.  Specifically, Walgreen will

be converted into a holding company structure under which Walgreen would become a wholly-owned subsidiary of WBA, a new Delaware corporation. In connection with the Reorganization, Walgreen shareholders will have their existing shares of Company stock automatically converted into shares of WBA.

4. That same day, August 6, 2014, Walgreen also publicly announced that it would be reducing its 2016 forecasted pharmacy unit earnings by $1.1 billion, in part because of a step-down of reimbursements via the federal Medicare Part D program. Following the August 6, 2014 announcements, Walgreen's stock price fell nearly 15%.

5. Just days prior to the August 6, 2014 announcements, the Company's Executive Vice President ("EVP"), Chief Financial Officer ("CFO") and President, International Wade Miquelon ("Miquelon") abruptly resigned from each of his positions with the Company.

6. On August 19, 2014 and September 30, 2014, *The Wall Street Journal* published articles criticizing Miquelon's performance at Walgreen and blaming Miquelon for the Company's dramatically revised forecast.

7. On October 16, 2014, Miquelon filed a complaint (the "Defamation Complaint") against the Company in the Circuit Court of Cook County, Illinois.[1] The Defamation Complaint levels a number of serious allegations against certain Walgreen senior executives, directors and large shareholders.

8. Among other things, the Defamation Complaint alleges that Walgreen President and Chief Executive Officer ("CEO") Gregory D. Wasson ("Wasson") and Pessina defamed Miquelon during a series of meetings with large Walgreen shareholders between August 5 and August 8, 2014, motivated by a desire to cover up or obscure the misconduct of certain Walgreen

---

[1] The Defamation Complaint is captioned *Miquelon v. Walgreen Co.* (WAG), 14-ch-16825, Cook County, Illinois Circuit Court (Chicago) and is attached hereto as Exhibit A.

directors. The Defamation Complaint further alleges that Wasson, Pessina and the rest of the Walgreen Board were complacent in allowing certain activist investors to pressure Walgreen management to raise its earnings forecast for the 2016 fiscal year, and that Pessina had improperly met directly with certain large Walgreen shareholders to discuss the future of the Company. The Defamation Complaint also alleges that Wasson and Pessina improperly interfered with the Company's financial reporting process.

9.    On September 16, 2014, WBA filed with the SEC a false and/or materially misleading registration statement on Form S-4, which was subsequently amended on October 29, 2014 and November 18, 2014 (as amended, the "S-4"). On November 24, 2014, Walgreen filed with the SEC a false and/or materially misleading proxy statement/prospectus on Schedule 14A (the "Proxy").

10.    The S-4 and the Proxy were issued in connection with Walgreen's solicitation of shareholder support for (a) the issuance of Walgreen stock to Pessina and KKR in connection with the Second Step Acquisition (the "Share Issuance") and (b) the Reorganization, at the upcoming special meeting of Walgreen shareholders (the "Special Meeting") scheduled for December 29, 2014.

11.    Despite the serious allegations in the Defamation Complaint leveled at Pessina, whose ownership stake in and influence over the Company will increase significantly if the Share Issuance is consummated, neither the S-4 nor the Proxy even address those allegations. In fact, both the S-4 and the Proxy fail to even reference the existence of the pending lawsuit filed by the Company's former CFO. Moreover, the S-4 and the Proxy do not disclose the impact of the Company's Reorganization on any potential derivative liability arising from the allegations against Walgreen's directors and officers in the Defamation Complaint.

12.     The S-4 and the Proxy also fail to disclose a litany of other information that is material to shareholders' voting decision on the Share Issuance and Reorganization, including (a) Pessina's and KKR's respective ownership stakes in the Company upon consummation of the Share Issuance, (b) certain information related to the Board's decision to accelerate the potential consummation of the Second Step Acquisition, and (c) certain information related to the Board's decision to add a representative of activist hedge fund JANA Partners LLC ("JANA") to the Board on September 8, 2014, and to enter an agreement obligating JANA to support the Second Step Acquisition.

13.     The material omissions detailed herein constitute violations of Section 14(a), Rule 14a-9, Section 20 and violations of the Board's duty of disclosure under Illinois state law.

14.     Through this action, Plaintiff seeks to enjoin Walgreen from convening the Special Meeting until Defendants supplement the S-4 and the Proxy to make them no longer false and/or materially misleading.

## THE PARTIES

15.     Plaintiff James Hays has been a shareholder of Walgreen at all relevant times.

16.     Defendant Janice M. Babiak has been a director of the Company since 2012.

17.     Defendant David J. Brailer has been a director of the Company since 2010.

18.     Defendant Steven A. Davis has been a director of the Company since 2009.

19.     Defendant William C. Foote has been a director of the Company since 1997.

20.     Defendants Mark P. Frissora has been a director of the Company since 2009.

21.     Defendant Ginger L. Graham has been a director of the Company since 2010.

22.     Defendant Alan G. McNally has been a director of the Company since 1999.

23.     Defendant Murphy has been a director of the Company since August 2012.

Murphy is a partner of Kohlberg Kravis Roberts & Co. L.L.P. and joined the Walgreen Board after the First Step Acquisition. Murphy played a significant role in KKR's investment in Alliance Boots and was appointed to the Alliance Boots board of directors in July 2007.

24. Defendant Pessina has been a director of the Company since August 2012. Pessina is executive-chairman of Alliance Boots.

25. Defendant Barry Rosenstein ("Rosenstein") has been a director of the Company since 2014. Rosenstein is the founder of JANA.

26. Defendant Nancy M. Schlichting has been a director of the Company since 2006.

27. Defendant Alejandro Silva has been a director of the Company since 2008.

28. Defendant James A. Skinner ("Skinner") was named Chairman of the Walgreen Board in July 2012 and has served as a Board member since 2005. Skinner personally signed a cover letter to the S-4 and the Proxy.

29. Defendant Wasson is President and CEO of Walgreen and has served on the Board since 2009. Wasson has served in various positions of increasing responsibility at Walgreen since joining the Company as a pharmacy intern in 1980. Wasson personally signed a cover letter to the S-4 and the Proxy. Wasson will be CEO of WBA upon consummation of the Reorganization.

30. In addition to being referred to herein as the "Board" or "Walgreen Board," the defendants listed in paragraphs 16 to 29 above are also collectively referred to herein as the "Director Defendants."

31. Walgreen, together with its subsidiaries, operates the largest drugstore chain in the United States, with net sales of $76.4 billion in the fiscal year ended August 31, 2014. Walgreen is incorporated in the State of Illinois and maintains its principal executive offices at

108 Wilmot Road, Deerfield, Illinois 60015. Walgreen trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WAG."

32. WBA is a Delaware corporation that will serve as the parent company to Walgreen upon consummation of the Reorganization.

33. WBA, Walgreen, and the Director Defendants are collectively referred to herein as "Defendants."

## JURISDICTION

34. The claims asserted herein arise under Sections 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

35. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the United States. This Court has supplemental jurisdiction over other state law claims under 28 U.S.C. § 1367 as the other claims are related.

36. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c) and (d). The Company has its principal place of business in this District, and many of the acts and deliberations that constitute violations of law complained of herein, including the dissemination to the public of solicitation statements that omit material facts, occurred in this District.

37. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchange.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**I.**      <u>**Walgreen Acquires 45% Equity Stake In Alliance Boots**</u>

38.      On June 18, 2012, Walgreen and Alliance Boots entered into a Purchase and Option Agreement (the "Purchase and Option Agreement") pursuant to which Walgreen agreed to buy a 45% stake in Alliance Boots.

39.      Specifically, Walgreen agreed to acquire 45% of the issued and outstanding share capital of Alliance Boots in exchange for $4.025 billion in cash and approximately 83.4 million shares of Walgreen common stock. At the time of announcement, the consideration paid to Alliance Boots in connection with the First Step Acquisition was valued at approximately $6.7 billion.

40.      Prior to the First Step Acquisition, Alliance Boots was owned by Defendant Pessina and global private equity firm KKR, who had partnered to take Alliance Boots private in a 2007 leveraged buyout.

41.      Pursuant to the Purchase and Option Agreement, Walgreen also received a call option (the "Call Option") to acquire the remaining Alliance Boots shares not already purchased in the First Step Acquisition in exchange for £3.133 billion in cash and 144,333,468 shares of Walgreen common stock.

42.      The Call Option could be exercised by Walgreen at any time during the period beginning on February 2, 2015 and ending on August 2, 2015 (the "Option Exercise Period").

43.      On August 2, 2012, Walgreen completed the First Step Acquisition.

44.      Upon completion of the First Step Acquisition, Pessina beneficially owned 72,841,856 shares of Walgreen common stock or about 7.7% of the Company's outstanding shares. At that time, KKR owned about 0.7% of Walgreen's outstanding shares.

45.     Also on August 2, 2012, Walgreen, Pessina, KKR and certain other entities entered a Shareholders Agreement (the "Shareholders Agreement").[2]  Among other things, the Shareholders Agreement provides that so long as Pessina and KKR continue to meet certain Walgreen common stock ownership thresholds (and subject to certain other conditions), Pessina and KKR will each be entitled to designate one nominee to the Walgreen Board.

46.     In connection with the closing of the First Step Acquisition, Pessina and Murphy joined the Walgreen Board.

47.     Additionally, Walgreen President and CEO Wasson and certain other Walgreen executives joined the Alliance Boots board of directors.

## II.     Walgreen Simultaneously Announces A Trio Of Transformative And/Or Material Events Involving The Company

### A.     Walgreen And Alliance Boots Amend The Purchase And Option Agreement And Walgreen Announces A Corporate Reorganization

48.     On August 6, 2014, Walgreen publicly announced that on August 5, 2014, the Company had entered into Amendment No. 1 to the Purchase and Option Agreement (the "Amendment").  Pursuant to the Amendment, the Option Exercise Period was accelerated to begin on August 5, 2014 and end on February 5, 2015.

49.     Concurrently with entering into the Amendment, Walgreen exercised the Call Option and announced its intention to purchase the remaining 55% of Alliance Boots that Walgreen does not already own.

50.     As stated above, the consideration payable to Alliance Boots in connection with the Second Step Acquisition is £3.133 billion in cash and 144,333,468 shares of Walgreen

---

[2] The parties to the Shareholders Agreement are Walgreen, Pessina, KKR Sprint (European II) Limited, KKR Sprint (2006) Limited and KKR Sprint (KPE) Limited, Alliance Sante Participations S.A., each other persons becoming party to the Shareholders Agreement as "Initial Other Investors" and Kohlberg Kravis Roberts & Co. L.P.

common stock.

51.　　As of November 17, 2014, Pessina and KKR – the owners of Alliance Boots – beneficially owned 7.7% and 0.7% of Walgreen stock, respectively.

52.　　The S-4 and the Proxy fail to disclose Pessina's and KKR's prospective share ownership upon consummation of the Second Step Acquisition.  In addition, the S-4 and the Proxy state that the share allocation that will result from the Second Step Acquisition "has not yet been determined" and that Pessina's and KKR's respective interests "[are] expected to significantly increase."

53.　　Also on August 6, 2014, the Company publicly announced the proposed Reorganization.  Pursuant to the Reorganization, Walgreen will be converted into a holding company structure under which Walgreen would become a wholly-owned subsidiary of a new Delaware corporation named "Walgreens Boots Alliance, Inc."

54.　　In connection with the Reorganization, Walgreen shareholders will have their existing shares of Company stock automatically converted into shares of WBA common stock on a one-for-one basis.  Walgreen shareholders will own the same number of shares of WBA that they own of Walgreen common stock immediately prior to the completion of the Reorganization.

55.　　Upon closing of the Reorganization, the combined enterprise will blend senior management from both Walgreen and Alliance Boots including (i) CEO Wasson, who will be President and CEO of WBA; and (ii) Pessina, who will be executive vice Chairman of the combined company responsible for strategy and M&A reporting to Wasson, and Chairman of a new strategy committee of the board of directors.

56.　　Both the Reorganization and the Share Issuance must be submitted to Walgreen shareholders for their approval.

57.     Under applicable Illinois law and Walgreen's articles of association, the affirmative vote of the holders of at least a majority of the outstanding shares of Walgreen common stock entitled to vote as of the record date is required to approve the Reorganization.

58.     NYSE Rules require that Walgreen seek shareholder approval for the Share Issuance.   Specifically NYSE Rule 312.03(b)(1) provides that "[s]hareholder approval is required prior to the issuance of common stock . . . in any transaction or series of related transactions, to . . . a director, officer or substantial security holder of the company. … if the number of shares of common stock to be issued, or if the number of shares of common stock into which the securities may be convertible or exercisable, exceeds either one percent of the number of shares of common stock or one percent of the voting power outstanding before the issuance." Here, the 144,333,468 shares to be issued upon consummation of the Share Issuance equal approximately 15.3% of the 945,496,180 Walgreen shares currently outstanding – far in excess of the 1% threshold under NYSE Rules.

**B.      Walgreen Announces A Significant Reduction In Its 2016 Goals**

59.     On June 24, 2014, less than two months prior to the announcement of its corporate Reorganization, Walgreen announced that it was withdrawing its fiscal year 2016 goals (the "2016 Goals") that were previously announced in 2012.   Walgreen announced that it expected to provide a new set of goals and metrics for the proposed combined company during an investor call expected to occur by late July or early August 2014.

60.     The withdrawn 2016 Goals for the combined company included revenue of over $130 billion and adjusted operating income of $9.0 to $9.5 billion.

61.     On August 6, 2014, at the same time Walgreen announced the Amendment and Reorganization, it also announced dramatically reduced forecasted 2016 earnings goals (the

"Revised 2016 Goals").

62.     Among other things, the Company publicly announced that it would be reducing its 2016 forecasted pharmacy unit earnings by $1.1 billion, in part because of a step-down of reimbursements via the federal Medicare Part D program.

63.     The Revised 2016 Goals consisted of a new adjusted earnings per share goal for fiscal 2016 for the combined company of $4.25 to $4.60 and a new revenue goal for fiscal year 2016 of the combined company of $126 billion to $130 billion (excluding Alliance Boots' share of sales by joint ventures and associates).

64.     Upon the August 6, 2014 announcement of the Amendment, Reorganization and Revised 2016 Goals, Walgreen's stock price tumbled from a closing price of $69.12 on August 5, 2014 to a closing price of $59.21 on August 6, 2014 – a nearly 15% decline.

### III.    Walgreen's CFO Resigns and *The Wall Street Journal* Publishes Articles Blaming Former CFO for the 2016 Goals Reduction

65.     On August 4, 2014, just two days before the announcement of the Amendment, Reorganization and Revised 2016 Goals, Walgreen announced that its EVP, CFO and President, International Wade Miquelon resigned from each of his positions with the Company effective that day (the "Resignation").   Miquelon agreed to serve as an advisor to Walgreen until December 2014.

66.     In connection with the Resignation, Walgreen and Miquelon executed a transition and separation agreement pursuant to which Miquelon would receive, among other things, $4.7 million in performance and severance payments relating to his tenure at the Company.   At the time of the Resignation, CEO Wasson purportedly told Miquelon that he had done a "tremendous job" in his capacity as CFO.

67.     On August 19, 2014, *The Wall Street Journal* published an article written by Michael Siconolfi entitled "Walgreen Shakeup Followed Bad Projection." The August 19, 2014 *Wall Street Journal* article contained allegedly false and defamatory statements about Miquelon that were ascribed to unnamed investors. The investors cited Walgreen directors and "people familiar" with the circumstances as the source of their information. In addition, the article reported that Walgreen directors told the investors that they had no idea that the Company's forecasting change was coming.

68.     The August 19, 2014 article also reported that Miquelon's finance department was not communicating with the Company's pharmacy department, leading to price miscalculations. The article not only described Miquelon's tenure at Walgreen as "rocky," but also revealed embarrassing personal information about Miquelon, suggesting malicious intent on the part of the story's sources.

69.     On September 30, 2014, *The Wall Street Journal* published an article entitled "Walgreen Profit Remains Pressured By Drug Price Miscalculation," which again criticized Miquelon's performance at Walgreen and blamed Miquelon for the Company's revised forecast.

70.     Specifically, the September 30, 2014 *Wall Street Journal* article stated that Walgreen's "shocking" earnings revision in August 2014 was the result of Miquelon's group's failure to account for a rapid rise in the price of generic medications. The article suggested that the error continued to plague the Company's market value months later.

**IV.     Walgreen Provides Activist Hedge Fund JANA With Board Representation**

71.     In the first half of 2014, there was market speculation that Walgreen would structure the Second Step Acquisition as a tax inversion, a method by which a company tries to reduce its corporate tax liability by relocating its headquarters to a lower-tax nation, usually

while retaining its material operations in its higher-tax country of origin. CEO Wasson, however, refuted that speculation.

72. After a private meeting in France in April 2014 with a group of Walgreen shareholders, including Goldman Sachs Investment Partners and hedge funds JANA, Corvex Management and Och-Ziff, Wasson suggested a tax inversion was in fact a consideration for the Company.

73. Then, at a Barclays conference held on April 30, 2014, Walgreen stated that it was "evaluating" the possibility of a tax inversion as part of a potential corporate reorganization in connection with the Second Step Acquisition. Similarly, on a call with Wall Street analysts in June 2014, Wasson stated that a tax inversion was very much a possibility as the Company approached the Option Exercise Period for the Second Step Acquisition.

74. Around this time, media reports put JANA at the forefront of Walgreen shareholders that were advocating for the Company to consummate a tax inversion. Among others, *The Motley Fool* wrote on July 15, 2014 that JANA was "pushing" for a Walgreen tax inversion.

75. After the Company announced the corporate Reorganization plan on August 6, 2014 that did not include an inversion component, JANA sought and obtained Walgreen Board representation despite owning barely 1% of the Company's outstanding common stock. On September 8, 2014, the Walgreen Board appointed Rosenstein, founder and managing partner of JANA, to the Board.

76. In connection with Rosenstein's appointment to the Board, on September 5, 2014, Walgreen entered into a Nomination and Support Agreement with JANA (the "Support Agreement"), which, among other things, provides for the appointment of an additional

independent director recommended by JANA and agreed to by Walgreen, and provides that if there is a vacancy which the Board chooses to fill during the term of the Support Agreement, such replacement director will be mutually agreed to by Walgreen and JANA. The Support Agreement also restricts JANA's ability to initiate or support a proxy contest and bring certain types of litigation against the Board, and provides other protections for the Walgreen then-incumbent directors.

77. In addition, the Support Agreement requires that JANA support the Second Step Acquisition, and requires JANA "to vote, in favor of all incumbent directors nominated by the Board and in accordance with the Board's recommendation on any other proposals or business that comes before any shareholders meeting, including [the Second Step Acquisition]." Further, the Support Agreement helps protect the then-incumbent Walgreen directors from derivative liability. The Support Agreement states that JANA may not "institute, solicit, assist or join, as a party, any litigation, arbitration or other proceeding against or involving the Company or any of its current or former directors or officers."

78. The Company characterized Rosenstein's appointment and the Support Agreement as part of "moving forward to complete its merger [with Alliance Boots]."

79. JANA's desire and intention to help Walgreen consummate the Second Step Acquisition was clear. Upon his appointment to the Board, Rosenstein stated that he was "eager to work constructively with Greg [Wasson], Stefano Pessina and the entire Walgreens board to help unlock greater value for shareholders and to help realize the exceptional future for these two iconic companies as they come together and move ahead."

80. Walgreen also announced on September 8, 2014, that the Company plans to hold an investor day shortly after the consummation of the Second Step Acquisition to provide

investors with greater insight into the Company's financial outlook, business strategy and capital structure. That information is material to shareholders' voting decision on the Reorganization and Share Issuance, and, to the extent available, should be disclosed in advance of the Special Meeting.

### V.     Miquelon Files A Defamation Lawsuit Against Walgreen, Alleging Misconduct Against Wasson And Pessina

81.     On October 16, 2014, Miquelon filed the Defamation Complaint against the Company in the Circuit Court of Cook County, Illinois. The Defamation Complaint levels a number of serious allegations against certain Company senior executives, directors and large shareholders.[3]

82.     Among other things, the Defamation Complaint alleges that Wasson and Pessina defamed Miquelon during a series of meetings with large shareholders between August 5 and August 8, 2014, motivated by a desire to cover-up or obscure the misconduct of certain Walgreen directors.

83.     According to the Defamation Complaint, Wasson and Pessina characterized Miquelon's finance department as being "weak" and having "lax controls." The Defamation Complaint alleges that an internal memo prepared by a member of Walgreen's investor relations department memorialized these disparaging remarks. In addition, the Defamation Complaint alleges that even after Miquelon requested that the Company correct these and other statements that Miquelon alleged were untrue, the Company refused.

84.     Moreover, the Defamation Complaint alleges that Wasson, Pessina and the rest of the Board were complacent in allowing certain activist investors to pressure Walgreen

---

[3] The Defamation Complaint contains internal email correspondence between Miquelon and certain Walgreen executives, including CEO Wasson, in addition to text messages that substantiate Miquelon's allegations.

management to raise its earnings forecast for the 2016 fiscal year ("FY16").

85.     Further, the Defamation Complaint alleges that, contrary to press reports, Wasson and Pessina were fully aware of the significant downside risk to the FY16 EBIT projection, and that they and the Board knew as early as April 2014 that Miquelon predicted a $1 billion risk to the FY16 EBIT projection beyond the projected $200-$300 million potential risk that had previously been identified.

86.     The Defamation Complaint notes that at the April 2014 Board meeting, Company executives made presentations about third party reimbursement developments as well as inflation and pricing tendencies in the generic drug market – the principal drivers of the reduction in the FY16 EBIT estimate – along with Alliance Boots' underperformance.

87.     The Defamation Complaint also alleges that Miquelon was subjected to pressure and threats from activist investors because of his decision to withdraw the FY16 EBIT projection, and that Wasson pressured Miquelon to raise his estimate of earnings per share. Specifically, the Defamation Complaint alleges that Wasson pressured Miquelon to forecast what Miquelon thought was an entirely unattainable $6 earnings per share figure for FY16. According to the Defamation Complaint, on June 11, 2014, Wasson sent a text message to Miquelon that stated, "Let's push for a 6 somehow."  Miquelon alleges he responded, "I don't think there is any way we could ensure that," to which Miquelon says Wasson replied, "No choice.  Need a 6. We'll find a way."

88.     The Defamation Complaint goes on to allege that Wasson and Pessina met with certain shareholders the night before the company's announcement regarding the tax inversion and the new FY16 earnings guidance, and met with at least one shareholder without an investor relations representative present.

89.     The Defamation Complaint also alleges that Miquelon's decision to reject a tax inversion structure for the Alliance Boots acquisition drew the ire of Pessina and Wasson, as well as large Walgreen investors.  According to the Defamation Complaint, after Walgreen decided not to pursue a tax inversion in which it would re-domicile in Europe, one activist hedge fund investor told Miquelon in a June 24, 2014 conference call that if he did not start "doing his job," two other activist investors would "stop at nothing to get you out of the way, including getting personal dirt on you and embarrassing you publicly."

90.     The Defamation Complaint also contains serious allegations relating to Company financial disclosures.  One email attached to the Defamation Complaint indicates that Wasson, apparently with the support of Board Chairman Skinner, sought to delay the withdrawal of the FY16 earnings guidance until the withdrawal announcement could be "bundled" with good news.

91.     The allegations in the Defamation Complaint raise serious questions about the Board's oversight of individual directors and officers, and suggest Company officials have attempted to blame missed earnings on Miquelon, rather than recognizing possible flaws in the Company's corporate governance.  Further, the allegations of the Defamation Complaint go directly to the propriety of Second Step Acquisition and the requisite shareholder approval. Indeed, the Board is currently soliciting Walgreen shareholder support to issue Pessina significant additional equity in the combined company while there are outstanding and unanswered allegations of misconduct against him by the Company's former CFO.

## VI.     Walgreen And WBA File And Disseminate Materially Incomplete S-4 And Proxy Seeking Shareholder Support For The Share Issuance And Reorganization

92. On September 16, 2014, WBA issued the S-4, which was subsequently amended on October 29, 2014 and November 18, 2014. On November 24, 2014, Walgreen issued the Proxy.

93. The S-4 and the Proxy solicit shareholder approval for three initiatives:

    a. a proposal to approve and adopt the Reorganization Merger Agreement, and to approve and adopt the Reorganization (the "Reorganization Proposal");

    b. a proposal to approve the issuance, in a private placement, of what is currently expected to be 144,333,468 shares of Walgreen stock to the owners of Alliance Boots (*i.e.*, Pessina and KKR) (the "Share Issuance Proposal" and together with the Reorganization Proposal, the "Proposals"); and

    c. a proposal to approve the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are no sufficient votes to approve and adopt the Reorganization Proposal and/or the Share Issuance Proposal.

94. The S-4 and the Proxy are both materially deficient and misleading with respect to the Proposals for which they solicit support from Walgreen shareholders. Specifically, the S-4 and the Proxy fail to disclose certain material information necessary to allow Walgreen shareholders to cast a fully informed vote on whether to approve the Reorganization and/or Share Issuance Proposals.

**A.**     **Failure to Disclose Material Facts Related to Miquelon**

95. The S-4 and the Proxy fail to address Miquelon's resignation, or the subsequent accusations made by him against certain Walgreen officers and directors. Notably, neither the S-4 nor the Proxy even mention the Defamation Complaint or addresses the serious allegations advanced therein.

96. These omissions are particularly material to any shareholder decision on the Reorganization and Share Issuance Proposals because both initiatives further empower the

Company's incumbent Board, the majority of which was in place during the period when the widespread misconduct alleged by Miquelon occurred.

97.     In addition, the omissions are critical to the shareholder decision on the Share Issuance Proposal because the issuance will significantly increase Pessina's ownership interest in the combined Company to an undisclosed amount, empowering him to exert additional influence over the Company's corporate affairs.  Given Miquelon's direct and specific allegations of misconduct by Pessina, Walgreen shareholders might justifiably oppose the Share Issuance Proposal given that it will necessarily increase Pessina's control over the Company and serve as an endorsement of his conduct.

98.     The S-4 and the Proxy also fail to address Miquelon's allegations of a concerted effort to defame him, and makes no mention of purported conversations between Wasson and Pessina on the one hand, and large Walgreen investors on the other, that purportedly occurred outside the oversight of the Company's investor relations department.

99.     The Proposals will make Wasson and Pessina by far the most powerful and influential people within the Company, and their reputation and standing will be critical to the Company's valuation and prospects.  Thus, in advance of any vote to endorse the Proposals, the Company must, at a minimum, address Miquelon's allegations within the S-4 and the Proxy.

100.    In addition, in order to provide shareholders all material information necessary to make an informed decision on whether to approve the Reorganization and Share Issuance Proposals, the S-4 and the Proxy must disclose:

      a.     Any meetings or discussions between senior executives or directors with activist investors in the lead-up to the finalization of the Second Step Acquisition, including the process leading to the appointment of Rosenstein to the Board;

b. The internal memo, prepared by Walgreen Investors Relations, describing the meetings held as a part of Pessina's and Wasson's supposed "road show" in early August 2014; and

c. Whether an internal investigation has commenced into alleged "lax controls" in Walgreen's finance department, as well as any other attempt to correct and address problems in financial reporting at the Company in the months since FY16 earnings projections were revised.

**B.   Failure to Disclose Material Information Related to the Alliance Boots Merger and the Amendment**

101. The S-4 and the Proxy also fail to adequately explain why, after careful construction of the merger with Alliance Boots, the Board decided to accelerate the Company's Call Option to consummate the Second Step Acquisition.

102. The S-4 and the Proxy highlight the benefits of accelerating the Second Step Acquisition, but essentially ignore what the Company concedes are "risks" associated with the Amendment.   For example, the S-4 and the Proxy list numerous potential benefits from accelerating the Second Step Acquisition, including: "(1) removing remaining barriers to progress by enabling both companies to focus on moving forward to aggressively drive business performance and capture additional opportunities, (2) allowing for synergy pull-forward and strategic flexibility to respond more quickly to industry developments, (3) removing uncertainty in the investor and analyst community, (4) providing clarity to employees by alleviating growing anxiety about their roles in the combined company and (5) potentially reducing interest rate and foreign exchange rate risk."   The S-4 and the Proxy state that these benefits outweighed the "potential risks," only one of which is even identified – accelerated integration planning – and which is dismissed as "manageable" in the view of management.

103. Further, the S-4 and the Proxy fail to disclose who at the Company deliberated, negotiated and ultimately decided to execute the Amendment.   Indeed, the Second Step

Acquisition is the quintessential related-party transaction because various Company insiders, including Pessina, stand squarely on both sides of the Share Issuance.[4]

104.    As a critical corporate decision and part of a related-party transaction, the Amendment must be fully and accurately described to Walgreen shareholders deciding whether to approve the Second Step Acquisition.  Among other things, the personal interests of Pessina and other Walgreen insiders in the Share Issuance – which will be made pursuant to the Amendment – is of utmost import to Walgreen shareholders in deciding whether to endorse the transformative transaction recommended by the Board.

105.    Also, in light of Miquelon's allegations of efforts to "bundle" positive and negative news, Walgreen must address the timing of the Amendment as it coincides with Miquelon's resignation and the revision of FY16 estimates.

**C.**    **Failure to Disclose Details Concerning the Support Agreement**

106.    The S-4 and the Proxy also fail to disclose the context and subject matter of discussions between JANA and Walgreen directors and officers.

107.    The Support Agreement was the product of deliberations and negotiations by Walgreen and the Board that are wholly omitted from the S-4 and the Proxy.

108.    As explained above, the Support Agreement serves to, among other things, facilitate consummation of the Second Step Acquisition, and it is an essential element of any description of the Board's conduct in recommending the Proposals.

109.    In addition, JANA, with less than 2% of the Company's outstanding stock, has secured for itself significant representation on the Walgreen Board and, if the Second Step

---

[4] According to the S-4, the Walgreen Board formed a "Transaction Committee" of independent directors to evaluate a potential tax inversion.  The S-4, however, does not disclose whether the Board formed a committee of disinterested directors to evaluate whether the Company should enter the Amendment despite the conflict of interest plaguing certain members of the Walgreen Board.

Acquisition is consummated, the board of the combined company. Thus, the context of the Support Agreement and the business rationale for adding Rosenstein and another JANA designee to the Board must be, but is not, addressed in the S-4 and the Proxy.

110. Further, neither the S-4 nor the Proxy disclose information concerning the April 2014 meeting between JANA and members of Walgreen management which concerned, among other things, the Second Step Acquisition. In fact, neither document even mentions the meeting at all.

**D. Failure to Disclose Share Ownership Percentage of Pessina and KKR Upon Share Issuance**

111. The Company must, but has not, disclosed an approximation or range of potential share ownership of Pessina and KKR following consummation the Second Step Acquisition.

112. While Walgreen shareholders know that Pessina's ownership percentage will increase significantly in connection with the Share Issuance, they are left guessing as to the actual (or even potential) amount.

113. Given Miquelon's allegations against Pessina and the implications of the Share Issuance, at a minimum, Walgreen shareholders are entitled to an approximation of Pessina's ownership in the combined company in the event the Share Issuance and the Reorganization are consummated.

**E. Failure to Disclose the Impact of the Reorganization on Potential Derivative Liability of Walgreen Directors and Officers**

114. The allegations contained in the Defamation Complaint – if true – suggest potential derivative liability on the part of the Walgreen Board. In connection with the Reorganization, shareholders will go from owning stock in Walgreen, an Illinois corporation, to WBA, a Delaware corporation.

115.    If shareholder derivative claims are asserted relating to the misconduct alleged in the Defamation Complaint, the Walgreen Board may attempt to argue that former Walgreen shareholders lost standing to pursue those claims on behalf of the Company upon the conversion of their Walgreen shares to WBA shares in connection with the Reorganization.  In making a voting decision on the Reorganization, a reasonable Walgreen shareholder would find it important to know whether the Company will be taking the position that the Reorganization effectively extinguished all potential derivative liability for conduct that occurred prior to the Reorganization.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all other holders of Walgreen common stock (except Defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the "Class").

117.    This action is properly maintainable as a class action.

118.    The Class is so numerous that joinder of all members is impracticable.  The Company has thousands of shareholders who are scattered throughout the United States and the world.  As of November 17, 2014, the record date for determining the Walgreen shareholders entitled to receive notice of and to vote at the Special Meeting, there were approximately 945,496,180 shares of Walgreen common stock outstanding and these shares were held by approximately 73,500 holders of record.

119.    There are questions of law and fact common to the Class including, *inter alia*, whether:

      a.      The Defendants violated Sections 14(a) and 20(a) of the Exchange Act;

      b.      The Director Defendants breached their fiduciary duties by failing to disclose all material information to Walgreen shareholders in connection with the shareholder vote on the Proposals; and

      c.      Plaintiff and the other members of the Class have been damaged by the misconduct complained of herein.

120.    Plaintiff is committed to prosecuting the action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class.

121.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class, which would as a practical matter be disjunctive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

122.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, injunctive relief on behalf of the Class, as a whole, is appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(For Violations of Section 14(a) Of The Exchange Act and Rule 14a-9 Promulgated Thereunder Against Defendants WBA, Wasson and Skinner)

123.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

124.     WBA, Wasson and Skinner have caused to be filed and disseminated the S-4, which is false and misleading because it misstates, omits and fails to disclose the existence of material facts necessary for shareholders to make an informed voting decision on the Proposals.

125.     Among other things, the S-4 that WBA, Wasson and Skinner have caused to be filed with the SEC and disseminated to shareholders (a) fails to address the Defamation Complaint; (b) fails to address Miquelon's allegations against certain Defendants, including Director Defendants Wasson and Pessina; (c) omits material information pertaining to solicitation of shareholder approval for the Proposals; and (d) omits other material facts required to be stated in order to make the statements contained in the S-4 not misleading.

126.     Defendants named in this count did not adequately update the S-4 when material information arose after its initial dissemination on September 16, 2014, including the existence of the Defamation Complaint.

127.     Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in the solicitations contained in the S-4.

128.     WBA issued the S-4.

129.     Wasson and Skinner signed the cover letter to the S-4.

130.     By means of the S-4, these Defendants sought to secure Plaintiff's and other Class members' approval of the Reorganization and the Share Issuance, and solicited proxies from Plaintiff and other members of the Class.

131.     Each of these Defendants has made false and misleading statements of material facts, and/or omitted material facts required to be stated in order to make the statements contained therein not misleading.  These Defendants were required to disclose the material facts discussed above, because Defendants were required to ensure that the S-4 fully and fairly

disclosed all objective material facts necessary to allow a reasonably prudent investor to make an informed investment decision. These Defendants also acted negligently or purposefully in failing to update the S-4, which was materially incomplete at the time it was issued and is also misleading by the omission of material information that arose after its initial dissemination and before the scheduled December 29, 2014 shareholder vote.

132. By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.[5]

133. Plaintiff and Class members eligible to vote on the Proposals will be denied the opportunity to make an informed voting decision and will be damaged as a direct and proximate result of the misleading statements and omissions in the S-4.

**SECOND CLAIM FOR RELIEF**
(For Violations of Section 20(a) Of The Exchange Act
Against the Director Defendants)

134. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

135. During their tenures as officers and/or directors of Walgreen, each of the Director Defendants was a controlling person of Walgreen and WBA within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Walgreen and WBA, the Director Defendants had the power and authority to cause Walgreen to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the S-4 made and issued by WBA, thereby causing the dissemination of the false and misleading statements and omissions of

---

[5] 17 C.F.R. 240.14a-9 states that no solicitation shall be made by means of any communication which, "at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

material facts as alleged herein.

136.     The Director Defendants participated in Walgreen Board meetings and conference calls, approved the Reorganization and Share Issuance and solicited approval of the same. The Director Defendants also recommend that Plaintiff and other members of the Class vote in favor of the Reorganization and Share Issuance, which recommendation appears in the S-4. The Director Defendants also signed numerous other filings with the SEC.

137.     In their capacities as senior corporate officers and/or directors of Walgreen and WBA, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above. As a result of the foregoing, the Director Defendants, as a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

138.     In addition, during the relevant time period, Wasson was a controlling person of Walgreen and WBA within the meaning of Section 20(a) of the Exchange Act. By reason of his position of control and authority as CEO of Walgreen and WBA, Wasson had and retains the power and authority to cause Walgreen and WBA to engage in the wrongful conduct complained of herein. Wasson was able to and did control, directly and indirectly, the contents of the S-4, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

139.     As set forth above, WBA violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Walgreen, and as a result of their own aforementioned conduct, the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Walgreen and WBA are liable under Section 14(a) of the Exchange Act, to Plaintiff and the other members of the Class. Moreover, as detailed above, during the respective times these

Defendants served as officers and/or directors of WBA, each of these Defendants is responsible for the material misstatements and omissions made by WBA.

140.    Plaintiff and Class members eligible to vote on the Proposals will be denied the opportunity to make an informed voting decision and will be damaged as a direct and proximate result of the misleading statements and omissions in the S-4.

**THIRD CLAIM FOR RELIEF**
(For Violations of Section 14(a) Of The Exchange Act and Rule 14a-9 Promulgated Thereunder Against Defendants Walgreen, Wasson and Skinner)

141.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

142.    Walgreen, Wasson and Skinner have caused to be filed and disseminated the Proxy, which is false and misleading because it misstates, omits and fails to disclose the existence of material facts necessary for shareholders to make an informed voting decision on the Proposals.

143.    Among other things, the Proxy that Walgreen, Wasson and Skinner have caused to be filed with the SEC and disseminated to shareholders (a) fails to address the Defamation Complaint; (b) fails to address Miquelon's allegations against certain Defendants, including Director Defendants Wasson and Pessina; (c) omits material information pertaining to solicitation of shareholder approval for the Proposals; and (d) omits other material facts required to be stated in order to make the statements contained in the Proxy not misleading.

144.    Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in the solicitations contained in the Proxy.

145.    Walgreen issued the Proxy.

146.    Wasson and Skinner signed the cover letter to the Proxy.

147.    By means of the Proxy, these Defendants sought to secure Plaintiff's and other Class members' approval of the Reorganization and the Share Issuance, and solicited proxies from Plaintiff and other members of the Class.

148.    Each Defendant named in this count has made false and misleading statements of material facts, and/or omitted material facts required to be stated in order to make the statements contained therein not misleading.  These Defendants were required to disclose the material facts discussed above, because Defendants were required to ensure that the Proxy fully and fairly disclosed all objective material facts necessary to allow a reasonably prudent investor to make an informed investment decision.  These Defendants also acted negligently or purposefully in failing to update the Proxy, which was materially incomplete at the time it was issued and is also misleading by the omission of material information that arose after its initial dissemination and before the scheduled December 29, 2014 shareholder vote.

149.    By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

150.    Plaintiff and Class members eligible to vote on the Proposals will be denied the opportunity to make an informed voting decision and will be damaged as a direct and proximate result of the misleading statements and omissions in the Proxy.

### FOURTH CLAIM FOR RELIEF
(For Violations of Section 20(a) Of The Exchange Act
Against the Director Defendants)

151.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

152.    During their tenures as officers and/or directors of Walgreen, each of the Director Defendants was a controlling person of Walgreen within the meaning of Section 20(a) of the

Exchange Act. By reason of their positions of control and authority as officers and/or directors of Walgreen, the Director Defendants had the power and authority to cause Walgreen to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the Proxy made and issued by Walgreen, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

153.     The Director Defendants participated in Walgreen Board meetings and conference calls, approved the Reorganization and Share Issuance and solicited approval of the same. The Director Defendants also recommend that Plaintiff and other members of the Class vote in favor of the Reorganization and Share Issuance, which recommendation appears in the Proxy. The Director Defendants also signed numerous other filings with the SEC.

154.     In their capacities as senior corporate officers and/or directors of Walgreen, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above. As a result of the foregoing, the Director Defendants, as a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

155.     In addition, during the relevant time period, Wasson was a controlling person of Walgreen within the meaning of Section 20(a) of the Exchange Act. By reason of his position of control and authority as CEO of Walgreen, Wasson had and retains the power and authority to cause Walgreen to engage in the wrongful conduct complained of herein. Wasson was able to and did control, directly and indirectly, the contents of the Proxy, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

156.     As set forth above, Walgreen violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Walgreen, and as a result of their own aforementioned conduct, the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Walgreen is liable under Section 14(a) of the Exchange Act, to Plaintiff and the other members of the Class.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Walgreen, each of these Defendants is responsible for the material misstatements and omissions made by Walgreen.

157.     Plaintiff and Class members eligible to vote on the Proposals will be denied the opportunity to make an informed voting decision and will be damaged as a direct and proximate result of the misleading statements and omissions in the Proxy.

**FIFTH CLAIM FOR RELIEF**
(Breach of Fiduciary Duty Against the Director Defendants)

158.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

159.     The Director Defendants, as Walgreen directors, owed the Company's shareholders the utmost fiduciary duties of due care, loyalty, good faith and candor.

160.     The Director Defendants breached their fiduciary duties to the Company's shareholders by filing and disseminating a false, misleading and incomplete Proxy and S-4 as detailed above.

161.     As a result, Plaintiff and the Class are being deprived of their right to be provided with all material information in connection with the shareholder vote on the Proposals.

162.     Plaintiff has no adequate remedy at law.

## SIXTH CLAIM FOR RELIEF
(Aiding and Abetting Breach of Fiduciary Duty
Against Walgreen and WBA)

163.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

164.    Walgreen and WBA have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Director Defendants are in breach of their fiduciary duties to Walgreen's public shareholders, and have participated in such breaches of fiduciary duties.

165.    Walgreen and WBA knowingly aided and abetted the Director Defendants' wrongdoing alleged herein. In doing so, Walgreen and WBA rendered substantial assistance in order to effectuate the Director Defendants' plan to consummate the Reorganization and the Share Issuance in breach of their fiduciary duties.

166.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Finding the Director Defendants liable for breaching their fiduciary duties to Walgreen shareholders;

C.    Finding Defendants Walgreen, WBA, Wasson and Skinner liable for violations of Section 14(a) of the Exchange Act;

D.    Finding Defendants liable for violations of Section 20(a) of the Exchange Act.

E.      Compelling disclosure of all material facts relevant to the shareholder vote on the Proposals in both the S-4 and the Proxy;

F.      Requiring the Company to implement corporate governance reform or other procedural safeguards to protect Walgreen and future WBA shareholders from future misconduct similar to that alleged herein;

G.      Awarding Plaintiff the costs, expenses and disbursements of this action, including attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

H.      Awarding Plaintiff such other and further relief as is just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all claims on which a jury trial is available.

Dated:  December 5, 2014                         Respectfully Submitted,

                                                 **POMERANTZ LLP**

**OF COUNSEL:**                                  */s/ Patrick Dahlstrom*
                                                 Patrick V. Dahlstrom
**POMERANTZ LLP**                                Tenth South LaSalle Street
Gustavo F. Bruckner                              Suite 3505
Ofer Ganot                                       Chicago, IL 60603
600 Third Avenue                                 Phone: (312) 377-1181
New York, NY 10016                               Fax: (312) 377-1184
Phone: (212) 661-1100
Fax: (917) 463-1044                              *Counsel for Plaintiff*

**FRIEDMAN OSTER PLLC**
Jeremy Friedman
Spencer Oster
240 East 79th Street, Suite A
New York, NY  10075
Phone: (888) 529-1108

**LAW OFFICE OF ALFRED G. YATES, JR.**
Alfred G. Yates
519 Allegheny Building
429 Forbes venue
Pittsburgh, PA  15219
Phone: (412) 391-5164
Fax: (412) 471-1033

## PLAINTIFF'S CERTIFICATION

James Hays ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

       1.     Plaintiff has reviewed the Complaint and authorized the commencement of an action on Plaintiff's behalf.

       2.     Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

       3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

       4.     Plaintiff's transactions in Walgreen Co. securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| 11/05/2008 | 200 | 0 | $24.96/share |

       5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

       6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

       I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of December, 2014.

_____
(Signature)