**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

------------------------------------------------------------- X

WADE D. MIQUELON,

      Plaintiff,

           v.

WALGREEN CO.,

      Defendant.

------------------------------------------------------------- X

**14CH16825**

**JURY TRIAL DEMANDED**

**FILED**

OCT 1 6 2014

DOROTHY BROWN
CLERK OF CIRCUIT COURT

**VERIFIED COMPLAINT**

Plaintiff Wade D. Miquelon ("Miquelon"), through his undersigned counsel, complains against defendant Walgreen Co. ("Walgreens" or the "Company") and alleges as follows:

**INTRODUCTION**

1. This past August 4, Miquelon stepped down as the Chief Financial Officer ("CFO") and President, International of Walgreens, the largest drugstore chain in the United States. The decision was personal, based on his desire to pursue opportunities outside of Walgreens after an outstanding six-year tenure. In announcing Miquelon's decision, the Company issued a press release that hailed Miquelon's "remarkable leadership, strategic vision and expertise." These words faithfully captured the Company's internal assessment of Miquelon: Only last April, Miquelon was offered a promotion by Walgreens' Chief Executive Officer ("CEO") Gregory Wasson ("Wasson") and was told both verbally and in writing that, if he accepted the offer, he would be in line to succeed Wasson as CEO.

2. Over the new few days, from August 5 through August 8, Wasson and Walgreens' Director and largest shareholder Stefano Pessina ("Pessina") met with certain investors,

including "activist" investors, to discuss the past and future performance of Walgreens and Walgreens' pending combination with Alliance Boots. The transaction would create the largest pharmacy company in the world.

3.     Within a week, Miquelon received a call from a *Wall Street Journal* reporter. The reporter purported to be exceedingly well-informed about the investor meetings and posed a series of questions that were both directed at Miquelon and very disturbing, such as "please address the contention by some senior Walgreens executives that there were lax financial controls in your group." After informing the Company and receiving clearance from Walgreens' Head of Corporate Communications, Charles Greener (who reported to the Company's General Counsel, Thomas Sabatino), Miquelon responded in writing to the reporter's questions.

4.     On August 19, the *Wall Street Journal* published an article with a headline that no CFO would ever want to see: "Walgreen Shakeup Followed Bad Projection – CFO, Pharmacy Chief Leave After Bungled Forecast Related to Prescription Drug Business."

5.     The article contained entirely false, defamatory, disparaging and devastating statements that attacked Miquelon professionally and personally. The sources cited also were stunning: The *Wall Street Journal* described information received from "investors," who in turn cited "Walgreen directors" and "people familiar" with the situation, people whom Miquelon likely would have counted among his colleagues only days before.

6.     Several Company officers then reached out to Miquelon to express sympathy over the article. They also told Miquelon that an internal memo, prepared by a Walgreens' Investor Relations Director who had attended certain of the meetings that Wasson and Pessina had with investors between August 5 and 8, reported that Wasson and Pessina had made many disparaging

2

and defamatory comments about Miquelon, other Walgreens executives, and the Board of Directors, and also had improperly disclosed Company confidential and/or proprietary information.

7.      Miquelon immediately pressed Sabatino to have Walgreens publicly report the truth and set the record straight: that Miquelon had **not** been forced or pressured to leave and, indeed, had performed his job exceedingly well and had never "bungled" a forecast. But the Company refused, suggesting that any response would prompt further coverage and therefore would not be in the Company's best interest.

8.      Coverage continued anyhow. A second and even more defamatory article was published in the *Wall Street Journal* on September 30. Again, Miquelon demanded a corrective public statement (this time specifically from Wasson and Pessina). And again, on October 3, the demand was flatly refused.

9.      Together, the two *Wall Street Journal* Articles spelled out in plain but highly inflammatory English a story of utter professional failure: That Miquelon "bungled" the Company's earnings before interest and taxes ("EBIT") forecast for Fiscal Year ("FY") 2016, that he was personally responsible for a "shock[ing]" "calculate[ion]" error that necessitated a $1.1 billion reduction in the FY 2016 EBIT goal, and that he was forced or pressured out of the Company. This story is flatly contradicted by the facts. Indeed, as Walgreens knew in detail, Miquelon made no error at all – calculation or otherwise. Wasson and Pessina had worked hand in hand with Miquelon on the FY 2016 EBIT forecast for many months and were fully aware of the magnitude of the market-related challenges to achieving the goal. Roughly six weeks before announcing the revised FY 2016 EBIT forecast number, the Company, at Miquelon's insistence

3

and despite pressure from Wasson to delay, announced that it had to withdraw its previously announced FY 2016 EBIT goal because it was no longer reasonable. Any notion that Wasson or Pessina could possibly have been "shock[ed]" by a "sudden[]" decrease in the forecast is entirely false.

10.     Further, apparently in order to obtain context for the basic (defamatory) storyline of the estimation error, the Wall Street Journal reporter also told Miquelon that "senior Walgreen executives" stated that Miquelon's finance unit was "weak" and had "lax controls." These additional defamatory and disparaging statements too were entirely false. In each financial reporting period during Miquelon's tenure as CFO, the Company had filed statements with the United States Securities and Exchange Commission ("SEC") certifying, pursuant to the Sarbanes Oxley Act of 2002, that it had in place effective financial reporting controls. These certifications were prepared under the direction of the Audit Committee of the Board of Directors and signed by the CEO, Wasson. If the finance unit had lax controls, federal law requires the Company to investigate and, as necessary, report these issues to the Company's outside auditor and disclose them in SEC filings. There has never been any such investigation or disclosure. No such action was taken because there were no "lax controls," the finance unit was not "weak" and Miquelon was an outstanding CFO throughout his tenure.

11.     The true context for defamatory statements made to the Wall Street lies not in a lack of financial controls but in an unchecked desire to push the combination of Walgreens and Alliance Boots forward to completion. Several weeks before the first *Wall Street Journal* article defaming Miquelon was published, an activist investor had threatened Miquelon on a conference call in which Wasson and other executives participated, stating that Miquelon was "giving [] bad

advice," was "too conservative," and that the Company should be increasing – not decreasing – the FY 2016 earnings forecast and completing a tax inversion (re-domiciling offshore to potentially save on taxes – a move that Miquelon opposed). This investor then told Miquelon that, if Miquelon did not recommend these things, two other activist investors that he mentioned by name would "stop at nothing to get you out of the way, including getting personal dirt on you and embarrassing you publicly . . . I wouldn't be surprised if that wheel is in motion."

12.     Instead of defending Miquelon and resisting such abusive tactics, Wasson and Pessina ultimately decided to disparage and defame Miquelon, as a way to deflect investor disappointment with the entirely proper decisions Miquelon advocated, i.e., to lower the FY 2016 EBIT forecast and not to re-domicile the Company offshore. Upon information and belief, the Company also wished and worked to deflect the *Wall Street Journal* reporter's attention away from the other improper and inaccurate statements Wasson and Pessina had made in investor meetings about other Company executive and the Board of Directors, which had been described to the *Wall Street Journal* reporter, and which the Company feared would become a focus of the article.

13.     The unanswered articles have had the inevitable negative impact on Miquelon: Miquelon has gone from being a 49-year-old former CFO of a Fortune 30 company CEO, who had Chief Operating Officer ("COO"), and CFO opportunities in the marketplace, to being a man with no such options and no recourse other than this lawsuit.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over the defendant Walgreens pursuant to 735 ILCS 5/2-209 because: Walgreens is a corporation organized under the laws of Illinois; Walgreens

5

conducts business and owns, uses, or possesses real estate in Illinois; the contract at issue in this Complaint between Miquelon and Walgreens was executed in, and is subject to the laws of, Illinois; and Walgreens has committed tortious acts against Miquelon that have damaged Miquelon within the State of Illinois.

15.     This Court has subject matter jurisdiction over the matter pursuant to 735 ILCS 5/2-701, because there exists a justiciable controversy capable of resolution by this Court.

16.     Venue is proper in Cook County pursuant to 725 ILCS 5/2-101, because Walgreens resides and conducts business in Cook County, Illinois.

## THE PARTIES

17.     Wade D. Miquelon is a resident of Cook County, Illinois. He served as Executive Vice President, CFO and President, International of Walgreens from June 16, 2008 to August 4, 2014. Prior to being recruited to join Walgreens, he served as the CFO and Executive Vice President of Tyson Foods from 2006-2008 and, prior to that, spent fifteen years in executive positions with Procter & Gamble in the United States and abroad.

18.     Defendant Walgreens is the largest drugstore chain in the United States operating approximately 8,192 drugstores throughout the nation, including stores in Chicago and throughout Cook County, Illinois. Walgreens' scope of pharmacy services includes retail, specialty, infusion medical facility and mail service, along with online and mobile services. Walgreens has announced that it intends to merge with Alliance Boots, the largest international pharmacy chain.

**RELEVANT INDIVIDUALS**

19.     Stefano Pessina is a resident of Monte Carlo, Monaco. He is a member of the Board of Directors of Walgreens and – through an entity he controls and of which his family trust is the beneficial owner – he is the single largest shareholder of the Company. Pessina owns approximately 8% of Walgreens, a stake worth approximately $4.5 billion. If Walgreens completes its combination with Alliance Boots as expected, Pessina's personal stake in the combined company will likely be worth between $9 and $12 billion. He will own approximately 15-20% of the combined company.

20.     Gregory Wasson is the President and Chief Executive Officer of Walgreens and a member of its Board of Directors.

## I.     WADE MIQUELON'S OUTSTANDING TENURE AS CFO OF WALGREENS

21.     Miquelon served as the CFO of Walgreens from June 16, 2008 through August 4, 2014 and was promoted twice in that time. As Executive Vice President, CFO and President, International of a Fortune 30 company with approximately 250,000 employees and approximately $76 billion in sales, Miquelon supervised over 1,000 employees in various areas, including Finance, Accounting, Strategy, Mergers and Acquisitions, Investor Relations, Business Development and Internal Audit.

22.     In addition to performing all of the functions of a traditional CFO, Miquelon played a key role in the overall strategy and business development initiatives of the Company. Miquelon spearheaded several large transactions for Walgreens, including Walgreens' acquisition of Duane Reade Holdings ("Duane Reade") in 2010, and, as set forth in more detail below, Walgreens' "two-step" merger with Alliance Boots.

7

23.     During Miquelon's tenure as CFO, Walgreens' stock price appreciated 116% (versus a
41% increase in the Dow Jones Industrial Average and an 88% increase in the price of CVS
Caremark stock, one of Walgreens' major competitors). Walgreens' market capitalization
roughly doubled, growing from approximately $36 billion to approximately $71 billion during
Miquelon's tenure. A chart summarizing key performance metrics for Walgreens while
Miquelon was CFO and, by comparison, the period 6 years prior to his assuming that role, is
attached as Exhibit 1.

24.     Miquelon was named "sell side CFO of the year" by *Institutional Investor* for 2011 and
was listed as one of eight 2012 "CFOs to Watch" by the *Wall Street Journal*.

25.     All of Miquelon's performance evaluations at Walgreens have documented his positive
performance, many contributions, and absolute dedication to Walgreens.

26.     Miquelon's annual bonuses to date have all been based on a personal payout factor at or
above target. These bonus awards were based on recommendations from CEO Wasson and were
all approved by the Board of Directors.

27.     Throughout Miquelon's service as CFO, SEC "SOX" rules required Walgreens to include
in its annual reports a certification of management that the Company's internal controls over
financial reporting were effective. SEC SOX rules further required that management evaluate
any change in the Company's internal controls that occurred during any fiscal quarter that has
materially affected, or is reasonably likely to materially affect, the Company's internal controls
over financial reporting.

28.     Accordingly, under these rules, if "senior Walgreens executives" concluded that there
were "lax controls in the Finance Group" and "that the Finance Group was weak," SEC

8

compliance would have dictated that an internal investigation be undertaken by the Company's Internal Audit department under the supervision of Jan Babiak, the Chair of the Walgreens Audit Committee, and by the Company's independent outside auditor, Deloitte. Such an investigation would have been required to have been reported in Walgreens' annual federally mandated internal control survey and Deloitte's annual certification as to the presence or absence of weakness in Walgreens' internal controls.

29.     During each reporting period in which Miquelon served as CFO of Walgreens such reports stated to investors and anyone relying on Walgreens' SEC filings that Walgreens internal controls over financial reporting were effective and without weakness. Those certifications were included in the Company's annual reports, signed under penalty of perjury, by the CEO, Wasson,[1] and filed with the SEC.

30.     Those certifications are made following an annual survey mandated by the Section 404 of SOX which requires management and the Company's external auditor to investigate and report on the adequacy of the Company's internal controls and financial reporting. Under Section 404, management is required to produce an "internal control report" each year. The report must affirm "the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting." The report must also "contain an assessment, as of the end of the most recent fiscal year of the Company, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting."

_____

[1] Walgreens' certification for 2008 was signed by Alan McNally, acting CEO.

9

31.     In fact, no such audit or investigation about Miquelon or his Finance Group concerning financial controls or reporting has ever been undertaken by Walgreens or its auditor Deloitte. Copies of the Company's SOX certifications are attached as Exhibit 2.

## II.     IN APRIL AND MAY, 2014 MIQUELON IS OFFERED AND DECLINES A PROMOTION THAT WOULD HAVE PUT HIM FIRST IN LINE TO SUCCEED THE CEO.

### A.     Miquelon Pioneers a Two-Step Merger Between Walgreens and Alliance Boots

32.     In 2012, Miquelon pioneered an innovative, "two-step" merger (to be completed in the near term) between Walgreens and Alliance Boots, the largest international pharmacy company, with approximately $40 billion in sales and operations in more than 25 countries.

33.     On June 19, 2012, Walgreens announced that it would invest approximately $6.7 billion in cash and stock in exchange for a 45% equity ownership stake in Alliance Boots ("Step 1") and an option to proceed with a full combination by acquiring the remaining 55% of Alliance Boots in "approximately three years time." ("Step 2").  A copy of Walgreens' Press Release announcing the transaction with Alliance Boots is attached as Exhibit 3.

34.     When "Step 1" closed on August 2, 2012, Pessina joined the Walgreens Board of Directors.  In addition, Alliance Sante Participations S.A., of which Pessina is a Director and whose ultimate ownership is a family trust, became the largest shareholder in Walgreens.  A copy of Walgreens' August 2, 2012 Press Release announcing these developments is attached as Exhibit 4.

35.     On August 6, 2014, Walgreens announced that the Board of Directors had voted to seek shareholder approval to exercise the option to complete the combination with Alliance Boots and

fully combine the companies, creating a "global pharmacy-led health and wellbeing enterprise."

A copy of Walgreens' August 6, 2014 Press Release is attached as Exhibit 5.

**B. Organizational Changes in Anticipation of Combination with Alliance Boots and Creation of the Position of President of Emerging Markets, Ventures and Global Strategy**

36.     In anticipation of the potential combination of Walgreens and Alliance Boots, starting in the Fall of 2013, internal discussions were held regarding the organizational design of a merged entity, given the anticipated dramatically increased size of the operation.

37.     In the Fall of 2013, Wasson retained a consulting firm to study the organizational issues. The consultant ultimately prepared a "white paper" entitled, "Organizational Design of Strategy and Finance Functions for the Combined Global Company."

38.     As reflected in the white paper, the consultant recommended separating the traditional finance role of CFO from the broader, strategic duties to be performed under a new position titled: "President of Emerging Markets, Ventures and Global Strategy."

39.     The white paper states: "As a result of the transaction by [Walgreens] to acquire Alliance Boots (Boots), the Company will become a global enterprise doing business in more than 25 countries. The new [Walgreens] will be the largest health care distribution system in the world by delivering on the three strategic growth priorities: to create a global health and wellness experience, advance the role of community pharmacy and establish an efficient global platform. This new organization will be far more complex with increased risks and opportunities. To deliver on the potential of this new organization will require significant shifts in the scope of responsibilities for all leaders."

11

40.     The consultant, in the white paper, concluded that "in light of the complexities associated

with a global strategic role and the expressed intent of the CEO to explore emerging markets and

ventures, it is recommended that the role of the CFO and the expanded Strategy (Chief Strategy

Office) roles be separated... As a traditional role, the CFO will focus on the discipline of

financial reporting for the company along with establishing global policies and procedures which

would allow [the Company] to remain financially and legally compliant globally."

41.     As for the Chief Strategy Office role, the white paper stated that: "The newly defined

strategy role will include 5 critical roles: strategy, M&A, new market development, new

ventures, and P&L responsibility for the emerging business organization.

1.  Strategy: The global strategy leader will be accountable for designing, implementing, and managing an effective annual strategy process across all of Walgreens/Boots portfolio of businesses. . . .

2.  M&A: As a large global enterprise seeking to grow and expand its presence around the world, acquisitions will be an important discipline to delivering on this promise. The new strategy leader will be accountable for managing the M&A function, as it oversees the largest acquisitions. . . .

3.  New Market Development: Boots brings to the new organization some experience in identifying and pursuing growth opportunities in new markets. To achieve its long term ambition, Walgreens/Boots will need to enhance this ability to identify and enter successfully new markets, generally through sizeable acquisitions. The new strategy leader will chair the New Market Development team and will work closely with Vice Chairman Stefano Pessina in identifying and evaluating these opportunities, as well as bringing them forward to the strategy committee of the board.

4.  New ventures: Walgreens will continue to pursue opportunistic investments in startup

12

ventures that can be enhanced by the combined companies' global footprint. The head
of strategy will be accountable for overseeing the team that evaluates and invests in
these deals.

5. Emerging Business Opportunities: As these ventures are brought into the Walgreens
fold, the new head of strategy will assume P&L responsibility for them until they have
reached sufficient scale to be absorbed within one of the individual business units.

42.     In the white paper, the consultant addressed what characteristics would be required of the
individual selected for the role of President of Emerging Markets, Ventures and Global Strategy:
"To be effective, such a role requires a seasoned executive with a strong strategy orientation and
financial acumen.  Other behavioral traits are noted as follows:

- Deeply trusted by the CEO
- A master of multitasking
- A jack of all trades
- A star player
- A doer not just a thinker
- The guardian of horizon
- An influencer, not a dictator
- Comfortable with ambiguity
- Objective"

### C.     In April 2014, Walgreen's Board of Directors Approves an Offer to Promote Miquelon and Put Him First in Line to Succeed the CEO

43.     As described in the white paper: "After review of the position requirements and
discussion with the Board of Directors, it has been determined and preliminarily approved that
Wade Miquelon (Miquelon) will be promoted to the position of President of Emerging Markets,

13

Ventures and Global Strategy. His portfolio will include the strategic work described above along with working closely with the CEO to recommend the investment strategy to the newly formed Strategy Board Committee for potential future ventures and emerging markets. One of the critical accountabilities of this role is to accelerate the transformation of the newly combined company by working closely with the business leaders. Miquelon is uniquely qualified to fill this role. His expertise and thinking is critical to realize the value of the Alliance Boots [] deal[s] and further growth opportunities. Going forward, the CEO is in need of his expertise as a trusted advisor who can see around corners where others cannot and can synthesize complex information in a way that no other talent can for the CEO and Board. This role will add tremendous value, which is absolutely imperative to the company as we consider the move to step two to fully consummate the deal with Alliance Boots."

44.     The white paper further noted: "This position is considered a potential successor candidate role as the CEO continues to build a new management team and operating role for the new global enterprise."

## D.     Wasson Presents the Offer to Miquelon

45.     Wasson personally presented the offer to Miquelon on April 22, 2014. During their meeting, Wasson provided Miquelon with a document Wasson had handwritten setting forth why Wasson believed it was so critical that Miquelon accept the promotion. That document is attached as Exhibit 6. Wasson reviewed each point on the document with Miquelon during their meeting.

46.     Under the heading "How Much You Mean to Me & Company," Wasson wrote: "Like you & trust you," "You make me better and vice versa (Buffet/Munger)," "MOST big strategic

14

decisions – your ideas and insights," "could not have done without you," "you see around corners—better than anyone."

47.     Under the heading "This is a promotion/not Demotion," Wasson wrote: "No one else can do this," "positions you as the strong [CEO] successor candidate," "I need you to successfully complete the [Alliance Boots] deal," "Would like you and I to ride this together."

48.     Under the heading "Global Role," Wasson wrote: "Separating Financial and Strategy for growth," "Two big functions – singular focus" "Finance – more traditional; Strategy – future growth of the Company."

49.     During the meeting, Wasson told Miquelon that Miquelon was the only one at Walgreens who could succeed him.  Wasson told Miquelon that if Miquelon accepted the offer, Miquelon would have Wasson's "all out commitment" to support Miquelon, ultimately, to serve as the CEO, if that is what Miquelon wanted.

50.     During the meeting, Wasson gave Miquelon a copy of the consultant's "white paper" and Wasson's handwritten notes and told Miquelon he could keep both documents and share them with whomever Miquelon felt it was appropriate.

    **E. Wasson Pressures Miquelon to Accept the Offer**

51.     Over the next several weeks, Miquelon deliberated about whether to accept the offer.

52.     During that time, Wasson reached out to Miquelon several times to encourage him to accept the promotion.

53.     In addition, between April 22, 2014 and May 30, 2014, Wasson contacted Miquelon's executive coach to enlist him to encourage Miquelon to accept the offer.  Wasson told him that

Wasson thought that Miquelon could do Wasson's job some day if Miquelon was to accept the offer.

**F.     On May 30, 2014, Miquelon Informs Wasson That He Is Declining the Offer**

54.     On May 30, 2014, Miquelon met with Wasson. Miquelon told Wasson that he was very thankful for the consideration and recognized that this would be an important role with the opportunity to shape the future of Walgreens and could lead directly to the CEO job.

55.     Miquelon, however, told Wasson that he had decided not to accept the offer. Miquelon explained that, on a personal basis, he did not view the opportunity as one where he would grow and develop professionally. Miquelon noted that he was already performing both a strategic role and a traditional CFO role. The new position would, Miquelon said, be a subset of his current role even though it was a promotion and could ultimately lead him to become the next CEO.

56.     The discussion then turned to transition. Miquelon told Wasson that he wanted to ensure that all the "moving parts" were handled with success and professionalism. Miquelon told Wasson that he wanted to ensure that the process of disclosing to the market that Miquelon was leaving was handled in a way that was as constructive as possible for the Company. Miquelon said that it would be critical to give investors clarity about his status at the time the Company announced it was going to proceed with Step 2 of the Alliance Boots transaction. Miquelon also said it would be important for investors to know that Miquelon would not be the CFO of the newly merged Company and, if possible, the Company should determine who would serve in that role and announce it to the market in short order.

57.     Miquelon assured Wasson that he had every intention of fulfilling his commitment to complete Step 2 of the Alliance Boots transaction and that he would ensure that the transition to

his successor was as smooth as possible. Wasson asked if Miquelon would be willing to stay on in some capacity for approximately 18 months, to ensure that Step 2 of the transaction and the succession proceeded smoothly. Miquelon agreed that 18 months was a reasonable time frame if Wasson wanted him to consult or act in other ways to help the company.

58.     At the end of the meeting, Wasson told Miquelon that Miquelon had done a "tremendous job" at Walgreens and that they "had a great ride together." Wasson further stated that he would like to see Miquelon get a "slug of money" in recognition for his work.

59.     Miquelon thereafter (at Wasson's direction) dealt with the Company's General Counsel and Chief Human Resources Officer to complete the arrangements, including the preparation of a "Transition and Separation Agreement" (described below in paragraphs 110-117) reflecting that Miquelon would separate from his position as an officer of the Company but would remain with the Company, in a non-executive position, through December 1, 2014.

60.     Unfortunately, instead of executing on this agreed transition and separation of a long-standing and valued employee who decided he wanted to move on to other opportunities, pressures brought to bear on Wasson and Pessina, and investor disappointment with a lowered earnings forecast and the Company's decision not to proceed with a tax inversion led them to sacrifice the career and reputation of Miquelon, as described below.

## III.     REVISING THE FY 2016 EBIT GOAL AND CONSIDERATION OF THE TAX INVERSION

### A.     The FY 2016 EBIT Goal

61.     Like most public companies, each year Walgreens conducts a Long Range Plan ("LRP"), which covers the next three fiscal years. The development of Walgreens' LRP begins in March

and extends through the end of June. The final results of the LRP are submitted to, and must be approved by, the Company's Board of Directors at the annual July meeting of the full Board.

62.    The annual LRP process is robust, time intensive, and involves dozens of meetings and planning sessions involving literally hundreds of business, financial, accounting, operational, and functional employees, executives, and stakeholders at various levels of the Company.

63.    In August 2012, after Step One of the Walgreens-Alliance Boots transaction closed, the Company, working closely with Alliance Boots, initiated a set of "goals" for FY 2016, which was anticipated to be the first full fiscal year of operation as a combined company. These publicly announced FY 2016 goals included $130 billion in combined sales, $1 billion in combined synergies, $8 billion in combined operating cash flow, $11 billion in combined net debt, and $9-9.5 billion in adjusted EBIT.

64.    On the Company's June 25, 2013 earnings call, Miquelon discussed the FY 2016 goals, stating: "As we progress, once a year on a quarterly earnings call, we plan on going into a deeper dive on our 2016 goals with respect to our progress, our risks and opportunities . . . ."

65.    As part of the LRP the Walgreens' Board approved in July 2013, it was determined that the FY 2016 goals appeared to be on track, except that the EBIT forecast was now lower, closer to $8.7 billion (with three years left to go). The Company determined that, despite this, the previously announced EBIT goal was still reasonable.

66.    By late 2013, an additional $200-300 million of risk in the FY 2016 EBIT goal was identified and brought to the Board's attention by Wasson and Miquelon. Miquelon and his team identified the largest source of this risk as the unprecedented level of inflation in the price of generic drugs that both Walgreens and the industry were experiencing at that time. Further,

Walgreens' contracts with payors had been structured in a way that failed to provide meaningful inflationary relief.

67.     Walgreens and Alliance Boots executives Jeffrey Berkowitz and John Donovan, co-Presidents of Walgreen's joint venture with Alliance Boots, reporting to Wasson (and up through Pessina) had direct responsibility for the generic drug procurement. Executives reporting to Kermit Crawford, Walgreen's President of Pharmacy, Health and Wellness, had direct oversight for all third party contracts and related negotiations and also reported directly to Wasson.

68.     While still comfortable that the FY 2016 EBIT forecast was not unreasonable, the Company started to signal more strongly to the market that there was increasing risk in the FY 2016 EBIT forecast. Wasson and Miquelon kept the Board apprised of the impact on the forecast of changing market conditions.

69.     As early as November 2013, Wall Street analysts following Walgreens had concluded that the Company's FY 2016 goals would likely not be met. For example, a report published by *Barron's* on November 19, 2013 stated: "In short, these targets look more difficult to achieve . . ." "Walgreen's fiscal 2016 targets assume 8.8% EBIT growth compounded annualized growth rate (CAGR) for both businesses pre-synergies, with fiscal 2013 well below these thresholds." "Net-net, if we were to assume a more realistic mid-single digit EBIT CAGR over the next three years versus the double digits now needed to reach the prior targets, we estimate $8.1 billion in adjusted EBIT in fiscal 2016 versus $9.0 billion-$9.5 billion." A copy of the November 19, 2013 Barron's report is attached as Exhibit 7.

70.     On a December 20, 2013 earnings call, Miquelon highlighted the continuing risk that the Company was no longer on track to reach its FY 2016 EBIT goal of $9-$9.5 billion:

I'd like to close today with a brief update on progress towards our fiscal year 2016 goals, which we provided to you after we announced our 45% investment in Alliance Boots in June of 2012. While still relatively early in our journey, performance to date with respect to four of our goals is on track with or slightly ahead of our expectations. These 4 goals are; sales of $130 billion including Alliance Boots share of associates and joint venture sales; synergies of $1 billion; operating cash flow of $8 billion; and net debt at $11 billion. ***Performance to date with respect to our adjusted operating income goal of [$9 billion to $9.5 billion] is currently tracking a bit below the CAGR required to meet this goal***, largely because of gross profit dollar growth pressure domestically, as I discussed today, and a challenging environment in some international markets. While we recognize there are risks to achieving this goal, we remain focused on delivering it . . . We intend to continue to update you on our progress against these goals in future calls. (at p. 8) (Emphasis added.)

A copy of the transcript of the December 20, 2013 earnings call is attached as Exhibit 8.

71.     By March 2014, it was becoming increasingly clear that the deflation in pricing of generic drugs that had been the trend over the last decade may have systemically reverted to an inflationary trend. In addition, at about this time, Walgreens' pricing and contracting group, which reported directly to Kermit Crawford, who in turn reported to Wasson, was having a very difficult time negotiating with a certain group of payors. This was adding risk and uncertainty to the Company's FY 2016 EBIT forecast.

72.     During this time, Alliance Boots also was underperforming on a U.S. GAAP adjusted EBIT basis. Published analyst reports were modeling an average of roughly $8.1 billion in FY 2016 EBIT for the combined companies. On the Company's March 25, 2014 earnings call, Miquelon reiterated that the Company was not on track to meet its 2016 EBIT goal:

Similar to last quarter, we have reviewed our reviewed our [check quote] fiscal 2016 goals internally. The performance to date with respect to 4 of our 5 goals remains on track with or slightly ahead of our expectations, and these 4 goals are: sales of $130 billion, including Alliance Boots' share of associates and joint venture sales; synergies of $1 billion; operating cash flow of $8 billion; and net debt of $11 million. ***As stated on our last call, our adjusted operating income goal of $9 billion to $9.5 billion is currently tracking below the CAGR required***

*to meet this goal and below our initial expectations. We continue to recognize that there are risks to achieving this goal* ... (at p. 9)

A copy of the transcript March 25, 2014 earnings call transcript is attached as Exhibit 9.

73. The annual LRP effort commencing in March 2014 factored these increasing risks into the LRP.

74. In April 2014, an interim LRP update was shared with the Board. The Board was informed that the current $8.5 billion FY 2016 outlook (the $8.7 billion forecast less the $200-300 million in risk identified in late 2013) now appeared to have an additional risk well in excess of $1 billion, primarily based on third party reimbursement negotiations (including Medicare Part D contracts), continued unprecedented inflation in the price of generic drugs, and underperformance of Alliance Boots. The Board was also advised of opportunities to mitigate some of these risks.

75. In April 2014, several important issues were presented to the Finance Committee, Audit Committee, and the full Board, including the following:

- The Senior Vice President of Pricing and Contracting, who reported directly to Crawford, made a presentation to the full Board regarding his view on third party reimbursements trends.

- The joint venture co-Presidents made an extensive presentation on inflation and pricing trends in the generic drug market.

76. At the conclusion of the April Board meeting, Miquelon advised the Board that the Company would complete the LRP process at the end of June and propose the new LRP and related FY 2016 EBIT forecast at the July Board meeting. Wasson said that he would keep the Board up-to-date as appropriate in the interim.

21

77.    Work on the LRP continued in the weeks that followed the April Board meeting.  Wasson was intimately involved in that work.

78.    By late April/early May 2014, it became clear that the Company's Medicare Part D negotiations, being led by Crawford with significant involvement from Wasson, were not going well.

79.    Miquelon and Wasson had no less than four working forecast sessions with Pessina during the months of May and June 2014 (in person and via teleconference).  Wasson also told Miquelon that he was keeping Pessina updated weekly during their standard one-to-one calls.

80.    By late May/early June, Miquelon and his Finance team determined that the FY 2016 EBIT number was tracking lower, in the range of $7.2-7.5 billion.

81.    In early June, Miquelon and his team worked in New York with Pessina's team to finalize the LRP estimate.  The $7.2-7.5 billion EBIT range estimate and analysis was shared with Wasson and Pessina in person at a June 11/12th working session in New York.  Wasson also told Miquelon that he was in constant communication with Board members related to these issues.

## B.    Miquelon Advocates Promptly Disclosing to the Market That the Previously Announced FY 2016 EBIT Number Was No Longer Reasonable in Light of Changed Market Conditions

82.    By early June 2014, Miquelon had become convinced that the previously announced FY 2016 EBIT goal was no longer reasonable and that the Company needed to announce promptly to the market that it was withdrawing the goals.  Miquelon advocated announcing this on the scheduled earnings call on June 24, 2014.

83.     Wasson argued for delaying the previously scheduled earnings call until July 10, so the negative news regarding withdrawing the previously announced FY 2016 EBIT goal could be "bundled" with other, more positive developments relating to progress on Step 2 of the merger with Alliance Boots and the potential that, in completing the combination, a "tax inversion" (re-domiciling the combined company offshore to potentially save on U.S. taxes) could be implemented.

84.     Miquelon sought the input of Janice Babiak, the Chair of Walgreens' Audit Committee. Babiak agreed with Miquelon.

85.     During the working session in New York, on June 11, 2014 at 3:35 pm, Miquelon e-mailed Wasson and informed him that Babiak "would not support delaying the earnings call." Wasson responded, dismissively, by stating in his email response at 4:53 pm that day: "We need to do what is best for the company and tell Jan[ice Babiak] what we are doing." Miquelon wrote back one minute later: "She has audit oversight and her buy in that we are doing the principled and appropriate thing is critical." A copy of this email is attached as Exhibit 10.

86.     Miquelon then forwarded the e-mail exchange to Thomas Sabatino, Walgreens' General Counsel and stated: "I could use some moral support." Sabatino never responded. A copy of Miquelon's email to Sabatino is included in Exhibit 10.

87.     Ultimately, Miquelon prevailed on this point.

## C.     On June 24, 2014, at Miquelon's Insistence, Walgreen's Withdraws its Previously Announced FY 2016 EBIT Goal

88.     On Walgreens' June 24, 2014 earnings call, the Company announced that its original FY 2016 EBIT goal was no longer feasible. Wasson stated:

As a result of the many Step 2 considerations and current business performance, *the company is withdrawing its fiscal year 2016 goals that were previously announced in 2012.* The company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal 2016, and we will communicate those to you on our call, which we expect to hold in late July or early August.

Let me speak directly to 2 of the prior goals. Regarding our adjusted operating income goal of $9 billion to $9.5 billion, on previous calls, we noted we were tracking below the CAGR required to meet the goal. We now no longer expect to reach that goal. On our combined synergy goals I noted earlier, we are tracking ahead of the -- of that goal and we expect to exceed the $1 billion amount by the end of fiscal 2016. As noted above, some of the opportunities we are pursuing are below the operating line -- income line on the income statement and decisions about those will be reflected in our new goals and metrics. (at p. 4)

(Emphasis added). A copy of the transcript of the June 24, 2014 call is attached as Exhibit 11.

### D. In June and July 2014 Miquelon Confers Extensively with Wasson and Pessina About a Revised FY 2016 EBIT Forecast

89.     Throughout late June and July 2014, Miquelon's team continued to work on a revised 2016 EBIT forecast figure. During this time, Miquelon was in regular contact with Wasson and Pessina regarding the FY 2016 EBIT forecast, including numerous meetings, telephone conversations and emails, all focused on what updated forecast number would be provided to the full Board at the next meeting in July.

### E. A Revised FY 2016 EBIT Figure is Approved by the Board and Announced

90.     At Board meetings on July 8-9, 2014, Miquelon advised the Board that the revised 2016 EBIT forecast was tracking to $7.5 billion. During the meetings, the Board reviewed the preliminary revised forecast but did not finalize it, pending decisions on other issues such as whether the Company would re-domicile overseas.

91.     On July 31, 2014, the Board was provided with a refreshed forecast number which remained unchanged.

24

92.    On August 6, 2014, Walgreens and Alliance Boots hosted an investor call. In addition to

announcing that the Company would proceed with Step 2 of Walgreens' merger with Alliance

Boots, the call addressed why the Company had withdrawn its previous goals. Wasson stated

that it was due to "current business trends at both Walgreens and Alliance Boots" and "more

pronounced trends across the global business." Wasson further stated:

> Now with our full combination and the Next Chapter plan, the Walgreen-Boots
> Alliance Enterprise has established new goals for fiscal 2016. As you know, we
> withdrew our previous 2016 goals that we put in place in 2012, due to the many
> step 2 considerations and current business performance trends at both Walgreen
> and Alliance Boots.
>
> We also committed to return with new goals and metrics that will reflect our view
> as the combined enterprise. Today, we're establishing new goals, focused on
> revenue and EPS. These goals are revenue of $126 billion to $130 billion,
> excluding JVs and associates; an adjusted EPS goal of $4.25 to $4.60. We
> believe it is important to highlight the size, scale and top line growth potential of
> the company post step 2.
>
> And our adjusted EPS reflects the full earnings power of the business, including
> our planned decisions around cost savings, capital allocation and tax planning for
> the combined enterprise. This adjusted EPS range we're setting forth today
> includes the following: Synergies greater than $1 billion; a tax rate in the high
> 20s; our announced $3 billion share repurchase program; and the accelerated cost
> savings that we announced today. While not an explicit goal, the adjusted EPS
> range also implies an adjusted EBIT range with mid-point around $7.2 billion.
>
> Our goal is to drive double-digit adjusted EPS growth over the long term. Let me
> pause here and acknowledge that we're not happy about lowering our previous
> goals, but we want to adjust our outlook given more pronounced trends across the
> global business.
>
> First, we've been challenged by the ongoing global pharmacy reimbursement
> pressure, which continues in the rapid and pronounced increase in generic drug
> pricing, which we did not fully anticipate and now expect to persist longer than
> we anticipated.
>
> Both factors are having an adverse affect on Walgreens' pharmacy margin, which
> we're not able to fully mitigate given the structure of certain existing contracts.
> In addition, we made strategic investments in margin over the near-term for long-
> term share gains in our retail pharmacy business. (at p. 4)

25

A copy of the transcript of the August 6 conference call is attached as Exhibit 12. The Company's August 6, 2014 Press Release is attached as Exhibit 13.

## F. Miquelon Opposes the Potential Tax Inversion

93. In anticipation of proceeding with Step 2 of its combination with Alliance Boots, from April–July 2014 there was significant focus at the Company on whether Walgreens, as part of the combination, should engage in a "tax inversion," which would re-domicile Walgreens to a foreign country which would have likely lowered its tax bill.

94. Miquelon opposed the tax inversion as it was proposed by Alliance Boots because he did not believe it met the Internal Revenue Service ("IRS") requirements and also because Miquelon believed the plan carried too much financial risk for too little benefit.

95. Pessina and Wasson strenuously argued in favor of the tax inversion and Wasson privately pressured Miquelon to agree with his position.

96. At the April 9, 2014 Board meeting, activist investors confronted Walgreens' Investor Relations personnel and demanded that the Company proceed with the tax inversion. This was followed by numerous letters from activist investors making the same demand.

97. In May 2014, Wasson told Miquelon, in substance, that Wasson was convinced that Walgreens must proceed with a tax inversion and that, if it did not, Wasson would be unable to keep his job because the activist investors would force him out.

98. By June 2014, Wasson had told Miquelon and others that he believed that an inversion was in the best interests of the Company because it was the only way he could keep his job and he was the best person to be the Company's CEO.

99.     In June 2014, Miquelon told Wasson that, after further study, Miquelon had personally

concluded that the tax inversion as proposed was not viable and not in the best long-term

interests of the shareholders. Miquelon stated that he would consider other potential options and

permit an inversion to be done properly, if there were such options.

100.    The Board of Directors appointed a Special Committee to review the tax inversion issue.

In July 2014, the Special Committee determined that a tax inversion as proposed by Alliance

Boots was not a feasible option for the Company and recommended against it.

101.    Ultimately, the Board of Directors accepted the recommendation of the Special

Committee. In the Company's August 6, 2014 Press Release (Exhibit 13), the Company

announced that "the fully combined Walgreens Boots Alliance global enterprise will be

domiciled in the United States and headquartered in the Chicago area."

### G.    Walgreens' Stock Price Plunges 14% After the August 6, 2014 Announcement

102.    Following Walgreens' August 6, 2014 announcement, the price of Walgreens' shares

decreased 14%, closing below $59 per share for the first time in six months.

### H.    During this period, Miquelon Faces Pressure/Threats on Financial Reporting and the Inversion

103.    In June 2014, Miquelon was advocating to promptly withdraw the previously disclosed

FY 2016 EBIT goal and was facing resistance from Wasson. At the same time, Miquelon was

being pressured to raise the earnings per share estimate ("EPS") that was being developed to be

announced in conjunction with the Company's announcement that it would proceed with Step 2

of the merger with Alliance Boots.

104.    Wasson told Miquelon on many occasions: "I need a 6, get me a 6," meaning that

Wasson was pressuring Miquelon to approve an EPS figure of at least $6.00 per share, despite

the lower figure Miquelon had determined was best supported by the evidence and plans.

105.    On June 11, 2014, Wasson sent a text message to Miquelon that stated: "Let's push for a

6 somehow." Miquelon responded: "I don't think there is anyway we could ensure that . . . "

106.    Wasson responded: "No choice. Need a 6. We'll find a way." Relevant portions of this

text exchange are attached as Exhibit 14.

107.    On June 24, 2014, following the earnings call described above (during which the

Company withdrew its previously announced FY 2016 EBIT goal), Miquelon, Wasson and

members of Walgreens' Investor Relations department, participated in a conference call with an

activist hedge fund investor. During that call, the activist investor chastised Miquelon for the

decision to withdraw the EBIT goal number, told him he was providing the Company with "bad

advice," was "too conservative," and that "failure to do an inversion at this point would be a

catastrophe."

108.    The activist investor then told Miquelon that if he did not start "doing his job," two other

activist investors would "stop at nothing to get you out of the way including getting personal dirt

on you and embarrassing you publicly . . . I wouldn't be surprised if that wheel was in motion."

109.    After the call, Miquelon immediately wrote to Walgreens' General Counsel Thomas

Sabatino and documented in an email what the activist investor had said on the call. Relevant

portions of Miquelon's email, sent to Sabatino on June 24, 2014 at 1:05 pm, are attached as

Exhibit 15.

110.    The following day, Miquelon confronted Wasson about Wasson's failure to come to

Miquelon's defense on the call. Miquelon also told Wasson that, as a result of Wasson's lack of

support, Miquelon wished to accelerate the Company's announcement about Miquelon's

transition and separation from the Company.

## IV.    MIQUELON'S TRANSITION AND SEPARATION

111.    On August 4, 2014, Miquelon and the Company entered into a "Transition and

Separation Agreement" (hereinafter the "Separation Agreement"). A copy of the Separation

Agreement, and relevant portions of the signature pages, is attached as Exhibit 16. The

Separation Agreement provided that Miquelon:

> [S]hall separate from his position as Executive Vice President--Chief Financial
> Officer and President, International, as well as any other officer, director and
> committee positions with the Company and its subsidiaries effective as of August
> [4] 2014 (the *"Transition Date"*), and thereafter shall transition into, and continue
> employment with the Company, in a non-executive position, until December 1,
> 2014 (the *"Termination Date"*), at which time his employment with the Company
> and its subsidiaries shall terminate.

Exhibit 16, ¶ 1 1.

### A.    Severance Payments

112.    As Wasson had suggested, the Separation Agreement provided for Miquelon to receive,

among other things, severance benefits in the form of cash payments totaling $3,200,000, with an

initial payment of $1,453,333.31 and the balance to be paid in a series of monthly payments

between June 2015 and July 2016.

113.    Under Walgreens' "Executive Severance and Change in Control Plan," Section 2.22, the

term "involuntary termination" is defined to exclude circumstances under which an employee is

offered "employment or re-employment with the Company . . . on terms and conditions

substantially similar to the terms and conditions of his employment before his or her Termination of Employment." A copy of the Plan is attached as Exhibit 17. As the new role Miquelon had been offered was not "substantially similar" to his CFO role, the Company's Legal and Human Relations departments determined that Miquelon was eligible for severance payments under the Plan.

## B. Walgreens and its Executive Management Team Agree Not to Libel, Defame or Disparage Miquelon

114. The Separation Agreement further provided that the Company "agrees that no member of its executive management team, human resources department or investor relations department shall, directly or indirectly, disclose, communicate, or publish in any format any libelous, defamatory, or disparaging information concerning [Miquelon], or cause others to do so."

Exhibit 16, ¶ 8.

## C. Release

115. The Separation Agreement contained a General Release, which stated:

As a condition to Executive's receipt and retention of the consideration described in Section 3, he shall (a) execute the General Release and Waiver attached hereto as Exhibit A hereto (the *"General Release"*) not later than 21 days after the date of this Agreement, and not revoke the General Release within the revocation period set forth in the General Release, and (b) execute the affirmation of the General Release attached hereto as Exhibit B hereto (the *"Affirmation"*) not later than 21 days after the Termination Date, and not revoke the Affirmation within the revocation period set forth in the Affirmation.

Exhibit 16, ¶ 6.

116. Miquelon signed the Separation Agreement on August 2, 2014.

117.    The General Release makes clear that Miquelon "does not waive or release any rights or claims that I may have which arise after the date [Miquelon] execute[s] this General Release." Exhibit 16, Exhibit A, ¶ 5.

118.    The General Release did not waive or release rights or claims for breach of the Separation Agreement: "Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect the rights or claims arising out of any breach by the Company or by any Released Party of the terms of the Separation Agreement after the date hereof." Exhibit 16, Exhibit A, ¶ 12.

### D.    Press Release Announcing Miquelon's Departure

119.    On August 4, 2014, the Company issued a press release titled "Walgreens Appoints Timothy R. McLevish to Succeed Wade Miquelon as Executive Vice President and Chief Financial Officer." In the press release, the Company quoted Wasson as saying: "Wade's remarkable leadership, strategic vision and expertise played a critical role in helping Walgreens transition and transform from a 20th century American drugstore chain into a 21st century global health and wellbeing enterprise, setting the stage for a new generation of growth and value creation for all. . . . Wade has been a strong contributor as together we charted and pursued a bold new course for Walgreens globally. We know Wade can't resist a new challenge, so we thank him and wish him the very best as he moves forward with the next chapter of his outstanding career." A copy of the August 4, 2014 Press Release is attached as Exhibit 18.

120.    Thus, after an outstanding six-year tenure as CFO, being offered a promotion that would have put him in line to be the next CEO, which he turned down so he could pursue opportunities

31

outside of Walgreens, and after being lauded by the Company in the press release announcing his departure, as of August 4, 2014, Miquelon was no longer an officer of the Company.

## V. DEFAMATORY AND DISPARAGING STATEMENTS ABOUT MIQUELON ARE REPORTED IN THE *WALL STREET JOURNAL*

### A. August 5-8 "Road-Show"

121. From August 5-8, 2014, immediately after Miquelon's resignation as CFO was announced, Wasson and Pessina went on a "road show," meeting with approximately twelve major investor groups. On information and belief, during that road show, Wasson and Pessina made disparaging and defamatory statements about Miquelon and his Finance Team, including statements that the Finance Team was "weak" and the Company had "lax internal controls," as well as the statements that were the basis of the defamatory articles that appeared in the Wall Street Journal articles dated August 20 and September 30, 2014. On information and belief, in addition, Wasson and Pessina made disparaging statements about other Walgreens' officers, the Board of Directors (which they also described as "weak") and divulged other sensitive and confidential information.

122. On information and belief, the first of these investor meetings took place on the evening of August 5, 2014, the night before the Company's August 6, 2014 announcements described above. On information and belief, during this August 5, 2014 meeting, Wasson and Pessina met privately with one of the activist investors. No one else was permitted to attend the meeting. In contravention of Company policy, which is designed, in part, to ensure that the Company remains in compliance with Regulation FD (Fair Disclosure), no member of the Investor Relations team was in attendance.

123. A Walgreens' Investor Relations director did attend meetings as part of the road show held on August 6-8, 2014 and, per Company protocol, made notes summarizing the meetings. The Investor Relations director sent the meeting notes to several Walgreens executives pursuant to Company protocol.

124. Two of the Company's most senior officers reviewed the notes from the road show and concluded that they reflected that Wasson and Pessina had made defamatory, disparaging, and inappropriate statements to investors during these meetings and had improperly disclosed confidential information.

125. These senior officers who reviewed the notes were so alarmed by what the notes reflected that they specifically requested that Thomas Sabatino, the Company's General Counsel, forward the notes to the entire Board of Directors. On information and belief, the road show meeting notes were not provided to the Board of Directors.

## B. Miquelon is Contacted by a *Wall Street Journal* Reporter

126. On August 11, 2014, Miquelon received a voice mail message from a Wall Street Journal reporter requesting commentary from Miquelon for a story about Walgreens. Miquelon did not respond to the message. As required by Company policy, Miquelon immediately contacted Chuck Greener, the Company's Head of Corporate Communications. Greener told Miquelon that he was aware that the Wall Street Journal was preparing an article about Walgreens. Greener told Miquelon, in substance, that the focus of the article was on overall governance and how the Board of Directors was doing in that regard. Greener further told Miquelon, in substance, that if Miquelon remained silent there was no reason to expect Miquelon would play prominently in the article.

127.    On August 12, 2014, Miquelon received another voice mail message from the Wall Street Journal reporter. The reporter stated that he was preparing a story about "what's gone down" as he "had heard" Wasson and Pessina "telling the Street" that the change in the 2016 FY EBIT forecast was "due to bad forecasting."

128.    On August 12, 2014, at 12:27 pm, the reporter, Michael Siconolfi, Senior Editor at the Wall Street Journal, emailed Miquelon: "I've left messages on your work and cell phones. We are preparing an article on what's gone down at Walgreen involving you and the missed projection et al. . . . It's important that we talk as soon as possible today." A copy of this email is attached as Exhibit 20.

129.    Before returning the reporter's call, Miquelon, consistent with Company policy, immediately emailed Greener. On August 12, 2014 at 12:39 pm, Miquelon wrote an email to Greener stating that he had received a voice mail message from a reporter and "They said they are running a story about what went down as they have heard Greg and Stefano telling the street that the change was due to bad forecasting." A copy of this email is attached as Exhibit 21.

130.    Less than an hour later, at 1:43 pm, Greener responded, stating: "Before you call back, let's discuss what you intend to say. Thanks." Miquelon replied, several minutes later: "I'm in a meeting in ny til 3 but I think its that 'for professional and personal reasons I decided to pursue other interests some time ago and the company has been nothing less than supportive.' Over and out. Can I find out what was said exactly?" A copy of this email is attached as Exhibit 21.

131.    On August 12, 2014 at 3:37 pm, Miquelon emailed Greener and wrote: "Ps. If asked if I was terminated I would expect the company to say no and that I was offered a President role in May, but declined. That's what I will say if asked and it's important to my future livelihood. I

34

can of course provide documentation to support. I took enough blows last week [referring to his understanding of the defamatory and disparaging statements that Wasson and Pessina had made about him during the August 5-8 road show] but now I'm at the point where I need to defend myself and the truth. Thanks for the help here ..." Relevant portions of this email are attached as Exhibit 22.

132.    Greener wrote back, at 4:43 pm: "Wade, He [referring to the reporter] has said nothing about [you] being terminated. He only said that you and Kermit [Crawford] had left the company, but will let you know if he says otherwise for any reason." A copy of this email is attached as Exhibit 22.

133.    Miquelon responded: "Thanks Chuck. I'm just weary of reading half truths. I'd like to move on . . . Thanks for the help." A copy of this email is attached as Exhibit 22.

134.    Greener wrote to Miquelon about 10 minutes later: "Here's the email we were going to send Mike [the Wall Street Journal] reporter, if you're okay with it." The proposed email included the following statement: "Mike, I understand you've reached out to Wade about your story. Because he's travelling, he's asked me to see if there is a specific question you wanted him to address. Then I can follow up on that with him for you. . . ." Relevant portions of this email are attached as Exhibit 23.

135.    On August 13, 2014 at 10:49 am, the Wall Street Journal reporter again emailed Miquelon stating: "Wade—I left you a v/m on your cell. Pls call me soonest . . ." A copy of this email is attached as Exhibit 24.

136. Miquelon then called Greener again. During the call, Greener told Miquelon that he should request that the reporter send him questions and Miquelon should provide written responses.

137. Miquelon accepted Greener's advice and wrote to the reporter: "Mike, as I am still a paid consultant for Walgreens thru dec 1, they have kindly asked that any correspondence I have via your questions be in writing. I need to thoughtfully respect that request." A copy of this email is attached as Exhibit 24.

138. At 12:02 pm on August 13, 2014, the *Wall Street Journal* reporter wrote: "Wade—I understand. I'd much rather have a conversation about this, but here are some issues on which we'd appreciate your input soonest." Miquelon reviewed the questions and responded in writing. Excerpts of the exchange appear below:

--at an April board meeting, you forecast $8.5 billion in fiscal 2016 pharmacy-unit
EBIT, based partly on long-term contracts with insurers and others to sell
prescription drugs under plans that include Medicare Part D. In July, you cut that
forecast to $7.4 billion, stunning the board and senior Walgreen executives.
Please address this disconnect and how it happened.
--please address why inflation in the price of some generic drugs wasn't reflected
in the April forecast

RESPONSE:

I cannot comment on any of the specific private board meeting discussions, but
can only say that all senior leaders were constantly updated on all relevant
financial matters and in turn apprise all board members transparently and
expeditiously on all material and relevant matters.

--please address why there wasn't better communication and coordination
between the finance group and Kermit Crawford's [pharmacy] department:

RESPONSE:

The finance organization works well across all aspects of the company and that is inclusive of Kermit's department. In fact, most finance resources are imbedded in the various business units and functions as a member of the team.

--please address exactly when you discovered the discrepancy, and what you did in the wake of that

RESPONSE:

I will not comment on company confidential matters.

--please address the contention by some senior Walgreen executives that there were lax financial controls in your group and reflected a "weak" finance unit, and that your group and the pharmacy unit "weren't talking to each other."

RESPONSE:

I am proud to have led an outstanding FA team. During this 6 year time span, Walgreens TSR (118 percent) outpaced all key competitors and []major indices. Further, free cash flow more than tripled and market cap roughly doubled. I would put this Finance team and these financial results up against any in this space.

--please address why you didn't provide financial projections to some directors, including Stefano Pessina

RESPONSE:

It has always been and continues to be the policy at Walgreen's to provide ALL directors with fully transparent and timely information and there has been no exception to this policy during my tenure.

. . . .

--please address why you're receiving severance of $3.2 million and a performance bonus of nearly $1.2 million after your forced departure.

RESPONSE:

It was not a forced departure. I was in fact offered in April what was a promotion to a President role in the to be newly merged company, which, while I was very grateful for, is not what I aspire to long term both professionally and personally.

Relevant portions of this email exchange are attached as Exhibit 25.

139.    On information and belief, during this same time, Greener and his organization was

communicating extensively with the *Wall Street Journal* reporter in an effort to get the reporter

to remove from the article references to many embarrassing, disparaging statements Wasson and

Pessina had made during the road show. On information and belief, the Company, during these

communications with the reporter, in an effort to deflect attention from Wasson and Pessina's

other defamatory statements, invited the reporter to focus the story on Miquelon.

140.    On August 19, 2014, the *Wall Street Journal* published an article on its website titled

"Walgreen Shakeup Followed Bad Projection." The article appeared on the front page of the

*Wall Street Journal's* August 20, 2014 print issue. In this article, the *Wall Street Journal* wrote:

> A billion-dollar forecasting error in Walgreen Co.'s Medicare-related business has
> cost the jobs of two top executives and alarmed big investors.
> At an April board meeting, Chief Financial Officer Wade Miquelon forecast $8.5
> billion in fiscal 2016 pharmacy unit earnings, based partly on contracts to sell
> drugs under Medicare. Last month, directors got a shock. Miquelon suddenly cut
> that forecast by $1.1 billion.
>
> In early August, the CFO of the nation's largest drugstore chain was gone.
>
> …
>
> *People familiar with the decision say [Miquelon was] pressured to leave.*
>
> …
>
> *Walgreen directors have told investors they were stunned by the change in the*
> *pharmacy forecast, which was for earnings before interest and taxes. Stefano*
> *Pessina, the company's largest shareholder and a director, has told the other*
> *investors he wasn't permitted to see the forecasts before they were submitted to*
> *the board.* The 73-year-old Mr. Pessina, who holds roughly an 8% stake, was
> unavailable for comment.
>
> In recent meetings, investors say, *Walgreen directors told them that forecasts*
> *given to directors in April were "inadequate" and that the company's finance*
> *and pharmacy units weren't "talking to each other."*

...

In some cases the firm found it would receive lower rates than expected for drugs it dispenses. Its finance unit didn't incorporate these prices into its April forecast of fiscal 2016 pharmacy profits. In making its July forecast, it did.

***In a meeting with investors two weeks ago, Walgreen officials said the company group writing contracts wasn't communicating with the finance group.*** Walgreens has scrambled to reflect the higher drug costs in the pricing of its contracts. It said it believes drug-price inflation will continue, and this is "baked into" future plans. Its major rival—CVS Caremark Corp.'s retail arm—said price increases on generic drugs weren't expected. CVS didn't indicate any effect on earnings or forecasts from such changes. In the investor conference call, Walgreen's Mr. Wasson said the new CFO, Timothy McLevish, has a "history of strong cost control and financial discipline," and he will "help us make sure that we're making good, sound financial decisions and forecasting going forward."

...

(Emphasis added.)

A copy of the August 20, 2014 *Wall Street Journal* article is attached as Exhibit 26.

141.    The substance of the article was re-published in numerous publications both in print and on the internet, including such publications as Bloomberg, Forbes.com, Reuters, Business Insider, the Chicago Tribune and numerous others. A set of these publications is attached as Exhibit 27.

## C.    Miquelon Learns of the Defamatory *Wall Street Journal* Article and Requests the Company to Make A Public Statement Correcting The False Information

142.    Miquelon first learned about the article on the evening of August 19, 2014, when he was alerted to it by Greener. At the same time, Miquelon was working closely on pursuing several high-level executive positions, including one opportunity to serve as the COO/CEO of a major public company with which Miquelon was in the late stages of discussions and was the lead candidate at the time the article was published.

143.     On August 20, 2014 at 8:20 am, Miquelon emailed an executive recruiter with whom he was working and explained that "the article is almost entirely false and that will quickly prove out. I have about 300 emails in my inbox from Walgreen's employees alone who are quite upset and left scratching their heads both for inaccuracies as well as the mean spirited content. I have no idea what prompted it other than an activist investor who threatened to slander me personally in front of multiple witnesses if I would not support an inversion. . . . My professional background in ethics and governance is as spotless as it gets . . ." Relevant portions of this email are attached as Exhibit 28.

144.     On August 20, 2014 at 9:30 am, Miquelon emailed Wasson. Miquelon referred to the "many disparaging and inaccurate comments" in the article and told Wasson that "whats pragmatic and most important[] to me is being able to seek gainful employment and here is where you can help me set the record straight. I would sincerely appreciate a simple paragraph signed by you/the company that validates that I was offered a promotion in April to a president role, but turned it down on my own accord and that the related decision to leave Walgreen's for personal and professional reasons was my own choice. . . . It is very important that I get this quickly as I am in the final stages of a very large and meaningful role and I don't yet know the related knock on impact of what was written last night . . ." A copy of this email is attached as Exhibit 29.

145.     Wasson responded: "Yes, a very reasonable request considering the unfortunate article. I have asked [Corporate Vice President and Deputy General Counsel] Jan [Reed] to prepare something by mid day. Hang in there. You will weather this storm." Relevant portions of this email are attached as Exhibit 30.

146.    On August 20, 2014, at 3:57 pm, Reed forwarded a letter to Miquelon, on Walgreens'

letterhead, signed by Walgreens' Chief Human Resources Officer (the "August 20th letter"). The

letter, addressed "To Whom it May Concern," stated: "This is to inform you that Wade D.

Miquelon joined Walgreen's in 2008, and has served in various capacities since that time, most

recently as Executive Vice President, Chief Financial Officer and President, International. Since

August 4, 2014, he has served in a transitional role as an advisor to the Company, which will

continue until December 1, 2014. Prior to entering into a Transition and Separation Agreement

with Miquelon, the Company had discussions with him regarding his future role in the Company,

including offering him the role of President International and Global Strategy, reporting to the

CEO, Greg Wasson, which he chose to decline. Subsequently, he decided to leave the Company

for professional and personal reasons." A copy of this email and the attached August 20, 2014

Letter is attached as Exhibit 31.

147.    On August 21, 2014, at 8:10 am, following additional discussions with executive

recruiters and others about the article and how it would impact him, Miquelon wrote to Tom

Sabatino, Walgreens' General Counsel. Miquelon stated: "I think there is little question that the

WSJ article is blowback from activist investors and statements made at recent investor meetings

so my question to you is how best to respond and right the wrongs? I am very thankful for

Greg's documentation that I was not terminated **but I'm still facing public headlines of a

falsity that I made a billion dollar forecasting error and the general public perception that

I was fired as a result**. It's not clear yet but I am lose [sic] the CEO role I was favored for

because in their words, in a job at that level, perception can be more important than reality. I

don't have a specific ask but a **public statement** of some kind could put this issue to bed for me.

41

I'd ask you to think about it and if you were me what you would deem to be the truth, fair for all and a creator of goodwill. My interest is solely in moving forward productively and with grace." (Emphasis added.) A copy of this email is attached as Exhibit 32.

148. On August 21, 2014 at 6:04 pm, Sabatino replied. He stated that "we have come to the conclusion that we are not going to publicly issue anything further on this matter. However, if you feel that it would help I am comfortable with you sending a letter, referencing me, to the Wall Street Journal, seeking a revision . . . We believe the story has died down and to further perpetuate this story at this point is not in the company's best interest."

149. Miquelon wrote back an hour later. Miquelon said that ". . . over the past 24 hours the damage to me from disparagement seems to have magnified far beyond what anyone probably anticipated from such an article." Miquelon explained that he had shown the August 20 letter to executive recruiters with whom he was working but that those recruiters told Miquelon that without a public statement from Walgreens to help with the overall public perception, Miquelon would not be able to get the "meaningful" jobs he would otherwise be able to get because potential employers had to manage public perceptions as well.

150. Miquelon asked Sabatino to re-consider. He emphasized that he wished to "work through these issues amicably and privately." Miquelon further requested that, if the Company persisted in its refusal to set the record straight with a public statement, that he wanted promptly to arrange a meeting with Sabatino, Wasson and "at least one mutually agreed Board director" so he could "share why I am so concerned about the damage and disparagement that has been done to me, my reputation and future employment prospects as well as other concerns that have been brought to my attention." A copy of this email is attached as Exhibit 33.

42

151.     Before Miquelon had received a response from Sabatino, he wrote an email to Sabatino

on August 22 at 4:38 pm with the subject: "Disappointing news." Miquelon informed Sabatino

that he had just been told by an executive recruiter that the very most senior role in a major

corporation, for which he had been the lead contender, was no longer an option and the specific

reason that corporation had given for not offering the position to Miquelon was the *Wall Street

Journal* article. Miquelon concluded: "I need that [press] release within the hour. My reputation

is very harmed and may get increasingly so and I need the company to act immediately."

Relevant portions of this email are attached as Exhibit 34.

152.     Sabatino responded on August 22, 2014 at 10:40 pm. Sabatino told Miquelon that,

instead of a press release from the Company, Miquelon should have potential employers directly

phone Wasson to "have a conversation that answers any questions they may have." Sabatino

further wrote: "For example, the potential employer could call Greg to get the 'real story' rather

than reading a "generic media statement."

153.     Sabatino also said the Company was willing to post a statement on its website reiterating

what it had said about the recent changes to its management team in its August 4, 2014 press

release.

154.     Finally, Sabatino acknowledged that "this is more limited than the statement you wanted"

but this is what "we are able to do." A copy of this email is attached as Exhibit 35.

155.     Miquelon wrote back the next day, August 23, 2014 at 10:10 am: "needless to say I [am]

very disappointed in your response last night which, as you know, does not address the problem.

I gather you are telling me to seek advice as to other alternatives." A copy of this email is

attached as Exhibit 36.

156.     On September 3, 2014, Miquelon, through counsel, made demand for a meeting with the

Company and informed the Company that it should "place a litigation hold on all documents that

relate in any way to the facts surrounding Miquelon's departure from the company." The request

for a document hold specifically referenced thirteen categories of documents, including all

communications relating in any way to: Miquelon's "performance" as CFO, his exit from the

Company, forecasting issues, the potential tax inversion, and communications between Company

representatives (including Board members) and investors and key stakeholders relating in any

way to Miquelon. In addition, the request included a demand that the Company preserve any

documents relating to meetings and discussions between Alliance Boots and investors where

Walgreens was not in attendance.

### D.     September 30, 2014 *Wall Street Journal* Article Again Disparages and Defames Miquelon

157.     On September 30, 2014, the *Wall Street Journal* published another article based on

Pessina and Wasson's defamatory and disparaging statements about Miquelon. The article

stated: "Walgreen Co. will take on that mantle when it completes its acquisition of Europe's

Alliance Boots [] announced last month. But what should have been a happy occasion for

shareholders quickly turned negative when the company also said it would drop plans for a tax

inversion. Shareholders were still digesting news from July that Walgreen's now former chief

financial officer made a $1.1 billion forecasting error in calculating future pharmacy earnings in

guidance. He had failed to take into account rising prices for generic drugs." A copy of the

September 30, 2014 article is attached as Exhibit 37.

158.     Thus, the *Wall Street Journal* again repeated the false and defamatory statements by the

defendants about Miquelon that had been published in August and, in addition, now specifically

44

asserted that Miquelon – and Miquelon alone – had made an "error in calculating" future pharmacy earnings. In truth and in fact, as defendants well knew, Miquelon made no error – calculation or otherwise – in connection with Walgreens' FY 2016 EBIT forecast.

159.     Immediately after the September 30, 2014 *Wall Street Journal* article was published, Miquelon, through counsel, demanded that Wasson and Pessina immediately issue press releases setting the record straight. After some delay, Wasson and Pessina decided not to do so.

## VI.     IMPACT ON MIQUELON

160.     In addition to the lost opportunity to serve as the top executive of a major, public company, described above, Miquelon was also a top prospect for the CFO role for a Fortune 100 company, and was also being considered to serve as the CFO/president of a major global retailer.

161.     Miquelon has been informed by executive recruiters that he lost all of these opportunities as a direct result of the Wall Street Journal article.

162.     A leading global executive recruiter has informed Miquelon that, until there is a public statement by the Company that Miquelon was not forced out due to a forecasting error, or any other reason, Miquelon will not be able to obtain the significant executive positions for which he would otherwise have been a top candidate.

## COUNT I: DECLARATORY JUDGMENT

### REGARDING MIQUELON'S RIGHTS TO PURSUE CLAIMS FOR BREACH OF CONTRACT, DEFAMATION, AND TORTIOUS INTERFERENCE AS ALLEGED HEREIN WITHOUT WAIVING HIS SEVERENCE BENEFITS

163.     Miquelon incorporates and realleges paragraphs 1-162 as if fully set forth herein.

164.     The General Release attached as Exhibit A to the Separation Agreement is "in consideration of and subject to the performance by Walgreen Co. . . . of its obligations" under the Separation Agreement. See Exhibit 16, Exhibit A, ¶ 1.

45

165.    Pursuant to the Separation Agreement, Walgreens agreed that "no member of its executive management team," among others, "shall, directly or indirectly, disclose, communicate, or publish in any format any libelous, defamatory, or disparaging information concerning [Miquelon], or cause others to do so." See Exhibit 16, ¶ 8.

166.    As alleged in this Complaint, defendant Walgreens (through CEO Wasson and others) breached the Separation Agreement by directly or indirectly communicating, disclosing, or causing others to communicate or disclose, defamatory or disparaging information about Miquelon.

167.    The General Release makes clear that Miquelon "does not waive or release any rights or claims" that may "arise after the date" Miquelon executed the General Release. See Exhibit 16, Exhibit A, ¶ 5.

168.    Each of the claims alleged herein arose after Miquelon signed the General Release, including Walgreens' breach of the Separation Agreement, defamation per se, and tortious interference with Miquelon's prospective economic advantage.

169.    Further, the General Release is explicit that it does not waive or release rights or claims for breach of the Separation Agreement: "Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect the rights or claims arising out of any breach by the Company or by any Released Party of the terms of the Separation Agreement after the date hereof." Id. at ¶ 12.

170.    Therefore, Miquelon has not and does not waive or forfeit his legal rights to pursue the claims alleged herein.

171.    Miquelon's "Termination Date" under the Separation Agreement is December 1, 2014. See Exhibit 16, ¶ 1.

172.    On or within 21 days after Miquelon's Termination Date, Miquelon is required by the Company to execute an "Affirmation and Additional Release" ("Additional Release") as a condition precedent to receiving any severance benefits. *See* Exhibit 16, Exhibit B.

173.    The Additional Release re-executes, affirms, and incorporates the General Release and all of its provisions, including those referenced above. Id.

174.    Miquelon cannot be required to sign the Additional Release in order to receive severance benefits, if to do so would be found to waive Miquelon's right to prosecute this case. Miquelon also will not (and cannot) waive or forfeit his legal rights to pursue the claims alleged herein.

175.    Pursuant to Section 2-701 of the Code of Civil Procedure, this Court may, "in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any . . . contract . . . and a declaration of the rights of the parties interested." 735 ILCS 5/2-701(a).

176.    A declaration of such rights "may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint . . . seeking other relief as well." 735 ILCS 5/2-701(b).

177.    A declaration of Miquelon's rights under the Separation Agreement, General Release, and Additional Release will serve a useful purpose by ruling on the legal relationships at issue before further dates in the Separation Agreement are reached.

178.    Further, a declaration of Miquelon's rights will provide a ruling on an important legal question that this Court is suited, in equity, to determine expeditiously.

179.    There is no adequate remedy at law.

## COUNT II: DECLARATORY JUDGMENT
## REGARDING THE FALSITY OF STATEMENTS PUBLISHED ABOUT MIQUELON

180.    Miquelon incorporates and realleges paragraphs 1-162 as if fully set forth herein.

181.    Pursuant to Section 2-701 of the Code of Civil Procedure, this Court may, "in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any . . . written instrument, and a declaration of the rights of the parties interested." 735 ILCS 5/2-701(a).

182.    The above "enumeration does not exclude other cases of actual controversy." Id.

183.    Such a declaration "may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint . . . seeking other relief as well." 735 ILCS 5/2-701(b).

184.    Based on uncontroverted evidence, it is false (a) that Miquelon was personally responsible for a "calculation error" that necessitated a $1.1 billion reduction in the EBIT goal, (b) that Miquelon made "a $1.1 billion forecasting error," and (c) that Miquelon was forced or "pressured to leave" the Company. Each of these statements is flatly contradicted by the facts, as alleged herein.

185.    As a direct and proximate result of the publication of these false, disparaging, and defamatory statements, Miquelon's reputation has been irreparably damaged. Indeed, Miquelon has lost several high-level executive positions with major public companies as a result of the false statements published in the *Wall Street Journal* and repeated elsewhere.

48

186.    Unless this Court declares that the above statements are false, Miquelon's reputation will continue to be irreparably damaged.

187.    A declaration of falsity is a needed remedy that this Court, in equity, is suited to provide expeditiously.

188.    A declaration of falsity also is necessary to support the injunctive relief sought in Counts VI and VII below.

189.    There is no adequate remedy at law.

## COUNT III: BREACH OF SEPARATION AGREEMENT

190.    Miquelon incorporates and realleges paragraphs 1-162 as if fully set forth herein.

191.    The Separation Agreement is a valid and enforceable contract.

192.    Miquelon has fully performed his obligations under the Separation Agreement.

193.    Pursuant to the Separation Agreement, Walgreens agreed that "no member of its executive management team," among others, "shall, directly or indirectly, disclose, communicate, or publish in any format any libelous, defamatory, or disparaging information concerning [Miquelon], or cause others to do so." See Exhibit 16, ¶ 8.

194.    As alleged in this Complaint, defendant Walgreens breached the Separation Agreement by directly or indirectly communicating, disclosing, or causing others to communicate or disclose, defamatory or disparaging information about Miquelon.

195.    As a direct and proximate result of this breach, Miquelon's reputation has been damaged. Miquelon has lost (and continues to lose) lucrative, high-level executive positions that he otherwise would have received.

196. As a result of Walgreens' breach, Miquelon's current and future income, and his ability to obtain future employment at a level commiserate with his experience and abilities, has been significantly damaged in an amount that exceeds $50,000, to be fully determined at trial.

197. Despite being provided numerous opportunities to do so, Walgreens has failed and refused to mitigate damages.

## COUNT IV: DEFAMATION *PER SE*

198. Miquelon incorporates and realleges paragraphs 1-162 as if fully set forth herein.

199. As alleged in this Complaint, Walgreens (through CEO Wasson and others) has directly or indirectly made numerous false and defamatory statements about Miquelon.

200. Those false and defamatory statements have been disclosed and published to (and through) third parties, including investors, reporters, the Wall Street Journal, and other publically-available sources.

201. As a direct and proximate result of the publication of these false and defamatory statements, Miquelon's reputation has been damaged in the marketplace with investors and potential employers. Miquelon has lost (and continues to lose) lucrative, high-level executive positions that he otherwise would have received.

202. Because defendants' statements have imputed that Miquelon is unable to perform, or lacks integrity in performing, his employment duties, such statements are defamatory per se and damages are presumed.

203. Because defendants' statements have imputed that Miquelon lacks ability and have otherwise prejudiced Miquelon in his profession, such statements are defamatory per se and damages are presumed.

204.    As a result of Walgreens' defamation per se, Miquelon's current and future income, and

his ability to obtain future employment at a level commiserate with his experience and abilities,

has been significantly damaged in an amount that exceeds $50,000, to be fully determined at

trial.

## COUNT V: TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE

205.    Miquelon incorporates and realleges paragraphs 1-162 as if fully set forth herein.

206.    Before the publication of the false, defamatory, and disparaging statements alleged

herein, Miquelon had a reasonable expectation of being offered numerous, high-level executive

positions with major public companies.

207.    Walgreens knew that Miquelon would pursue new employment opportunities after he

chose to step down as CFO of the Company.

208.    Despite this knowledge, Walgreens (through CEO Wasson and others) directly or

indirectly made false, defamatory, and disparaging statements about Miquelon to investors and

reporters that were published in the Wall Street Journal and repeated in other publically-available

sources.

209.    Walgreens' conduct was intentional and unjustified.

210.    Walgreens refused to publicly correct the false and disparaging statements after the

articles were published, despite Miquelon's repeated assertions that he would lose job

opportunities without a public corrective statement.

211.    As a direct and proximate result of Walgreens' false, defamatory, and disparaging

statements, and the Company's refusal to publicly correct such statements, Miquelon has lost

several lucrative, high-level executive positions.

51

212.    As a result of Walgreens' intentional and unjustified conduct, Miquelon's current and future income, and his ability to obtain future employment at a level commiserate with his experience and abilities, has been significantly damaged in an amount that exceeds $50,000, to be fully determined at trial.

## COUNT VI: PRELIMINARY INJUNCTION

213.    Miquelon incorporates and realleges paragraphs 1-162 as if fully set forth herein.

214.    Miquelon has a clearly ascertainable right both at common law and pursuant to the terms of the Separation Agreement not to be defamed or disparaged, directly or indirectly, by Walgreens.

215.    Such rights have been, and continue to be, violated and are in need of immediate protection, as evidenced by the September 30 Wall Street Journal article.

216.    Miquelon has and will continue to suffer irreparable harm as a direct and proximate result of Walgreens' false, defamatory, and disparaging statements unless Walgreens is preliminarily enjoined from doing so.

217.    There is no adequate remedy at law.

218.    There is a reasonable likelihood that Miquelon will succeed on the merits, as alleged herein.

## COUNT VII: PERMANENT INJUNCTION

219.    Miquelon incorporates and realleges paragraphs 1-162 as if fully set forth herein.

220.    Miquelon has a clearly ascertainable right both at common law and pursuant to the terms of the Separation Agreement not to be defamed or disparaged, directly or indirectly, by Walgreens.

52

221.    Such rights have been violated and are in need of protection.

222.    Miquelon has and will continue to suffer irreparable harm as a direct and proximate result of Walgreens' false, defamatory, and disparaging statements unless Walgreens is permanently enjoined and prohibited from doing so.

223.    There is no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for the following relief:

(1)    A declaration that the General Release and the Additional Release do not and cannot forfeit Miquelon's severance benefits or legal rights to pursue the claims alleged herein.

(2)    A declaration of falsity regarding the following statements, both individually and in combination:

> (a) that Miquelon was personally responsible for a "calculation error" that necessitated a $1.1 billion reduction in the EBIT goal;

> (b) that Miquelon made "a $1.1 billion forecasting error"; and

> (c) that Miquelon was forced or "pressured to leave" Walgreens.

(3)    A preliminary injunction prohibiting Walgreens from defaming or disparaging Miquelon.

(4)    Following a full hearing on the merits, a permanent injunction prohibiting Walgreens from defaming or disparaging Miquelon.

(5)    An award of compensatory damages, to be fully determined at trial, in an amount that exceeds $50,000.

(6)    All such further relief that this Court determines is proper and just.

Dated:       October 16, 2014

Respectfully submitted,

Wade D. Miquelon

By:_____

One of the Attorney's for plaintiff

Nathan E. Hoffman
DECHERT LLP
77 West Wacker Drive
Suite 3200
Chicago, IL 60601
TEL:   (312) 646-5827
FAX:   (312) 646-5887
nathan.hoffman@dechert.com
Firm ID: 56333

David Bernick
Michael J. Gilbert
Gordon Sung
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
TEL:   (212) 698-3500
FAX:   (212) 698-3599
david.bernick@dechert.com
michael.gilbert@dechert.com
gordon.sung@dechert.com

Laurence H. Levine
LAURENCE H. LEVINE LAW OFFICES
190 South LaSalle Street
Suite 3120
Chicago, IL 60603
TEL:   (312) 291-7000
FAX:   (312) 291-7015
Firm ID: 43772

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

---------------------------------------------------------------

WADE D. MIQUELON,               :

                                     :

           Plaintiff,             :

                                       :

               v.                :

                                       :

WALGREEN CO.,                :

                                       :

                                       :

           Defendant.          :

---------------------------------------------------------------

## AFFIDAVIT PURSUANT TO ILLINOIS SUPREME COURT RULE 222(b)

       Pursuant to Illinois Supreme Court Rule 222(b), under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that as of the date of the attached Verified Complaint, the total amount of money damages sought **exceeds** $50,000.00.

       The undersigned certifies that the foregoing is true and correct based upon personal knowledge.

                                      Respectfully submitted,

                                      Wade D. Miquelon

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, plaintiff Wade D. Miquelon certifies that the statements contained in this Verified Complaint are true and correct, except as to matters stated to be on information and belief, and as to such matters the undersigned certifies that he believes the same to be true.

Wade D. Miquelon

# KEY PERFORMANCE METRICS FOR WALGREENS
Pre and post the tenure of Wade Miquelon as CFO and President International

## Total Shareholder Return (Stock appreciation + Dividends) [1]

|  | During WDM 6 Year Tenure (6/16/08 - 8/04/2014) | 6 years Prior to WDM (6/16/02 - 6/16/2008) |
|---|---|---|
| Walgreens | 116% | -3% |
| DJIA | 41% | 35% |
| S&P 500 | 52% | 40% |
| CVS Caremark | 88% | 142% |
| Wal Mart | 39% | 14% |
| Target | 26% | 45% |
| Cash Returned to Shareholders | > $10B | $ 3B |

## Other Key Performance Metrics

|  | - Baseline - Pre-WDM FY 2008 | - Most recent - WDM FY 2014 (est [2]) | CAGR |
|---|---|---|---|
| Revenue ($B) | 59 | 76 | 4.3% |
| Profit After Tax ($B) | 2.1 | 3.2 | 7.3% |
| Free Cash Flow ($B) | 0.8 | 3.1 | 25.3% |
| Market Capitalization ($B) | $36B | $71B | 11.7% |
| Countries of operation | 1 | 28 |  |

Notes:
1) TSR includes share price appreciation plus best available data on dividends paid/reinvested.
2) FY 2014 estimates based on 11 months of FY2014 plus last 12 months of data.

**Management's Report on Internal Control**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, management concluded that our internal control over financial reporting was effective as of August 31, 2010. Deloitte & Touche LLP, the Company's independent registered public accounting firm, has audited our internal control over financial reporting, as stated in its report which is included herein.

/s/  Gregory D. Wasson
Gregory D. Wasson
President and Chief Executive Officer

/s/  Wade D. Miquelon
Wade D. Miquelon
Executive Vice President and Chief Financial Officer

**Management's Report on Internal Control**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, management concluded that our internal control over financial reporting was effective as of August 31, 2012. Deloitte & Touche LLP, the Company's independent registered public accounting firm, has audited our internal control over financial reporting, as stated in its report which is included herein.

/s/ Gregory D. Wasson                  /s/ Wade D. Miquelon
Gregory D. Wasson                      Wade D. Miquelon
President and Chief Executive Officer   Executive Vice President and Chief
                                       Financial Officer and President,
                                       International

**Management's Report on Internal Control**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, management concluded that our internal control over financial reporting was effective as of August 31, 2011. Deloitte & Touche LLP, the Company's independent registered public accounting firm, has audited our internal control over financial reporting, as stated in its report which is included herein.

/s/  Gregory D. Wasson
　　　Gregory D. Wasson
　　　President and Chief Executive
　　　Officer

/s/  Wade D. Miquelon
　　　Wade D. Miquelon
　　　Executive Vice President and Chief Financial
　　　Officer

Table of Contents

## Management's Report on Internal Control

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, management concluded that our internal control over financial reporting was effective as of August 31, 2009. Deloitte & Touche LLP, the company's independent registered public accounting firm, has audited our internal control over financial reporting, as stated in its report which is included herein.

/s/ Gregory D. Wasson                          /s/ Wade D. Miquelon
Gregory D. Wasson                              Wade D. Miquelon
President and Chief Executive Officer          Executive Vice President and Chief Financial Officer

**Management's Report on Internal Control**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, management concluded that our internal control over financial reporting was effective as of August 31, 2008. Deloitte & Touche LLP, the company's independent registered public accounting firm, has audited our internal control over financial reporting, as stated in its report which is included herein.

/s/ Alan G. McNally

Alan G. McNally
Chairman and acting Chief Executive Officer

/s/ Wade D. Miquelon

Wade D. Miquelon
Senior Vice President and Chief Financial Officer

## Management's Report on Internal Control

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control - Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, management concluded that our internal control over financial reporting was effective as of August 31, 2013. Deloitte & Touche LLP, the Company's independent registered public accounting firm, has audited our internal control over financial reporting, as stated in its report which is included herein.

/s/Gregory D. Wasson                 /s/Wade D. Miquelon
Gregory D. Wasson                  Wade D. Miquelon
President and Chief Executive         Executive Vice President and
Officer                            Chief Financial Officer and
                                   President, International

EXHIBIT 31.1

## CERTIFICATION

I, Alan G. McNally, acting Chief Executive Officer, certify that:

1.  I have reviewed this annual report on Form 10-K of Walgreen Co.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in,this report;
4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and have:
    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

|  |  | Date |
| --- | --- | --- |
| /s/ Alan G. McNally | Chairman and acting Chief Executive Officer | October 28, 2008 |

Alan G. McNally

EXHIBIT 31.2

## CERTIFICATION

I, Wade D. Miquelon, Chief Financial Officer, certify that:

1. I have reviewed this annual report on Form 10-K of Walgreen Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

|  |  | Date |
| --- | --- | --- |
| /s/ Wade D. Miquelon | Chief Financial Officer | October 28, 2008 |
| Wade D. Miquelon |  |  |

Exhibit 32.1

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(18 U.S.C. SECTION 1350)**

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ending August 31, 2008 as filed with the Securities and Exchange Commission (the "Report"), I, Alan G. McNally, acting Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Alan G. McNally
Alan G. McNally
Chairman and acting Chief Executive Officer
Dated: October 28, 2008

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32.2

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(18 U.S.C. SECTION 1350)**

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ending August 31, 2008 a
with the Securities and Exchange Commission (the "Report"), I, Wade D. Miquelon, Chief Financial Officer of the Company, certify, pursuant to Secti
the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Comp

/s/ Wade D. Miquelon
Wade D. Miquelon
Chief Financial Officer
Dated: October 28, 2008

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furr
the Securities and Exchange Commission or its staff upon request.

EXHIBIT 31.1

## CERTIFICATION

I, Gregory D. Wasson, President and Chief Executive Officer, certify that:

1.  I have reviewed this annual report on Form 10-K of Walgreen Co.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15 (f) and 15d-15(f)) for the registrant and have:
    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/    Gregory D. Wasson            President and Chief Executive Officer  Date: October 23, 2009
       Gregory D. Wasson

EXHIBIT 31.2

CERTIFICATION

I, Wade D. Miquelon, Executive Vice President and Chief Financial Officer, certify that:

1. I have reviewed this annual report on Form 10-K of Walgreen Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/  Wade D. Miquelon          Executive Vice President and Chief Financial          Date: October 23, 2009
                               Officer
     Wade D. Miquelon

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(18 U.S.C. SECTION 1350)**

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2009 as filed with the Securities and Exchange Commission (the "Report"), I, Greg D. Wasson, President and Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Gregory D. Wasson
Gregory D. Wasson
President and Chief Executive Officer
Dated:  October 23, 2009

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(18 U.S.C. SECTION 1350)**

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2009 as filed with the Securities and Exchange Commission (the "Report"), I, Wade D. Miquelon, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ Wade D. Miquelon
Wade D. Miquelon
Executive Vice President and Chief Financial Officer
Dated: October 23, 2009

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 31.1

## CERTIFICATION

I, Gregory D. Wasson, Chief Executive Officer, certify that:

1.  I have reviewed this annual report on Form 10-K of Walgreen Co.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and have:
    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/     Gregory D. Wasson     Chief Executive Officer          Date:  October 26, 2010
        Gregory D. Wasson

EXHIBIT 31.2

## CERTIFICATION

I, Wade D. Miquelon, Chief Financial Officer, certify that:

1.   I have reviewed this annual report on Form 10-K of Walgreen Co.;
2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and have:
     a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
     b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
     c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
     d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
     a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
     b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


/s/   Wade D. Miquelon          Chief Financial Officer          Date:  October 26, 2010
      Wade D. Miquelon

Exhibit 32.1

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(18 U.S.C. SECTION 1350)**

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2010 as filed with the Securities and Exchange Commission (the "Report"), I, Greg D. Wasson, Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Gregory D. Wasson
Gregory D. Wasson
Chief Executive Officer
Dated: October 26, 2010

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32.2

### CERTIFICATION PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
### (18 U.S.C. SECTION 1350)

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2010 as filed with the Securities and Exchange Commission (the "Report"), I, Wade D. Miquelon, Chief Financial Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)    , The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Wade D. Miquelon
Wade D. Miquelon
Chief Financial Officer
Dated: October 26, 2010

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 31.2

## CERTIFICATION

I, Wade D. Miquelon, certify that:

1. I have reviewed this annual report on Form 10-K of Walgreen Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/    Wade D. Miquelon     Chief Financial Officer     Date: October 25, 2011
    Wade D. Miquelon

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(18 U.S.C. SECTION 1350)**

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2011 as filed with the Securities and Exchange Commission (the "Report"), I, Greg D. Wasson, Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Gregory D. Wasson
Gregory D. Wasson
Chief Executive Officer
Dated:  October 25, 2011

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32.2

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
## (18 U.S.C. SECTION 1350)

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2011 as filed with the Securities and Exchange Commission (the "Report"), I, Wade D. Miquelon, Chief Financial Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Wade D. Miquelon
Wade D. Miquelon
Chief Financial Officer
Dated: October 25, 2011

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 31.1

CERTIFICATION

I, Gregory D. Wasson, certify that:

1. I have reviewed this annual report on Form 10-K of Walgreen Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15 (f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/     Gregory D. Wasson_____     Chief Executive Officer                    Date: October 18, 2013
        Gregory D. Wasson

EXHIBIT 31.2

CERTIFICATION

I, Wade D. Miquelon, certify that:

1. I have reviewed this annual report on Form 10-K of Walgreen Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15 (f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/     Wade D. Miquelon                    Chief Financial Officer                    Date: October 18, 2013
        Wade D. Miquelon

Exhibit 32.1

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
## (18 U.S.C. SECTION 1350)

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2013 as filed with the Securities and Exchange Commission (the "Report"), I, Gregory D. Wasson, Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Gregory D. Wasson
Gregory D. Wasson
Chief Executive Officer
Dated: October 18, 2013

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(18 U.S.C. SECTION 1350)**

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2013 as filed with the Securities and Exchange Commission (the "Report"), I, Wade D. Miquelon, Chief Financial Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Wade D. Miquelon
Wade D. Miquelon
Chief Financial Officer
Dated: October 18, 2013

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 31.1

CERTIFICATION

I, Gregory D. Wasson, certify that:

1. I have reviewed this annual report on Form 10-K of Walgreen Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Gregory D. Wasson                    Chief Executive Officer                    Date: October 19, 2012
      Gregory D. Wasson

EXHIBIT 31.2

CERTIFICATION

I, Wade D. Miquelon, certify that:

1. I have reviewed this annual report on Form 10-K of Walgreen Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/  Wade D. Miquelon                    Chief Financial Officer          Date: October 19, 2012
     Wade D. Miquelon

Exhibit 32.1

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
## (18 U.S.C. SECTION 1350)

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2012 as filed with the Securities and Exchange Commission (the "Report"), I, Gregory D. Wasson, Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Gregory D. Wasson
Gregory D. Wasson
Chief Executive Officer
Dated: October 19, 2012

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32.2

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
## (18 U.S.C. SECTION 1350)

In connection with the Annual Report of Walgreen Co., an Illinois corporation (the "Company"), on Form 10-K for the year ended August 31, 2012 as filed with the Securities and Exchange Commission (the "Report"), I, Wade D. Miquelon, Chief Financial Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Wade D. Miquelon
Wade D. Miquelon
Chief Financial Officer
Dated: October 19, 2012

A signed original of this written statement required by Section 906 has been provided to Walgreen Co. and will be retained by Walgreen Co. and furnished to the Securities and Exchange Commission or its staff upon request.



June 19, 2012

## Walgreens and Alliance Boots Form Strategic Partnership to Create the First Global Pharmacy-Led, Health and Wellbeing Enterprise

- **Together Walgreens and Alliance Boots are uniquely positioned to anticipate the rapidly changing global health and wellbeing marketplace to the benefit of customers, employees and business partners**
- **Walgreens to initially invest $6.7 billion in cash and stock to acquire a 45% equity interest in Alliance Boots, with the option to proceed to a full combination**
- **Transaction expected to be substantially accretive to Walgreens net earnings per diluted share in Year One, with a compelling return on investment**

DEERFIELD, IL - June 19, 2012 - Walgreen Co. (NYSE: WAG) (NASDAQ: WAG), the largest drug store chain in the U.S., and Alliance Boots GmbH, the leading international pharmacy-led health and beauty group, today announce that they have entered into a strategic transaction designed to bring together the strengths and expertise of both companies to create the first global pharmacy-led, health and wellbeing enterprise.

This transaction will bring together two great companies with iconic brands, complementary geographic footprints, shared values and a heritage of trusted healthcare services, through pharmaceutical wholesaling and community pharmacy care, dating back over 100 years. Walgreens and Alliance Boots are the largest retail pharmacy, health and daily living destinations in the U.S. and Europe, respectively, and together they would be:

- the global leader in pharmacy-led, health and wellbeing retail with over 11,000* stores in 12* countries
- the largest global pharmaceutical wholesale and distribution network with over 370* distribution centers delivering to more than 170,000* pharmacies, doctors, health centers and hospitals in 21* countries
- the world's largest purchaser of prescription drugs and many other health and wellbeing products

Together Walgreens and Alliance Boots would have:

- unmatched supply chain and procurement expertise, offering customers innovative solutions and optimal efficiencies
- an unparalleled portfolio of retail and business brands (Walgreens, Duane Reade, Boots and Alliance Healthcare), as well as increasingly global health and beauty product brands (No7, Botanics and Boots Laboratories)
- diversified and robust profit pools across the U.S., Europe and key emerging markets
- a unique platform for growth in developed and emerging markets

Walgreens will invest approximately $6.7 billion in cash and stock (comprised of $4.0 billion in cash and 83.4 million shares) in exchange for a 45% equity ownership stake in Alliance Boots. Walgreens will have the option to proceed to a full combination by acquiring the remaining 55% of Alliance Boots in approximately three years' time. At the current Walgreens share price and at a $1.55=£1 exchange rate, the second step of the transaction would be valued at approximately $9.5 billion in cash and stock, plus the assumption of Alliance Boots then-outstanding debt. Completion of the initial investment, which is subject to various regulatory approvals, is expected to take place by September 1, 2012.

The Boards of Directors of Walgreens and Alliance Boots have unanimously approved the transaction. Upon the completion of Walgreens initial investment in Alliance Boots, Gregory Wasson, President and Chief Executive Officer of Walgreens, Wade Miquelon, Executive Vice President and Chief Financial Officer, Thomas Sabatino, Executive Vice President and General Counsel, and Robert Zimmerman, Senior Vice President and Chief Strategy Officer, will join the Alliance Boots Board of Directors. In addition, Stefano Pessina, Executive Chairman of Alliance Boots, and Dominic Murphy, Director and Member of KKR & Co. L.P., will join the Walgreens Board of Directors. Alliance Santé Participations S.A., of which Stefano Pessina is a director and whose ultimate ownership is a family trust, will hold a significant stake in Walgreens, which it intends to hold for the long term. KKR, through its funds, will also be an important shareholder of Walgreens.

The transaction is expected to be accretive to Walgreens net earnings per diluted share in the first year following completion of the initial step of the transaction, by approximately $0.23 to $0.27, excluding one-time transaction costs. Walgreens expects combined synergies across both companies to be between $100 million and $150 million in the first year and $1 billion by the end of 2016. The most significant short-term and long-term opportunities are:

- procurement synergies, including prescription drug, OTC, front-of-store purchasing and indirect spend; and

- revenue synergies, as a result of introducing Alliance Boots product brands to Walgreens and Duane Reade stores and sharing of best practices, particularly in pharmacy operations, health and wellness services and logistics.

The transaction has been structured to allow synergies to be realized by the respective management teams working closely together on key projects, while progressing to full integration in approximately three years' time. Walgreens and Alliance Boots believe that this transaction structure maximizes the potential for value creation, while minimizing the initial business disruption and allowing time for thoughtful integration planning.

Gregory Wasson, President and CEO of Walgreens, said, "At Walgreens, our mission is to be America's first choice for health and daily living - helping our customers to live well, stay well and get well. Today's announcement represents an exciting opportunity to accelerate our five core strategies and advance that mission - in the U.S. and now internationally. We are bringing together the strengths and expertise of each company to create a worldwide healthcare platform for the future that can provide innovative ways to address global health and wellness challenges.

"We are looking forward to working with Alliance Boots to leverage our combined strengths and provide an even broader range of innovative, cost-effective products and services to patients and customers across the healthcare landscape. Together we will be ideally positioned to expand our customer offerings in our existing markets and become the health and wellbeing partner of choice in emerging markets."

Stefano Pessina, Executive Chairman of Alliance Boots, commented, "This strategic transaction represents a further vital step in achieving our vision of becoming a global healthcare leader. We believe that it will bring clear benefits to all stakeholders, creating significant and sustainable industrial value through synergies and the deployment of our joint expertise. The fit is natural, Walgreens consumer profile in the U.S. is similar to Boots in the UK in many ways: a trusted and much-loved pharmacy brand with a strong heritage. Our pharmaceutical wholesale businesses will provide their logistics know-how to Walgreens and are well placed to be one of the growth engines of the new enterprise.

"Today's announcement is testimony to the great track record and accomplishments of the Alliance Healthcare and Boots teams that have delivered strong growth since the creation of Alliance Boots six years ago and its subsequent privatization. I strongly believe that this transaction offers further significant growth opportunities and marks a very positive milestone for the healthcare industry as a whole."

With the exercise of the option by Walgreens to proceed to a full combination, the new combined company will be a true world leader in its field, with the combined scale, expertise and financial strength to grow rapidly in existing markets and fast growing emerging markets across the globe, within existing business lines and in new segments. These growth opportunities are expected to be key drivers of long-term shareholder value.

The pharmacy-led retail and wholesale businesses of both companies will continue to operate under their well-known and trusted brand names. Upon completion of the second step of the transaction, the name of the new combined entity will reflect the strong heritage of both companies.

Given the complementary geographic footprints of Walgreens and Alliance Boots, there are no plans for job reductions at either company as a result of the transaction. Walgreens will maintain its existing headquarters in Deerfield, Illinois; and Alliance Boots remains committed to its current support offices across Europe, including in the UK, as well as keeping the Boots operational hub in Nottingham, England.

### Transaction Structure

Under the terms of the agreement announced today, Walgreens will pay a total of $6.7 billion to acquire a 45% equity interest in Alliance Boots. This payment will consist of $4.0 billion in cash and 83.4 million shares of Walgreens common stock. This is equivalent to $2.7 billion, at the Walgreens closing share price of $31.96 on June 18, 2012. The owners of Alliance Boots will enter into lock-up agreements of varying lengths with respect to the Walgreens shares they will acquire in the transaction. Walgreens expects to complete its initial investment in Alliance Boots by September 1, 2012, at which time it will account for its interest in Alliance Boots using the equity method of accounting.

During the six-month period beginning two and a half years after the initial closing, Walgreens has the option, but not the obligation, to elect to proceed to a full combination and acquire the remaining 55% equity interest in Alliance Boots. In conjunction with such an election, Walgreens would seek shareholder approval of the transaction in accordance with stock exchange rules. If the option is exercised, Walgreens will pay £3.1 billion (equivalent to $4.9 billion**) in cash and issue 144.3 million shares for the remaining equity of Alliance Boots, subject to the price of Walgreens shares of common stock at that point not being below $31.18 per share. If the price is below this level, the difference in value will be made up by a cash payment or the issuance of additional shares of common stock at Walgreens election. In the event that Walgreens does not exercise its option, under certain circumstances, its ownership of Alliance Boots will reduce from 45% to 42% in exchange for nominal consideration to Walgreens.

Walgreens initial investment and option excludes the Alliance Boots minority interest in Galenica, the Swiss healthcare group. The Alliance Boots investment in Galenica will continue to be owned by Alliance Boots and its existing shareholders for the benefit of those shareholders.

### Conditions

The closing of Walgreens initial investment in Alliance Boots is subject to the satisfaction or waiver of certain conditions including notification and clearance by antitrust authorities in the U.S. and Germany. No approval by the shareholders of Walgreens is required to complete the initial investment.

### Financing

Walgreens plans to finance the cash payment deliverable at the initial closing through existing cash and new borrowings. Commitments for a $3.5 billion bridge facility have been received from Goldman, Sachs & Co. and Bank of America Merrill Lynch and are subject to customary conditions. Based on the anticipated closing, Walgreens currently expects to finance the initial investment using this bridge facility and to subsequently replace that facility with permanent financing.

### Advisors

Walgreens financial advisors are Goldman, Sachs & Co. and Lazard, and its legal advisors are Wachtell, Lipton, Rosen & Katz and Allen & Overy. Alliance Boots financial advisor is Centerview Partners and its legal advisors are Darrois Villey Maillot Brochier and Simpson Thacher & Bartlett LLP.

### Conference Call / Webcast

Walgreens will hold a conference call to discuss today's announcement beginning at 8:00 a.m. Eastern time today, June 19. The conference call will be simulcast through Walgreens investor relations website at: http://investor.walgreens.com.

A replay of the conference call will be archived on the website for 12 months after the call. A podcast will be available on the investor relations website.

The replay also will be available from 11:00 a.m. Eastern time, June 19, 2012 through June 26, 2012 by calling 855-859-2056 within the U.S. and Canada, or +1 404-537-3406 outside the U.S. and Canada, using replay code 92759086.

### Transaction website

For further information and to view video material concerning this announcement, please visit the microsite at www.globalhealthandwellbeing.com.

### Additional Information

Walgreens intends to promptly file with the Securities and Exchange Commission a current report on Form 8-K, which will include the Purchase and Option Agreement and related documents. You should refer to the Form 8-K when it is available for more detailed information regarding this strategic transaction between Walgreens and Alliance Boots and related matters.

### About Walgreens

As the nation's largest drugstore chain with fiscal 2011 sales of $72 billion, Walgreens (www.walgreens.com) vision is to become America's first choice for health and daily living. Each day, Walgreens provides nearly 6 million customers the most convenient, multichannel access to consumer goods and services and trusted, cost-effective pharmacy, health and wellness services and advice in communities across America. Walgreens scope of pharmacy services includes retail, specialty, infusion, medical facility and mail service, along with respiratory services. These services improve health outcomes and lower costs for payers including employers, managed care organizations, health systems, pharmacy benefit managers and the public sector. The company operates 7,890 drugstores in all 50 states, the District of Columbia and Puerto Rico. Take Care Health Systems is a Walgreens subsidiary that is the largest and most comprehensive manager of worksite health and wellness centers and in-store convenient care clinics, with more than 700 locations throughout the country.

### About Alliance Boots

Alliance Boots is a leading international, pharmacy-led health and beauty group delivering a range of products and services to customers. For the financial year ended 31 March 2012, Alliance Boots reported revenue of £23.0 billion ($35.7 billion**), (£25.4 billion ($39.4 billion**) including share of associates and joint ventures), and EBITDA of £1,443 million ($2,237 million**),

(£1,568 million ($ 2,430 million\*\*) including share of associates and joint ventures).

Working in close partnership with manufacturers and pharmacists, Alliance Boots is committed to improving health in the local communities it serves and helping its customers and patients to look and feel their best. Alliance Boots focus is on growing its two core businesses: pharmacy-led health and beauty retailing and pharmaceutical wholesaling and distribution.

Alliance Boots has a presence in more than 25\* countries and employs over 116,000\* people. Alliance Boots has pharmacy-led health and beauty retail businesses in 11\* countries and operates more than 3,330\* health and beauty retail stores, of which just over 3,200\* have a pharmacy. In addition, Alliance Boots has around 625\* optical practices, of which around 185\* operate on a franchise basis. Its pharmaceutical wholesale businesses supply medicines, other healthcare products and related services to more than 170,000\* pharmacies, doctors, health centers and hospitals from over 370\* distribution centers in 21\* countries.

\* Figures include Alliance Boots associates and joint ventures (including Galenica).
\*\* At a $1.55=£1 exchange rate.

**Contacts**

Investor Relations (Walgreens):
Rick Hans / Lisa Meers
+1 847 315 2385 / +1 847 315 2361

Investor Relations (Alliance Boots):
Brunswick Group
+44 (0)20 7404 5959
Investor.relations@allianceboots.com

Media Relations (Walgreens):
Michael Polzin , Walgreens
+1 847 372 3502
Steve Lipin / Gemma Hart, Brunswick Group
+1 212 333 3810

Media Relations (Alliance Boots):
Yves Romestan / Laura Vergani / Katie Johnson, Alliance Boots
+44 (0)207 980 8585
Justine McIlroy / Tim Danaher, Brunswick Group
+44 (0)20 7404 5959

**Walgreens Cautionary Note Regarding Forward-Looking Statements**

*Statements in this release that are not historical are forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Words such as "expect," "likely," "outlook," "forecast," "would," "could," "should," "can," "will," "project," "intend," "plan," "continue," "sustain," "synergy", "on track," "believe," "seek," "estimate," "anticipate," "may," "possible," "assume," variations of such words and similar expressions are intended to identify such forward-looking statements. These forward-looking statements are not guarantees of future performance and are subject to risks, uncertainties and assumptions that could cause actual results to vary materially from those indicated, including: the ability to satisfy the closing conditions and consummate the proposed transactions on a timely basis or at all, the occurrence of any event, change or other circumstances that could give rise to the termination of the Purchase and Option Agreement or the financing commitment letter, Walgreens ability to consummate the financing arrangements contemplated by the financing commitment letter, Walgreens ability to subsequently arrange for and consummate permanent financing on acceptable terms, risks that the proposed transactions disrupt plans and operations of either Walgreens or Alliance Boots, the ability to realize anticipated synergies, the ability to achieve anticipated financial results, the amount of costs, fees, expenses and charges incurred by Walgreens or Alliance Boots related to the transaction, the risks associated with international business operations, the risks associated with Walgreens lack of majority control over the Alliance Boots business, whether the option to acquire the remainder of the Alliance Boots equity interest will be exercised, changes in vendor, payer and customer relationships and terms, and other factors described in Item 1A (Risk Factors) of our most recent Annual Report on Form 10-K and Quarterly Report on Form 10-Q, each of which is incorporated herein by reference and in other documents that we file or furnish with the Securities and Exchange Commission. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, Walgreens does not undertake, and expressly disclaims, any duty or obligation to update publicly any forward-looking statement after the date of this report, whether as a result of new information, future events, changes in assumptions or otherwise.*

*Walgreens*



## COMPLETION OF INITIAL INVESTMENT IN STRATEGIC PARTNERSHIP

### BETWEEN WALGREENS AND ALLIANCE BOOTS

DEERFIELD, IL - August 2, 2012 – Walgreen Co. (NYSE: WAG) (NASDAQ: WAG), the largest drug store chain in the U.S., and Alliance Boots, a leading international pharmacy-led health and beauty group, announced the completion today of Walgreens initial investment in the strategic partnership to create the first global pharmacy-led, health and wellbeing enterprise. This follows receipt of all required regulatory approvals.

The Walgreens investment consists of approximately \$4.0 billion in cash and 83.4 million shares of Walgreens common stock in exchange for a 45% equity stake in Alliance Boots*. Walgreens has the option to proceed to a full combination in approximately three years' time by acquiring the remaining 55% of Alliance Boots*. As a result of the transaction, Alliance Santé Participations S.A. (of which Stefano Pessina, Executive Chairman, Alliance Boots, is a director and whose ultimate ownership is a family trust) becomes the largest shareholder of Walgreens, with a stake it intends to hold for the long term.

Stefano Pessina and Dominic Murphy, Member of the general partner of KKR & Co. L.P., have today joined the Walgreens Board of Directors. At the same time, Gregory Wasson, President and Chief Executive Officer of Walgreens, Wade Miquelon, Executive Vice President and Chief Financial Officer, Thomas Sabatino, Executive Vice-President and General Counsel, and Robert Zimmerman, Senior Vice President and Chief Strategy Officer, have become members of the Alliance Boots Board of Directors.

*\*Excludes the Alliance Boots minority interest in Galenica, the Swiss healthcare group. The Alliance Boots investment in Galenica will continue to be owned by Alliance Boots and its existing shareholders for the benefit of those shareholders.*

## About Walgreens

As the nation's largest drugstore chain with fiscal 2011 sales of $72 billion, Walgreens (www.walgreens.com) vision is to become America's first choice for health and daily living. Each day, Walgreens provides nearly 6 million customers the most convenient, multichannel access to consumer goods and services and trusted, cost-effective, pharmacy, health and wellness services and advice in communities across America. Walgreens scope of pharmacy services includes retail, specialty, infusion, medical facility and mail service, along with respiratory services. These services improve health outcomes and lower costs for payers including employers, managed care organizations, health systems, pharmacy benefit managers and the public sector. The company operates 7,907 drugstores in all 50 states, the District of Columbia and Puerto Rico. Take Care Health Systems is a Walgreens subsidiary that is the largest and most comprehensive manager of worksite health and wellness centers and in-store convenient care clinics, with more than 700 locations throughout the country.

## About Alliance Boots

Alliance Boots is a leading international, pharmacy-led health and beauty group delivering a range of products and services to customers. For the financial year ended '31 March 2012, Alliance Boots reported revenue of £23.0 billion ($35.7 billion**), (£25.4 billion ($39.4 billion**) including share of associates and joint ventures), and EBITDA of £1,443 million ($2,237 million**), (£1,568 million ($ 2,430 million**) including share of associates and joint ventures). Working in close partnership with manufacturers and pharmacists, Alliance Boots is committed to improving health in the local communities it serves and helping its customers and patients to look and feel their best. Alliance Boots focus is on growing its two core businesses: pharmacy-led health and beauty retailing and pharmaceutical wholesaling and distribution.

Alliance Boots has a presence in more than 25*** countries and employs over 116,000*** people. Alliance Boots has pharmacy-led health and beauty retail businesses in 11*** countries and operates more than 3,330*** health and beauty retail stores, of which just over 3,200*** have a pharmacy. In addition, Alliance Boots has around 625*** optical practices, of which around 185*** operate on a franchise basis. Its pharmaceutical wholesale businesses supply medicines, other healthcare products and related services to more than 170,000*** pharmacies, doctors, health centers and hospitals from over 370*** distribution centers in 21*** countries.

** *At a $1.55=£1 exchange rate as used in the June 19, 2012 joint press release.*
*** *Figures include Alliance Boots associates and joint ventures (including Galenica).*

## Contacts

**Investor Relations (Walgreens):** Rick Hans / Lisa Meers +1 847 315 2385 / +1 847 315 2361

**Investor Relations (Alliance Boots):** Gerald Gradwell +44 20 7 138 1132

**Media Relations (Walgreens):**
Michael Polzin, Walgreens +1 847 315 2920
Steve Lipin / Gemma Hart, Brunswick Group +1 212 333 3810

**Media Relations (Alliance Boots):**
Yves Romestan / Laura Vergani / Katie Johnson, Alliance Boots +44 20 7980 8585
Justine McIlroy / Tim Danaher, Brunswick Group +44 20 7404 5959

## Walgreens Cautionary Note Regarding Forward-Looking Statements

Statements in this release that are not historical are forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Words such as "expect," "likely," "outlook," "forecast," "would," "could," "should," "can," "will," "project," "intend," "plan," "goal," "continue," "sustain," "synergy," "on track," "believe," "seek," "estimate," "anticipate," "may," "possible," "assume," variations of such words and similar expressions are intended to identify such forward-looking statements. These forward-looking statements are not guarantees of future performance and are subject

to risks, uncertainties and assumptions that could cause actual results to vary materially from those indicated, including: risks that the transactions contemplated by the Purchase and Option Agreement and Walgreens and Alliance Books shareholders agreements relating to the strategic partnership disrupt plans and operations of either Walgreens or Alliance Boots, the parties' ability to realize anticipated synergies, the parties' ability to achieve anticipated financial results, the amount of costs, fees, expenses and charges incurred by Walgreens and Alliance Boots related to the transaction, the risks associated with international business operations, the risks associated with governance and control matters, whether the option to acquire the remainder of the Alliance Boots equity interest will be exercised and the financial ramifications thereof, Walgreens' ability to timely arrange for and consummate permanent financing to replace the bridge facility entered into in connection with the transaction on acceptable terms, changes in vendor, payer and customer relationships and terms, changes in network participation, and other factors described in Item 1A (Risk Factors) of Walgreens most recent Annual Report on Form 10-K and Quarterly Report on Form 10-Q, as amended, each of which is incorporated herein by reference and in other documents that Walgreens files or furnishes with the Securities and Exchange Commission. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, Walgreens does not undertake, and expressly disclaims, any duty or obligation to update publicly any forward-looking statement after the date of this release, whether as a result of new information, future events, changes in assumptions or otherwise.

5

*Walgreens*

**Walgreens Board of Directors Exercises Option to Complete Second Step of Strategic Partnership with Alliance Boots and Fully Combine Both Companies, Creating First Global Pharmacy-Led, Health and Wellbeing Enterprise**

DEERFIELD, Ill., August 06, 2014 - Walgreens (NYSE: WAG) (Nasdaq: WAG) today said it has exercised its option to complete the second step of its strategic transaction with Alliance Boots GmbH ahead of the original option period, which was between February and August 2015. The transaction, subject to shareholder and various regulatory approvals, would fully combine the two companies to form the first global pharmacy-led, health and wellbeing enterprise.

This action follows the launch of the companies' long-term strategic partnership in June 2012, when Walgreens acquired a 45 percent equity ownership in Alliance Boots, with the option to proceed to a full combination by acquiring the remaining 55 percent of Alliance Boots in three years' time (Step 2). Walgreens expects to close the transaction in the first quarter of calendar 2015.

Walgreens also announced the following decisions related to moving forward with Step 2:

- A new holding company to be formed in connection with the transaction will be named Walgreens Boots Alliance, Inc., and will include four divisions: Walgreen Co. (the largest drugstore chain in the United States); Boots (the U.K. and Republic of Ireland's leading pharmacy-led health and beauty retailer); Pharmaceutical Wholesale and International Retail (including Alliance Healthcare, Europe's largest pharmaceutical wholesaler); and Global Brands. In addition, the combined company is establishing a cross-divisional global pharmacy market access group.
- Upon closing, the combined enterprise will blend senior management from both companies including Walgreens President, CEO and board member Greg Wasson who will be president and CEO of Walgreens Boots Alliance, and Stefano Pessina, executive chairman of Alliance Boots, who will be executive vice chairman of the combined company responsible for strategy and M&A reporting to Wasson, and chairman of a new strategy committee of the board of directors.
- Jim Skinner will serve as the non-executive chairman of the board of directors for the combined company.
- The Walgreens Boots Alliance holding company will be headquartered in the Chicago area, while Walgreens operations will remain headquartered in Deerfield, Ill. Boots operations also will remain headquartered at its current location in Nottingham, U.K.
- The company is outlining a new three-year "Next Chapter" plan through fiscal 2017 that sets strategic goals for the combined company. The plan reflects significant value-creating opportunities for the combined enterprise to drive long-term shareholder value.
- In conjunction with its strategic plan, the company is establishing a new adjusted earnings per share goal for fiscal 2016 of $4.25-$4.60.
- The adjusted EPS goal includes accelerated cost reduction initiatives that target $1 billion in savings by the end of fiscal 2017 to establish an efficient global enterprise.
- Walgreens board of directors also authorized a new capital allocation policy that includes a $3 billion share repurchase program through the end of fiscal 2016. In addition, the board declared a 7.1 percent quarterly dividend increase to 33.75 cents per share.

Walgreens Boots Alliance combines two leading companies with iconic brands, complementary geographic footprints, shared values and a heritage of trusted health care services through pharmaceutical wholesaling and community pharmacy care, dating back more than 100 years each.

Combining the companies will create a new global leader in pharmacy-led health and wellbeing retail with more than 11,000* stores in 10* countries and an unparalleled portfolio of retail and business brands, as well as increasingly global health and beauty product brands. The full combination also will establish the world's largest pharmaceutical wholesale and distribution network with more than 370* distribution centers delivering to more than 180,000* pharmacies, doctors, health centers and hospitals in 20* countries. Walgreens Boots Alliance will be the world's largest purchaser of prescription drugs and many other health and wellbeing products. The combined size, scale and expertise will help Walgreens and Alliance Boots expand the supply, and address the rising cost, of prescription drugs in America and worldwide.

"We are excited to move forward with the next important step in becoming a new kind of global health care leader," said Wasson. "Expanding globally with Alliance Boots will make quality health care more affordable and accessible to communities here in America and around the world. In addition, Stefano and I are pleased with the comprehensive plan we've announced today as part of Step 2. These elements will provide additional shareholder value creation, both in the near and long term. I congratulate our teams for getting us to this point and together we have a bright future."

Pessina said, "The expected creation of the new enterprise will represent the most significant milestone in the history of Alliance Boots and, importantly, a very positive step for the health care industry as a whole. Together with Walgreens, we have already made good progress over the past two years and I strongly believe that the merger will bring significant growth opportunities for both mature and emerging markets. Today's announcement reflects the great track record and accomplishments of our people to date and I am convinced that their skills, expertise and commitment will continue to make a positive contribution in the years to come. This combination is a true partnership, further evidenced by the composition of the future management team of Walgreens Boots Alliance."

Under the terms of the revised agreement announced today, the period during which Walgreens is permitted to exercise its option to acquire the remaining 55 percent of Alliance Boots that it does not currently own, in exchange for £3,133 million in cash (equivalent to approximately $5.29 billion at a current $1.69=£1 exchange rate) payable in British pounds sterling, and approximately 144.3 million shares of common stock of Walgreens, has been accelerated to begin on Aug. 5, 2014 and end on Feb. 5, 2015. Pursuant to the agreement, Walgreens exercised the option through an affiliate on Aug. 5.

## Blended Management Team

Leading Walgreens Boots Alliance will be a top management team led by Wasson and consisting of senior executives from both companies. In addition to Wasson's and Pessina's roles, the following appointments are being announced:

- Ornella Barra, chief executive, Wholesale and Brands of Alliance Boots, will become executive vice president of Walgreens Boots Alliance and president and chief executive of global wholesale and international retail.
- Jeff Berkowitz, president of Walgreens Boots Alliance Development GmbH, will serve as executive vice president of Walgreens Boots Alliance and president of pharma and global market access, which will include responsibility for specialty pharmacy.
- Alex Gourlay, Walgreens president of customer experience and daily living, will become executive vice president of Walgreens Boots Alliance and president of Walgreens.
- Tim McLevish, previously announced as Walgreens executive vice president and chief financial officer, will serve in that role in a global capacity for Walgreens Boots Alliance.
- Ken Murphy, managing director, Health & Beauty International and Brands of Alliance Boots, will serve as executive vice president of Walgreens Boots Alliance and president of global

brands.

- Simon Roberts, managing director, Health & Beauty, UK and the Republic of Ireland of Alliance Boots, will serve as executive vice president of Walgreens Boots Alliance and president of Boots.
- Tom Sabatino, Walgreens chief administrative officer and general counsel, will serve as executive vice president and global chief legal and administrative officer of Walgreens Boots Alliance.
- Tim Theriault, chief information, innovation and improvement officer at Walgreens, will assume the role of executive vice president and global chief information officer of Walgreens Boots Alliance.
- Kathleen Wilson-Thompson, Walgreens chief human resources officer, will become executive vice president and global chief human resources officer of Walgreens Boots Alliance.

### Domicile of Walgreens Boots Alliance Enterprise

The fully combined Walgreens Boots Alliance global enterprise will be domiciled in the United States and headquartered in the Chicago area. Walgreens operations will remain headquartered in Deerfield, Ill., and Boots operations will remain headquartered at its current location in Nottingham, U.K.

In connection with moving forward with the option exercise, and given the potentially significant business, financial, legal and competitive implications, Walgreens management and the board of directors thoroughly evaluated the possibility of combining Walgreens and Alliance Boots under a foreign parent company in an "inversion" transaction. The original option transaction would not qualify for an inversion under the current tax inversion rules. The company and board of directors, including a special committee of independent directors, and with the benefit of leading advisors in the fields of tax policy and inversions, undertook an extensive analysis to explore the feasibility of a restructured inversion transaction that would provide the company with the customary level of confidence needed to withstand IRS review and scrutiny. As part of this process, the company considered a wide range of issues, including the potential financial benefits (and their sustainability) and the technical viability of a restructured inversion transaction under current U.S. law. The company also was mindful of the ongoing public reaction to a potential inversion and Walgreens unique role as an iconic American consumer retail company with a major portion of its revenues derived from government-funded reimbursement programs.

"In line with our fiduciary duty to the company and our shareholders, we undertook an extensive and rigorous analysis with a team of leading experts to determine the most optimal – and sustainable – course of action," said Wasson. "We took into account all factors, including that we could not arrive at a structure that provided the company and our board with the requisite level of confidence that a transaction of this significance would need to withstand extensive IRS review and scrutiny. As a result the company concluded it was not in the best long-term interest of our shareholders to attempt to re-domicile outside the U.S. The board did, however, believe accelerating the option to exercise Step 2 was in the best interest of our shareholders, and with this decision, we are now moving forward on an accelerated basis to create the global leader in pharmacy-led health and wellbeing."

### Three-Year "Next Chapter" Plan and Financial Goals

With the full combination, Walgreens Boots Alliance will be positioned for a new era of profitable growth and is aggressively pursuing future opportunities to drive sustainable shareholder value over the long term. To do so, the company is launching a new three-year "Next Chapter" plan that will maximize the scope and scale of the new combined company. Through the plan, core business performance will be accelerated by providing:

- A differentiated retail experience that transforms the retail model for health and wellness and changes the way women shop for beauty
- Integrated pharmacy and health care that advance the role of pharmacists and provide access to innovative health care services
- Global pharmaceutical services that reinvent the pharmaceutical value chain and deliver a seamless specialty pharmacy model

With the plan, the combined company is establishing goals for fiscal 2016 including revenue of between $126 billion and $130 billion and adjusted earnings per share of $4.25 to $4.60. In addition, the combined company anticipates exceeding the previously established $1 billion synergy goal.

The company's continuing focus on improving core performance in the near-term at both Walgreens and Alliance Boots also remains a critical component of the "Next Chapter" plan. "As we launch our global plan, we are more focused than ever on what it will take to compete and succeed on the world stage," said Wasson. "We are uniquely positioned to be a leader and a champion for accessible, affordable health care, and that means continuing to innovate, to find new ways to be as efficient as possible, and more agile and nimble as we compete in the worldwide market. We also are encouraged by the improving performance of our daily living business and the further potential of our expanded beauty and own brands portfolio to drive margin expansion."

**Cost Reduction Initiative**

As part of the combined company's goal to establish an efficient global platform, the management team is accelerating a multi-faceted cost-reduction initiative across the enterprise. The $1 billion, three-year plan includes corporate, field and store-level cost reductions. The company is making significant progress in an effort that is already under way in order to begin realizing incremental benefits in fiscal 2015. Additional details will be provided in coming quarters as the company recognizes certain costs associated with these initiatives. These cost savings are additive to the synergies discussed above.

"Walgreens has demonstrated a strong focus on cost control as adjusted SG&A growth has slowed significantly from historical trends," said Wasson. "We have made this impact by driving efficiencies across the enterprise, and we are continuing to focus on that. Earlier this year, we announced enterprise optimization initiatives to further accelerate these efforts, which we've executed this fiscal year through strategic closures of certain distribution centers and stores, exiting certain businesses and driving cost reduction programs at our headquarters and in the field. We also plan to expand these efforts as we leverage the expertise of both companies and move forward integrating Walgreens and Alliance Boots."

**Capital Allocation Policy**

The board of directors has approved a new capital allocation policy for the combined enterprise. The policy is designed to ensure a balanced and disciplined approach to capital intended to drive business growth and generate strong returns, while returning cash to shareholders through dividends and share repurchases over the long term. The key elements of the new capital allocation policy include:

- Investing across core businesses at suitable returns to drive organic growth
- Pursuing strategic opportunities, including mergers and acquisitions, that are consistent with the company's strategy, meet its return requirements, are accretive and drive long-term growth
- Maintaining a strong balance sheet and financial flexibility with a commitment to solid investment grade credit ratings to govern future capital allocation.
- Returning cash to shareholders by targeting a 30-35 percent long-term dividend payout ratio and a new $3 billion share repurchase authorization through the end of fiscal 2016.

In addition, the board of directors of Walgreen Co. on Aug. 5, 2014 increased the quarterly dividend to 33.75 cents per share, a 7.1 percent increase over the year-ago quarterly dividend of 31.5 cents per share. The increased dividend is payable Sept. 12, 2014, to shareholders of record Aug. 21, 2014, and raises the annual rate from $1.26 per share to $1.35 per share. This marks the 39th consecutive year Walgreens has raised its dividend.

"This is a pivotal moment in Walgreens history as we venture ahead from the best corners in America to the four corners of the world," said Wasson. "In a changing global marketplace with new opportunities and challenges, we will serve our communities, our country and the world in ways we could never have imagined even a few years ago."

Walgreens financial advisors in connection with the second step of the Alliance Boots transaction are Goldman, Sachs & Co. and Lazard, and its legal advisors are Wachtell, Lipton, Rosen & Katz, and Allen Overy.

Walgreens will hold a one-hour conference call to discuss the Alliance Boots transaction and related matters beginning at 8 a.m. Eastern time today, Aug. 6. The conference call will be simulcast through Walgreens investor relations website at: http://investor.walgreens.com. A replay of the conference call will be archived on the website for 12 months after the call. A podcast also will be available on the investor relations website.

The replay also will be available from 11:30 a.m. Eastern time, Aug. 6 through Aug. 13, by calling 855-859-2056 within the U.S. and Canada, or 404-537-3406 outside the U.S. and Canada, using replay code 82609242.

*Note: Figures include Alliance Boots associates and joint ventures*

### About Walgreens

As the nation's largest drugstore chain with fiscal 2013 sales of $72 billion, Walgreens (www.walgreens.com) vision is to be the first choice in health and daily living for everyone in America, and beyond. Each day, in communities across America, more than 8 million customers interact with Walgreens using the most convenient, multichannel access to consumer goods and services and trusted, cost-effective pharmacy, health and wellness services and advice. Walgreens scope of pharmacy services includes retail, specialty, infusion, medical facility and mail service, along with online and mobile services. These services improve health outcomes and lower costs for payers including employers, managed care organizations, health systems, pharmacy benefit managers and the public sector. The company operates 8,192 drugstores in all 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Walgreens digital business includes Walgreens.com, drugstore.com, Beauty.com, SkinStore.com and VisionDirect.com. Take Care Health Systems is a Walgreens subsidiary that manages more than 400 in-store convenient care clinics throughout the country.

*Cautionary Note Regarding Forward-Looking Statements. Statements in this release that are not historical are forward-looking statements for purposes of applicable securities laws. Words such as "expect," "likely," "outlook," "forecast," "would," "could," "should," "can," "will," "project," "intend," "plan," "goal," "target," "continue," "sustain," "synergy," "on track," "believe," "seek," "estimate," "anticipate," "may," "possible," "assume," variations of such words and similar expressions are intended to identify such forward-looking statements. These forward-looking statements are not guarantees of future performance and involve risks, assumptions and uncertainties, including: the risks that one or more closing conditions to the transactions may not be satisfied or waived, on a timely basis or otherwise, including that a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the transactions or that the required approvals by the Company's shareholders may not be obtained; the risk of a material*

adverse change that the Company or Alliance Boots or either of their respective businesses may suffer as a result of disruption or uncertainty relating to the transactions; risks associated with changes in economic and business conditions generally or in the markets in which we or Alliance Boots participate; risks associated with new business areas and activities; risks associated with acquisitions, joint ventures, strategic investments and divestitures, including those associated with cross-border transactions; risks associated with governance and control matters; risks associated with the Company's ability to timely arrange for and consummate financing for the contemplated transactions on acceptable terms; risks relating to the Company and Alliance Boots' ability to successfully integrate our operations, systems and employees, realize anticipated synergies and achieve anticipated financial results, tax and operating results in the amounts and at the times anticipated; the potential impact of announcement of the transactions or consummation of the transactions on relationships and terms, including with employees, vendors, payers, customers and competitors; the amounts and timing of costs and charges associated with our optimization initiatives; our ability to realize expected savings and benefits in the amounts and at the times anticipated; changes in management's assumptions; the risks associated with transitions in supply arrangements; risks that legal proceedings may be initiated related to the transactions; the amount of costs, fees, expenses and charges incurred by Walgreens and Alliance Boots related to the transactions; the ability to retain key personnel; changes in financial markets, interest rates and foreign currency exchange rates; the risks associated with international business operations; the risk of unexpected costs, liabilities or delays; changes in network participation and reimbursement and other terms; risks associated with the operation and growth of our customer loyalty program; risks associated with outcomes of legal and regulatory matters, and changes in legislation, regulations or interpretations thereof; and other factors described in Item 1A (Risk Factors) of our most recent Form 10-K and Form 10-Q, each of which is incorporated herein by reference, and in other documents that we file or furnish with the SEC. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, Walgreens does not undertake, and expressly disclaims, any duty or obligation to update publicly any forward-looking statement after the date of this release, whether as a result of new information, future events, changes in assumptions or otherwise.

Non-GAAP Financial Measures. This press release contains certain non-GAAP financial measures, as defined under SEC rules, that are not calculated or presented in accordance with generally accepted accounting principles in the United States (GAAP). These non-GAAP financial measures are presented supplementally because management evaluates the company's financial results both including and excluding the adjusted items and believes that the non-GAAP financial measures presented provide additional perspective and insights when analyzing the core operating performance of the Company's business from period to period and trends in the company's historical operating results. The company does not provide a non-GAAP reconciliation for non-GAAP estimates on a forward-looking basis where it is unable to provide a meaningful or accurate calculation or estimation of reconciling items and the information is not available without unreasonable effort. The supplemental non-GAAP financial measures presented should not be considered superior to, as a substitute for or as an alternative to, and should be considered in conjunction with, our financial measures determined in accordance with GAAP.

## Important Information for Investors and Shareholders

This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or

qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended. In connection with the proposed transactions between Walgreens and Alliance Boots, Walgreens Boots Alliance will file with the Securities and Exchange Commission (SEC) a registration statement on Form S-4 that will include a proxy statement of Walgreens that also constitutes a prospectus of Walgreens Boots Alliance. After the registration statement has been declared effective by the SEC, the definitive proxy statement/prospectus will be delivered to shareholders of Walgreens. **INVESTORS AND SECURITY HOLDERS OF WALGREENS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT/PROSPECTUS (INCLUDING ALL AMENDMENTS AND SUPPLEMENTS THERETO) AND OTHER DOCUMENTS RELATING TO THE TRANSACTIONS THAT WILL BE FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTIONS.** Investors and security holders will be able to obtain free copies of the registration statement and the definitive proxy statement/prospectus (when available) and other documents filed with the SEC by Walgreens or Walgreens Boots Alliance through the website maintained by the SEC at www.sec.gov. Copies of the documents filed with the SEC by Walgreens or Walgreens Boots Alliance will be available free of charge on Walgreens' internet website at www.walgreens.com under the heading "Investor Relations" and then under the heading "SEC Filings" or by contacting Walgreen's Investor Relations Department at (847) 315-2361.

**Participants in the Solicitation**

Walgreens, Alliance Boots, Walgreens Boots Alliance and their respective directors, executive officers and certain other members of management and employees may be deemed to be participants in the solicitation of proxies from the holders of Walgreens common stock in respect of the proposed transactions. Information regarding the persons who are, under the rules of the SEC, participants in the solicitation of proxies in favor of the proposed transactions will be set forth in the proxy statement/prospectus when it is filed with the SEC. You can find information about Walgreens' directors and executive officers in Walgreens' Annual Report on Form 10-K for the year ended August 31, 2013 and definitive proxy statement filed with the SEC on November 25, 2013. You can obtain free copies of these documents, which are filed with the SEC, from Walgreens using the contact information above.


Photos/Multimedia Gallery Available:
http://www.businesswire.com/multimedia/home/20140806005191/en/

# Walgreens/Alliance Boots Operating Model

MOST important conversation of my career

Three Buckets:

① How much you mean to me + Company
- Like you + trust you
- You make me better + vice versa (Builder/mentors)
- Most big strategic decisions — your ideas + mine/ours
- Could not have done without you
- You see around corners — I start then you do

① This is a PROMOTION (NOT DEMOTION)
- This role — Both V + Bismal want you in this.
- Leverage your talents
- No one else can do them —
- Puts you as my #1 Exec
- Positions [...] as Strong Successor candidate or V (I will give you your mandate) [future exec appraisal]
- You are the first I am telling
- with me you is most important role
- And I want you engaged in role
- I need you to successfully collaborate
- Rajal I'd like you and I to go work together

② Global Role
- President Bring in markets, partner and Global Strategy
- Separating Finance — Strategy for group
  - Too big functions — Strategy focus
  - Finance — more tactical
  - Strategy — [...] future grand pl
  - I don't have time to do it by itself Company
- enlarged industry
- includes global H/C pipeline
- also you see it

③ $ will position to SP + I
- Stefano reports you — stays, you will need SP talent
- Our working relationship need to go bigger, Teamwell +

Walgreens

Alliance Boots

- RSUs — check if you...
  5 year vesting.

### *Has Walgreen Hit a Wall?*

Barron's Online

November 19, 2013

Copyright 2013 Factiva ®, from Dow Jones
All Rights Reserved

## Dow Jones Factiva

Copyright 2013 Dow Jones & Company, Inc. All Rights Reserved.

## BARRON'S

**Section:** HOME

**Length:** 698 words

## Body

---

*Walgreen* (WAG: NYSE) By Raymond James & Associates ($60.12, Nov. 19, 2013)

We are downgrading shares of *Walgreen* to Market Perform from Outperform following our deep-dive analysis into the company's fiscal 2016 combined earnings before interest and taxes targets.



In short, these targets look more difficult to achieve following the surprisingly slow (about 3%) organic fiscal 2013 earnings before interest and taxes (EBIT) growth at *Walgreen* (ticker: WAG) (excluding synergies), despite the tailwinds from both *a* strong generic calendar and the recovery of nearly 40 million Express Scripts Holding (ESRX) prescriptions. While we remain optimistic about upside to the long-term synergy capture from the [closely held] Alliance Boots transaction, we believe that the stock price now reflects much of this upside, as fiscal 2016 pro-forma price/earnings valuation has nearly doubled from seven times to start the year (and the time of our upgrade) to 13 times on lower assumed fiscal 2016 earnings per share. Specifically, as we incorporate lower EBIT growth projections, we now project pro-forma fiscal 2016 EPS to be $4.70 versus the $5.24-5.55 original range and adjusted EBIT of $8.1 billion versus the $9.0 billion-$9.5 billion guidance.

Excluding Boots income and *Walgreen*'s portion of the fiscal 2013 realized synergies, we estimate *Walgreen*'s adjusted EBIT grew *a* mere 3% in fiscal 2013 off of the depressed fiscal 2012 levels, which included the Express Scripts' headwind. Similarly, while Boots' trading profit grew 5.9%, we estimate that after factoring in certain GAAP conversions such as amortization of brands, pension, and other items as well as exchange rates, Boots U.S. GAAP EBIT dollars grew only 1.6% in fiscal 2013 (utilizing same definition that *Walgreen* used at the Analyst Day for fiscal 2012). *Walgreen*'s fiscal 2016 targets assume 8.8% EBIT growth compounded annualized growth rate (CAGR) for both businesses pre-synergies, with fiscal 2013 well below these thresholds.

In total, we estimate combined Boots and *Walgreen* EBIT, including synergies, grew *an* estimated 5.3% in fiscal 2013 versus the 12.1% CAGR embedded in the fiscal 2016 outlook. Turning to fiscal 2014, we have *a* tough time envisioning *a* material improvement in *Walgreen*'s core EBIT considering the tougher generic comparisons this year, alongside *a* more challenging flu season comp and front-end promotional environment. Similarly, for Boots, while the

BRIAN DEAVER

Has Walgreen Hit a Wall?

European economic outlook is gradually improving, we see no reason to assume *a* significant improvement in trading profit growth off of the 6% level in fiscal 2013. Net-net, if we were to assume *a* more realistic mid-single digit EBIT CAGR over the next three years versus the double digits now needed to reach the prior targets, we estimate $8.1 billion in adjusted EBIT in fiscal 2016 versus $9.0 billion-$9.5 billion. Note our model assumes $1.1 billion in synergies, more than the $1 billion targeted, due to the upside from the AmerisourceBergen (ABC) agreement.

Using the lower EBIT target and guided below-the-line assumptions (for net debt in fiscal 2016, share count, etc.), we now estimate fiscal 2016 EPS of $4.70 in fiscal 2016 versus our $5.24 low-end EPS estimate under prior assumptions (and consensus of $4.86 for those who have combined models). Under this lower EPS scenario, *Walgreen* currently trades at 13 times versus the seven times price/earnings multiple when we upgraded the name to start the year. With tough generic comps upcoming (particularly in the fiscal second quarter) and the potential need for management to revisit their fiscal 2016 targets, we see the risk/ reward as more balanced and note that the stock is now within shouting distance of our prior $62 price target.

-- John W. Ransom -- Nicholas Jansen -- Melissa Fairbanks

The companies mentioned in Hot Research are subjects of research reports issued recently by investment firms. Their opinions in no way represent those of Barrons.com or Dow Jones & Company, Inc. Share prices at the time the report was issued and the date of the report are in parentheses.

To be considered for this feature, please send material to

Comments: E-mail *online.editors@barrons.com*

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** BON

**Subject:** COMPANY EARNINGS (91%); HOLDING COMPANIES (90%); PHARMACY BENEFITS (90%); PHARMACIES (90%); EBITDA (90%); COMPANY PROFITS (89%); EARNINGS PER SHARE (78%); PHARMACEUTICALS TRADE (78%); FINANCIAL RESULTS (77%); PRESCRIPTION DRUG INSURANCE (74%); PHARMACEUTICALS WHOLESALERS (74%); ECONOMIC CONDITIONS (71%); NEWS BRIEFS (70%); EXCHANGE RATES (68%); INFLUENZA (50%); ECONOMIC NEWS (50%); c1521 Analyst Comment/ Recommendation; c15 Performance; c152 Earnings Projections; ccat Corporate/Industrial News; ncat Content Types; nfact Factiva Filters; nfce FC&E Exclusion Filter; nfcpin FC&E Industry News Filter; PROVIDER TERMS: ONLY

**Company:** WALGREEN CO (90%); EXPRESS SCRIPTS HOLDING CO (70%); RAYMOND JAMES & ASSOCIATES INC (58%); ALLIANCE BOOTS PLC (56%); bootz Alliance Boots GmbH; expscr Express Scripts Holding Co; wlgrn Walgreen Co; kkr KKR & Co. L.P.; PROVIDER TERMS: Walgreen Express Scripts Holding Co AmerisourceBergen

**Ticker:** WAG (NYSE) (90%); WAG (NASDAQ) (90%); ESRX (NASDAQ) (70%)

**Company-Number:** DJ Ticker: ABC ESRX WAG

**Industry:** NAICS446110 PHARMACIES & DRUG STORES (90%); SIC5912 DRUG STORES & PROPRIETARY STORES (90%); NAICS424210 DRUGS & DRUGGISTS' SUNDRIES MERCHANT WHOLESALERS (70%);

BRIAN DEAVER

Has Walgreen Hit a Wall?

NAICS454111 ELECTRONIC SHOPPING (70%); SIC6211 SECURITY BROKERS, DEALERS, & FLOTATION COMPANIES (58%); NAICS446120 COSMETICS, BEAUTY SUPPLIES & PERFUME STORES (56%); NAICS325412 PHARMACEUTICAL PREPARATION MANUFACTURING (56%); NAICS325411 MEDICINAL & BOTANICAL MANUFACTURING (56%); i64 Retail/Wholesale; i643 Pharmacies/Drug Stores; i654 Specialty Stores; i951 Health Care/Life Sciences; iphhss Healthcare Support Services; iphmbn Pharmacy Benefit Management; iretail Retail

**Geographic:** NORTH AMERICA (79%); UNITED STATES (79%); EUROPE (70%); usa United States; namz North America

IP Descriptors: Hot Research PM

**Load-Date:** November 20, 2013

BRIAN DEAVER

## Walgreen Co WAG
## Q1 2014 Earnings Call Transcript

Executives

- Wade D. Miquelon : EVP, CFO and President, International
- Rick J. Hans : Divisional VP, IR and Finance
- Kermit R. Crawford : President of Pharmacy, Health and Wellness
- Gregory D. Wasson : President and CEO

Analysts

- Charles Rhyee : Cowen and Company
- Mark Miller : William Blair & Company, LLC.
- George Hill : Deutsche Bank
- Ricky Goldwasser : Morgan Stanley
- Steven Valiquette : UBS
- Robert Jones : Goldman Sachs
- Meredith Adler : Barclays Capital
- Michael Minchak : JPMorgan
- John Heinbockel : Guggenheim
- Edward Kelly : Credit Suisse-North America

Transcript Call Date 12/20/2013

**Operator**: Good day, ladies and gentlemen and welcome to the Walgreen Co., First Quarter 2014 Earnings Conference Call. At this time all participants are in a listen-only mode. Later, we will conduct a question-and-answer session and instructions will follow at that time. As a reminder, this conference call is being recorded.

I would now like to introduce your host for today's conference, Rick Hans. You may begin.

**Rick J. Hans - Divisional VP, IR and Finance**: Thank you, Nicole. Good morning, everyone. Welcome to our first quarter 2014 conference call. Today, Greg Wasson, our President and CEO; and Wade Miquelon, Executive Vice President, CFO and President International, will discuss the quarter. Also joining us on the call are Kermit Crawford, President of Pharmacy; and Mark Wagner, President of Store Operations.

As a reminder, today's presentation includes certain non-GAAP financial measures and I would direct you to our website at investor.walgreens.com for reconciliations to the most directly comparable GAAP measures and related information. You can find a link to our webcast on our Investor Relations website. After the call, this presentation and a podcast will be archived on our website for 12 months.

Certain statements and projections of future results made in this presentation constitute forward-looking statements that are based on current market, competitive and regulatory expectations that involve risk and uncertainty. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking statement after this presentation, whether as a result of new information, future events, changes in assumptions or otherwise. Please see our latest Forms 10-K and 10-Q and subsequent filings for a discussion of risk factors as they relate to forward-

looking statements.

Now, I'll turn the call over to Greg.

**Gregory D. Wasson - President and CEO:** Thank you, Rick. Good morning, everyone and thank you for joining us on our call. Today, I'll begin with highlights of our performance in the first quarter. Next, I'll update our strategic progress in light of the continued soft economy and finally, I'll look ahead into the fiscal year. Then, I'll turn the call over to Wade for a more detailed financial review of the quarter and the coming year.

Before we get into the highlights, I want to start by saying we are generally satisfied with the top line results, our cost management and our synergy performance this quarter. Our margins however were most significantly affected by the year-over-year negative impact related to generics. This quarter saw a significant shift in the generic wave from a peak in introductions in the first quarter last year to a trough this year. We also saw an impact from our strategic decision to make meaningful promotional investments in our Daily Living business.

Wade will walk you through the gross margin story in more detail later. Regarding sales for the quarter, we generated a record $18.3 billion. GAAP and adjusted first quarter earnings per diluted share were $0.72, which includes the positive impact of $0.07 per diluted share attributable to a deferred tax adjustment from a reduction to the U.K. corporate tax rate for Alliance Boots.

We filled a record 213 million prescriptions in the quarter and increased our pharmacy market share 50 basis points to 19.4% year-over-year. We opened an innovative new store with Johns Hopkins Medicine, which will allow us to codevelop clinical initiatives, designed to improve community healthcare that we intend the pull throughout the chain.

Walgreens and Theranos also took the next step in our plan to national rollout of groundbreaking new lab services with the opening of Theranos Wellness Centers in two stores in Phoenix. We continue to participate in industry consolidation as we completed the acquisition of certain assets of Kerr Drug's retail drugstores and specialty pharmacy business.

Finally, we opened our net zero energy store in Evanston, Illinois. We're investing in this store to bring what we learn through our other locations and help us reduce our chain-wide energy consumption 20% by 2020. As I mentioned, we reported first quarter sales of $18.3 billion, up 5.9% from $17.3 billion a year ago. GAAP operating income for the quarter was $924 million, up 31.1% from $705 million last year. Adjusted operating income for the quarter was $1.1 billion, up 19.4% from $924 million in first quarter 2013. GAAP earnings per diluted share were $0.72 in the first quarter, compared to $0.43 last year, up 66.1% and first quarter adjusted earnings per diluted share were $0.72 up 24.1% from $0.58 in the same quarter last year.

Finally, we generated operating cash flow of $133 million in the first quarter, compared with $601 million in the year-ago quarter. The decrease was primarily the result of the timing of working capital changes associated with our transition to

AmerisourceBergen.

Looking at our gross profit dollar growth and SG&A dollar growth on a GAAP basis, this quarter, the spread was $72 million. On an adjusted basis, the spread was $44 million. Adjusted gross profit dollar growth increased by $61 million or 1.2% compared to the same quarter last year. Adjusted SG&A dollar growth increased $17 million or 0.4% compared to the same quarter last year as we continued our strong focus on cost management. In fact, our SG&A dollar growth performance this quarter was among the best we've had in the past several years.

As we made progress on our top line results, we also advanced our three strategic growth drivers, creating a well experienced transforming role of community pharmacy and establish an efficient global platform.

Today, I'll provide an update on that progress beginning with Well Experience we are continuing to see a value conscious consumer in the impact of a soft economy. We responded with meaningful promotional investments in the quarter, resulting in an increase in traffic of 210 basis points, compared to fourth quarter fiscal 2013.

In addition, basket size grew 2.2% and Daily Living sales in comparable stores increased 2.4%, all compared to the same quarter last year.

We also saw aggregate gains in market share in the quarter across Nielsen-tracked categories in our Daily Living business which improved as the quarter progressed. While these numbers represent solid gains in our Daily Living business, as we go forward into fiscal 2014, we will leverage our data and insights from Balance Rewards to improve the effectiveness of our promotional investment.

We're elevating our focus on meeting customer's expectations in all channels and are driving alignment across our organization with the appointment of Sona Chawla as President of Digital and Chief Marketing Officer. Through her new role, we bring together the power of e-commerce, marketing and insights and Analytics teams to help deliver our Well Experience. A key part of that strategy is the continuing rollout of our Well Experience store format. We're pleased with our progress to-date on Well Experience with 87 new and converted stores this quarter totaling 600 across the country.

As we continue to refine our strategy, we will bring our innovative format with its updated assortments and integrated healthcare offering into new markets. We're also enhancing our beauty offering, which we rolled out in nearly 200 of our Phoenix and Arizona stores this quarter and where we launched Boots No7 products and partnership with Alliance Boots along with the broader assortment of beauty brands. We also created a more engaging interactive experienced for our customers with specialized training for our beauty advisors and most importantly performance is exceeding our expectations.

Finally, turning to Balance Rewards, 70% of front-end sales in November were processed through our loyalty program with 74 million active members and 92 million members enrolled. Also with more than 12 months of data, we are gaining valuable insights into our customers shopping and purchasing habits giving us excellent

information to work with as we sharpen our category plans for the year ahead.

In our Pharmacy, Health and Wellness business demand for flu shots remains high despite the low start to the cough, cold and flu season. In the quarter we administered 1.1 million more flu shots than we did last year bringing our total for the season to-date to 6.4 million. In addition our script comp was up 5.5% in the quarter and our retail pharmacy market share increased 50 basis points to 19.4% year-over-year. We also exceeded the industry prescription growth rate in the quarter by 2.9 percentage points and sold a record 213 million prescriptions.

However, as I described earlier, our margin was impacted by a negative effect related to generics, including a slowdown in generic introductions as well as an impact to control pain medications. The past year we lead the industry to ensure the safe dispensing of controlled medications, working to ensure our patients received the medications they need, and to help control abuse through new processes, procedures and training as part of our good faith dispensing policies. As a result of our enhanced procedures, we saw some drop off in volume of these higher margin medications and a 50 basis point impact to gross profit dollar growth.

As we begin to look beyond the flu season, we will leverage our success with flu shots to drive our non-flu vaccine program. We have seen year-over-year growth in vaccines of 34% and we continue to see tremendous potential to grow our share of this $7.4 billion market. We also will continue to grow our share of Medicare Part B patients, as we take advantage of the consolidation of mail-order diabetes testing supply companies. As a result, we have seen significant growth in our testing supply prescriptions and are looking to continue to increase that business.

Last year, our share in Med D outpaced the industry and we are focused on improving our performance this year. Once again, we're a preferred provider for four of the top national plans, offering our customers lower co-pays for the medications. We have experience with these programs, know the customers and believe we are well-positioned to improve our Med D script volume.

Through our Well network we have brought over 400 healthcare clinics, specialty and infusion assets, hospital on-sites, centers of excellence and other resources together with our 8,200 retail pharmacies and connected them with partners across the industry, including physicians, health plans, payers and plants. Together, we are pioneering new kinds of partnerships and models of care that will create better experiences for patients, improve health outcomes and lower the overall healthcare costs.

Next, our partnership with Alliance Boots also continued to add to our results contributing $0.14 per diluted share to Walgreens first quarter 2014 adjusted results, which included $0.07 per diluted share attributable to the deferred tax adjustment I referenced earlier. As you recall, that compares favorably to our previous estimate of $0.05 for the quarter.

In addition to the Company's contribution, we're making solid progress through our joint venture in Berne, Switzerland, building productive relationships with generic manufacturers and integrating AmerisourceBergen into our global procurement

process. In addition, with our scale and expertise, we can add value beyond procurement working with manufacturers on a full range of programs that bring together our healthcare assets, improve service delivery and health outcomes. 16 months into our work, I'm more confident than ever in our game changing strategic partnership with Alliance Boots and our strategic relationship with AmerisourceBergen.

We're bringing together two iconic retail brands, the leading European integrated wholesale retailer and a leading U.S. wholesaler to create a truly unique collaborative global retail, wholesale model. This combination is powerful in itself, three of the world's leaders in our respective industry sectors, building a global platform that is unmatched in the retail or wholesale pharmacy industry, that will allow to not only better serve the U.S. and European health care systems and patients, but allows to serve the growing markets around the world. Wade will give you more details on this as well as our progress toward our 2016 goals shortly.

Overall, we believe we are well positioned for future growth. As we noted in our press release, we anticipate the effect of the generic trough will moderate in the back half of the year and with our joint venture in Berne, we are best positioned to manage the changes taking place across the industry.

We are focused on determined execution in our core business, the fundamentals that have always defined this Company, disciplined cost management, driving topline results and meeting the needs of customers every day in our stores.

Finally, with Christmas just a few days away, we're in the midst of our busiest season. I want to thank our employees who have done a great job providing extraordinary customer care and ensuring that we execute with excellence during a very critical time for our business. We wish everyone on our team a happy and healthy holiday season.

With that, thank you, happy holidays and I'll turn the call over to Wade.

**Wade D. Miquelon - EVP, CFO and President, International:** Thank you, Greg. Good morning, everyone and thank you for joining us on the call. This morning, I will take you through our quarterly results as well as update you on our Alliance Boots partnership and our AmerisourceBergen relationship.

As Greg noted earlier, for the quarter we reported a GAAP EPS of $0.72 per diluted share based on $960 million shares. GAAP EPS walks to an adjusted EPS of $0.72 for the quarter as illustrated by this chart. A LIFO provision of $0.04, acquisition related items were $0.11 per share consisting of $0.05 of acquisition related amortization costs, $0.02 of acquisition related costs, $0.03 of Alliance Boots related tax and $0.01 of Alliance Boots related amortization.

Finally, special items were a net reduction of $0.15 per share. As noted there was $0.02 per share in cost associated primarily with the closing of the Lehigh Valley Distribution Center. As the Company positions itself to operate on a global perform, which was more than offset by the positive EPS impact of $0.17 per share related to the warrant issued by AmerisourceBergen. GAAP and adjusted net earnings in this

year's quarter include the positive impact of $0.07 per diluted share attributable to a deferred tax adjustment resulting from reduction to the U.K. corporate tax rate applicable to Alliance Boots, which was enacted in July of 2013.

Let me now provide more detail on our comparable store sales for the quarter. Comp prescription sales increased 7.2%, comp front-end sales increased 2.4% and total comp store sales increased 5.4%. Comp prescriptions filled increased 5.5% versus a script comp of negative 4.8% in the year ago period. I'm pleased to recall the year ago quarter was negatively impacted by our exit from Express Scripts network.

In the first quarter, the front-end comp increased 2.4%, traffic increased by 0.2% and the basket size increased by 2.2%. As Greg mentioned earlier our front-end has now turned positive on both a one and two year stacked basis primarily due to the momentum of our new promotional decisions designed to balance traffic and basket with profitability.

Looking at comparable store script numbers, our retail scripts were up 5.5%. This continues to reflect the fundamentals of our underlying business, the return of Express Scripts customers, and our continued progress in winning new Medicare Part D customers. It is also worth noting that the two-year stack on script comps has turned positive for the first time in eight quarters.

With respect to margin, our adjusted FIFO gross margin was 28.5% in the current quarter compared to 29.8% last year, a 130 basis point decline. But we always experience some reimbursement pressure. As far as the most significant factor affecting the Pharmacy margins, was dramatically slower rate of new generic introductions this quarter versus a quarter a year ago. The front-end margin was negatively impacted by increased promotional investment designed to drive traffic as well. As Greg mentioned the loss of some controlled substances in the business impacted the margin negatively.

Taking a look at our longer-term adjusted FIFO gross margin trends, this quarter's 130 basis point decline was up against 140 basis point increase a year ago. In essence the benefit of a generic wave last year reversed itself this year and we expect an impact of similar magnitude in the second quarter. As stated earlier, both the pharmacy and front-end margins decreased in the quarter which impacted our overall results. Moving forward front-end margins will continue to be impacted by our new promotional adjustments until we cycle these changes.

This next chart which we demonstrated and discussed last quarter illustrates the impact the new generic drug introductions have our multi-prescription sales comps. You can see that the generic impact on comp prescription sales was greatest in the first quarter of fiscal 2013, reaching a negative 8.8% versus the generic impact of the most recent quarter of a negative 0.9%. The highlighted quarter is illustrated that the number of new generic drug introductions have slowed dramatically versus a year ago. In our experience, the margin change resulted from generics is inversely correlated and slightly lagged to the impact of generic changes. That is, the strongest positive effect on margin typically occurs shortly after generic impact on prescription sales and is the most deflationary and conversely, the weakest positive effect on margin typically occurs shortly after generic impact on prescription sales is the least

deflationary.

Transitioning now to gross profit; this slide illustrates our quarterly gross profit dollar growth trends for the past nine quarters on a GAAP basis. The next slide shows these trends on an adjusted basis. Adjusted gross profit dollar growth slowed from 4.3% in the fourth quarter of 2013 to 1.2% in the first quarter of 2014 commensurate with the generic wave shift in the front end investment.

To get to adjusted SG&A dollar growth, you can see that our GAAP SG&A dollar growth was a negative 0.4% to which add back 0.3 percentage points with Walgreen acquisition related amortization and 0.9 percentage point for the Hurricane Sandy offset, summed up by a 0.4 percentage point related to organizational efficiency costs.

Netting these items resulted in adjusted SG&A dollar growth of positive 0.4% in the quarter. Shown here are the SG&A dollar growth trends for the past nine quarters on a GAAP basis. The follow-on slide shows a similar trend on adjusted basis. The adjusted SG&A dollar growth for the quarter was a 0.4% year-over-year increase versus the 2.5% increase in the first quarter of fiscal 2013.

This next chart illustrates that our two year stack for the SG&A dollar growth trends on a GAAP basis for the last nine quarters. Now, let's review the two year stack trends on an adjusted basis. Two year stack adjusted SG&A trends improved versus a year ago by 450 basis points. The two year stack of 2.9% growth in the first quarter of 2014, down from 7.4% last year. During the quarter, the rate of growth in adjusted FIFO gross profit dollars exceeded adjusted SG&A dollar growth by 80 basis points. Given the very powerful margin headwinds we've faced, we are pleased with the effort needed to yield this positive spread. As you can see, this is the third consecutive quarter with a positive spread.

Turning to a few other components of our income statement, this quarter included LIFO provision of $58 million, versus the provision or charge or $55 million a year ago. Our effective LIFO rate for the quarter was 2.8%, up slightly from 2.5% a year ago. Net interest expense for the quarter was $41 million versus $37 million from a year ago. Average diluted shares outstanding were 952 million shares versus 951 million shares last year. The change is primarily due to the impact of a higher stock price on the number of in the money options, which are accounted in diluted shares.

In Q2, you can expect diluted share count of approximately 960 million shares subject to changes in the current share price. You can also expect interest expense of approximately $40 million in Q2. Our blended effective tax rate for the quarter was 36.8% versus 38.2% last year. On a go forward basis, Walgreens tax rate is expected to be about 37.5%, excluding the various impacts associated with the Alliance Boots partnership.

Cash and cash equivalents were $969 million in the first quarter versus $1.8 billion dollars a year ago. Accounts receivable increased by 20.5%, primarily due to increased business including the return of Express Scripts network prescriptions, while accounts payable decreased by 1.2%. LIFO inventories were down 1.2% and FIFO inventories were up 1.5% year-over-year versus the sales growth of 5.9%.

Overall, net working capital decreased by 5.7% versus a year ago.

During the first quarter, we generated $133 million in cash from generations versus $601 million a year ago. The decrease was primarily the result of timing of working capital changes associated with our transition to AmerisourceBergen, which we expect will work itself out over time. Free cash flow in the quarter was a negative $231 million versus a positive $265 million a year ago.

Shifting to our quarterly Alliance Boots accretion walk as shown, the walk yields an accretion of $0.14 in the quarter including a $0.07 one-time tax benefit due to lowering of corporate taxes in the U.K. A detailed description of this walk in included in the appendix.

Looking forward, we estimate the adjusted EPS accretion from Alliance Boots for the second quarter of fiscal year 2014 to be $0.07 to $0.08 per share based on our current estimates of IFRS to GAAP conversion and foreign exchange rates. Moving forward, we will continue to provide our accretion estimates on the call each quarter in advance. We're also confirming the combined synergies for fiscal year 2014 and expect them to be in the $350 million to $400 million range.

A key consideration for the second quarter each year is the relative population affected by the flu as illustrated in this chart. As noted, the red line is the incidence of flu last year with a peak in January and the purple line is the average incidence of flu for the last three years. The black line is the actual flu incidence, season to-date this year. As you can see the flu incidence this year is less per basis than last year and is running 5% to 10% below last year. We will keep you posted on how this relative flu incidence plays out throughout the season with our monthly sales releases.

I'd like to close today with a brief update on progress towards our fiscal year 2016 goals, which we provided to you after we announced our 45% investment in Alliance Boots in June of 2012. While still relatively early in our journey, the performance to-date with respect to our four of our goals is on track with or slightly ahead of our expectations. These four goals are; sales of $130 billion including Alliance Boots share of associates and joint venture sales; synergies of $1 billion; operating cash flow of $8 billion; and net debt of $11 billion.

Performance to-date with respect to our adjusted operating income goal of $99.5 billion is currently tracking a bit below the CAGR required to meet this goal, largely because of gross profit dollar growth pressure domestically as I discussed today and challenging environment in some international markets. While we recognize there are risks to achieving this goal, we remain focused on delivering it and have identified a range of further opportunities, including benefits of our AmerisourceBergen relationship, incremental Alliance Boots synergies, business expansion and new initiatives, and accelerated cost savings, all of which can help mitigate these risks. We intend to continue to update you on our progress against these goals in future calls.

In summary we continue to be very optimistic and excited about our future. We have made tremendous progress in our Well Experience journey to become the most relevant retailer in our space. But still, we believe we are just scratching the surface

of ways we can continue to leverage our best-n-class footprint with differentiated products and services to please and reward our most valuable customers and gain new customers, just like them. We believe we have the strategies, tools, and talent to do exactly that. We are gaining share in retail pharmacy as we are finding new ways to please and attract pharmacy patients.

But what gets us even more excited is the tremendous opportunity we have before us to move from a traditional pharmacy, historically participating about 12% of the healthcare market to a Company that has increasingly participated much more broadly; in areas like, specialty, home infusion, workplace health, vaccinations, diagnostic lab, hospital partnerships and primary care. Because of our unmatched infrastructure, over 70,000 healthcare service providers and new emerging technologies, we are extraordinarily well positioned to capture value. We're helping deliver better outcomes on healthcare spend across the board. Thereby, benefiting patients, payers, suppliers and in many cases even other providers.

Lastly, our partnership with Alliance Boots and AmerisourceBergen gives us a unique opportunity to leverage our combined assets and capabilities to be more efficient and effective in our core business and to continue our journey to influence health, beauty and well-being on a global stage. We believe that this unique combination will continue to lead to other value creating partnerships.

We've always said, there will be some ups and downs in this journey, but if we stay relentlessly focused we can achieve our purpose to help people get stay and live well and continue to reward our stakeholders.

Thank you for all your combined and continued support and I hope the holiday season blesses you and all of yours and now I'll turn it back to Rick.

**Rick J. Hans - Divisional VP, IR and Finance**: Thank you, Wade. That concludes our prepared remarks. We are now ready to take your questions.

Transcript Call Date 12/20/2013

**Operator**: Steven Valiquette, UBS.

**Steven Valiquette - UBS**: I guess, with some other large scale generic deals being announced in the pharma supply channel recently. Just kind of curious if you guys think you have your first-mover advantage with manufacturers, just given the – your earlier timing of your JV. Also just overall, do you think, these are the deals that help your cause, do they hurt a little, are they neutral, just curious for more color, given some of these other deals?

**Gregory D. Wasson - President and CEO**: Certainly I think we do realize we have first-mover advantage, we've been at this for a period of time now and I think Jeff and team and in Bern, John Donovan, are doing a great job as we've talked about. Certainly, we're focused on maintaining that first mover advantage and not giving that up. I think, as I somewhat said in my remarks, we do feel like we've got a truly differentiated model, which is not only an integrated retail wholesale model, but certainly two great partners with AmerisourceBergen here in the U.S., Alliance Boots in Europe. So, I think we've put together an opportunity to serve both the U.S. and

the European market, with an integrated wholesale retail market with three iconic brands which gives us the opportunity to even go beyond. So, we think our model frankly is a superior model. We do not want to lose that first mover advantage as far as what it may do in the market, we'll see. I think, certainly with three big buying groups out there, the industry's going to continue to change and we'll have to stay ahead of that and make sure we react, but we think we're advantaged.

**Operator**: Mark Miller, William Blair & Company, LLC.

**Mark Miller - William Blair & Company, LLC.**: Can you expand on the business expansion and new initiatives Wade, that you called out to be able to offset for the operating profit tracking thus far, a little bit below the long-term plan? Then also, the efficiencies and cost savings you alluded to, is that something we're going to see, those expenses come through on a quarter by quarter basis or might we see a larger restructuring for the Company?

**Wade D. Miquelon - EVP, CFO and President, International**: Yeah, I'll speak a little bit to the business initiatives and expansion. Obviously, some of these things are public and known, and some of these things are still things that are not, but they're the kinds of things we talked about, we're doing with for example, big pharma to help reinvent their model to help save cost in clinical trials, which we're doing some work with right now. Also, things like Theranos, which we believe has very meaningful potential, we're very excited about. In various geographies, we've got a strong footprint, but we've got opportunities to do even more breadth of services in those markets and get deeper and broader in working with our partners Alliance Boots, we're doing exactly that. On the cost side, I think you saw we had very good cost progress. We think we do a lot of things efficiently, but there's always opportunities to do a lot more and under Tim Theriault's leadership we're bringing continuous improvement to a whole another level in the Company really looking at every process end-to-end and how we can be much more efficient, much more . enabling to our employees. So, we have continued opportunities and we're aggressively going after it, but it's going to make us I think a much better Company and allow us to serve our customers even better to Boot.

**Mark Miller - William Blair & Company, LLC.**: My second question is there's a lot of adjustments here to get to the underlying performance but one, I need help with is the $0.07 positive impact on Alliance Boots, is that being added back to the $151 million that's flowing through the equity earnings line such that if we took that out it'd be around $80 million underlying?

**Wade D. Miquelon - EVP, CFO and President, International**: Yeah, that's correct.

**Operator**: John Heinbockel, Guggenheim Securities.

**John Heinbockel - Guggenheim**: So, couple of things, in your release you have a statement in here about assessing various steps to optimize assets and cost structure alongside AB and ABC, what are you thinking about there either generally or specifically?

**Gregory D. Wasson - President and CEO**: I think we did mention it and I think as Wade said in his remarks, the first couple of things we looked at for this quarter were some distribution centers, but as we – what we want to do is make sure that we're looking to the future with our new partners AmerisourceBergen and Alliance Boots and if that obviously comes together like we think it will. There's opportunities for us to position ourselves going forward and whether it's looking at distribution centers and making sure we've got the right footprint, we're looking at all types of cost within corporate and make sure that we've got the right initiatives, the right people devoted to those and certainly we are looking at all of our assets and the cost of the enterprise to make sure that we are set up for the future. So real nothing truly defined but just an effort to make sure that we are indeed positioning ourselves for the future. As Wade said, I have designated Tim Theriault who is our CIO and head of innovation and continuous improvement as our (indiscernible) to Lean Six Sigma and drive that throughout the organization. I think the one thing that we have seen from our Alliance Boots partnership with the wholesale expertise and cost focus that our wholesaler has bringing to Boots over the years is opportunities to bring costs out of the system. So it's really all that in a nutshell to kind of make sure that we are positioned for the future.

**John Heinbockel - Guggenheim**: Do you think alongside that historically I think you have looked at an SG&A run rate maybe in the 3% to 4% range, obviously you are well below that here. Is there a new long term run rate well below that prior one?

**Wade D. Miquelon - EVP, CFO and President, International**: We get 3.5% to 4.5% is kind of what we have historically said on an organic basis. I don't think we are prepared to give a new number today. I would just say that we think there is opportunities to be increasingly efficient. It's not just SG&A, it's – by the way it's across the board and it's really end-to-end processes. But again I think the big idea here is who we are becoming in partnership with both Alliance Boots and AmerisourceBergen, is an enhanced and different Company than who we have been and we are really readying ourselves to make sure that we can capitalize on that to the maximum extent possible.

**John Heinbockel - Guggenheim**: Then one last thing, when you look about the billing in orders or synergy, do you think some of that will end up getting reinvested back in the business maybe not so much at the front-end but your pharmacy labor, things inside the store to deal with higher volumes or no, very little of that will get reinvested?

**Gregory D. Wasson - President and CEO**: Well certainly as we go forward some of it could John, but I think right now we are focused on a lot of the initiatives we have over and above that to drive the business. So we think most – the majority of that will indeed come to the bottom line. At the same time, we haven't really given out what we think we can accomplish with AmerisourceBergen. AmerisourceBergen is indeed in those fiscal '16 goals, but we're just beginning to get – touch the – get started on that. So we think there's opportunity over and above that.

**Gregory D. Wasson - President and CEO**: Back to on the $1 billion, John, to the extent that some of it was reinvested then we'll deliver more. I mean that's really a

net that we're targeting.

**Operator**: Ricky Goldwasser, Morgan Stanley.

**Ricky Goldwasser - Morgan Stanley**: Can you help us think a little bit more details on the margin trajectory for fiscal year '14, so giving all the moving parts, when I think about the promotional activity in generics for second half of the year, should we model gross margin at the year-over-year or only sequentially?

**Gregory D. Wasson - President and CEO**: Ricky, maybe I'll start and turn it over Wade. I would say based on what we're seeing certainly that I wouldn't think Q2 directionally will be much different than what we're seeing in Q1. I think we're already through the first – nearly through the first month, the biggest month of the second quarter. We're continuing to see a cautious consumer and therefore our promotional activity will probably directionally remain the same. I think obviously as you've seen in the one chart that we put up as far as the sales impact of the generic wave, certainly Q2 has got a significant peak from last year that we're going against another trough. So directionally for Q2, I don't see, I wouldn't think much of a change. Certainly, we've got some help in the back half with generics and as we get more and more Balance Rewards data and insights, we want to continue to make our promotional goal more effective. But I would say – as I said I think Q2 not much directionally and we try to do what we can in the back half of the year. Wade?

**Wade D. Miquelon - EVP, CFO and President, International**: No, I agree. I think, certainly, we often joke about Rick's theory of Heisenberg and certainly principle of generics. The more that you try to study and analyze the timing of these, the more they seem to change a bit, but you have similar information that we do, certainly the back half looks to be stronger. Again, I think under Alex's leadership, I think we're doing a lot of things to get the smart balance between both growth and profitability and hence we sweeten the mix around health and beauty down the road as well. It's an opportunity for us.

**Ricky Goldwasser - Morgan Stanley**: Just to confirm, because I think you mentioned that the promotional activity had a negligible impact on the front-end margin. So, should we just assume the promotional activity spend is going to stay at constant levels throughout the year?

**Wade D. Miquelon - EVP, CFO and President, International**: The largest impact was, as we said was, the wave or the trough rather of new generics, significantly, but then the next largest would have been the front end promotion with, as we said, to a lesser degree 50 bps from controlled substances and gross profit dollar growth, but it was meaningful, but the largest was the drop in generics by far.

**Gregory D. Wasson - President and CEO**: Ricky, with that promotional investment, as we said, we grew our traffic a couple of hundred basis points from the quarter before. We increased basket size and increased the comp, which is good. We just had to throw a lot more at it than we anticipated, and that's what we meant by meaningful investment. That's what I meant directionally, I don't see the competitive promotional environment changing much.

**Ricky Goldwasser - Morgan Stanley**: Then, I know that you've – you talked very positively about Theranos, can you share with us, it sounds like you're experiencing – it's now already has been in your pharmacies for a couple of months now, what are you seeing the marketplace?

**Gregory D. Wasson - President and CEO**: We're very, very positive on Theranos. I mean, it's really a, one of these disruptive plays, it's a better patient experience with a prick of blood, it's the highest standards of quality in lab with cost, half the cost of Medicare and the patient feedback we're getting is very good, but it's really a better, faster, cheaper, more conveniently play. We're going to – as we expand here we'll keep learning and perfecting the patient experience, which is really the key thing. But we're very, very positive and I think this is one more example of how community pharmacy can play a role in broader healthcare. That's a direction we're going, we've got the assets, we have the healthcare professionals, we have the convenience, we have the right to win in these spaces and we're very excited about it.

**Ricky Goldwasser - Morgan Stanley**: Just to confirm, are you still in the market buying ABC shares?

**Wade D. Miquelon - EVP, CFO and President, International**: We are, but we only give that information as off the last quarter as you know, but we are doing that.

**Operator**: George Hill, Deutsche Bank.

**George Hill - Deutsche Bank**: I guess, Wade, first, as we look at the synergies you guys have reported today and kind of the buckets that you guys laid out at the analyst presentation in Europe. Can you bucket for us where they're coming from and kind of give us a sense for where you're seeing the most traction early?

**Wade D. Miquelon - EVP, CFO and President, International**: Yeah, I mean, sure the biggest benefit we've been getting is generics as we've said and that hasn't changed. The other areas where we're getting meaningful early synergies are things like own brand procurement, (indiscernible) for us in direct spend, our relationship with some of the CPG players. So, all of those are providing opportunities, given one that we'll ramp up overtime, but becomes really a point of differentiation and ongoing giving is what we're doing to drive the own brand in the Boots portfolio. Again it's just today a few select stores, but the broad Phoenix area, but the results are very, very good and we're very optimistic that as we expand this, this will become something that becomes a very strong part of our value creating portfolio for many years.

**George Hill - Deutsche Bank**: Then maybe on the inventory, I guess maybe just as update as you guys ramp the ABC agreement, how should we think about inventory levels going forward either measured as a – I don't know if you want to talk about it in an absolute dollar sense or inventory days on hand or change in mix. I guess kind of ability to extract cash from that line going forward? I guess could you give us an update on how to think about that?

**Gregory D. Wasson - President and CEO**: Yes. I mean there is a lot of moving parts as you can see in our cash numbers and working capital numbers associated

with this transition and this is not a normal quarter if you will, because even while we are transitioning inventory for example, on brands to ABC that reduces inventory for us. But our payables go up commensurately, but in a very short-term on the cutover date we also get fairly large levels of inventory at that store for example. So that we could make sure that we had a flawless transition that will work its way out. So I guess what I would say is two things. One is, this kind of picking the (python) who will work its way out from the transition over time from a cash flow basis. But then beyond that because we have daily deliveries, because of their expertise we should be able to over time take out additional days as inventory, although we have put no specific goal there. Also keep in mind that starting next month we will begin the generic transition which will go several months, nine months, region by region, store by store and that will also create a little bit of timing flux up and down with our cash flow, working capital. But again over time these things will work themselves out and lend themselves to a net-net inventory opportunity in the future.

**George Hill - Deutsche Bank**: Then maybe just one last one quickly. As we think about the income statement moving through this year you've got the margin erosion that's a component of a tough generic comp. Probably until we get to fiscal '15, you are going to see faster specialty growth and brand drug growth, from a dollar basis driving the pharmacy top line. I guess how much of the margin erosion should we think of as the tough comp on generics? How much of the erosion is kind of, the mix impact of accelerating brand and specialty drug growth versus growth in generics?

**Gregory D. Wasson - President and CEO**: There is, from a margin percentage, you are right, specialty are the lowest and brand would be higher than that and generics, the best, but from a gross profit dollar growth, it's a little bit different. Obviously, we have for example, when there's brand inflation we get some benefit on that. So, I guess what I would say is our model, really think of it in terms of gross profit dollar growth versus the margin percent per se. This certainly probably will drive any quarter it gets in generics, next quarter is about the same as that, but again that's what would really swing the gross profit dollar growth once we get into the back half and beyond.

**Operator**: Lisa Gill, JPMorgan.

**Michael Minchak - JPMorgan**: Mike Minchak in for Lisa. Just with respect to the combined alliance with synergy number in the first quarter, the $107 million you reported, it appears to be tracking a little bit ahead of expectations based on the $350 million to $400 million forecast for '14. Can you talk about what's driving the upside there and sort of the cadence of those synergies going forward in '14?

**Gregory D. Wasson - President and CEO**: Yeah, it is tracking ahead. Good observation. It does give us confidence. Actually, even more so leading up to those fiscal '16 goals that Wade talked about. I think, the team in Bern's doing a tremendous job working with our pharmaceutical suppliers in new and creative ways. Now, that we're bringing AmerisourceBergen by, I mean, as I said that's positive as well. It could be a little less in 2Q because there's some bumpiness, but we feel for the fiscal year, that we're ahead of that target that we've given and we feel confident in the billion and we believe there is upside.

**Michael Minchak - JPMorgan**: Just as a follow-up, with respect to the pharmacy reimbursement environment, can you sort of talk about how things are trending there and whether you anticipate things getting any material, better or worse from here?

**Gregory D. Wasson - President and CEO**: Well, as we say, and as I say all the time, anybody in healthcare, we always face ongoing reimbursement and certainly that hasn't changed and frankly won't change, we have to deal with that. I think that, probably similar to what we've seen, but there's certainly more and more focus on it. I think what we're working to do is to work with people in preferred ways to create more value and be able to bring more and more services in addition to just the pharmacy provision that we bring, but I think we have to expect ongoing reimbursement pressures, which were focused on our cost of pill. Also, we think we're positioned better than anyone as far as procurement and to make sure that we're working all three of those metrics in unison.

**Operator**: Robert Jones, Goldman Sachs.

**Robert Jones - Goldman Sachs**: Just a follow-up on the cadence of the Alliance Boots contribution. It looks like you're calling for about $0.07 next quarter, $0.07 to $0.08, about the same as what we saw organically this quarter. I was just wondering if you could maybe shed a little light on why that contribution would be flat sequentially and then anything you can give us around the balance of the year would be helpful.

**Wade D. Miquelon - EVP, CFO and President, International**: Well, there's a couple of things going on here. I mean, one is just, it's a bit iterative right? You never know exactly what the accretion dilution is until our numbers are done, right. So, as they grow their earnings and grow synergies, it also is relative to whatever our base is. Again, there's also flexibility of what will the synergies be, which some of those are known and some are unknown completely, but I think that we have it close enough at this point because of the three month lag to know a general range, but again, there are a couple of moving parts that, in the end can move around. So, for example, this quarter, we were thinking it would be $0.05 I think was our guidance, $0.04 to $0.05, we ended up at $0.07, again, because of these moving parts, the final synergies and how they come in as well, as our relative performance and then how you calculate that.

**Robert Jones - Goldman Sachs**: Then just on generic price inflation, has obviously been a big topic. One of your competitors called this out as a headwind to them in the quarter. I guess, specifically anything worth calling out in the quarter as far as generic price inflation goes? Then more broadly, how should we think about in an environment where it does appear that generic price inflation will continue? As you guys look at that over the balance of the year, sort of of headwind, tailwind neutral, any thoughts would be helpful?

**Gregory D. Wasson - President and CEO**: Yes. There is always some inflation in the industry. In the past we did see some unusual inflation on select molecules in this past quarter, which did give us a little bit of an impact. It's hard to say whether that will be ongoing or not. Certainly, we think we are very well positioned with Jeff and John Donovan team in Switzerland to make sure that we're working with both generic

and branded pharmaceutical companies provide value and offset or anything that may occur. But we saw a little bit of unusual activity. But again our folks in Bern are on top of it, and we want to work with these folks in a way that helps them create value as well as the synergy opportunities we see.

**Robert Jones - Goldman Sachs**: Then I guess just a last one if you guys wouldn't mind. Any update around changing view around ACA contribution as we've seen a little bit more progress I guess on uptake of enrollment and then also around Medicaid expansion? Any thoughts you guys have there, relative to the rest of the year, will be great?

**Wade D. Miquelon - EVP, CFO and President, International**: I would just say that it's probably too early for us to know all the implications and timing as we go forward here. I think there is lots of opinions out there and one is probably as good as the next. But right now, we're not modeling in a lot from the early days but over time obviously it's going to change the structure of the industry and how we participate with players. Maybe Kermit, you want to?

**Kermit R. Crawford - President of Pharmacy, Health and Wellness**: Yes. Robert I'd add. Certainly we have seen the enrollment has been slow but we continue to work on our healthcare partners and go help educate these patients. We've always said that we expect the Affordable Care Act to bring more people into the healthcare system as a result of coverage, which we certainly will think will benefit from this increase in enrollment. We have built our strategy around an access to quality care over the past decade and we think we are well positioned to serve these patients not only from a prescription perspective but for additional healthcare services like vaccines and immunizations and also some of the preventive services you now see in our healthcare clinic.

**Operator**: Edward Kelly, Credit Suisse.

**Edward Kelly - Credit Suisse-North America**: A few questions for you. Wade I guess, first of all related to the 2016 commentary. When do you expect to give us some update as to how these numbers are playing out? When you talk about adjusted operating income tracking a little bit lighter does that also include now the benefit of ABC?

**Wade D. Miquelon - EVP, CFO and President, International**: Yes. I mean I think – we obviously put these goals before ABC and then we announced ABC we said that there is additional opportunity but we wouldn't be changing our goals. That's in part because $9 billion we already believe is a very meaningful, large goal to hit and an appropriate goal. But the other thing is we also had other projects built in. If we had not gone with ABC like project GAAP and others, where we would have then changed our distribution supply system internally and had meaningful benefits built in for that. So, this is really swapping out this for that and albeit a little bit better, but I think – the key thing is, is we really start to reap the benefits of ABC in a meaningful way in 2015. Both on the generic distribution side as well on the procurement side and even other opportunities that we are now starting to work among the two and the three parties. So there is a bit of a hockey stick here versus a CAGR, but that was always to some extent the case and I think that this is really now just part of our base

operating model.

**Edward Kelly - Credit Suisse-North America**: Any sense just on timing of when we should – when we will be getting an update you think?

**Wade D. Miquelon - EVP, CFO and President, International**: Well, quarter-to-quarter we look at it and say are these realistic based upon all the risks and opportunities we have internally. I mean, if we ever feel that's not the case, we'll certainly tell you. You can put together a glide path like we can and take our numbers and put it along that path, but we've been into the assessments and so we think it's still possible to hit these and do we have the right bullets in the chamber, if you will, and at this point we do.

**Gregory D. Wasson - President and CEO**: This is Greg, I would say that we're doing this quarter-by-quarter. Obviously, we're kicking the tires as we go to make sure that we can achieve those goals and we do. So, I would somewhat consider this as an update, but at the same time, you can rest assured that we'll continue to look at those numbers and make sure that we're confident. I think to Wade's point, we think that we've got ways to achieve those goals. The CAGR on the operating adjusted income is a little bit soft, but we think the change in the mix of the business will allow us to get it.

**Edward Kelly - Credit Suisse-North America**: I think, when you talked about that, Wade, I thought I heard you say something about international as well as the U.S. business, is that right? Could you give us a little bit more color on that front?

**Wade D. Miquelon - EVP, CFO and President, International**: I mean, right. There are business initiatives as well as, I think global growth opportunities or whatever, but these are the series of initiatives that we're working with our partners, Alliance Boots to strengthen various markets, introduce new services in some case, work with new partners like global pharma and create value in unique ways so.

**Edward Kelly - Credit Suisse-North America**: I actually meant the CAGR, when you were talking about the CAGR being a little softer, I thought you'd mentioned international too?

**Wade D. Miquelon - EVP, CFO and President, International**: I mean, just I guess, putting it simplistically there's some markets that had been a bit challenging for AB on an EBIT basis, but on the other hand, because of their accelerated cash flow, their accelerated delevering, excellent work on refinancing on after-tax, and also some tax benefits on after-tax basis, they're generating great value creation. So, it's a little bit of that EBIT pressure, but actually from a bottom line impact, we're getting it back.

**Edward Kelly - Credit Suisse-North America**: Just one other question for you on the front-end, can we just dig in a little bit more into the promotional strategy here, because, you are successfully driving better comp growth, better traffic growth. It's not up a ton right, the traffic year-over-year and on a two year basis. It's better, but not a huge improvement, and the gross margin seems to be taking a little bit of a beating. So, I'm not so sure that your comparable gross profit dollar growth is up.

Could you comment on that? Then just generally, if that's all the case, is it working, or do you need to make further adjustments and is that what you're talking about, when you talk about balancing front end sales and margins?

**Gregory D. Wasson - President and CEO**: Yeah, I agree with you. I think that the good news is, we've made investment. We've got the top line moving. When I said, I'm generally satisfied that's what I mean. I'm never truly fully satisfied. With that, we did have to make more meaningful investment than we anticipated. We want to make sure that we're getting a bang for a buck for that investment. We've probably had to overinvest based on what we anticipated. I think the opportunity we have, now that we have 12 months of data coming from our Balance Rewards program, there's tremendous insights to help us get much more effective with that investment that we're having to make, but, we obviously want to make sure that the investment we're making gives us a much greater return than what it did this quarter. Now, you can't change that overnight. So, rather the plans and activity as I said, are in place for the next quarter. So, that's the reason I say, I don't think directionally we're going to see much of a difference, but I do think as Alex and team get more and more insights we are absolutely going to be using that to get a better return for the investment in promotional activity we're making.

**Operator**: Charles Rhyee, Cowen and Company.

**Charles Rhyee - Cowen and Company**: Greg, I think you or Wade made a comment about impact from controlled substances reduction in the volumes there and I'm not sure if, I might have missed it earlier but Greg did you say that the impact to gross margin in the quarter was 50 basis points? Is that something that is sort of like just a step down overall because the dispensing of those drugs will just be reduced overall or how should we think about that?

**Gregory D. Wasson - President and CEO**: Yeah, I did mention that and I think we obviously as a leader in industry believe it is frankly up to us now, this is on us to make sure that we are indeed leading with best practices. We have Kermit and team. I'll let him talk about his own business. He's implemented good big dispensing efforts. I think as a result we are indeed seeing a reduction in some of those higher margin pain controlled substances. We want to make sure that we're getting them to patients appropriately and the patients that frankly need those medications are able to receive them and frankly those that don't, don't and now and it will be ongoing as far as that hit that we've talked about that's an ongoing hit.

**Wade D. Miquelon - EVP, CFO and President, International**: Charles, Just to clarify it was actually a reduction of 50 basis points in gross profit dollar growth not in margin.

**Gregory D. Wasson - President and CEO**: Charles, I would just add that, we implemented our good base dispensing policy back in late April of last year and it's probably it's really designed to assure that the patients get the right medication as they need but while at the same time helping us to control abuse of these controlled substances.

**Operator**: Meredith Adler, Barclays.

**Meredith Adler - Barclays Capital**: I would like to go back and talk a little bit about expense control. You did a great job this quarter. There was some press rumors about actually shrinking the number of people in your corporate office. I know it's an awkward topic as people listen to your calls. However, it was in the press and I was just wondering, whether some of the improvement you are seeing is because you have become more efficient in reduced headcount and are there more plans to reduce headcount in corporate?

**Gregory D. Wasson - President and CEO**: Yes. Meredith, yes, I think I remember the article you are talking about and I think obviously it was – got overstated and sensationalized maybe a little bit. So we – as we go forward part of our Lean Six Sigma is just make sure we have got the right projects, processes in place. We have got the appropriate people signed to those and frankly continue to look at optimizing not only our headcount but our assets along the way. So the article that you are talking about was extremely over sensationalized.

**Meredith Adler - Barclays Capital**: Does Boots have or Alliance Boots have any impact on the way you look at becoming more efficient and productive in corporate?

**Gregory D. Wasson - President and CEO**: Yes. Well I think there are some best practices not only in corporate but even out in the field and Alex Gourlay is not on the call, maybe the next one I will have him on. But one of the things I think we are doing with Mark Wagner and team is focusing on trying to get more and more work out of these stores. The AmerisourceBergen distribution agreement with daily deliveries and so forth, we hope as not – have to carry as much inventory and be able to diminish the workload in our stores. But we have a real focus on moving more – from more and more tasks to more focus on the customer. I think that in itself we are able to bring some of the best practices that Alex is bringing from Boots and what they have done over the years as well.

**Meredith Adler - Barclays Capital**: Then I do actually have a question about something that Wade was saying about synergies and I think there was a – he mentioned that you were working on making your distribution network and structure processes more efficient, even if you hadn't done the ABC deal and that was included in the synergies. That just kind of surprised me, because I guess, I thought synergies would be related strictly to whatever happens with Alliance Boots. Are you saying that you're learning – is it part of the best practices you learned from them or was that a kind of a separate initiative that you're working on anyway?

**Wade D. Miquelon - EVP, CFO and President, International**: No, actually I apologize if I confused you. What I said was is that the benefit that we anticipate we'll get from ABC in distribution and in buying is part of our plan to get to our $9 billion goal. This is not included in the $1 billion AB synergies. That's just with AB, this is separate from that. But I guess, prior to ABC, we were looking at a variety of different models that would have made us more efficient, which had some savings built into our plan. These are certainly bigger. But to the extent that this is our partner and our chosen way to go to market with both generics and with our supply chain, those basically built into our base model and into our goals.

**Meredith Adler - Barclays Capital**: Final thing is a plea. We would love it, if you

guys would give us more data about the healthcare side of the business. It may not be material, but the forecasting that we do now is, kind of weird, that come up with what incremental revenues you're getting that are outside of the stores? I'd love it, if you had, give revenues and profits?

**Wade D. Miquelon - EVP, CFO and President, International**: Point taken Meredith. We will study it and consider it.

**Operator**: I'm showing now further questions at this time. I'd like to hand the call back over to Rick for any closing remarks. Thank you.

**Rick J. Hans - Divisional VP, IR and Finance**: Ladies and gentlemen, that was our final question. Thank you for joining us today. As a reminder, the Company will report December sales on January 6th. We'll also be hosting our Annual Shareholder's Meeting on January 8th at Navy Pier in Chicago. We hope to see you there. Until then thank you for listening and happy holidays.

**Operator**: Ladies and gentlemen, thank you for participating in today's conference. This does conclude today's program. You may all disconnect. Have a great day everyone.

© Copyright 2014 Morningstar, Inc.

## Walgreen Co WAG
## Q2 2014 Earnings Call Transcript

Executives
- Rick J. Hans : Divisional VP of IR and Finance
- Mark A. Wagner : President - Operations and Community
- Wade D. Miquelon : CFO
- Alex Gourlay : EVP, President Customer Experience and Daily Living
- Kermit R. Crawford : President of Pharmacy, Health and Wellness
- Gregory D. Wasson : President and CEO

Analysts
- Eric Bosshard : Cleveland Research
- Lisa Gill : JPMorgan
- Charles Rhyee : Cowen and Company
- Scott Mushkin : Wolfe Research
- Ricky Goldwasser : Morgan Stanley
- Robert Jones : Goldman Sachs
- Mark Wiltamuth : Jefferies
- John Heinbockel : Guggenheim
- Edward Kelly : Credit Suisse

Transcript Call Date 03/25/2014

**Operator**: Good day, ladies and gentlemen and welcome to the Walgreen Co. Second Quarter 2014 Earnings Conference Call. At this time all participants are in a listen-only mode. Later, we will conduct a question-and-answer session and instructions will follow at that time.

As a reminder this conference call is being recorded. I would now like to introduce your host for today's conference, Rick Hans, you may begin.

**Rick J. Hans - Divisional VP of IR and Finance**: Thank you, Nicole and good morning everyone. Welcome to our second quarter conference call 2014. Today, Greg Wasson, President and CEO and Wade Miquelon, Executive Vice President, CFO and President of International will discuss the results for the quarter.

Also joining us on the call and available for questions are Kermit Crawford, President of Pharmacy and Mark Wagner, President of Store Operations and Alex Gourlay, President of Customer Experience and Daily Living.

As a reminder, today's presentation includes certain non-GAAP financial measures and I would direct you to our website at investor.wallgreens.com for reconciliations to the most directly comparable GAAP measures and related information. You can also find a link to our webcast on our Investor Relations website. After this call, this presentation and a podcast will be archived there for 12 months.

Certain statements and projections of future results made in this presentation constitute forward-looking statements that are based on current market, competitive, and regulatory expectations that involve risk and uncertainty. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking

statement after this presentation, whether as a result of new information, future events, changes in assumptions or otherwise. Please see our latest Forms 10-K and 10-Q and subsequent filings for a discussion of risk factors as they relate to forward-looking statements.

Now, I'll turn the call over to Greg.

**Gregory D. Wasson - President and CEO**: Thank you, Rick. Good morning, everyone, and thank you for joining us on our call. Today, I'll begin with a review of our financial performance. Next, I'll discuss our performance against our three strategic growth drivers and finally I'll look ahead to how we're preparing our Company as we head towards fiscal 2015. Then I'll turn the call over to Wade for a more detailed financial review of the quarter and the fiscal year.

This quarter was marked by solid top line growth and performance. We achieved record quarterly sales and record second quarter prescriptions filled in spite of continued headwinds from slower generic drug introductions and severe weather.

For the quarter, sales were $19.6 billion, up 5.1% from $18.6 billion a year ago, driven in part by 4.3% increase in comp store sales. GAAP operating income for the quarter was $1.3 billion, up 4.9% from $1.2 billion last year. Adjusted operating income for the quarter was $1.3 billion, down 4.3% from $1.4 billion in second quarter 2013.

GAAP earnings per diluted share were $0.78 in the second quarter, compared to $0.79 last year, down 1.3%. Second quarter adjusted earnings per diluted share were $0.91, down 5.2% from $0.96 in the same quarter last year. Finally, we generated operating cash flow of $1.1 billion in the second quarter and free cash flow of $877 million.

Turning to trends in gross profit dollars and SG&A dollars, in the second quarter on a GAAP basis, our gross profit dollars increased 0.8% or $43 million from a year ago. SG&A dollars increased 1.6% or $72 million compared to year ago. Adjusted gross profit dollars increased 0.4% or $22 million compared to a 4% increase in the same quarter last year. This difference resulted from several key factors. The shift in the generic wave from a peak in introductions in the first quarter last year to a trough this year, continue to have a negative impact. The impact which moderated somewhat from the first quarter is expected to continue to moderate in the third quarter and turn positive in the fourth quarter.

A weak flu season compared to last year resulted in fewer cough, cold and flu related prescriptions and lower sales of over-the-counter products compared to same period last year. And we also maintained meaningful promotional investments in our daily living business in the quarter.

While we did see some pressure on a gross profit dollar growth, we were able to balance that with ongoing cost discipline, in a quarter with record sales and an increase in comp store sales, our adjusted SG&A dollars increased by only 1.7% or $76 million compared to the same quarter last year.

I want to give credit to our leadership team in the stores, who are using their

resources efficiently to serve our customers. In our estimation, adjusted gross profit dollar growth would have been about the same as our adjusted SG&A dollar growth, if we have not had the impact from severe winter weather.

In the quarter we also made progress on our three strategic growth drivers, creating a well-experienced advancing the role of community pharmacy and establishing an efficient global platform. Today, I'll provide more details on that progress.

In our Well Experience growth driver, we saw the ongoing impact of a value conscious consumer, while unseasonably cold temperatures, which I mentioned earlier, further affected our sales. In response, we continue to invest in promotions and increasing front end comp sales by 2%. We're also continuing to roll out of our Well Experience stores, reaching a total of 628 across the country. We realized market share gains across a Nielsen-tracked categories in our Daily Living business and in addition average basket size increased 3.4% in the quarter as customers continued to consolidate trips.

This quarter, we successfully reached a milestone for enrollment in our balance rewards program topping 100 million enrollees with almost 80 million active members, we now have the largest retail loyalty program in the industry.

We also are leveraging our customer insights from Balance Rewards to evolve our value proposition and simplify promotions to help both our stores and our customers. On our Well Experience rollout we're pleased with our progress to-date. We continue to refine our store format to integrate healthcare, provide an elevated beauty experience and also deliver exceptional seasonal and consumable convenience to meet customers' needs.

Also, this quarter, we expanded and enhanced our beauty offering introducing Boots No7 in New York City. We completed the roll out to 10 stores in February and plan to reach 150 stores in the city. Our New York City expansion follows our successful launch of Boots No7 and other Boots brands in our Arizona market and our flagship stores across the country.

Finally, we continue to bring together our world-class digital capabilities to complement our convenient store locations and leverage our omni-channel contacts to delight customers. Today, 9 million customers touch the Walgreens brand every day at our stores, over the web or through mobile channels making Walgreens a true omni-channel provider.

In our pharmacy health and wellness business, our script comp was up 2.2% in the quarter. Our retail pharmacy market share increased to 19% for the quarter, up 20 basis points year-over-year and we filled a record 214 million prescriptions, up 2.8% from the same period last year.

We also continued to grow our 90-day at Retail program. According to IMS, in the second quarter, the 90-day at Retail market grew 15% year-over-year, while the mail market declined 10%.

Also our 90-day at Retail volumes in the second quarter increased by 17% over the prior year. From perspective, our 90-day at Retail business alone is as large as one-

third of the total mail industry and mail market industry. We believe this validates that consumers' value the ability to receive a 90-day supply at retail from their trusted community pharmacists and that payers are increasingly seeing the value in adding a retail benefit to the mail offering.

In addition, we had a strong season for immunizations with the total 8.6 million vaccines administered through the first half of the fiscal year. That's an increase of 11% over the same period last year.

While that increase was mainly on the strength of a strong flu shot season, we also continued to build our non-flu immunizations business. For example, today we are the number one retail provider of Zostavax, a vaccine for shingles.

Finally, we continued to see some impact on margin from the ongoing negative effect related to generics and the volume drop-off of controlled pain medications which we referenced last quarter.

Looking ahead, our Medicare Part D program is accelerating our momentum in pharmacy. In the quarter, our Med D volume was up year-over-year with significant growth in new customers, on top of strong performance in fiscal '13. Our Part D market share for the quarter increased 80 basis points compared to same period last year.

As we move forward, we are well-positioned to win with senior customers as a preferred provider in four of the top national plans, giving older Americans more plan choices which offer them lower copays for the prescription.

Also, as you know we are tightly integrating our Healthcare Clinics with our pharmacies in hundreds of locations. We're experiencing growing interest from customers, who value convenient affordable high-quality health care services and from payors who view Walgreens as an emerging health alternative care model and an important part of the patient's care delivery team.

To help meet this growing demand, we have a goal to add nearly 100 new Healthcare Clinic locations in calendar 2014, on top of our 400 current retail clinics, and we will continue to expand our network to develop a comprehensive national footprint.

Our strategic partnership with Alliance Boots contributed $0.08 per diluted share to Walgreens second quarter 2014 adjusted results. Combined synergies for the first half of fiscal 2014 were approximately $236 million. We now expect to exceed our second year combined synergy target and are now estimating $375 million to $425 million in the second quarter combined synergies.

We estimate that the accretion from Alliance Boots in the third quarter of fiscal 2014 will be an adjusted $0.13 to $0.14 per diluted share, and we purchased approximately 10.5 million shares of AmerisourceBergen stock as of February 28 and we own approximately 4.5% of the Company.

We continue to make good progress on our global initiatives. We are pleased with the performance of our global procurement organization. With the introduction of AmerisourceBergen, we believe we will be the largest purchaser of pharmaceuticals

worldwide. More importantly, we are working with manufacturers transparently and collaboratively, to help drive sustainable growth in the U.S. and Europe. Manufacturers have told us they appreciate our approach. We think this sets us apart from others in the market, benefits our organizations over the long haul and positions us and our pharmaceutical manufacturer partners extremely well for both short-term and long-term sustainable value creation.

In addition, after successfully transitioning our branded drugs to AmerisourceBergen last fall, we began our generic transition this January and are making excellent progress. We are on track to complete the work by September 1st. It's part of the Company's efforts to optimize our cost structure and assets and we are also taking a closer look at our store network. As we mentioned in our press release this morning, between now and August, we intend to close 76 stores spread across the country. Importantly overall this year, including store closings, we expect to expand our store base by approximately 55 to 75 locations in fiscal 2014.

We look at several factors in deciding, which doors to close. We address the impact of increased density from our own stores, the impact of real estate positioning within the market, and material changes to a store's trade area. In total, this represents a very small portion, less than 1% of rated 200 plus store base. As we position for future growth and markets and communities continue to change, we want to optimize our store footprint and make sure our stores remain on the best corners in America.

I will also want to note that because most of these stores are located near another Walgreens, we will be reassigning a majority of our team members. The store optimization is expected to resulted in more than $40 million to $50 million in additional annual EBIT, beginning in fiscal 2015, representing an estimated $0.02 to $0.03 in adjusted diluted earnings per share, as well as estimated charges of $240 million to $280 million, substantially all of which is expected to be recognized in the third and fourth quarters of fiscal '14. Keep in mind that we plan to exclude these charges from our adjusted EPS calculation.

As we head into the second half of the fiscal year, we are well-positioned to create value and accelerate long-term growth. We expect to continue to make meaningful investments in our front end that drive the right balance in sales and margins. We are also focused on our important programs in Pharmacy, Health and Wellness, such as Medicare Part D, immunizations and Healthcare Clinics that will improve – will continue to improve volumes and expand access to convenient high-quality, affordable healthcare services.

With these areas of focus, we will capitalize on the convergence of our two dynamic industries; retail and healthcare and continue to meet the changing demands of our customers, partners and payers. That, coupled with the commitment to excellence in execution that has always defined Walgreens, I'm excited about the future of our Company.

Finally I'd like to thank our team members who did such a great job serving our customers through a very difficult winter. Across the country, they ensured our customers had convenient access to the essential products, emergency supplies and the necessary prescriptions they needed through this harsh winter.

Now I'll turn the call over to Wade.

**Wade D. Miquelon - CFO**: Thank you, Greg. Good morning, everyone and thank you for joining us on the call. This morning I will take you through our quarterly results, as well as update you on our Alliance Boots strategic partnership and our AmerisourceBergen relationship.

As Greg noted earlier, for the quarter we reported a GAAP EPS of $0.78 per diluted share based on nearly 964 million shares. GAAP EPS walks to an adjusted EPS of $0.91 for the quarter as illustrated by this chart. A LIFO provision of $0.04, acquisition related items were $0.12 per share consisting of $0.06 of acquisition related amortization costs, $0.01 of acquisition related costs, and $0.05 Alliance Boots related tax. Finally, the special items were net $0.03 per share through the combined impact of the warrants issued by AmerisourceBergen to Walgreens and Alliance Boots, with the Alliance Boots impact reported on a three-month lag basis.

In our review our comparable store sales for the quarter; comp prescription sales increased 5.8%, comp front end sales increased 2% and total comp store sales increased 4.3%. Comp prescription sales increased 2.2% versus a script comp of 4.3% in the year ago period. In the second quarter, the front end comp increased 2%. Components of this comp are traffic which decreased by 1.4% and basket size, which increased by 3.4%. As Greg touched upon earlier, our front-end was impacted by the tough cough/cold//flu compare and the severe weather versus the prior year.

Looking forward, please keep in mind that the March front end comp sales will begin – will be negatively impacted by the Easter shift this year versus last year. Recall Easter fell on March 31st last year and falls on April 20th this year. As always we will provide the combined March-April comp, on May 5th, to give you a better understanding of our underlying sales for these two months.

Looking at comparable store script numbers, our retail scripts were up 2.2%. In spite of the tough cough/cold//flu compare this performance reflects the fundamentals of our underlying business, the return of Express Scripts' customers and our ongoing progress in winning new Medicare Part D customers. It also worth noting that the two-year stack on script comps has risen back to levels last, which were prior to Express Scripts dispute.

With respect to margin, our adjusted gross margin reflects our FIFO inventory was 29.1% in the current quarter compared to 30.5% last year, a 140 basis point decline. While we always experience some level of reimbursement pressure, the most significant factor affecting the pharmacy margin, was a dramatically slower rate of new generic introductions year-over-year. The front-end margin was negatively impacted by increased promotional investment, designed to drive traffic and sales. Partially offsetting these margin headwinds is the fact that purchasing synergies positively impacted both the front end and the pharmacy margins.

Taking a look at our adjusted gross margin trends, this quarter's 140 basis point decrease was versus a 120 basis point increase a year ago. In essence the benefit of the generic wave last year reversed itself this year. We expect this impact to continue to moderate in the third and fourth quarter and become a tailwind to some degree in

the fourth quarter of fiscal '14. Now keep in mind that the timing of the introduction of some generic drugs remains a question mark. For instance, as most of you know, the launch of generic versions of Diovan and Nexium may be delayed, which would result in their benefit being pushed out from our second half of fiscal 2014 into fiscal year '15.

Moving forward the front end margin will continue to be impacted by our promotional investments until we cycle these changes beginning this summer. As we demonstrated and discussed the last two quarters, this graph illustrates the impact that new generic drug introductions have had on our monthly prescription sales comps. The highlighted quarters illustrate that the number of new generic drug introductions have slowed dramatically versus a year ago. You can see that the generic impact on comp prescription sales was about a negative 6% in the second quarter of fiscal year 2013 versus the generic impact of negative 1.3% in the most recent quarter.

In our experience the margin change resulted from generics inversely correlated and slightly lagged due to the impact of generic sales changes. That is the strongest positive effect on margins typically occurs shortly after generic the impact on prescription sales is the most deflationary. That period occurred in the year ago quarter. As you can see the tough year-over-year generic impact margin comparisons dissipate in the latter half of fiscal 2014 given that generic impact on pharmacy sales comps is expected to increase in that period.

Transitioning now to gross profit, this slide illustrates our quarterly gross profit dollar growth trends for the past 10 quarters on a GAAP basis. The next slide shows the trends on an adjusted basis. Adjusted gross profit dollar growth slowed to 0.4% from 4% in the year ago period, as a result of the headwinds, we described for you in the first quarter, including generic wave shift, the front end investment and the impact of weaker cough/cold/flu. For the quarter GAAP SG&A dollar growth was 1.6%, to which we add back 0.1 percentage point for the acquisition related cost, resulting in adjusted SG&A dollar growth of 1.7%.

Shown here are the SG&A dollar growth trends for the past 10 quarters on a GAAP basis and the following slide shows a similar trend on adjusted basis. The adjusted SG&A dollar growth for the quarter was 1.7% year-over-year increase versus the 4.2% increase in the second quarter of fiscal 2013. Included in this SG&A dollar growth rate was approximately 50 basis points or $23 million of incremental weather related expenses mostly snow removal.

This next chart illustrates our two year stacked SG&A dollar growth trends on a GAAP basis for the last nine quarters.

Now let's review the two year stack trend on adjusted basis.

Two year stack adjusted SG&A trends improved versus a year ago by 200 basis points. With a two year stack of 5.9% growth in second quarter of 2014 down from 7.9% last year at about half the rate of growth of 11.6% two years ago.

During the quarter the rate of growth and adjusted gross profit dollars trailed

adjusted SG&A dollar growth by 130 basis points. As you can see gross profit dollar growth accelerated year-over-year which reflects in incremental headwinds we encountered.

Turning to few other components of our income statement this quarter included LIFO provision of $51 million versus a provision or a charge of $72 million a year ago. Our effective LIFO rate for the quarter was 2.5% down slightly from 2.75% a year ago. Net interest expense for the quarter was $37 million versus $23 million from a year ago.

Now I'd recall that quarter a year ago benefited from the receipt of $19 million of interest income generated by pharmacy reimbursement payments.

We expect interest expense of approximately $40 million in the third quarter. Average diluted shares outstanding were 964 million shares versus 953 million shares last year the change is primarily due to the impact of a higher stock price and the number of in the money options which are counted as diluted shares.

In third quarter we expect a diluted share count of approximately 965 million shares subject to changes in the current share price. Our blended effective tax rate for the quarter was 34.9% versus 36.6% last year. The difference is primarily attributed to foreign sourced income taxed at a lower rate partially offset by increases to estimated differences between book and tax income.

On a go forward basis Walgreens tax rate is expected to be about 37.5% and Alliance Boots tax rate is expected to be approximately 20%.

Accounts receivable increased by 11.8%, primarily due to increased business including the return of Express Scripts network prescriptions, and while accounts payable increased 2.3%. LIFO inventories were down 0.6% and FIFO inventories were up 2% year-over-year versus sales growth of 5.1%.

We expect inventory levels to come down in the back half of the year as we realize greater efficiencies due to daily delivery and complete the full generic distribution transition to AmerisourceBergen.

Overall, net working capital increased by 2.9% versus a year ago.

During the second quarter, we generated approximately $1.1 billion in cash from operations versus $1.2 billion in the year ago period. The free cash flow in the quarter was $877 million versus $903 million a year ago.

The next slide shows our quarterly accretion from Alliance Boots which was $0.08 per share for the quarter versus our forecast of $0.07 to $0.08 per share. You can find a more detailed walk including in the appendix to this presentation on our investor relations website.

Combined net synergies for the quarter totaled $129 million and for the first half of the year have totaled $236 million. As Greg noted because we are running ahead of our original estimate of $350 million to $400 million of combined synergies for the year we are now raising the range over our estimated $375 million to $425 million.

Looking forward we estimate the adjusted EPS accretion from Alliance Boots for the third quarter of fiscal year2014 to be $0.13 to $0.14 per share based on our current estimates of IFRS to GAAP conversion and foreign exchange rates and moving forward we plan to continue to provide our accretion estimate one quarter in advance.

Similar to last quarter we have reviewed our fiscal year 2016 goals internally. Our performance-to-date with respect to four of our five goals remains on track with or slightly ahead of our expectations. These four goals are sales of $130 billion including Alliance Boots share of associates and joint venture sales, synergies of $1 billion, operating cash flow of $8 billion and net debt of $11 billion.

As stated in our last call our adjusted operating income goal of $9 billion to $9.5 billion is currently tracking below the CAGR required to meet this goal and below our initial expectations. We continue to recognize that there are risks for achieving this goal however we remain focused on delivering it and have also stated we have identified a range of further opportunities including benefits from our AmerisourceBergen relationship, incremental Alliance Boots synergies, business expansion and new initiatives and cost savings which can all help mitigate these risks.

The asset optimization program that Greg described highlights our focus on efficiencies while the increase in our fiscal year '14 synergy estimate demonstrates that we are driving additional synergies with Alliance Boots and AmerisourceBergen.

In closing we believe our strategies to a long term are sound and should further differentiate us versus competition and create value for our stake holders.

When recapping the current state of our business there are many indicators that give us confidence in our future. As Greg said we've been growing share of competitive U.S. data living and retail pharmacy businesses and we continue on our Well Experience journey and we are focused on continuing the spread in momentum and also focused on positively impacting margin over time via mix and promotional and supply chain efficiencies.

Our pharmacy business is well positioned at patient side, such as acute needs, Part D customers and key chronic conditions and we continue to drive real efficiencies and build our pharmacy operations.

We also have a significant opportunity to participate in and influence the healthcare market more broadly via our asset and healthcare professional breadth. Through our various healthcare partnerships and initiatives we are on the path to do exactly that.

Now lastly we continue to be very pleased with our Alliance Boots partnership and AmerisourceBergen relationship. On Alliance Boots side their business remains resilient in a European environment that remains challenging. The continue strong cash flow and deleveraging focus has also been very positive. Our combined synergies have continued to track at the high end of our estimates and we are learning from each other every day. And are step 2 join operational and financial planning is going well.

Our AmerisourceBergen relationship thus far has also met our expectations with the distribution in our joint synergy efforts progressing right on plan. We also continue to identify additional ways that all three partners can work together to create value and change the paradigm in various areas of our business.

In short we believe we are just scratching the surface in what we can ultimately create as a global pharmacy health and wellbeing enterprise. In my humble opinion we are off to a terrific start.

With that I'll turn the call back over to Rick.

**Rick J. Hans - Divisional VP of IR and Finance**: Thank you, Wade. That concludes our prepared remarks. We are now ready to take your question.

Transcript Call Date 03/25/2014

**Operator**: Lisa Gill, JPMorgan.

**Lisa Gill - JPMorgan**: I guess just a couple of quick follow-up questions. The first would just be around the global procurement impact and timing. Greg you talked about number being better as far as synergies going up to $375 million to $425 million. But you didn't necessarily update that $1 billion overall shouldn't you be thinking about that $1 billion number as being a more of a contributor to overall number?

**Gregory D. Wasson - President and CEO**: We feel comfortable up in the number for this year, the $375 million to $425 million based on what we are seeing. We still feel confident on $1 billion and aren't ready to make any comments on it. Longer term we still feel confident that there are opportunities that we are identifying. But at this point in time we feel confident that we'll get to that $1 billion.

**Lisa Gill - JPMorgan**: You did make some comments today about the Affordable Care Act. Yesterday there were some comments that perhaps Florida looking at expanding Medicaid. Can you just update us on anything you have seen thus far around ACA volume and then maybe any expectations for an increase in the back half of the year?

**Gregory D. Wasson - President and CEO**: I saw that announcement and we think obviously as we've said. As enrollment grows it's going to be a positive for the business as you would expect with prescription business and people getting coverage who have not had coverage some of those maybe cash customers that were getting prescription that may not be a complete new prescription customer, but we think that it will be an additive benefit to more and more people getting coverage. It's still early to tell as far as the number of people that are coming onboard. I think there are some positive signs over last month or so that more and more people are getting coverage. Let me turn it over to Kermit. Kermit if you got any additional color that you are seeing.

**Kermit R. Crawford - President of Pharmacy, Health and Wellness**: Lisa, I think the other thing to add. Is that we continue to work with many of the new customers, new patients during the transition period we've announced that we will

continue to do that through April. We're also working with many of our health plan partners on educating many of the new potential enrollee. So we think the bulk of the volume will continue to be in the open networks and as we see more and more of the open network business we think that will be good for us.

**Lisa Gill - JPMorgan**: In terms of expense maybe, if you could in the back half the next couple of quarters in your fiscal year or do you think that's going to be more of a fiscal '15 event.

**Kermit R. Crawford - President of Pharmacy, Health and Wellness**: I think we've seen a slow enrolment period but I think we'll see that gradually increase over the next couple of quarters and into next year.

**Operator**: Robert Jones, Goldman Sachs.

**Robert Jones - Goldman Sachs**: Let me start on the gross margin trend. I know you guys mentioned that you expected negative generic comp, experienced in the front half to ease as we move into the back half, and I understand you guys don't give specific guidance, but could you maybe just help us think about the components of the gross margin trend in the back half maybe for instance relative to the year-over-year declines that we've seen in 1Q and 2Q? Any sense you can give us on what we should be looking for on the year-over-year trend into the back half?

**Wade D. Miquelon - CFO**: Yeah, I mean I would just say – just – there's couple of factors. A big one obviously is the timing of new generic introductions and so we start to move in a phase for those comps now. Again, the exact date of these can never be perfectly predicted. So you have in general the information that we have, but that makes a very substantive difference. Again, we're starting to cycle the front investments that we made that were quite substantial to get back to more of a normalized rebalancing mix. So over the next quarter or two, we'll move into that cycling. And then, even things like flu and it's going to have some mix effects and so we'll start both cycle that and get into more of a normalized period. So these things will kind of all come when they come, but directionally especially when you also look to stacks for compare, they tend to even out over time, but I think we're moving into that phase.

**Robert Jones - Goldman Sachs**: Then just going back to the synergies, I know originally you guys were calling for this to be a little bit less than what we saw last quarter. Clearly not the case, you've realized more synergies in Q2 than 1Q. And then looking at the full year even though you did increased it, it does look like the back half would actually be on track to produce less than what we saw on the front half. Just any more specifics or commentary you can give us around the drivers of synergies and maybe what's causing some of the cadence in this fiscal year at least?

**Wade D. Miquelon - CFO**: Yeah. I mean, I think we feel very good where we are, but I would also say that for the people there in the trenches, working, these people like, you know Jeff and John, I mean, these – some of the deals that we work, you never can predict exactly when they are going to hit and for what period they will (prove to) but separately, I would say that you know every day we have multiple streams working very hard to identify new synergies to work – negotiate new

synergies, and so, again while we feel very good on the glide path and even the long-term as Greg suggested, these things are going to require hard work each and every quarter, every quarter going forward, and we still don't want to get ahead of ourselves there.

**Robert Jones - Goldman Sachs**: So, then it's not something that's necessarily linear clearly based on the guidance that you guys put out for the back half?

**Wade D. Miquelon - CFO**: Well, I don't know if it's linear or not, but I'd say they can be choppy along the way, because – you know because sometimes you get a step-up for something that we do, but other times, we identify new source of synergies and start working with that. I guess there's a lot of moving parts underneath the hood, but you know directionally, we feel we have the right momentum towards our goal.

**Operator**: Ricky Goldwasser, Morgan Stanley.

**Ricky Goldwasser - Morgan Stanley**: A couple of questions. First on the SG&A spend, I mean this is the second quarter where you've grown SG&A at well below your 3.5% to 4.5% organic targets. So, if you can talk a little bit more in detail about the cost control. Is this kind of like a new level going forward? And also how much of it is being driven by distribution efficiencies from the ABC relationship? When does that normalize, if it does?

**Gregory D. Wasson - President and CEO**: Rick, maybe I'll update eye level and let Wade get in a little more detail. I think, as I said, I think we feel good with what the stores are doing and the efficiencies that Mark and team have really driven to the store. I think we'll continue to see the stores do a nice job of balancing payroll according to the volume. I think, a lot of the corporate initiatives that we've had in place regarding really looking at core initiatives and core programs and projects, we feel good we're making progress there and that should continue. Yeah, I don't think frankly that you should be factoring a lot of efficiencies yet for the AmerisourceBergen transition, although we do expect to see that going forward, but we're still in the process of transitioning the generic distribution from our distribution centers. So, theirs, that's certainly on. So, there's not a lot of that built in. We certainly do expect there'd be opportunities going forward with it. Wade, anything to add?

**Wade D. Miquelon - CFO**: Yeah, no. I think we're just aggressively attacking all costs. So, we have had a couple of very, I think, strong quarters versus to what we've had prior in our sustainable growth model. We'll continue to attack all costs and make sure that we focus on our resources and the core strategies that will drive value. So, I hesitate to lay into any kind of guidance on that, but as Greg said, also the big distribution benefit for us really comes at the end of this fiscal and into next fiscal when we have all of our generic volume, which is the smaller dollar piece, about 80% of the unit volume fully consolidating their systems and I think that's also when they see the – once we get the full integration of branded generics. So, that will be a next year pipeline launch.

**Ricky Goldwasser - Morgan Stanley**: And what, if you can share with us, what

percent of your generic volumes is now distributed via ABC?

**Wade D. Miquelon - CFO**: We haven't given that a number. We're making good progress and we intend to be completed by the end of the fiscal year and we're on track to meet that date for sure.

**Ricky Goldwasser - Morgan Stanley**: Then secondly on the tax rate, I know the tax rate in the quarter was below historical levels and Wade, you touched upon that, but just to clarify, should we expect in the next quarter then, higher tax to go up or is there any change in how you account for the AEP equity earnings? How you're accounting of taxes for that?

**Wade D. Miquelon - CFO**: Connie, I think you can expect probably going forward a rate similar to what you saw in this quarter. It's again – I think it's fairly complex to kind of track the rate through this based upon our joint venture, their business and our business, but I think that you will see something markedly different from you what saw in this period.

**Operator**: Mark Wiltamuth, Jefferies.

**Mark Wiltamuth - Jefferies**: I wanted to get some insights on the Alliance Boots number. The reported income from Alliance Boots of $194 million was much higher than a lot of us were expecting. What was in that number? Was there anything unusual in that? What do you think the core operating earnings growth for Alliance Boots is running at right now?

**Wade D. Miquelon - CFO**: Yes. I mean, the big thing in their number for IFRS purposes is the warrant income from ABC and they have a lag, so it was actually a gain in this period for them and without the lag for us, the stock pulled back a little bit, it was a slight loss. But that was the big thing in the IFRS number and again for our purposes for GAAP, we have grossed that out. There's always some nuances back and forth. With respect to their overall business, I'm not going to provide any kind of guidance on a going forward, but they are going to be reporting their numbers for the full year in May. So closing at the end of March here in the next week or two, so I think you'll be able to get a lot more color on their business probably and that should probably be very helpful.

**Mark Wiltamuth - Jefferies**: The difference between that $194 million that was in the reported numbers and the $100 million that you had in the slides that were kind of tax affected, what's – is that just a picking up that gain that you're talking about?

**Gregory D. Wasson - President and CEO**: It's primarily the warrant.

**Wade D. Miquelon - CFO**: I don't have the full rec but that would be the meaning of that, but we can get you the specific details on that.

**Mark Wiltamuth - Jefferies**: Then on the weather impact, I guess there was some commentary on the SG&A impact from removing snow and so forth, but what do you think the total weather impact was in the quarter?

**Wade D. Miquelon - CFO**: As Greg has said, you know our gross profit SG&A spread

(

would have been basically equal, have it not had it, so you can deduct about 20 couple of million, $22 million for snow removal – $ 25 million in the balance up to $60 million, so $35 million or so for gross profit impact. I think that was both through store closures where we had substantial store closure days and a little bit of traffic too.

**Mark Wiltamuth - Jefferies**: So $22 million plus the $35 million...

**Wade D. Miquelon - CFO**: Yeah, about that, say $60 million in total.

**Operator**: Eric Bosshard, Cleveland Research.

**Eric Bosshard - Cleveland Research**: Two things. First of all in terms of merchandising changes with Alex involved and with beauty, I'm curious if you can give us an update of where that is going in terms of an opportunity to further expand beauty? What you're doing in terms of adding product, adding space, adding labor and then also the opportunity to expand brands to further driver share opportunities from that area?

**Gregory D. Wasson - President and CEO**: I have got Alex here, so I will lead off and maybe I'll let Eric or Alex weight in a little bit. But as I said, we do think we have an opportunity to build bigger in beauty. We feel good with our pilot rollout of the Boots brands in Arizona as I said. I think we've been in that since last fall. We're seeing some pretty good results not only in – with the brands specifically, but in the total category itself which is encouraging. We intend as I said the rollout in New York City next. We think that's a good metropolitan market to introduce the brand in a very special way and we're going to do it right, so we're feeling pretty good there. I guess, maybe I'll – Alex, I will let you kind of weigh in here with new thoughts.

**Alex Gourlay - EVP, President Customer Experience and Daily Living**: Thanks, Greg. Yes. As Greg has said we're pleased with progress so far. We've seen a really positive response from some of the customers who are already shopping for Beauty in Walgreens and do more shopping for Beauty in Walgreens, particularly in developing some countries. But you're absolutely right, it's really about the whole experience not just about the product. It's about the customer care that surrounds a product and we have seen that consistently both in Phoenix and in the 10 stores that we have upgraded in New York. So, my advice will be, if you're interested, go and have a look at, when you use this great example of New York City, Empire State Building in New York City. They're both underground and we'll have a (indiscernible) by the end of this fiscal year, and I'm feeling good. That's certainly encouraging Walgreens shoppers to shop a bit more in beauty already and it's not just No7. It's the Boots brands and beyond that.

**Eric Bosshard - Cleveland Research**: Just a follow on as you think about the future opportunity to gain share, perhaps never getting to where Boots is in the U.K., but moving in that direction, how important is the ability to gain access to brands that you don't have today, national brands or prestige brands? How critical is that or how far can you get without those?

**Alex Gourlay - EVP, President Customer Experience and Daily Living**: We

believe we can go quite a long way without them. Again the history in Boots, the premium brands have only been in Boots for about 15, 20 years; and Boots had a very strong beauty business en masse and we call it (indiscernible), which has been in market brands before then. So, we are feeling pretty good about being able to expand without premium brands, and obviously as we go forward into the future, we attract customers to think more about the experience of beauty inside of Walgreens. We believe that some of the premium brands may be interested in joining us in Walgreens, that is somewhere down the road and we think we can get quite a long way down that road without the support of the premium brands.

**Eric Bosshard - Cleveland Research**: Just one other if I could, the store closings is a little bit different than what we've seen in the past. Curious about the timing on that and thinking on that and then also if there's a larger opportunity to manage down the SG&A or corporate opportunity within the business as you look at combining the organizations?

**Gregory D. Wasson - President and CEO**: Maybe I'll lead off and get Wade and even Mark Wagner if he wants to weigh in here. Keep in mind that when we talked earlier in the year about our enterprise optimization program to really set ourselves up for the global – the international entity we're about to become, we really want to make sure we're positioned ad ready to roll for that, and we've been doing some good steps corporately as we talked about to position ourselves; and then the next thing, we wanted to look at some of the assets. We took a real hard look trade area by trade area at our store locations. Something to your point, we really – we've done in the past but not with a real focused effort. The good news is frankly we've got great a lot of great locations out there and we've only really stumbled on about the 75 or so that we're talking about. A lot of that's just due to – some of that's due to us. We put in maybe an extra store in the trade area than probably what we should have and we've been stepping so forth, but with that, maybe I'll turn it over to Mark a little bit as far as he went through – he led that exercise to look at our store base and I think he maybe would add a little color.

**Mark A. Wagner - President - Operations and Community**: We looked at it really with two lenses; one with a strategic lens, one with a financial lens, and losing the Pareto philosophy, 80% of the closings are really in some of our denser markets, some of our big growth states that were – we were the biggest competitor in these trade areas. Some of the other challenges we had in the trade areas were they changed over time due to pattern changes, overpasses, underpasses, you name it, that really made our store real estate sites not as competitive or out-positioned in most cases.

**Operator**: Scott Mushkin, Wolfe Research.

**Scott Mushkin - Wolfe Research**: First one, I want to talk about is free cash flow. Looks like it's running about half of last year's levels and I want to get your thoughts as we go forward and we get to next year when we're going to close the acquisition and what impact if this trend, continues that will have?

**Wade D. Miquelon - CFO**: I would just say that this year both operating and free cash flow looks a little bit lumpy just because we've got this major transition with

AmerisourceBergen, the timing of the brand move, the timing of the generic move, the re-selling of contract for how we think about inventory versus payables. But, this is really going to work its way through the system, because at the end of the year, we anticipate that we'll have what will be the targeted levels for this type of transition. So, I guess what I would just say – I don't think anything is unusual this year in operating or free cash versus prior year, in that slight changes and working capital slight changes and whatever. So, as we look forward, I guess 2016, we still are very – remain very confident and are combining cash goal of $8 billion in operating and very strong free cash flow. And again, I think what you saw last quarter was very level, but it's really just because of this transitional effect and this quarter was more normalized, but the next couple of quarter, we should kind of even out the entire year as we complete the full transition.

**Scott Mushkin - Wolfe Research**: We should think of free cash flow kind of similar to the levels we saw last year, is that how you – its' lumpy, but it's going to be about the same?

**Wade D. Miquelon - CFO**: Yeah, well, I mean the real test – just for us operating less the capital, but you know – but it's not substantially different. You got our guidance for what we planned on capital spending and you could do the math yourself there.

**Scott Mushkin - Wolfe Research**: Then my second question goes, I think you guys said you had $628 Well stores. Wondering, if could you give us any or maybe you've done this before, but any kind of – as you convert stores to the Well Experience, what the sales lift looks like, what's the profit lift, and then how many more are you expecting this year? If you could give us a little insight on that, that'd be great.

**Gregory D. Wasson - President and CEO**: We haven't really given out color on actual performance. I can say that, as we've been working on this for the last three years, it's kind of a crawl, walk, run. We want to make sure that the investment we're putting in, we're getting the right return. We feel pretty good. There's still some areas that we're tweaking to make sure that we can continue to put the pedal to the metal. One of the things we've done is, the good thing is, is we now have a pretty good idea of the various components within the Well Experience format and what's working, what still needs to work and the good thing is you're beginning to see the various components within the Well Experience format show up throughout the chain in a much quicker way than what we would have been if we just continued to roll out the entire format or try to get the entire format right. So, bottom line, we feel good about it. There's still areas where we want to tweak and get the returns on that added content and product so forth, but there's a lot of the areas that are modular that we can begin to roll out throughout the chain. Alex, you want to add any color there?

**Alex Gourlay - EVP, President Customer Experience and Daily Living**: Yeah, thanks Greg. The only thing I would say is that, success in the Balance Reward card in terms of having 80 million active customers and 100 million total signed up, has given us real-time data about how people are using our stores and that data's helping us to design, as Greg has said, even better assortments going forward. So, I think

the design has been really appreciated. The customers' feedback in terms of the brand perception is good, in terms of moving on the brand perception to a more differentiated experience in the normal drug store channel, which is exactly what the teams hoped to do a few years ago. The data from the Balance Reward card is now allowing us to build better assortments for our customers. So, I think, we'll accelerate from this point based on that data and based on what the customers are telling us right now in terms of their perception of the Walgreens brand within it.

**Operator**: Charles Rhyee, Cowen and Company.

**Charles Rhyee - Cowen and Company**: Maybe if I could just follow-up on that question, Alex. In terms of the data from Balance Rewards, how much is that data being really analyzed and how much has it already been acted upon or is this something you're still kind of – call in data and crunching it to really understand sort of the behavior of your shoppers?

**Alex Gourlay - EVP, President Customer Experience and Daily Living**: Yeah, I mean, I think it's a bit of all three. I mean, I think some of it is really well understood and we're using already to simplify some of the things we're doing particularly in the commercial strategy. Some of it, we're understanding in terms of building assortments as I said already, and why not from experience of being with Boots, there's a lot more we can do with this data over time, but the team – a strong team, they are really a good team and are working closely with their associates and partners across in Alliance Boots. I think this will give it a lot of momentum going forward. So I think all three to be honest for very good reasons.

**Gregory D. Wasson - President and CEO**: Charles, I would weigh in on it as well. I think – I'd say we're really kind of in the infancy of the insights that we're beginning to gather from having launched nearly 100 million, 80 million active members a year ago. So, there's a lot of excitement from the merchants, let me tell you, about the data and the insights are beginning to have.

**Charles Rhyee - Cowen and Company**: Then maybe a question for Wade. If I look at the cash flow statement, am I correct – I think you didn't really repurchase any shares in the quarter. How should we think about that maybe for the balance of the year?

**Wade D. Miquelon - CFO**: We didn't repurchase any shares. We, I think as we've said before – our allocation policy was to get us through step two, very strong balance sheet position prior to reconsidering any buybacks. We have been buying as you also see some AmerisourceBergen stock. I think the number at the end of the quarter was 1.5%, 1.6%.

**Charles Rhyee - Cowen and Company**: Then, maybe if I can just sneak one last question in. On the – you touched on sort of the stores that you are closing and so our net stores are 55-75 for the year opening. How should we think about store expansions as we go forward? You might have touched on that. I'm sorry if I missed it?

**Wade D. Miquelon - CFO**: We don't think they are kind of rate of annualized growth

that we've talked is going to be different. Again, you know there – in the grand scheme of things, these 76 stores are less than 1% of our total and many of them have you know – circumstance have changed over many years, but on a go-forward basis, we will see the same kind of cadence we've had in the past few years.

**Gregory D. Wasson - President and CEO**: I'd say, one of the things that we have, we do feel good about with the opening of at a slower rate, although still, plenty of new store growth year-over-year. We are really finding some great locations, and that what we want to do is, we want to fine A plus locations now and open at the same rate going forward. We still have several geographies out there that we can expand in and find great locations.

**Operator**: John Heinbockel, Guggenheim Securities.

**John Heinbockel - Guggenheim**: Two things. How do you think about tobacco? How much of an opportunity is that near term right as CVS exits? Is it a liability long-term, and then do your partners HMOs, PBMs, customers, do they care whether you sell it or not?

**Gregory D. Wasson - President and CEO**: Let me start with kind of where we're focused and what we're focused on is that will help encourage our customers to make healthy choices and not only with just with cigarettes, but with daily habits and that's kind of what our Walk with Well and some of the things we're doing are designed to do. That includes helping people quit. I think that the CDC has said that the two most important factors that help someone quit smoking is a healthcare professional as well as nicotine replacement therapy and some stats that maybe, you may have or may not have but, back in the '60s, '70s better than half this population smoked today. It's down to about 18%. It's been 18% for a period of time. Those folks, 60%-something of them want to quit. 45% last year tried to quit. We think we are well positioned to help folks change their behavior and want to quit. So, our pharmacists are geared up and we really want to begin to help change behaviors. So, that's our area of focus.

**John Heinbockel - Guggenheim**: It sounds like you're going to stick with it unless it's mandated like in San Fran that you can't sell it.

**Gregory D. Wasson - President and CEO**: Well, as I said, we're going to help people change behavior. We're going to help them quit and I don't think there's anyone better than a retail pharmacy with a pharmacist and smoking cessation products that can help people change their behavior and help them quit.

**John Heinbockel - Guggenheim**: Then for Alex, obviously beauty, No7, that's pretty obvious, how that can help Walgreen. What are some of the less obvious things you can bring from Boots? One of the things that's always intrigued me is migrating Pink Friday to the U.S., what are some of the things you've looked at that can be impactful to Walgreen U.S. that may have flown below the radar screen?

**Alex Gourlay - EVP, President Customer Experience and Daily Living**: I think to start with Pink Friday, which, as you know is a (indiscernible) in the U.K. Walgreens already has a really, really good seasonal business, and particularly it's

been at a last minute gift destination for many Americans and that's exactly what Boots store is as well. So, we think we can really join together and improve that, and improve some of these, the beauty ranges in Walgreens and I am sure to improve the range across both Boots and Walgreens by even better for customers. The seasonal is definitely one area. I think also the second area to point to would be the fantastic Well at Walgreens brand. At Walgreens healthcare brand is a number one healthcare brand from a consumer healthcare point of view. And again working closely together to bring new innovative products both to the U.S. and to the U.K. market is primarily based that's another big opportunity initially on the consumer and the front end.

**Gregory D. Wasson - President and CEO**: I think one of the things that we're bringing as well and helping us with is the understanding of how their Boots loyalty program was successful and helped drive a lot of the success that they had moving into beauty and other areas within the U.K. and I think the knowledge that we are bringing with our $80 million active members now to continue to improve our loyalty program is going to be a big opportunity for us.

**Operator**: Edward Kelly, Credit Suisse.

**Edward Kelly - Credit Suisse**: I was hoping we could may be wrap up with two topics that have become more top of mind with investors recently. The first is around the longer term view of leverage at the company you obviously historically haven't operated with a lot of leverage at all. Alliance Boots has rate and I think impression is as you go forward as a combined company generating a ton of free cash flow. Would it make sense to operate positively with a lot more leverage than where you are today to a (mock) cash or either share repo or additional deals. So your thought on that for us would be helpful.

**Kermit R. Crawford - President of Pharmacy, Health and Wellness**: Yeah I guess, one thing, obviously I think when you look at our business, you need to look through to the leases and the lease aspect on our overall balance sheet which is significant. You know we like where we are investment grade, and I think it's been important philosophically for us to stay investment grade, we're in that investment grade zone. We should be over time, I think you know – we've decided over time as we go. But I guess, what I would say is, yes, we are – we do believe, we'll generate lot of free cash, we'll have a lot of options. But at this point, we're really focused on getting through to step two with the structure, with the ratings, with the overall metrics that we've had. At that point, I'm sure that we'll look broadly and reassess all of our options as a company to say what's the best capital allocation process going forward and what are the best value-creating ideas returning excess to shareholders or is investing back in the business. So, I'd say it's really, it's little premature to have that discussion fully now.

**Edward Kelly - Credit Suisse**: Second question, which, I know the answer might be similar, but it's on the notion of tax inversion because there has been a lot of speculation at least amongst investors about the opportunity here. Could you maybe just talk about what the issues maybe you know for a Company like Walgreens and potentially doing something like this and whether it's something that you would be

open to considering?

**Gregory D. Wasson - President and CEO**: Maybe I'd start with – just reiterating what I said, I think you've – not on last earnings call, the one before that, we have no plans to do so – to do an inversion or re-domicile the Company. I think what we are focused on frankly is spending the time with our Board and on diligence and so forth to make sure that we put our Board and our shareholder in the position to make the right decision on step two, and that's what we're focused on. But, just to reiterate, as I said, on last call, we have no plans to do an inversion.

**Operator**: Thanks. Here, I'm showing no further question at this time. I'd like to hand the call back over to Mr. Rick Hans for any closing remarks.

**Rick J. Hans - Divisional VP of IR and Finance**: Folks that was our final question. Thank you for joining us today. As a reminder, we will report March sales on April 3rd and until then. Thank you for listening.

**Operator**: Ladies and gentlemen, thank you for participating in today's conference. This does conclude today's program. You may all disconnect. Have a great day everyone.

© Copyright 2014 Morningstar, Inc.

**From:** "Miquelon, Wade" <wade.miquelon@walgreens.com>
**Date:** June 11, 2014 at 3:55:18 PM CDT
**To:** "Sabatino, Thomas" <thomas.sabatino@walgreens.com>
**Subject: Fwd: Call thoughts**

I could use some moral support.    Wade

Begin forwarded message:

**From:** "Miquelon, Wade" <wade.miquelon@walgreens.com>
**Date:** June 11, 2014 at 4:54:37 PM EDT
**To:** "Wasson, Greg" <greg.wasson@walgreens.com>
**Cc:** "Greener, Chuck" <chuck.greener@walgreens.com>, "Hans, Rick" <rick.hans@walgreens.com>, "Sabatino, Thomas" <thomas.sabatino@walgreens.com>
**Subject: Re: Call thoughts**

She has audit oversight and her buy in that we are doing the principled and appropriate thing is critical.    Wade

On Jun 11, 2014, at 4:53 PM, "Wasson, Greg" <greg.wasson@walgreens.com> wrote:

> We need to do what is best for the company and tell Jan what we are doing. Thanks
>
> Be well,
> Greg
>
> **Every day I help people get, stay and live well.**
>
> On Jun 11, 2014, at 3:35 PM, "Miquelon, Wade" <wade.miquelon@walgreens.com> wrote:
>
>> Jan and I had our one to one today.  I talked her thru all options.  She said she would fully support the outlined solution below but would not support delaying the earnings call and would want to understand a lot more before agreeing to that.
>>
>> Goldman just said to Joe and I they do not feel pulling the goals is investor problematic if everyone feels the full deal info will be shared in 3 weeks.
>>
>> Wade
>>
>> On Jun 11, 2014, at 11:19 AM, "Wasson, Greg" <greg.wasson@walgreens.com> wrote:
>>
>>> Wade,
>>>
>>> I just talked this with Jim Skinner and Steve Davis who both support the logic of releasing earnings on the 24th and delaying the call until the 10th. Wade, this looks like a slight twist in that you are recommending a short call on the 24th as well. We should debate the pros and cons of a release only or a release with a short call. Thanks.
>>>
>>> Be well,
>>> Greg
>>>
>>> **Every day I help people get, stay and live well.**
>>>
>>> On Jun 11, 2014, at 10:11 AM, "Miquelon, Wade" <wade.miquelon@walgreens.com> wrote:
>>>
>>>> All,
>>>>
>>>> For what it's worth the wag and AB team talked how to manage earnings and deal timing dilemma.
>>>>
>>>> We talked all the options outlined by Rick and team

After a robust discussion, we ultimately landed on the following we would recommend.

1.  Have the earnings call on 24th

2.  Keep it short and sweet and on the business

3.  Pull all forward looking guidance as we are looking at a comprehensive plan with many interrelated and moving parts, including looking at many suggested ideas

4.  Explain that we are getting close in finalizing plan

5.  Say that we are anticipating having a call to talk the plans in much more detail in the second week of July.

Everyone feels giving any parts without the whole including an acceleration amendment.

There is also a general belief the investors will be patient until then but not much longer.

Wade

Seeking Alpha $^\alpha$

# Walgreen's (WAG) CEO Greg Wasson on Q3 2014 Results - Earnings Call Transcript

Start Time: 08:37

End Time: 09:39

Walgreen Co. (NYSE:WAG)

Q3 2014 Earnings Conference Call

June 24, 2014 08:30 AM ET

### Executives

Greg Wasson - President and CEO

Wade Miquelon - EVP, CFO and President, International

Kermit Crawford - President, Pharmacy

Mark Wagner - President, Operations & Community Management

Alex Gourlay - President, Customer Experience & Daily Living

Rick Hans - DVP, IR and Finance

### Analysts

George Hill - Deutsche Bank

John Heinbockel - Guggenheim Securities

Meredith Adler - Barclays Capital

Ricky Goldwasser - Morgan Stanley

Steven Valiquette - UBS Securities LLC

David Larsen - Leerink Swann & Company

Robert Jones - Goldman Sachs

Lisa Gill - JPMorgan

Edward Kelly - Credit Suisse

### Operator

Good day, ladies and gentlemen and welcome to the Walgreen Company Third Quarter 2014 Earnings Conference Call. At this time, all participants are in a listen-only mode. Later we will conduct a question-and-answer session and instructions will follow at that time. (Operator Instructions) As a reminder, today's conference is being recorded.

I'd now like to introduce your host for today's conference call Mr. Rick Hans, Divisional VP of IR. You may begin sir.

### Rick Hans

Thank you, Kevin. Good morning, everyone. Welcome to our third quarter 2014 conference call. Today, Greg Wasson, President and CEO; and Wade Miquelon, Executive Vice President, CFO and President International, will discuss the

results for the quarter. Also joining us on the call, and available for questions are Kermit Crawford, President of Pharmacy; and Mark Wagner, President of Store Operations; and Alex Gourlay, President of Customer Experience and Daily Living.

As a reminder, today's presentation includes certain non-GAAP financial measures, and I would direct you to our website at investor.walgreens.com for reconciliations to the most directly comparable GAAP measures and related information. You can also find a link to our Webcast on our Investor Relations Web site. After the call, this presentation and a podcast will be archived there for 12 months.

Certain statements and projections of future results made in this presentation constitute forward-looking statements that are based on current market, competitive and regulatory expectations that involve risk and·uncertainty. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking statement after this presentation, whether as a result of new information, future events, changes in assumptions or otherwise. Please see our latest Forms 10-K and 10-Q and subsequent Exchange Act filings for a discussion of risk factors as they relate to forward-looking statements.

Now, I'll turn the call over to Greg.

### Greg Wasson

Thank you, Rick. Good morning, everyone and thank you for joining us on our call. Before we get to today's financial results, I'd like to begin with a few comments on the proposed second step in our transaction with Alliance Boots.

Our Management Team and Board are making significant progress evaluating the proposed transaction determining the timing and structure, the combined management team, additional synergy and cost reduction initiatives and potential changes to our future capital structure. We will be in a position to hold an investor call once key decisions on these major issues have been made, which is expect to occur by late July or early August.

Now I'll turn to our third quarter financial results. Today I'll begin with a review of the quarter. Next I'll discuss the key factors affecting our financial performance, and finally I'll provide more detail on our strategies and overall progress and then I'll turn the call over to Wade for a more detailed financial review.

In the quarter, we continue to see improving top line growth with increased daily living sales and strong performance in both prescriptions filled and our pharmacy market share. For the quarter, sales were $19.4 billion, up 5.9% from $18.3 billion a year-ago. GAAP operating income for the quarter was $1 billion, up 3.5% from $991 million last year.

Adjusted operating income for the quarter was $1.3 billion, up 4.5$% from $1.2 billion in third quarter of 2013. GAAP earnings per diluted share were $0.75 in the third quarter compared to $0.65 last year; up 15.4%.Third quarter adjusted earnings per diluted share were $0.91, up 7.1% from $0.85 in the same quarter last year.

Our results this quarter benefited from a lower GAAP effective income tax rate. The lower rate of 31.5% compared with 38.7% last year resulted from increased foreign income taxed at a lower rate, favorable audit settlements, certain nondeductible expenses last year and other discrete events.

Turning to trends in gross profit dollars and SG&A dollars in the third quarter. On a GAAP basis, our gross profit dollars increased 4.2% or $218 million from a year-ago. SG&A dollars increased 4.3% or $189 million compared to a year-ago. Adjusted gross profit dollars increased 2.6% or $139 million compared to a 5.3% increase in the same quarter last year. This difference primarily resulted from decline in pharmacy gross margin, which we will discuss in detail later in the call.

On adjusted SG&A dollars increased by 2.9% or $121 million compared to the same quarter last year. We remain focused on cost disciplined to offset a negative effect to our gross profit dollar growth. We will be accelerating our optimization efforts, taking additional steps to lower our expenses company wide.

I appointed a key member of my executive team to lead this effort. We've been making tremendous progress in identifying opportunities when combined with additional synergies and cost reduction initiatives that are part of step two and the completion of the strategic transaction with Alliance Boots, we expect to drive sustainable efficiencies and value for the combined enterprise.

In the quarter, we continue to focus on our three strategic growth drivers, create a well experience, advance the role of community pharmacy, and establish an efficient global platform. Today I will provide more detail on those strategies.

Performance and our well experienced growth driver has continued to improve, giving us even greater confidence in the significant potential of our daily living business. Our front-end comp increased 2.2% in the third quarter. And when you

look at the two-year stack, our performance is the best it's been in eight quarters. Average basket size grew 2.9% as customers consolidate -- continued to consolidate trips.

In addition, front-end margin improved in the third quarter compared to the same quarter last year. To drive margins, gains, we improved our product mix with a strategy to advance our health and beauty categories. We are also delivering great efficiencies in our promotional investment with our Balance Rewards program.

At the end of May, we had 81 million active Balance Rewards members, allowing us to reach more customers with our offers. We received solid response rates on our personalized point offers. We've integrated our award winning Paperless Coupons into our program and have nearly 1.5 million people enrolled in our Balance Rewards for healthy choices program.

Also in the quarter, while we continued our program to optimize our store footprint, we opened our converted 24 well experienced stores, reaching a total of 642 across the country. To further engage our beauty customers, we extended the reach of Boots brands. We launched Boots No7 and more than 300 stores across the chain primarily in our Phoenix and New York markets.

In New York, one of the countries most important beauty markets, we currently have Boots brands and more than 125 Walgreens and Duane Reade stores with a goal of 183. From New York, we will begin our launch across the United States. As we prepare for that expansion, results were coming in from Phoenix, our most mature market for Boots No7 and its clear our new beauty experience is elevating our performance. Boots No7 is the number one skin care brand sold in all of our Phoenix stores and baskets with boots items are bigger than the average beauty basket.

In addition, 80% of our beauty customers tell us their beauty experience is improving. We are not only seeing better performance in our stores No7, it's also the number one beauty brand on walgreens.com.

Finally, our focus on extraordinary customer care is paying off. Our customer delight score increased 230 basis points this quarter and is at an all-time high for the Company. Pharmacy delight is also at its highest level ever, up 270 basis points this quarter over last year. This performance is a credit to our store leaders and our team members who are demonstrating their commitment to our customers with every transaction.

In our Pharmacy and Health and Wellness business, our script comp was up 4.1% in the quarter. Our retail pharmacy market share increased to 19% from the quarter, up 20 basis points year-over-year and we filled 218 million prescriptions, up 4.5% from the same period last year.

To drive our performance, we've been making deliberate strategic decisions to win with high value seniors through preferred relationships with Medicare part D plans by growing 90-day at retail and expanding vaccines and other preventative care services. These decisions continue to drive results in the quarter, contributing to strong top line growth. We saw solid growth in prescriptions filled for part D patients with an increase of 11.6% this quarter compared to the same quarter last year.

Part D market share increased 60 basis points this May compared to the same month last year and overall 90-day volume was up 15%. Our 90-day retail product is competing effectively with mail giving customers a choice to receive their chronic medications at their pharmacy.

As you know 90-day at retail is at a lower margin than comparable 30-day fills, but we believe this strategy will have a long-term positive impact on gross profit dollar and EBIT growth for our Pharmacy business as we grow our share of maintenance meds.

Turning to headwinds faced in the industry, we've seen an increase in reimbursement pressure as well as a shift from historical patterns of deflation in generic drug cost to inflation. Over the past year, we've seen cost increases on a subset of generic drugs and in some cases these increases have been significant. Both reimbursement pressure and generic inflation are having an adverse effect on margin.

In addition, this quarter on a year-over-year basis, there was a slow down in generic introductions, although the impact continues to moderate as we move through the second half of the calendar year. To address the pressure on our gross margin, we're focused on our contracting strategy to account for increasing drug cost. We are aggressively working to increase efficiencies and providing high quality and cost effective pharmacy services that reduce total pharmacy costs.

With our global procurement organization in Bern, Switzerland, we also are well positioned to offset the impact. Along with Alliance Boots and AmerisourceBergen, our three companies are the largest purchaser of pharmaceuticals worldwide. Together we're working closely and collaboratively with manufacturers to drive sustainable growth both here, in the U.S and in Europe.

Our strategic partnership with Alliance Boots contributed $0.15 per diluted share to Walgreens third quarter 2014 adjusted results. Combined synergies for the first nine months of fiscal 2014 were approximately $367 million. We now expect to exceed our second year combined synergy target and are now estimating $400 million to $450 million in the second year of combined synergies.

We estimate that accretion from Alliance Boots in the fourth quarter of fiscal 2014 will be an adjusted $0.06 to $0.07 per diluted share. As I said at the top of the call, there are a number of opportunities we continue to work on as we move toward consideration by the Board of Directors of the second step of our strategic transaction with Alliance Boots.

Stefano and I are pleased with our progress to realize our joint vision for exercising step two of our strategic transaction. We are working through complex issues and we're taking the appropriate time to come to the right resolutions for the combined enterprise.

One final note, as a result of the many step two considerations and current business performance, the Company is withdrawing its fiscal year 2016 goals that were previously announced in 2012. The Company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal 2016 and we will communicate those to you on our call, which we expect to hold in late July or early August.

Let me speak directly to two of the prior goals regarding our adjusted operating income goal of $9 billion to $9.5 billion. On previous calls we noted we were tracking below the CAGR required to meet the goal. We now no longer expect to reach that goal on our combined synergy goals I noted earlier. We are tracking ahead of that goal and we expect to exceed the $1 billion amount by the end of fiscal 2016.

As noted above, some of the opportunities we're pursuing are below the operating line, the income line on the income statement and decisions about those will be reflected in our new goals and metrics. Two years ago, we announced our strategic partnership with Alliance Boots, an opportunity to bring together two companies with iconic brands.

We've made tremendous progress over the past two years, bringing to life our vision for a global pharmacy led health and well-being enterprise that can address the needs of a challenging healthcare market, improve service delivery and health outcomes. With the addition of our strategic relationship with AmerisourceBergen, we're creating a truly powerful combination of retail and wholesale leaders that can better serve customers in the U.S and around the world.

Now we're focused on making the decisions necessary for the combined enterprise in preparation for step two. We've work to do; we're intent on getting that work done right for the benefit of our enterprise, our team members, customers and shareholders. We look forward to sharing our decisions with you later this summer.

And now I'll turn the call over to Wade.

### Wade Miquelon

Thank you, Greg. Good morning everyone and thank you for joining us on the call. This morning I will take you through our quarterly results as well as update you on our Alliance Boots strategic partnership and our AmerisourceBergen relationship.

As Greg noted earlier, for the quarter, we reported a GAAP EPS of $0.75 per diluted share based on nearly 968 million shares. GAAP EPS walks to an adjusted EPS of $0.91 for the quarter as illustrated by this chart. A LIFO provision of $0.03, acquisition related items were $0.13 per share consisting of $0.06 of acquisition related amortization costs, $0.01 of acquisition related cost and $0.06 from Alliance Boots related tax.

Finally, the special items had no net impact due to the positive $0.07 impact of the warrants issued by AmerisourceBergen to Walgreens and Alliance Boots with the Alliance Boots impact reported on a three month lag basis, offset by the negative $0.07 impact of store closures and other asset optimization costs.

Let me now review our comparable store sales for the quarter. Comp prescription sales increased 6.3%. Comp front-end sales increased 2.2% and total comp store sales increased 4.8%. Comp prescriptions filled increased 4.1% versus a script comp of 7.1% in the year-ago period.

The components of the 2.2% front-end comp traffic which decreased by 0.7% and basket size which increased by 2.9%. We are pleased with the trends in the one and two year stack comps over the past few quarters.

Moving to comp store script numbers, our retail scripts were up 4.1%. This performance reflects the fundamentals of our underlying business, the ongoing progress and winning new Medicare Part D customers and increase of 90-day at retail scripts and return of Express Scripts customers. The two-year stack on script comp has improved dramatically in the

last two years.

With respect to margin, our adjusted gross margin reflecting FIFO inventory was 28.3% in the current quarter compared to 29.2% last year, a 90 basis point decline. The primary drivers of the pharmacy margin decrease were increasing third-party reimbursement pressure, particularly due to a few contract step downs, increases in Medicare Part D mix including the strategy to continue driving 90-day prescriptions at retail, fewer generic drug introductions versus the year-ago and pronounced generic drug inflation on a subset of generic drugs as well as the mix from specialty drugs.

Purchasing synergies in the pharmacy and front-end did partially offset this margin pressure. Front-end margin increased in the quarter, benefiting from mix and promotional adjustments, and we still expect the rate of generic drug introductions to increase in the fourth quarter to the point that it should not be a drag on margin year-over-year. On net, we expect the negative factors impacting pharmacy margin will more than offset generic introductions and front-end margin benefit next quarter on a year-over-year basis.

Taking a look at our adjusted gross margin trends, this quarter's 90 basis point decrease versus a 50 basis point increase a year-ago. Based on our strategies and plans, we do expect the front-end margin to continue to improve over the long-term. As we demonstrated and discussed in the last few quarters, this graph illustrate the impact of new generic drug introductions had on our monthly prescription sales comps.

The highlighted quarters illustrate the number of new generic drug introductions remain slower than a year-ago. And you can see that the generic impact on a comp prescription sales was about a negative 4% in the third quarter of fiscal 2013 versus a generic impact of negative 1.4% in the most recent quarter.

In our experience, the margin change resulted from generics is inversely correlated and slightly lagged to the impact of generic sales changes. And that is the strongest positive effect on margin typically occurs shortly after the generic impact on prescription sales is the most deflationary.

The tough year-over-year generic impact margin comparison has continued to dissipate throughout fiscal year 2014 and expected to turn positive in the fourth quarter of 2014, given the increase in generic impact on pharmacy sales comps expected in that period. This trend however continues to be negatively impacted by the delay of a few large volume drugs like generic forms of Nexium and Diovan.

Transitioning now to gross profit, this slide illustrates our quarterly gross profit dollar growth trends for the past 11 quarters on a GAAP basis. And the next slide shows this trend on adjusted basis. Adjusted gross profit dollar growth increased to 2.6% versus 5.3% in the year-ago period. Gross profit dollar growth was positively impacted by the comps in both the pharmacy and the front-end and further helped by a margin expansion on the front-end.

On the pharmacy side, gross profit dollar growth was negatively impacted by the same issues impacting pharmacy margin, which I described a moment ago. But despite these headwinds and the benefit of synergies, adjusted gross profit dollars grew faster than the average 1% growth rate in the first half of the year.

For the quarter, GAAP SG&A dollar growth was 4.3%. We then deduct 2.3% per store closures and other optimization costs and 0.1% for Walgreens amortization cost, and add back 0.3 percentage point for the acquisition related cost and 0.7% for the DEA legal settlement. This walk yields an adjusted SG&A dollar growth of 2.9% for the quarter.

Shown here are the SG&A dollar growth trends for the past 11 quarters on a GAAP basis and the follow on slide shows a similar trend on an adjusted basis. The adjusted SG&A dollar growth for the quarter was 2.9% year-over-year increase versus the 4.5% increase in the third quarter of fiscal 2013.

Keep in mind that last year's fourth quarter GAAP and adjusted net earnings include a $0.03 per diluted share in net gains from certain litigation matters. This net litigation gain reduced SG&A dollar growth by 0.9% last year and will be a factor in the SG&A dollar growth comparison year-over-year in the fourth quarter.

This next chart illustrates our two-year stacked SG&A dollar growth trends on a GAAP basis for the last nine quarters.

Now let's review the two-year stacked trends on adjusted basis. Two-year stack adjusted SG&A trends increased versus a year-ago by 510 basis points. With a two-year stack of 7.4% growth in the third quarter of 2014, up from 2.3% last year. The two-year stack from a year-ago included a period when we were out of Express Scripts network in the third quarter of fiscal year 2012.

SG&A grew at a negative 2.2% in that period as we responded to the lower volumes in the pharmacy. Likewise a two-year stack SG&A dollar growth will be difficult to lap for the next two quarters is shown by the fourth quarter two-year stack of 0.5% and the first quarter two-year stack of 2.9%.

Turning to a few other components of our income statement, this quarter included LIFO provision of $41 million versus a provision or charge of $120 million a year-ago. Our effective LIFO rate for the quarter was 2.25%, down from 3.5% a year-ago. Net interest expense for the quarter was $35 million versus $50 million from a year-ago.

We expect interest expense of approximately $35 million in the fourth quarter. Average diluted shares outstanding were 968 million shares versus 959 million shares last year. And the change is primarily due to the impact of a higher stock price on a number of in the money options which are counted in diluted shares.

In the fourth quarter, we expect diluted share count of approximately 968 million shares subject to changes in the current share price. Our effective tax rate for the quarter was 31.5% versus 38.7% last year. And the difference is primarily attributable to additional foreign income tax taxed at a lower rate and net benefit per changes in uncertain tax provisions as well as a lower permanent difference between book and tax income.

For the fourth quarter, we estimate our GAAP tax rate to be approximately 36%, and we expect a similar increase in our adjusted tax rate in the fourth quarter compared to the third quarter.

Accounts receivable increased by 25.3% primarily due to higher vendor funding receivables from the Bern JV and AmerisourceBergen for brand and generic rebates along with the higher receivables generated by higher third-party pharmacy sales. Accounts payable decreased 6.5% and LIFO inventories decreased 6.4% in conjunction with our new agreement in terms of the AmerisourceBergen as more of the generic pharmacy distribution transitions to them. Overall, net working capital increased by 9.8% versus a year-ago.

During the second quarter we generated approximately $1.3 billion in cash from operations versus $1.4 billion in the year-ago period. And free cash flow in the quarter was $1 billion versus $1.1 billion a year-ago.

The next slide shows our correlated accretion from Alliance Boots which was $0.15 per share for the quarter versus our forecast of $0.13 to $0.14 per share with the out performance primarily related to incremental procurement synergies. You can find a more detailed walk included in the appendix to this presentation on our Investor Relations Web site.

Combined net synergies for the quarter totaled $131 million and for the first three quarters of the year totaled $367 million. And as Greg noted, because we're running ahead of our previous estimate of $375 million to $425 million of combined synergies for the year, we're raising the estimated to $400 million to $450 million.

Looking forward, we estimate the adjusted EPS accretion from Alliance Boots for the fourth quarter of fiscal year 2014 to be $0.67 per share based on our current estimate of IFRS to GAAP conversion and foreign exchange rates versus $0.08 in the year-ago quarter. The adjusted accretion is expected to be slightly lower than the year-ago period for Alliance Boots primarily driven by the timing of recognition of certain tax matters.

Additionally, we're assessing whether the fair value of one of the Alliance Boots wholesale reporting units is below its current value for U.S GAAP purposes. Our share of the goodwill from this reporting unit is approximately $195 million. We plan to finalize this assessment prior to filing our Form 10-Q, any impact will be reflected in our fourth quarter financial statements and we'd expect to exclude any impact from adjusted earnings.

Since I usually end with commentary on the fiscal year 2016 goals, let me reiterate the comments made in the press release and by Greg regarding these goals. As a result of the many step two considerations in current business performance, we're withdrawing the fiscal year 2016 goals that were previously announced in 2012.

As Greg mentioned, we're evaluating the proposed transaction including the potential timing and structure and combine management team; continued synergy and cost reduction initiatives and potential changes to our future capital structure, all through the lens of what is in the best interest of our shareholders long-term.

Once key decisions have been made on the above matters, Walgreens anticipate to being in a position to hold an Investor Call, which is expected to occur by late July or early August. Many of the areas under consideration are interdependent and so we believe that the prudent course is to share the scope of our decisions and related financial objectives and metrics together all the time.

In summary, our strategies remain sound in the fundamentals of our business and particularly with respect to top line growth has continued to strengthen. While we have gross profit reimbursement pressure in the traditional pharmacy as mentioned, we also have significant opportunities to drive additional cost efficiency and also turn the front-end of our business into a very meaningful profit pillar.

Our Alliance Boots and AmerisourceBergen partnerships also continue to go well and we're beginning to move beyond the cost only synergy phase to one where we're starting to share and exploit organizational capabilities to strengthen

our core business and find new labors to create value for shareholders.

With respect to our merger with Alliance Boots, we realize that our investors have been patiently awaiting additional information about step 2. I can assure you that we have been using the time to evaluate all aspects of the transaction with the best long-term interests of our company and shareholders in mind. And now with that, I'll turn the call back over to, Rick.

### Rick Hans

Thank you, Wade. That concludes our prepared remarks. We're now ready to take your questions.

### Question-and-Answer Session

### Operator

(Operator Instructions) Our first question comes from George Hill with Deutsche Bank.

### George Hill - Deutsche Bank

I appreciate you taking the question. I guess maybe we will start first with the 2016 guidance. It seems like that you guys aren't going to come in in-line with the original expected range. But I don't think most investors had kind of expected you to hit the numbers given current business performance. Is there any color you can give us with respect to how far off that range you think you are?

### Greg Wasson

George, Greg, so yes I think as we had said we're in the last couple of quarters we weren't tracking on the CAGR that we required to hit that adjusted 30's number and certainly with our current performance in some of the lines we talked about on the call that's impacting pharmacy, we didn't think that it was achievable. Now that, that meeting was, we're still not working on a whole host of things to try to continue to drive value. I think the main point, and I'll let Wade kind of take it from there as a fact that, four to six weeks we do have a lot of moving parts. We are going to be looking at different goals of metrics both above that line and below the line and we want to really get focused on those. So, Wade you want to add a little color?

### Wade Miquelon

Yes, I think that's right. I think we're still aggressively driving all the [ph] [above] opportunities, but as Greg said we have opportunities below the line as well in terms of how we think about structure or cap structure, refinancing in the like and so we're making sure at this point in time that we look at every thing kind of interdependently as a web of choices and we maximize value as best we can.

### George Hill - Deutsche Bank

Okay, that's helpful. And then Wade, maybe a quick follow-up. I recognize that you guys are planning to do a call I guess in a little over a month from this point now. Is there any more color you can give us on what the puts and takes the -- kind of the company is considering as it evaluates Step 2?

### Wade Miquelon

Yes, I think both Greg and I kind of listed them, but I would say everything, anything that can create value so we're looking at apart from again kind of the organizational operational structure, we're looking at more to the ideal cost structure moving forward. We're looking at what's the ideal way to structure the transaction from a legal point of view. We're looking at what's the best balance of the cap structures we think about the amount of cash this company can generate in a combined form. We're looking at again the best way to refinance the transaction as we move forward. So, I would say that everything or anything what related to the big measures and again I think we're going to make sure that we land down in a place that's in the best interest of our shareholders long-term.

### Greg Wasson

And George I would add, and I think the main point is all those that Wade just rattled are interdependent, and therefore we want to make sure that we thought through them all and that's the reason we thought kind of late July we'd just have a lot more visibility on how all those connect and drive value together.

### George Hill - Deutsche Bank

That's very helpful. And then I'll ask one quickly and I'll drop off. In the press release you highlighted a focused -- increased focus on internal cost and reducing internal costs. Is there anyway to ballpark that opportunity for us, I guess kind of as we think about the next 12 to 18 months?

### Greg Wasson

Well we're working on accelerating up the optimization efforts across the entire organization. George we've actually identified and actually realized a lot of opportunity. Current the challenges unfortunately some of the pressure we've seen on pharmacy margin has eaten some of that up, that's the reason I have elected a key executive begin to look for and identify new opportunities. The good news is, is we're finding opportunities. We're now in the process of trying to figure out how to get at it. What are the plans, the processes, several or some of those maybe require some restructuring or not. So we're in the process of doing that. The other thing is that, we've been four to six weeks away from the real work that Wade and team are doing around the combined merger. We definitely, we see to reduce cost as the entity comes together. So, again we want to kind of put all that together and come to you with as much as we possibly can in that call that's coming up in four to six weeks.

### George Hill - Deutsche Bank

Okay. We'll wait for that. Thanks guys.

### Greg Wasson

Thanks, George.

### Operator

The next question comes from John Heinbockel of Guggenheim Securities.

### Greg Wasson

Hi, John.

### John Heinbockel - Guggenheim Securities

Greg, I guess looking at the big picture, when you think about the US pharmacy or drug retail business, you and all your peers, do you think is that business not going to be as profitable going forward as maybe you thought because of reimbursement pressure, government involvement, etc.? Do you think it's a secular issue? And then if that's true or remotely true, the things you think about on the cost side, are they really more strategic i.e. supply chain, what do we need to do with that long term in how we staff our stores? Is it really very secular and strategic or you think, no, it's just a period we are going through and it requires more tactical stuff?

### Greg Wasson

Yes, John on the first part, no, I don't necessarily think that we should assume that the US business cannot continue to grow on profitability. I think the work that Alex and Mark and team are doing on the front end of the business, we think we have -- we think we actually have tremendous opportunity to grow EBIT and operating margin on the front end of the business. We are beginning to getting more confidence in just that, and I think that is obviously going to help us with the overall business. I think in the pharmacy business the good thing is, is that we're growing top line for the first time consistently in a long time with some of those strategic decisions I've talked about. We're absolutely winning in a Part D space. We're growing 90 day customers and so forth. We do have obviously the pharmacy margin pressure that we talked about. But I think Kermit and team and he can maybe allude a little bit about how we think will go at that. We think we have -- we think with our contracting strategy going forward, with the generic inflation that we're seeing versus historical deflation we're going to start taking that in consideration in our contracting. He's going at cost of fill reduction with a vengeance and I think with Bern, and Jeff Berkowitz and John out in Bern, we're positioned better than anyone to be able to get at comp. As far as the cost opportunities, I think there's a little of both. I think that there's opportunity to get at cost to your point that's more maybe cyclical, but I think structurally we're going after -- we're going after the business from a structural point of view, everything from supply chain, everything from how we supervise and manage stores, everything from looking at our store footprint as we never have in the past and as we indicated on the last call. So we're really taking a step back and looking at the entire enterprise from a structural perspective.

### John Heinbockel - Guggenheim Securities

And is there, what's going on in Bern, how much opportunity is there to accelerate those efforts to offset the margin pressure you're seeing today? Is there enough flexibility to do that or not really to play around with that?

### Greg Wasson

I think there's opportunity. Yes, I think Jeff and team have their pedal on the metal and their foot on the accelerator as far as trying to find to deliver additional opportunities. And yes, I'm optimistic that there's additional opportunity in Bern.

### John Heinbockel - Guggenheim Securities

Okay. Thank you.

### Greg Wasson

Thanks, John.

### Operator

Our next question comes from Meredith Adler with Barclays.

### Meredith Adler - Barclays Capital

Good morning, this is Meredith Adler and I've got questions from Eric Percher as well. I guess I would like to start by asking about talking with payers about the fact that you have generic inflation. How much work do you have to do to change the terms of the contracts? I mean if it was branded drugs, I think the inflation would be dealt with automatically but not so with generics. What kind of discussions are you having and how hard do you think it will be to get this adjusted?

### Wade Miquelon

Well, I'd say that it's a fairly complex topic, but there's lots of different levers. One is, I think that we're going to be — we're not going to be very tolerant of long-term partnership with people that are opportunistic. I think number two is, we do have contracts which over time need to reflect the market, but then there's also indexes that those contracts are based on and some of those are sometimes maybe late in reflecting the realities of the market place, but over time we believe that those will catch up as well and therefore that will flow through. So, there are many different levers to go at it and we're working all of them. But I do think that it will roll through as we go through. So, I don't know Kermit, if you want to comment on it.

### Kermit Crawford

Yes, Meredith maybe I'd add to that, that sort of this past year we have seen a shift from historical patterns of deflation in the generic drug cost which we have planned for into one that is inflation and it is negatively impacting our margin. But I wouldn't say it's all around the drug inflation. I mean we've certainly had some increase in our third party reimbursement pressures. We have had fewer brand-to-generic drug conversions compared to a year ago. And so as we think about our contracting strategy it certainly will account for these increases in the drug cost. But there are other things we're doing as well. Greg had mentioned we're aggressively looking at our cost of fill around improving efficiencies in our cost of fill sometimes like technology where our customers are refilling their prescriptions through digital and mobile technology, through automation that is making us more efficient in selling prescriptions, through centralization that is reducing labor in the stores but as the same time increasing our customer service level. And I also do believe that our joint venture with Alliance Boots, we're well positioned to provide some offset to this increase in drug pricing. So, I think over time you'll see the market adjust through market efficiencies, through supply and demand.

### Meredith Adler - Barclays Capital

And then, I guess I have a question, I mean I would have said that some of these pressures have been there for a while. Was there's something in particular that really made you feel that you needed to start addressing both aspects of cost structure, the way you fill scripts and becoming more efficient. Is there something particular that drove that now?

### Greg Wasson

Yes, Meredith as I would say, I am three-bucket for a person. I would say that we have, bucket one, we have made strategic decisions that I believe are absolutely the right thing for the company to do long-term which is to grow our share of high value senior patients with preferred positions already planned, convert 30 day supply of the chronic

medications to 90 days, those, that's helping us win share, but it's also impacting margin as those preferred positions have a little more aggressive rates with them and obviously 90 day supplies a little more -- have little less margin of 30 day fill. So bucket two would be there are reimbursement pressures that are on going step down to some of the contracts year-over-year, but there's also consolidation going on in the industry and there's been some signification step downs in consolidation. And third would be in fact as Kermit alluded to, we are seeing inflation versus deflation in some of those contracts we'll have to make up for. So I think with that all those together, as I said we've got to get at one trying to make sure that we account for that both in our purchasing of Bern, our contracting with payers, but the same time get after a cost structure to offset. But I do think the opportunity for us to continue to grow share and win in the senior market is encouraging because we're starting to see real growth.

### Meredith Adler - Barclays Capital

Okay. And then I guess just a final question on expenses. How, the -- some of what you sounded like you're going to do is going to be taking cost out of the operations and how you run the stores, and I'd assume some of it is just more looking at the overhead structure. How much opportunity do you think there is in either place to lower -- generally lower cost?

### Greg Wasson

Yes, I think we still have opportunity in both, and again I think it's looking at how we support stores, the businesses we have, the projects we have, the way we run projects, so forth in corporate. So all of the above we have opportunity. I don't know Wade if you want to add anything?

### Wade Miquelon

No, I think that the way we're going at it is to really look closely across the major processes that drive cost versus in silos or in small buckets and I think that I guess one of the examples currently it's just the entire cost of fill process and how we think about in 90 day and how we think about ePrescribe and how we think about working with payers differently to drive really radical improvements in those processes and therefore cost. So I think there's a lot of opportunity in both, but I think that it's looking at it more systemically going after the big prices, the way we're going to get the bit cost out, Kermit.

### Kermit Crawford

Mark, Alex anybody want to add. Mark.

### Mark Wagner

Yes, Meredith this is Mark. I think we -- part of like looking at the cost structure was what I talked about on the last quarter call was the store optimization and shutting down some of the unprofitable stores or stores that weren't really strategically positioned. But there's a lot of opportunity dealing with any operation of the store in terms of one, making the right investments in the stores in terms of labor, but then pulling out where it doesn't make sense. I think there's other ways to manage the cost that's on a property side that the team is taking a look at and have really engineered through the stuff, through the last six months into the stores. I think that there is always opportunity to reexamine the cost structure and to pull out what's not necessary or to reestablish what really adds value and not.

### Meredith Adler - Barclays Capital

Okay, that's all very helpful. Thank you. I wish you guys luck.

### Greg Wasson

Thanks, Meredith.

### Operator

The next question comes from Ricky Goldwasser with Morgan Stanley.

### Ricky Goldwasser - Morgan Stanley

Yes, hi good morning and thank you for taking my question. Greg, there's a lot of discussion around inversions especially in the healthcare world. In couple of times on this call both you and Wade highlighted the below-the-line benefits, so can you just give us a sense of what kind of like is your most updated perspective on the prospect of

inversion?

### Greg Wasson

Yes, Ricky I think as I said we're certainly analyzing all the moving parts that will lead us to certainly our decision on the timing the structure of step 2 and so it's difficult to kind of break those apart and talk more of a piecemeal. I'll say as we had said that we're looking at all and everything. We're looking at everything from what the timing, best timing would be, what the capital structure should be, what our tax structure or what the structure could do to as far as our effective tax rate. So, and that's complex stuff I guess is what I would say Ricky as we work through this. We are working around the clock to try to understand all the above so that we're able to make the right decision for the company. And again that's why we need a little more time to be able to bring all this together. But I would say that we're looking at everything. It is complex and it's all interdependent and that's why we want to come forth with a call where we can give as much as we possibly can at late July early August.

### Ricky Goldwasser - Morgan Stanley

Okay. And then I mean obviously the -- on the expense side and kind of like the margins, trends have been sluggish for some time now. I guess the question is, have you kind of like not been as, I would say proactive about kind of like, and I know you have done some but maybe you have not been as proactive as you could about managing the margin, because you are kind of like looking now at the combination and looking at things and doing holistic, it's kind of like trying to understand what could have been done already versus kind of like the opportunity going forward.

### Greg Wasson

Yes, Ricky I'll start off maybe my peers can weigh in. I would say that historically we've done I think an admirable job on controlling on SG&A into your stack. Now with that said, we need to do more. And I also think that frankly we have cut a lot in the last six months to a year unfortunately some of that's got absorbed in the increased pharmacy margin pressure that we've seen. With that said, we're continuing to identify additional opportunity. So, I wouldn't want you to read into the fact that we have not been getting after it. Now with that said, we also think that as we look at the current Walgreen business and opportunities in addition with the merger of the two that there are going to be even greater opportunities in different ways of looking at that. So, we're absolutely focused on the core business. We have made significant reductions, some of that's been absorbed as I said because the pressure of the margin we're identifying additional opportunities and we're going to combine those with every other opportunities we have at Step 2.

### Ricky Goldwasser - Morgan Stanley

Okay. And one final one because you did mention the re-pricing and then to Meredith -- just to follow-up on Meredith's question, can you remind us when is your contract with Express Scripts is up for renewal?

### Greg Wasson

We don't give that out. They were both to multi-year contract Ricky, but we don't -- and the reason is, for competitive reasons we don't -- obviously we don't want to be disadvantaged.

### Ricky Goldwasser - Morgan Stanley

Okay. Understood. Thank you.

### Greg Wasson

Thanks, Ricky.

### Operator

Our next question comes from Steven Valiquette with UBS.

### Steven Valiquette - UBS Securities LLC

Yes, that color on the complex issue, I think it's definitely helpful for people. So, I will just leave that alone. But I guess, Greg, since you mentioned you are a three-bucket guy, I guess just a quick three-bucket question for you on the gross margins. Since you did mention the pharmacy reimbursement pressure, the generic price inflation and fewer launches, just curious which of those buckets had the biggest impact in the quarter? And then also just to be clear, did the generic price inflation in particular did that definitely increase in the May quarter specifically versus the trends you saw back in

the February quarter? So, I definitely want to hone in on that generic price inflation specifically.

### Greg Wasson

Yes. Thanks Steve for putting in three buckets for me. Yes, I think and I'll let Kermit maybe weigh in. I think certainly generic inflation kind of runs through a lot of this, and meaning that it shows up in the contracts obviously we're – certainly we were thinking about the deflation and now seeing some inflation. We're also just – obviously just playing cogs. We're certainly doing everything we can do at Bern to offset that. But I think in the order of magnitude I think probably generic inflation is specifically more -- probably more important because it was -- we didn't quite anticipate it. A lot of the other strategic decisions we certainly anticipated. We know exactly what our contract arrangements with some of the commercial plans are. We know what our Part D preferred positions cost this as far as gross margin. This was really kind of snuck up I think on the industry and us, and now I do think as I said I don't -- I can't think of anyone that's better positioned than us to offset this because of what we're doing at Bern. But I would say inflation. Kermit, you want to add.

### Kermit Crawford

Steve, I would add that generic inflation was higher than we expected compared to the normal deflation that we planned for and we saw the full impact of that in the third quarter versus the second quarter. But I'd also add our growing 90 day share and our market share of Medicare Part D. I mean both of those as Greg mentioned earlier we are growing market share. Both of those margins have been hurt in the near term. Because of that and the expectation in both 90 day and in our mix of the Medicare Part D is greater than we had anticipated this quarter. So, I think when you look at a combination of the impact of our reimbursement pressure we've not been able to fully offset.that due to a lack of new generics as well as the generic inflation versus deflation.

### Steven Valiquette - UBS Securities LLC

Okay, got it. Okay. Thanks.

### Operator

Our next question comes from David Larsen with Leerink.

### David Larsen - Leerink Swann & Company

Hi. With respect to the reimbursement pressure, aren't the generic rates typically set at a max price, and aren't those fixed so that the pressure is really the cost of the generic at the higher inflated rate and the difference between that and the fixed mac price or do those prices actually shift around or are they fixed? Thanks.

### Greg Wasson

So, every contract is different. But you're right, it's kind of a general abstraction that's more or less true, but the thing is that I guess the key thing I alluded to earlier is that the indexes that those are based on don't always immediately reflect the changes in that inflation, and so that's the disconnect. But again I think we're working this from many different angles.

### David Larsen - Leerink Swann & Company

Okay, great. And then, how were volumes relative to your own expectations? Did you see any flow from newly enrolled members through the public exchanges?

### Greg Wasson

David, it's still very early to tail around ACA. I mean obviously publicly they have announced 8 million people have joined the ACA. We certainly feel like we're getting our share of that 8 million people, but certainly some of those folks were former cash paying customers that are now in the exchange. They were former customers at other forms of coverage that are now in the exchange. So, I think it's still early on around ACA where we're seeing growth in our core business. I mean Wade talked about gaining back customers from our ESI customers. But primarily when we look at this business our core business Med D 90-day return of ESI, low ACA is all growing our underlying business.

### Wade Miquelon

Yes, I guess I just would say across the board both in the front end and the pharmacy I think we've got real growth

momentum. And I think what's also encouraging is that our customer satisfaction metrics continue to strengthen. That's very fundamental and important for the long-term.

### David Larsen - Leerink Swann & Company

Great. And then just one more quick one; any thoughts around specialty, is that a positive driver or longer term and any impact from Hep-C? Thanks.

### Greg Wasson

Yes, it's certainly a positive driver long-term. David, as you know it does impact the margin. Wade mentioned earlier in our speech and, but we're seeing positive growth in our specialty business.

### Wade Miquelon

I think one of the things David that we're excited about and again I think it's the work that Jeff Berkowitz and team in Bern are doing combined with Mike Ellis and Kermit's group that's running our specialty group there with a central and retail model. We're gaining access to limited distribution drugs. In fact, I think we've gained access to every one of the last 14 or 15 launches of limited distribution drugs. I think that's reflective of the fact the good work that Jeff and team are doing with our pharma partners who are looking for special services as well as what Kermit and team are doing with the services we provide both centrally and at retail. So to me that's a solid proof of point that we are making progress and winning in specialty space.

### David Larsen - Leerink Swann & Company

Thanks very much.

### Wade Miquelon

Yes.

### Operator

Our next question comes from Robert Jones with Goldman Sachs.

### Robert Jones - Goldman Sachs

Not to keep going back to this topic, but just on the gross profit margin in the quarter, I guess what the concern is in the last couple of quarters is you guys are pacing very nicely on the procurement synergies. If I look at this quarter it looks like $89 million to Walgreen's. But if I back that out assuming most of that is clearly from purchasing the gross margin rate looked like it was somewhere in the 27% to 28% range, clearly below where I think the company has been historically. Could you maybe just give us a little bit of context relative to history of where these pressures are and is it something that is more transient in such that as we move past them we will start to really realize the benefit of the procurement synergies?

### Wade Miquelon

Yes, I'll just take it. I mean look, there are some conscious choices we made as Greg said. So for example, driving 90 day and also being aggressive about Part D, and I think those are the kind of opportunities though based upon how they are set up structurally and the volume over time that we can cost optimize on the other side to make sure that it's beneficial and accretive. But that's a conscious choice. I think there's things that we will cycle. So for example as I talked about just the pace of new generics and the timing of that and we've been very explicit with that, but I do think there's just and there are some new things. And we also have contractual step downs but of course there's things like brand inflation and generics and whatever that compensate. I think the real thing that's probably different is what we've seen in the inflation generics and how we handle that. But at the end of the day I guess what I would say and as an aggregate we're focused on gross dollar -- gross profit dollar growth. And again both those choices are what we can control, and then what in the short-term we can't. But over the long-term we have to address. That's really I think the focus and in terms of how we drive the business.

### Robert Jones - Goldman Sachs

So I guess just to be clear, that you wouldn't characterize any of these pressures as some kind of structural change in the business that you didn't contemplate say a year and a half, two years ago when you embarked on the AB

transaction?

**Wade Miquelon**

I think the thing that -- I think Greg said that the thing that probably wasn't fully anticipated probably was just what we've seen in some inflation on drugs, and it's a fairly narrow subset but some pretty hefty increases. And those contracts historically have been under the assumption that there is net deflation. But like I said I think there's many ways that we can attack this, and I can assure you that we're going after it from all angles. And I do think though that again I think that if we can drive market share growth, if we can drive better customer satisfaction, if we can optimize our cost accordingly, and if we can tack this issue on all fronts I think we're as well positioned as anybody to be successful.

**Robert Jones - Goldman Sachs**

Got it. And I guess just my follow-up changing subjects a bit, just around ABC obviously now being part of the purchasing platform, it sounds like you're getting the incremental benefit from their volume. Are you looking at opportunities of bringing any of other companies into the joint venture to further enhance that scale? Are there ongoing conversations that you could highlight in the marketplace?

**Wade Miquelon**

Yes, I think certainly right now we're focused on maximize and optimize, I mean the synergies that we can achieve through the three of us with AB and ABC, and I think there's tremendous opportunity there to continue to realize before we'd begin to really discuss maybe other partners.

**Robert Jones - Goldman Sachs**

Got it. All right. Thanks.

**Wade Miquelon**

Yes. Thank you.

**Operator**

Our next question comes from Lisa Gill with JPMorgan.

**Lisa Gill - JPMorgan**

Thanks very much and good morning. Greg, I heard you made a comment around regaining or Wade made the comment around regaining some scripts for Express Scripts. And you talked about 90 day as well on the growth of that. Are you seeing the scripts that you are regaining are through the Smart90 Program? Can you maybe just update us on how that program has gone thus far with Express Scripts?

**Greg Wasson**

Yes, maybe I'll start and let Kermit jump in. When I'm talking about the growth in 90 day, Lisa it's 90 day in general across the entire market place which excites me because I think as I said we launched it, we realized it was going to impact margin because of the fills, but at the same time we have seen male level off, we have seen customers who want to get 90 day supplies. There are few many pharmacists that continue to grow, so therefore I think it was absolutely the right thing for us to do for the consumer. Smart90 is a subset of that, and I do think we have been working with Express Scripts customer-by-customer somewhat unique. Those that are looking for a Smart90 solution is, the good thing is Express Scripts has an opportunity to present that. And Kermit, I think we've been pretty pleased with that.

**Kermit Crawford**

When you compare to that, that Smart90 is just hitting the market now and right now it wouldn't be a significant contributor to our overall 90 day retail. I mean, a lot of the 90 day retail has been driven by the increase in market share of our preferred networks under Medicare Part D.

**Lisa Gill - JPMorgan**

Okay, great. And I know you have already talked a lot about the reimbursement buckets, etc. and around generics, but the one thing that I am still a little bit confused about is just you should be one of the largest global generic purchasers,

Is it that the timing of Bern hasn't kicked in yet? Because I am just, if we go back and we look at Rite Aid last week, they talked about the fact that their relationship with Tussin hasn't kicked in yet and therefore that's why they're feeling this pressure. Given the fact that you're already starting to see some of the synergies I'm just trying to understand what's happening around procurement and the timing aspect of how you are buying from Bern?

### Greg Wasson

Yes. Lisa, I wouldn't say that it's been delayed. I think Bern, we're pleased with and we're out of the gates pretty quickly and on track. I think it's a subset of molecules that have kind of popped up in this inflationary environment that we're -- that caught I think the entire industry a little off guar. I'd say ourselves as well. We're now all over with the combined Walgreen team with Bern team focused on those molecules. I do think that and there is a lot of moving parts there as Wade alluded to earlier, that the cost increase, the -- the corresponding AWP is not keeping up with the cost increases. There is a whole lot of things that we're looking at. But I will say back to kind of the structural issue, I think the good thing is we're aware of it, we're on it. We know how to go at it and we -- and I think we're well positioned as anyone to get after. But it did -- it was something that we didn't expect. We are working through it and I think we're well positioned to cover it and correct for it.

### Lisa Gill - JPMorgan

And as we talked about gross margins, it sounds like most of this was on the healthcare pharmacy side in the quarter, but I was just wondering if Mark or Alex had any comments around promotional activity and what you're seeing on that side of your retail business?

### Alex Gourlay

Yes. Hi, its Alec here Lisa. We are feeling pretty good about progress in the front-end margin. We increased it quarter-on-quarter through more promotional efficiencies, really making sure that we reward our best customers are using the data from the Loyalty Card. So some of that is promotional market that would be more efficient and more targeted and we're feeling pretty confident we can keep that going into the long-term.

### Lisa Gill - JPMorgan

Okay, great. Thank you.

### Operator

Our last question comes from Edward Kelly with Credit Suisse.

### Edward Kelly - Credit Suisse

Hi. I wanted to start off with Alliance Boots. We did get results out of Alliance Boots more recently and I was hoping, could you just provide a little bit color on their performance, how they're faring versus relative to what you thought and how much of the shortfall to EBIT in '16 is the Walgreens business versus the Alliance Boots business, any color there I think would be helpful?

### Greg Wasson

Maybe I'll start Ed, and let Wade fill in. I think obviously still a challenging environment in some of the countries throughout Europe. I think as I've said, Stefano and his team pretty solid team, they're managing through that. I think -- but they're indeed had some challenges in some areas of the business. I do think when you look at their business compared to the markets whether it's the retail business, boots business or the wholesale business and compare them to the market, to their competitors. They're actually winning against the rest of the market and therefore that's encouraging, they're growing share. But as we've had some softness in parts of our business that we're correcting for, they've had softness in parts of their business that they're working to correct for.

### Wade Miquelon

I think -- I guess I would just augment it and say I think they've also done some great work below the line, so both in terms of some of the tax efficiency work they've done in terms of driving very aggressive cash flow which has helped them to lever and as you know they refinanced a while back. Also we have a strong pound situation, which is also very favorable too, so I think on that we feel very good about their business and again they've a couple of challenging markets they're in, but they're positioned well for the long-term and I think on a cash flow base and after tax basis, the business had made up a lot of ground there. So we feel good.

### Greg Wasson

And then I do think as we've said, certainly we weren't on hitting the CAGR, to hit our adjusted earnings we had and their CAGR -- their EBIT CAGR has not been -- is below their original plan, but they're doing a lot of things to try to offset that and correct for it.

### Edward Kelly - Credit Suisse

And just one follow-up on your 2016 commentary. Are you optimistic that the below-the-line considerations may potentially offset the shortfall on the EBIT or even more than offset the shortfall on the EBIT as you sort of think about 2016?

### Greg Wasson

Hey Ed, I will jump and let Wade -- I would be -- I'm hesitant to go there. I think as I said, we just had too many moving parts right now that we're working through. There is potential obviously and that's what we're looking through from all of those how they come together. But I think give us the four to six weeks and we will be able to give -- we have a lot more clarity on how this is coming together and be able to give you a lot more information at that time.

### Wade Miquelon

And there is lot opportunity, but I think the key is making the right choice, so they all interplay with each other for the best long-term value creation for shareholders and we're looking at everything.

### Edward Kelly - Credit Suisse

Okay, great. Thank you.

### Greg Wasson

Thanks, Ed.

### Rick Hans

Ladies and gentlemen that was our final question. Thank you for joining us today. As a reminder, the Company will report June sales on July 3rd. Have a Happy 4th of July. Until then, thank you for listening.

### Operator

Ladies and gentlemen, this does conclude today's presentation. You may now disconnect and have a wonderful day.

**Copyright policy:** All transcripts on this site are the copyright of Seeking Alpha. However, we view them as an important resource for bloggers and journalists, and are excited to contribute to the democratization of financial information on the Internet. (Until now investors have had to pay thousands of dollars in subscription fees for transcripts.) So our reproduction policy is as follows: **You may quote up to 400 words of any transcript on the condition that you attribute the transcript to Seeking Alpha and either link to the original transcript or to www.SeekingAlpha.com. All other use is prohibited.**

THE INFORMATION CONTAINED HERE IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL, CONFERENCE PRESENTATION OR OTHER AUDIO PRESENTATION, AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE AUDIO PRESENTATIONS. IN NO WAY DOES SEEKING ALPHA ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S AUDIO PRESENTATION ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

If you have any additional questions about our online transcripts, please contact us at: transcripts@seekingalpha.com. Thank you!

### Operator

Good day, ladies and gentlemen and welcome to the Walgreen Company Third Quarter 2014 Earnings Conference Call. At this time, all participants are in a listen-only mode. Later we will conduct a question-and-answer session and

instructions will follow at that time. (Operator Instructions) As a reminder, today's conference is being recorded.

I'd now like to introduce your host for today's conference call Mr. Rick Hans, Divisional VP of IR. You may begin sir.

### Rick Hans - DVP, IR and Finance

Thank you, Kevin. Good morning, everyone. Welcome to our third quarter 2014 conference call. Today, Greg Wasson, President and CEO; and Wade Miquelon, Executive Vice President, CFO and President International, will discuss the results for the quarter. Also joining us on the call, and available for questions are Kermit Crawford, President of Pharmacy; and Mark Wagner, President of Store Operations; and Alex Gourlay, President of Customer Experience and Daily Living.

As a reminder, today's presentation includes certain non-GAAP financial measures, and I would direct you to our website at investor.walgreens.com for reconciliations to the most directly comparable GAAP measures and related information. You can also find a link to our Webcast on our Investor Relations Web site. After the call, this presentation and a podcast will be archived there for 12 months.

Certain statements and projections of future results made in this presentation constitute forward-looking statements that are based on current market, competitive and regulatory expectations that involve risk and uncertainty. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking statement after this presentation, whether as a result of new information, future events, changes in assumptions or otherwise. Please see our latest Forms 10-K and 10-Q and subsequent Exchange Act filings for a discussion of risk factors as they relate to forward-looking statements.

Now, I'll turn the call over to Greg.

### Greg Wasson - President and CEO

Thank you, Rick. Good morning, everyone and thank you for joining us on our call. Before we get to today's financial results, I'd like to begin with a few comments on the proposed second step in our transaction with Alliance Boots.

Our Management Team and Board are making significant progress evaluating the proposed transaction determining the timing and structure, the combined management team, additional synergy and cost reduction initiatives and potential changes to our future capital structure. We will be in a position to hold an investor call once key decisions on these major issues have been made, which is expect to occur by late July or early August.

Now I'll turn to our third quarter financial results. Today I'll begin with a review of the quarter. Next I'll discuss the key factors affecting our financial performance, and finally I'll provide more detail on our strategies and overall progress and then I'll turn the call over to Wade for a more detailed financial review.

In the quarter, we continue to see improving top line growth with increased daily living sales and strong performance in both prescriptions filled and our pharmacy market share. For the quarter, sales were $19.4 billion, up 5.9% from $18.3 billion a year-ago. GAAP operating income for the quarter was $1 billion, up 3.5% from $991 million last year.

Adjusted operating income for the quarter was $1.3 billion, up 4.5$% from $1.2 billion in third quarter of 2013. GAAP earnings per diluted share were $0.75 in the third quarter compared to $0.65 last year; up 15.4%.Third quarter adjusted earnings per diluted share were $0.91, up 7.1% from $0.85 in the same quarter last year.

Our results this quarter benefited from a lower GAAP effective income tax rate. The lower rate of 31.5% compared with 38.7% last year resulted from increased foreign income taxed at a lower rate, favorable audit settlements, certain nondeductible expenses last year and other discrete events.

Exhibit 99.2

## CORPORATE PARTICIPANTS

**Rick Hans** *Walgreen Company - Divisional VP of IR & Finance*

**Greg Wasson** *Walgreen Company - President & CEO*

**Tim McLevish** *Walgreen Company - EVP & CFO*

**Stefano Pessina** *Alliance Boots - Executive Chairman*

**Jason Dubinsky** *Walgreen Company - Treasurer*

## CONFERENCE CALL PARTICIPANTS

**John Heinbockel** *Guggenheim Securities LLC - Analyst*

**Meredith Adler** *Barclays Capital - Analyst*

**Eric Percher** *Barclays Capital - Analyst*

**Lisa Gill** *JPMorgan Chase & Co. - Analyst*

**Ricky Goldwasser** *Morgan Stanley - Analyst*

**George Hill** *Deutsche Bank - Analyst*

**Robert Jones** *Goldman Sachs - Analyst*

**Mark Miller** *William Blair & Company - Analyst*

**Mark Wiltamuth** *Jefferies & Company - Analyst*

**Steven Valiquette** *UBS - Analyst*

**Edward Kelly** *Credit Suisse - Analyst*

**Ross Muken** *ISI Group - Analyst*

## PRESENTATION

---

**Operator**

Good day, ladies and gentlemen, and welcome to the Walgreens Alliance Boots investor call.

(Operator Instructions)

As a reminder, this conference call is being recorded. I would now like to introduce your host for today's conference. Rick Hans, you may begin.

---

**Rick Hans - *Walgreen Company - Divisional VP of IR & Finance***

Thank you, Nicole, and good morning, everyone. Welcome to our conference call regarding our strategic partnership with Alliance Boots. Today, Greg Wasson, President and CEO, and Stefano Pessina, Alliance Boots Executive Chairman, will discuss the exercise of our option to complete the second step of our strategic partnership and fully combined our two companies. They will also discuss a number of decisions related to moving forward with step two. Also joining us on the call is Walgreens' new Executive Vice President and Chief Financial Officer, Tim McLevish. Tim will not be taking any questions today.

As a reminder, today's presentation includes certain non-GAAP financial measures. I direct you to our website at www.investor.Walgreens.com for disclosures regarding the most directly comparable GAAP measures and related information. You can find a link to our webcast on our investor relations website. After the call, this presentation and a podcast will be archived on our website for 12 months.

Certain statements and projections of future results made in this presentation constitute forward-looking statements that are based on current market competitive and regulatory expectations that involve risk and uncertainty that could cause actual results to vary materially. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking statement after this presentation whether as a result of new information, future events, changes in assumptions, or otherwise. Please see our latest Form 10-K and 10-Q filings and subsequent exchange act filings for a discussion of risk factors as they relate to forward-looking statements. Now, I will turn the call over to Greg.

---

**Greg Wasson - *Walgreen Company - President & CEO***

Thank you, Rick, and good morning, everyone. Thank you for joining us on this very important call. We will take a little more time than usual because we have a lot of ground to cover today. Before I start, let me first offer my thanks and farewell to our departing Chief Financial Officer, Wade Miquelon, as me moves on to pursue a number of new opportunities. As most of you know, Wade contributed to the establishment of our partnership with Alliance Boots and our strategic long-term relationship with AmerisourceBergen. Appreciate that Wade will continue to assist the Company with the transition.

I'd also like to welcome Tim McLevish, our new Executive Vice President and Chief Financial Officer, who we just announced was joining Walgreens. Tim brings us extensive US and global experience in finance and business strategy. He has guided a number of successful mergers and acquisitions through the integration process creating exceptional value for shareholders along the way. He also has a history of strong cost control and financial discipline, and this experience will be critical as we move forward. Tim, would you like to say a few words?

### Tim McLevish - *Walgreen Company - EVP & CFO*

Sure. Good morning, everyone. Thanks for the kind introduction, Greg. It is my great privilege to join such an iconic Company especially at this exciting and pivotal time as Walgreens expands to become a global enterprise. I'd very much appreciate the opportunity to help the team achieve the Company's important mission and carry out their remarkable vision to expand health and well-being across America and around the world for the benefit of customers, patients, healthcare partners, and shareholders. I look forward to meeting you all in the coming months, and with that, I will turn the call back to Greg.

### Greg Wasson - *Walgreen Company - President & CEO*

Thanks, Tim. With that, let me begin with our announcement today.

Two years ago, Stefano and I stood together and set forth a bold vision to create the first global, pharmacy-led health and well-being enterprise in the world. We shared a goal to combine two leading Companies with iconic brands, complementary geographic footprints, shared values, and a heritage of trusted healthcare services dating back more than 100 years each. Our vision had a compelling strategic rationale giving us complementary capabilities and assets, substantial synergy potential, revenue and profit diversification, and a platform for future growth.

We imagined creating a new international leader in retail pharmacy with an unparalleled portfolio of retail and business brands, a network of more than 11,000 stores in 10 countries, more than 92,000 healthcare service providers, and the world's largest pharmaceutical wholesale and distribution network with 370 distribution centers serving some 180,000 pharmacies, health centers, and hospitals in 20 countries.

We launched this vision in June, 2012 with the first step in a unique two-step transaction designed to bring our companies together over time while creating significant shareholder value along the way. Today, pending shareholder and regulatory approval, we are ready to move forward to complete step two in our strategic partnership fully combining our companies and realize the vision we share. This is truly an exciting day for Walgreens and Alliance Boots as together we create a new kind of global health care leader. We also believe this is an important day for our customers, stakeholders, and you, our shareholders, as we expand globally to make quality healthcare more affordable and accessible to communities in America and around the world.

On this call today, I will begin by covering three main areas. First, I will touch on the transaction itself. Second, I will walk through a number of key decisions related to moving forward with the merger including the timing of the transaction as well as the blended senior management team and the domicile of the fully combined Company. Third, I will look ahead at our three-year next chapter plan that will maximize the scope and scale of the new combined Company and sets new strategic goals. Then, I will turn to Stefano to talk about the full combination of our companies and his leadership role in the new enterprise.

Starting with an overview of today's announcement, as you know, we launched our strategic partnership in 2012 with Walgreens initial 45% investment stake in Alliance Boots. That transaction included an option to proceed to a full combination by acquiring the remaining 55% of Alliance Boots in three-years' time. The terms of our original deal established a window to exercise the option between February and August of 2015. Given the significant progress in bringing our companies together and finalizing the transaction, we announced today that we exercised our option early and now expect to close transaction in the first calendar quarter of 2015.

In completing step two, we will establish a new holding Company for our combined enterprise called Walgreens Boots Alliance with four operating divisions Walgreen Co., Boots, the UK's leading health and beauty retailer, Alliance healthcare, pharmaceutical wholesale business, and global brands. We're also have a cross-divisional global pharmacy, market access group.

Let me thank and congratulate the Walgreens and Alliance Boots teams who have been working around-the-clock. As we moved toward finalizing the merger, we made a number of decisions related to the full combination of our Companies. First, Walgreens Boots Alliance will be led by a blended senior management team consisting of senior executives from both Companies.

2

Let me just run through the top team. I will serve as President and CEO of the combined enterprise. Stefano will be Executive Vice Chairman of the combined Company reporting to me responsible for strategy and M&A and Chairman of a new strategy committee of the Board. I look forward to working with Stefano and leveraging his immense industry and business expertise and his tremendous focus on you, our shareholders.

In alphabetical order, the remainder of the blended management team includes Ornella Barra, Chief Executive Wholesale and Brands for Alliance Boots who will become Executive Vice President, President, and Chief Executive Global Wholesale and International Retail. Jeff Berkowitz, Co-president of our Walgreens Boots Alliance Development joint venture in [Bern], will assume the role of Executive Vice President and President Pharma and global market access which will include responsibility for specialty pharmacy.

Alex Gourlay, Walgreens President of Customer Experience and Daily Living, will become Executive Vice President and President of Walgreens. Tim McLevish, who we just heard from, Walgreens new Executive Vice President and CFO, will now serve as the Executive Vice President and global CFO for the combined Companies.

Ken Murphy, Managing Director Health and Beauty International and Brands for Alliance Boots, will serve as Executive Vice President and President of Global Brands. Simon Roberts, Managing Director of Health and Beauty UK and the Republic of Ireland for Alliance Boots, will serve as Executive Vice President and President of Boots. Tom Sabatino, Walgreens Chief Administrative Officer and General Counsel, will serve as Executive Vice President and Global Chief Legal and Administrative Officer. Tim Theriault, Chief Information Innovation and Improvement Officer of Walgreens, will assume the role of Executive Vice President, Global Chief Information Officer. Kathleen Wilson-Thompson, Walgreens Chief Human Resources Officer, will become Executive Vice President and Global Chief Human Resources Officer.

I'd like to pause and thank these folks for all they and their teams have done to advance our strategic partnership, and most of all for all they will do to build our teams to lead our combined enterprise into the future. Let me also thank the over 350,000 team members of Walgreens and Alliance Boots in the US and around the world for their dedicated service.

Moving to the next major element of our transaction, as you saw in our press release, we determined that the new holding Company will be a US-based Company headquartered in the Chicago area. Walgreens' operations will remain headquartered in Deerfield, Illinois. Boots' headquarters will remain in Nottingham in the UK.

Given the intense speculation and public commentary around the inversion issue, let me step back for a moment to make sure that everyone clearly understands the diligent and disciplined way that we went about making this important decision. There are three point I want to make about this process. First, the Company and Board undertook a balanced, rigorous, and extensive analysis of the issue. As part of our fiduciary duty to shareholders and given the potentially significant implications from a business, financial, and competitive perspective, we carefully and extensively evaluated a possibility of an inversion in connection with step two.

We engaged nationally recognized legal tax and policy advisers who are experts in the field of cross-border acquisitions, tax policy, and, in particular, inversions. We taxed the experts to conduct a thorough, objective analysis to determine optimal and sustainable course of action. We also formed a special committee of the Board comprised solely of independent directors, which in turn engaged its own independent tax advisor, to review the inversion issue in order to make a recommendation to the full Board.

Second point. The Company and Board looked at the full range of issues, both the potential opportunities and benefits as well as the risks that may be associated with an inversion. Understand that these are highly complicated issues that come with a wide range of assumptions. I can't emphasize enough this is a highly technical and complex area of the tax code that requires companies to comply with specific requirements, and there are many opinions out there.

The ranges of issues that we explored fall into three buckets. Structure, does our existing transaction permit an inversion, and if not, is there acceptable alternative structure? Benefits and risks. What are the benefits of an inversion? How sustainable are they in our current environment? What are the risks, and how acceptable are those risks? And third, what is the level of competence required by the Board on the answers to these questions to recommend a path forward to our shareholders?

Briefly with regard to the first bucket with our existing transaction with Alliance Boots — whether our existing transaction with Alliance Boots would permit an inversion, the answer is that it would not. We then looked to see whether we could find an alternative structure that would sustain the inversion tax position. We explored several alternative structures while simultaneously assessing the benefits and risks of each. We considered benefits such as substantial financial advantages, competitive considerations, and future M&A opportunities, and risks that include potentially putting the Company in a significantly worse position than if we had not inverted at all such as a protracted controversy with the IRS. Possibly including litigation, which could go on for 3 to 10 years, and would significantly complicate and impede everyday tax and business planning. Possible dual taxation during the intervening years and payment of back taxes with interest and significant penalties. And third, somewhat harder to quantify but still quite significant, the potential consumer backlash and political ramifications including the risk to our government book of business.

That leads to my third point, the conclusion of this process. First, the Board determined that a significant level of confidence with regard to the sustainability of the inversion tax position was essential given the potential substantial downside risks. With that in mind in the end, the parties could not arrive upon a structure that provided the level of confidence required by the Board to ensure that the transaction could withstand almost certain, intense protracted IRS scrutiny.

3

While we fully understand and considered the significant financial benefits of an inversion, when weighed against the risks, the Company and Board determined that pursuing a structure that included an inversion was not the right course of action for our combined future enterprise. Rather, we felt that our Company would be better served by focusing on accelerating the option exercise, expeditiously moving forward with combining our two Companies, and tackling the issues we face today to position our new global enterprise for the long-term future.

Let me focus on the future and outline the third area of our announcement today, our next chapter plan and financial goals. With our full combination, Walgreens Alliance Boots will be well-positioned for a new era of profitable growth. We are aggressively pursuing future opportunities to drive sustainable shareholder value over the long-term. To do so, we are launching a new, three-year next chapter plan designed to maximize the scope and scale of the new combined Company.

Through this plan, we will accelerate our core business performance in three specific areas. First, a differentiated retail experience that transforms the retail model for health and wellness and changes the way people shop for beauty products. Second, integrated pharmacy and health care that advances the role of pharmacists to provide access to innovative health care services. And third, global pharmaceutical services that reinvent the pharmaceutical value chain and deliver a seamless specialty pharmacy model. We'll certainly be talking more about these growth areas as we move ahead.

Now with our full combination and the next chapter planned, the Walgreens Boots Alliance enterprise is establishing new goals for FY16. As you know, we withdrew our previous 2016 goals that we put in place in 2012 due to the many step two considerations and current business performance trends in both Walgreens and Alliance Boots. We also committed to return with new goals and metrics that would reflect our view of the combined enterprise.

Today, we are establishing new goals focused on revenue and EPS. These goals are revenue of $126 billion to $130 billion excluding JVs and Associates. And, an adjusted EPS goal of $4.25 to $4.60. We believe it is important to highlight its — the size, scale, and top line growth potential of the Company post-step two. Our adjusted EPS reflects the full earnings power of the business including our planned decisions around cost savings, capital allocation, and tax planning for the combined enterprise.

This adjusted EPS range we're setting for today includes the following. Synergies greater than $1 billion, a tax rate in the high 20%, our announced $3 billion share repurchase program, and the accelerated cost savings that we announced today. While not an explicit goal, the adjusted EPS range also implies an adjusted EBIT range with a midpoint around $7.2 billion. Our goal is to drive double-digit adjusted EPS growth over the long-term.

Let me pause here and acknowledge that we're not happy about lowering our previous goals, but we want to adjust our outlook given more pronounced trends across the global business. First, we have been challenged by the ongoing global pharmacy reimbursement pressure, which continues, and the rapid and pronounced increase in generic drug pricing, which we did not fully anticipate, and now expect to persist longer than we anticipated. Both factors are having an adverse effect on Walgreens pharmacy margin which we were not able to fully mitigate given the structure of certain existing contracts. In addition, we made strategic investments in margin over the near-term for long-term share gains in our retail pharmacy business.

In particular, while our decision to win with high value Medicare part D seniors drives market share in this key segment, it is having a near-term impact on margin as reimbursement rates are lower. Having just completed the annual renewal cycle for 2015, it is now clear that we will have margin compression in calendar 2015 and beyond. It is clear that these factors will have a negative impact on gross profit dollar growth in our pharmacy business, so therefore, we have incorporated the impact into our revised outlook for business.

Stefano and I are very focused on addressing this challenge. In our US business, we're realigning our contracting strategies to this new market reality of price pressure but also to take advantage of the overall growth trends in the market. We're also drive our differentiated front-end business where we believe we have incredible opportunities to grow including by building our global brands with Alliance Boots.

Globally, we will continue to leverage our combined scale and purchasing power to offset margin pressure and work closely and collaboratively with manufacturers to drive growth and innovation. Finally, we are pleased the Board voted to bring our two Companies together bringing Stefano and his leadership team together with ours to reposition the Company for long-term growth as we work through the changing and challenging marketing conditions.

That leads to a key element of our next-chapter plan, increasing efficiency in our global platform. As you know, we remain externally focused on gross profit dollar growth relative to SG&A dollar growth. With the pressure we have experienced on pharmacy margins, we have become even more focused on cost control in general and lowering our cost to fill to create more sustainable profitability. More broadly, we've worked hard to identify $1 billion in cost savings by FY17, the majority of which is already reflected in our FY16 goals. This effort is focused on several areas including store costs, field costs, distribution costs, and corporate costs.

But, we also realize that's not sufficient based on the environment I just described. We know we need to do more, and we will. Stefano and I believe that together we can accelerate our cost reduction initiatives and synergies even more, leverage our size and scale to lower our cost of goods, and identify additional cost savings opportunities that we can't see individually. We will do this prudently in order to impact our customer and patient experience, and in fact, the objective is to improve it. Stefano and his organization have a track record of getting at costs, and we intend to leverage that expertise.

Finally, as part of our next-chapter plan, the Walgreens Board has established a new capital allocation policy for the combined enterprise. The new policy is structured to ensure a balanced and disciplined approach to capital and includes several key elements. Investing across core businesses at sustainable returns to drive organic

growth. Pursuing strategic opportunities including mergers and acquisitions. These would be consistent with our strategy and return requirements, be accretive, and drive long-term growth. Maintaining a strong balance sheet and financial flexibility with a commitment to solid, investment-grade credit ratings.

Returning cash to shareholders by committing to a 30% to 35% dividend payout ratio target over the long-term. As you saw in this morning's press release, the Board also declared a quarterly dividend of $0.3375 per share, a 7% increase over the year-ago dividend. This increase is the annual dividend rate to $1.35 per share and marks the 39th consecutive year Walgreens has raised its dividend. It also includes a $3 billion share repurchase authorization through FY16.

Before I close, let me give just a brief look ahead to the fourth quarter. We expect gross margin to be down a similar percentage year-over-year to what we saw in the third quarter. That is due to the ongoing gross margin pressures from the items we mentioned before. These include the recent changes in the environment of our pharmacy business including ongoing generic inflation, reimbursement pressure, and a shift in pharmacy mix toward 90-day at retail, and Medicare part D. Also, please keep in mind that last year's fourth quarter included net gains from certain litigation matters which reduced our SG&A dollar growth by just under 1%.

Our FY15 results, of course, will depend on the timing of the closure of our transaction. We will update you on trends affecting our performance on a quarterly basis as we proceed through the year. We are resetting and asking for more performance from our core business. We have much more we can do and must do. I'm looking forward to getting Stefano and the Alliance Boots folks more involved in helping to lead the combined Company.

Longer term, we are excited by the opportunities of our fully combined enterprise including — additional synergies, growth in our healthcare business as the US and global populations continue to age, expansion of our own brands and going bigger in beauty, growth in our health and wellness businesses, and of course, international expansion, not only in our current markets but in the new emerging markets as well.

To wrap up my opening, I covered a lot of ground here this morning. We have a lot of important announcements to make, and I know it's a lot to digest. Stefano and I look forward to taking as many questions as possible on this call. We also have more opportunities in the coming days and weeks as our team gets on the road to talk to investors.

Let me also take this opportunity to thank the many, many shareholders who have engaged us over the past weeks and months. Our plan is even stronger for all of your thoughts, insights, and guidance.

With that before I hand off to Stefano, let me just try to capture what I believe is the magnitude of this moment. We are lifting Walgreens from a US-only business to a truly international group with Alliance Boots. This group is unparalleled in our industry in the world. Today, we're entering a new state in our strategic partnership.

What Walgreens gets from our full combination with Alliance Boots is more than just new businesses, new products, new markets, and fresh thinking which I'm always looking for. We also get Stefano and his remarkable strategic experience. When combining his leadership team with Walgreens' leadership team, Stefano and I are convinced we're fielding the strongest combined team in the industry. Together, we are establishing one of the most inspiring, far-reaching, and game-changing strategic partnerships I've ever known and created a new global platform for long-term growth and value creation for the Company and its shareholders.

So, I want to thank my colleague and friend, Stefano, for all he's done to make this day possible, and all he will do to make it successful in the future. Stefano?

**Stefano Pessina - *Alliance Boots - Executive Chairman***

Thank you, Greg. Good morning, everybody. I believe that I shall start today by reminding you that the fundamental focuses that drive our businesses and market have not changed. Demographics and the demands on the healthcare system continue to drive volume to our network, both in pharmacy and in distribution. With this volume growth, comes continuous demand for efficiencies and price constraints to help accept that they inevitably increase our costs.

With this underlying pressure, there is no doubt in my mind that our core businesses remain highly attractive and continue to offer huge potential on a global basis. Retail pharmacy remains an important and, I believe, a still radically underutilized platform for the provision of healthcare in the community. In many geographies, the[co-location of pharmacy with specialization provides a unique opportunity to reach the very heart of the communities we serve. So, combining we [fostering] as such as convenience retail in the US or the beauty and personal care in the UK.

Within this environment, innovative services in the specialist product offerings particularly in the beauty and personal care space answer [to both brands and answer] customer loyalty and create economic value in their own right. We have seen these repeatedly throughout our group. We have been the innovators and leaders of this globally, across many markets, and we continue to develop this model where we can adapt it to the local culture.

Today again, we see the opportunity to innovate and lead. We see the opportunity to define the spread and best practice in pharmacy across continents and the healthcare system. You are seeing us to do this not just between Europe and the US but also in Asia and most recently in South America through our work in Mexico and Chile.

We see a huge opportunity to update and enhance our daily living retail offering using the tool in novelty Boots [granted]. And, this clearly targets to differentiate our offerings in the US and drive customer experience [including] revenue and margins as part of a revised, dynamic, and truly unique retail offering. We are committed to

5

seeing Walgreens as a brand that people have a clear understanding of and loyalty to. The people are prepared — I would say happy — to walk past our competitors to come to us no matter what.

This differentiation and localization can only work in an increasingly global healthcare market if supported by a robust and efficient supply chain to optimize cost and availability at the very local level. And, the knowledge and expertise that this brings to support the day-to-day pharmacies.

Of course, none of this should be new to anyone listening. It is something that the US heard in the past, but now this is the time to back up these words with actions. [Macro] trends and opportunities are not enough to [lead us to success, obviously]. To [try], our business must be flexible and agile and must move with its markets and, if possible, [grant] them. It must remain relevant, efficient, and stay ahead of its competitors.

Yet, we have [to wait] analyze and understand the situation we face, but we can only afford to spend so much time debating it before we must act to embrace these opportunities. We will earn our place as the leader of this sector. Complacency, indecision, and [inconsistence] are all certain roads to extinction in these dynamic markets.

People will be disappointed with some of what they have heard from us today. While I can understand that completely, and indeed, I will not pretend to be particularly happy about it myself. Over the past two years as the healthcare and retail markets have reacted to the changing shape of our industry, frankly in part as a response to our own transaction, we have perhaps allowed ourselves to become a little too preoccupied with the transaction and have not given the attention we might have to evolving our businesses in these markets.

The completion of the transaction gives us the opportunity to renew our focus, to transform our businesses once again into a shape to lead the market of innovation, efficiency, drive, and reliability. To do this, the group must be led by a team with clear and common goals, unified, aligned in their commitment and passion to create true and meaningful value for shareholders as the ultimate owners of the business. We must not forget our (inaudible). But, that there can be no place looking forward for self-interest or prejudice or to stand in the way of the common goal. The unified Company that will be created by the merger must deliver the promised ambition that has been articulated to you.

When finally, the two businesses come together, we will have the potential to do more than anyone else in this space to improve the affordability and accessibility of healthcare globally. We will not only have the scale and reach to be a defining force in both primary and consumer healthcare all around the globe, but we will also have a platform in which to continue our expansion into new markets that can deliver us new sources of growth for many years to come.

If we are to do that, we must do so from a sound foundation and position of unqualified strength in our existing markets. We must always innovate and work on a platform that enables us to quickly exploit and share the benefits of that innovation. Now, we must move on and move quickly.

Of course, we do not underestimate the task ahead of us to shape this group into what it needs to be and to ensure all its parts are [fit to process] and pulling in the same direction. It is not going to be an easy task, and it will not be achieved overnight. Starting as we are unfortunately in some ways farther back economically than we thought we would, it is undoubtedly going to take us a little longer than we had hoped to deliver all the benefits we can see. Indeed some of them may no longer be available to us, but other, new opportunities will show themselves and we must be ready to take them.

I hope that today we have announced a team that is ready and able to meet the challenges and opportunities ahead of us with the right attitude, open minds, flexibility, energy, and above all, focus [to be leaders]. Undoubtedly, we will face challenges we are not expecting. And, we will have to make the changes to our [coach] and thinking accordingly. But, I have been in such situations many times before, and I know that with the right mindset and the right people, it is possible to overcome any obstacle we meet. And, find us [to believer] even though a little later than we hoped, the full potential of the merger.

Today, we have also announced that [in as well as to the chair of the new strategy committee for the Board], I will be adopting the role of Executive Vice Chairman of the combined Company, joining the executive team with the responsibility for strategy and M&A. In this role, I am really looking forward to working with Greg to make sure that the Company delivers on what has been promised, pursues the opportunities available to it, and creates real value for you, the shareholders, our [partners].

**Rick Hans - *Walgreen Company - Divisional VP of IR & Finance***

Thank you, Stefano and Greg. Those are our prepared remarks. We are now ready to take your questions. Nicole?

**QUESTION AND ANSWER**

**Operator**

(Operator Instructions)

John Heinbockel, Guggenheim Securities.

**John Heinbockel - *Guggenheim Securities LLC - Analyst***

Hi Greg. Couple of things on the reimbursement environment. The pressure with regard to the contracting is that more how you buy product? I ,assume it's not how you buy product as much as how you are being reimbursed. Is that right? And then, why do you think it's — I think the view had always been that there would be pressure, but it would be somewhat manageable. Seems like it is a little less manageable. Why is that? What has caused a step-up in sustainable pressure on reimbursement?

**Greg Wasson - *Walgreen Company - President & CEO***

Thanks, John. It's actually a little of both. I think the generic inflation that we have seen in addition to driving up cost of goods is impacting our commercial contracts which historically have been crafted off of deflation of generics. And so, we're going to need to continue to go back to those commercial plans now that we're in an inflationary period and adjust for that. The second biggest and probably most significant impact was the negotiation and the reimbursement in the fiscal — or calendar year 2015 med D books of business. Those plans have really challenged us. We are in preferred positions with the part D plans. We think it' a strategic investment to grow market share with the lucrative senior market. But, there were significant margin step-downs in the med D contracts beginning in 2015. Combine those two, and that's what we're looking at in trying to be realistic as we forecast out the next couple years.

**John Heinbockel - *Guggenheim Securities LLC - Analyst***

As a follow-on to that, it looks like — if I look at your $7.2 million of EBIT, right? It looks maybe core growth likely to be in the mid-single digit range through 2016. Do think long-term the growth rate is higher than that? And, if that's true, why would that be?

**Greg Wasson - *Walgreen Company - President & CEO***

As I said in the script, John, we would expect to get back to double-digit EPS increase, and we think, as Stefano and I both said in our prepared remarks, I think that while we are resetting our Outlook for the next two years and FY16 and certainly not happy to have to do that. We do believe that going forward in this combined entity, we don't think that there is anyone better positioned to win in the challenging environment that we described with our global scale. As we're seeing with the joint venture in Bern, and what we're able to accomplish there. The integrated supply chain we've talked about. I think that you are beginning to see some tremendous progress that we're making in the front end of our stores. We think there's huge opportunity there as we go forward. You can look across the pond to Stefano's — to the Boots stores and what they've done in the front end. Longer term, I think we've got the opportunity to bring the two organizations together and find and identify additional synergies and cost opportunities. While we have reset expectations for FY16, John, our long-term Outlook has not changed.

**John Heinbockel - *Guggenheim Securities LLC - Analyst***

All right. Thank you.

**Greg Wasson - *Walgreen Company - President & CEO***

Thanks, John.

**Operator**

Meredith Adler, Barclays

**Meredith Adler - *Barclays Capital - Analyst***

This is Meredith Adler and Eric Percher. I'd like to start with a question talking about your plans to buy back stock and what you would do with your cash if you don't buy back stock? We were wondering whether you actually have had conversations with the rating agencies? And, why is it so important to stay a very solid BBB? Stock could easily be a great buy, certainly after today. Why wouldn't you consider leveraging up more to buy back more stock? And, if not, what will you do with your substantial free cash flow?

**Greg Wasson - *Walgreen Company - President & CEO***

7

Meredith, thanks for the question. I actually have Jason Dubinsky, our Treasurer, with us, and maybe I will let him address the first part of that. Certainly, as I said, we'd continue to invest in the core business and look for opportunities that meet the return and the hurdles we would expect to have. As far as how we have looked through and walked through the share buyback plan, I'll let Jason weigh in there a little bit.

### Jason Dubinsky - *Walgreen Company - Treasurer*

Meredith, it's Jason. I would start and echo that we strongly believe firmly in the cash flow — future cash flow generation capabilities of the Company. But, to your point on solid investment-grade ratings, very important to us on a go-forward basis. And, by that, we mean not dropping below BBB at both S&P and Moody's. And, why do we want to be a solid investment grade credit rating? I think primarily financial flexibility is important for the long-term to pursue the strategic opportunities for the Company. It is critical for us as a Company of our size and stature to keep liquidity and maintain strong tier 2 commercial paper rating. And, certainly for capital markets access, remaining solid investment grade is important. We've taken all that into account and believe we've adequately sized the share repurchase capacity to keep us in that zone. We're confident that that's the right place to be for us right now and for the longer term

### Meredith Adler - *Barclays Capital - Analyst*

There are companies of similar size who, not only do they buy back more stock, but they actually give a multi-year vision. You've got $3 billion for over three years, but clearly you could do $3 billion this year. Why not lay out a longer-term strategy? I think you're going to have an awful lot of free cash flow. Are you really — I guess I would say that this doesn't — I don't understand. It seems to me you are doing a disservice to shareholders to count on some future acquisitions that may or may not have a good return when you could be buying back stock and generating a meeting value to shareholders. That's a statement, I guess, not a question. Eric, do you have any questions?

### Eric Percher - *Barclays Capital - Analyst*

I'd be interested in the response to that, and maybe I would add on, are you still expecting to fund the second portion — the cash portion via debt issuance?

### Jason Dubinsky - *Walgreen Company - Treasurer*

Maybe I can help frame capital structure a bit in that context. We do have to deliver $5.3 billion — US dollar equivalent in sterling. You can consider that into your planning along with the fact that we do intend to refinance Alliance Boots' debt which their net borrowings as of their last annual report was roughly $8.5 billion in US dollar terms. That does not include any debt incurred with the FASA acquisition. All of those are part of our financing plans as we consider approaching step two and the amount of debt that would likely be required to close the transaction.

### Meredith Adler - *Barclays Capital - Analyst*

Thank you.

### Greg Wasson - *Walgreen Company - President & CEO*

Thank you, Meredith.

### Operator

Thank you. Lisa Gill, JPMorgan.

### Lisa Gill - *JPMorgan Chase & Co. - Analyst*

Thank you. Greg, just going back to reimbursement, I really have two questions here. The first is just as you think about contracting, can you give us an idea of when some of those contracts are up for renewal? Do you think that there's an opportunity in the next 12 to 18 months to renew that? And then, a bigger question. If you look at your largest US competitor, they own a PBM. They don't seem to have the same reimbursement pressure that you're having today. Any thoughts around perhaps owning a PBM in the future? I know you've been against it in the past, but does this change any of your thought process as you become a bigger health and wellness Company?

### Greg Wasson - *Walgreen Company - President & CEO*

8

Thanks, Lisa. As far as the reimbursement of contracts, typically the commercial contracts have two to three years. We're somewhere in the cycle of those that maybe under renegotiation this year or two years left, and we're going back to working on those contracts. In some, we will have success, and some we may be longer-term. I think the bigger impact, as I said, was the Medicare part D programs.

Regarding the structure that we have, I think irregardless of our competitor and the structure that they have, I think Stefano and I are thrilled with what we've put together. I think to his point earlier if we focus — now that the Board has approved the second step — that we have a tremendous opportunity to drive significant volume with the model we have, an integrated retail wholesale model. And, believe that with the scale that we have longer-term, we are well-positioned and better positioned globally than I believe anyone else out there.

**Lisa Gill - *JPMorgan Chase & Co. - Analyst***

As we think globally and you talk about the $7.2 billion of EBIT, can you or Stefano give us any indication as to what you're seeing on the European side of the business? Are you seeing equal amount of reimbursement pressure? Or, this new number is really more of a takedown on the US side of the business? I'll stop there. Thanks.

**Stefano Pessina - *Alliance Boots - Executive Chairman***

The pressure on the pharmacies is a global issue. Everywhere in the world, the margin of the pharmacies is under pressure. To be honest, not just the margin of the pharmacies. So, it is something we have to cope with, and we have to respond cutting the cost and maybe finding new ways to develop our business.

20 years ago, Boots, as you know, was making its money on the pharmacies. 75% of the profit of Boots was coming from the pharmacies. Today, 75% comes from the front of the store. The pharmacies losing money not at all. They are still very profitable in Boots because the margin has suffered, but of course, they are selling much more. And so, they are still very profitable. But, of course, in terms of margins, they don't have the margin they used to have in the past.

Over time, we have developed something to compensate for it. We have developed the front of store. This happens everywhere in the world. If you see what happens in the Netherlands, the margins have almost collapsed in Sweden. But, at the end of the day, the pharmacists, the chains, where allowed have found a way to compensate with less cost and new offers, new products, and new services to the patients. This is what will happen in the US.

I have never doubted that the pharmacy in the US was and maybe still is quite rich, and so over time, we have to wait for a reduction in margins. This is why I believe we have done this deal at the end because Greg was very clear that he wanted to develop the front of stores in order to compensate for it. It has happened a little quicker than we expected. Maybe we have not seen it coming. It has been a surprise for the people of Walgreens. But, at the end, the day the trends are there. Sooner or later, this had to happen. Sooner or later, we had to develop our front of the store. Sooner or later, we will have to find new ways to deliver the medicines at the lowest cost and deliver something else which can compensate for [the margins that we've seen].

**Lisa Gill - *JPMorgan Chase & Co. - Analyst***

Thank you.

**Operator**

Thank you. Ricky Goldwasser, Morgan Stanley.

**Ricky Goldwasser - *Morgan Stanley - Analyst***

Hey, good morning. You established a three-year cost saving plan and talked about $1 billion in synergies. Can you just help us understand what percent of savings will be captured by FY16 so we can tie it to the 2016 guidance?

**Greg Wasson - *Walgreen Company - President & CEO***

Jason, you want to handle that one?

**Jason Dubinsky - *Walgreen Company - Treasurer***

You can assume that a substantial majority of those savings will be realized by the end of FY16. A bit of a step to 2017, but you can factor that into your modeling.

**Ricky Goldwasser - *Morgan Stanley - Analyst***

And, the baseline — the $1 billion in synergies that you are referring to. Should we use the baseline against FY13 as the starting point, or FY14?

**Jason Dubinsky - *Walgreen Company - Treasurer***

FY14 is the base.

**Ricky Goldwasser - *Morgan Stanley - Analyst***

And then, obviously your potential tax rate goals have been an issue with a lot of discussion and controversy for the last six months. Greg, you talked about tax rate in the high 20% factored into the guidance. Can you talk with us a little bit about how can you get that tax rate from the high 20% that's embedded into guidance to a lower level? What other things outside the inversion that is off the table can you do in order to manage your tax levels?

**Greg Wasson - *Walgreen Company - President & CEO***

Certainly, Ricky, we do think that getting it down to the high 20% is significant. We will be and will continue to look for opportunities to optimize our position. I think that as we bring the two Companies together, certainly we will hopefully find and identify new opportunities. But, I think at this point, we feel confident that we can get certainly to the high 20% as we said. We don't typically get into tax planning discussions on these calls, but certainly as we move forward, we will be looking for opportunities.

**Ricky Goldwasser - *Morgan Stanley - Analyst***

Okay, and then given that you established an EPS guidance, are you going to also guide on an annual basis? Or, are we still staying with the monthly comps in a FY16 goal type of format?

**Greg Wasson - *Walgreen Company - President & CEO***

At this time, we are remaining with the FY16 EPS goal. We are and will consider listening to our investors, but we will continue to give monthly sales comps in the information that we try to give as we previously have.

**Ricky Goldwasser - *Morgan Stanley - Analyst***

Thank you.

**Greg Wasson - *Walgreen Company - President & CEO***

Thanks, Ricky.

**Operator**

Thank you. George Hill, Deutsche Bank.

**George Hill - *Deutsche Bank - Analyst***

Good morning. Thanks for taking the question. Greg, first, a point of clarification. The new $1 billion synergy target is in addition to the $1 billion of procurement synergies that were announced in 2012?

**Greg Wasson - *Walgreen Company - President & CEO***

10

No, it is not, George. Jason, you want to cover that?

**Jason Dubinsky - *Walgreen Company - Treasurer***

We have not provided — making sure I understand —. George, repeat the question. Are we talking about the synergies we referenced in the press release and the script?

**George Hill - *Deutsche Bank - Analyst***

The synergies that you referenced in the press release and the script — the $1 billion. That is in addition to the $1 billion that was originally announced in 2012? Or, is that stating that you're going to exceed the $1 billion that was announced in 2012?

**Greg Wasson - *Walgreen Company - President & CEO***

We're going to exceed the $1 billion that was announced in 2012, George.

**George Hill - *Deutsche Bank - Analyst***

That is helpful. Greg, if we think about the guidance that was provided in 2012 versus where we are today, what are the — it's basically a negative revision of more than 20%. What are the biggest moving parts and what are the biggest contributor to the change in the Outlook in 2012 versus the change in outlook today?

**Greg Wasson - *Walgreen Company - President & CEO***

George, it's primarily that global pharmacy pressure that we are seeing on both businesses. Certainly in the US, it's the pharmacy reimbursement and the inflation that we've seen spike as I discussed. I think as far as Stefano's business in Europe, you can certainly see similar-type pharmacy reimbursement pressure in the wholesale part of the business. Primarily from the pharmacy reimbursement and generic inflation environment across the globe

**George Hill - *Deutsche Bank - Analyst***

Okay. So, I guess just if I'm thinking about the model right, if I back out synergies and I back out share repo, we're basically expecting the EBIT of the combined business to be flat to maybe even — to basically be flattish now through the end of 2016?

**Greg Wasson - *Walgreen Company - President & CEO***

Yes, we are looking to be through the next couple of years probably flat to a little up. But again, that's why we are — with the Outlook that we gave in 2016. But, we do believe that we have opportunity to continue to drive growth beyond this reset.

**George Hill - *Deutsche Bank - Analyst***

Okay. I'll hop back in the queue. Thanks for the call.

**Greg Wasson - *Walgreen Company - President & CEO***

Thanks.

**Operator**

Thank you. Robert Jones, Goldman Sachs.

**Robert Jones - *Goldman Sachs - Analyst***

Thanks for the questions. Greg, just wanted to go back again to the combined EBIT target of $7.2 billion. Obviously, as noted on this call, quite a bit lower than the previous range. And now, this range does include at least one year's worth of the new $1 billion of cost savings. I guess maybe just a higher level question. It seems like things changed on you fairly dramatically since the original guidance was given. I'm curious — almost to the extent that it seems like it's wiping out a lot of the synergies. I'm curious how much of this change in the market — you refer to generic inflation was a reaction to your transaction to begin with? And, was this may be something that you just underestimated, the ability of the market to shift along with your scale shifting?

#### Greg Wasson - *Walgreen Company - President & CEO*

It's a fair question. It would be hard to determine what the exact cause was. I do think that it's primarily a challenge in reimbursement model across the US business that has accelerated. Specifically, as we went into FY15 — or calendar 2015 med D contracting process, that's where we really saw a significant change that impacted —. And, the generic inflation that we talked about that we didn't expect it to be quite as significant and prolonged as it is. Combine — those two combined would be the lion's share of what has impacted the new metrics from what we put out in 2012.

#### Robert Jones - *Goldman Sachs - Analyst*

That is fair. I know we touched on the debt and the cap structure, but I'm wondering if you would be willing to share some leverage targets? Where are you comfortable as far as carrying debt? And then, anything, or early thoughts around refinancing Alliance Boots' debt at this point?

#### Jason Dubinsky - *Walgreen Company - Treasurer*

Robert, it's Jason again. We're not going to give out any specific debt targets other than our commitment to the solid investment-grade ratings and not dropping below BBB flat at S&P and Baa2 at Moody's. And, metrics consistent to keep us within those targets.

As far as refinancing the Alliance Boots debt, we won't give any specific plans. You'll have more as we come closer to the transaction. But, we recognize the importance to refinance that debt just given the higher costs of debt in Alliance Boots versus the combined entity will provide from a synergistic standpoint. As, I mentioned before there is roughly $8.5 billion of net debt there today excluding the FASA acquisition so our intent would be to take that into account in our financing prior — or concurrent with the closing.

#### Robert Jones - *Goldman Sachs - Analyst*

Fair enough. Thanks.

#### Operator

Thank you. Mark Miller, William Blair.

#### Mark Miller - *William Blair & Company - Analyst*

Hey, good morning. I guess weighing all this, it's pretty shocking that there is such limited visibility and control over the business given the Company is selling consumables and pharmacy. It's an observation. With EBIT coming in — it looks like more than $2 billion lower in 2016 than what you originally contemplated, can you put this into buckets, Greg? I know you like to think about the business in components. How much of it is the US business versus Alliance Boots? How much of it is retail versus wholesale? And then, given the lower Outlook, is there an expected change in incentive compensation? Can you just case clarify whether these goals are organic? And, to what extent you expect acquisitions to be meaningful in your Outlook by 2016. Thanks.

#### Greg Wasson - *Walgreen Company - President & CEO*

Mark, the breakdown with the reimbursement and the challenges we've seen would probably be similar to the scale of the businesses. Certainly, the US business, we've seen a significant step-down there, but also Stefano's business and wholesale piece has stepped down as well. I think it would be pretty similar to the scale of the business. Primarily, pharmacy-related, Mark. Again, as I said. In fact, the front end of the business we're optimistic about. Compensation is absolutely tied to the plan and the internal plan that we set. As we go forward, it's tied to performance.

#### Jason Dubinsky - *Walgreen Company - Treasurer*

12

On acquisitions — to clarify, this goal is organic. It does not contemplate additional deals.

**Greg Wasson - *Walgreen Company - President & CEO***

No, this is organic.

**Mark Miller - *William Blair & Company - Analyst***

And then, just a final one. The reimbursement on the med D for 2015, has come a as surprise it looks to the team. Are you at the mercy of third parties? Or, is there something the Company can do to gain greater control over this process going forward? Thanks.

**Greg Wasson - *Walgreen Company - President & CEO***

Mark, I think that certainly the reason that we made the strategic investment is to grow share in this business — this market — and we are. With the restructuring that we've put in place, we're going to have a new team focused on the contracting opportunities and working with these plans. Jeff Berkowitz, when I announced that his role will be market access, will be specifically focused on this to help us work with payers and drive additional EBIT from these plans.

**Mark Miller - *William Blair & Company - Analyst***

Thanks, Greg.

**Greg Wasson - *Walgreen Company - President & CEO***

Thanks, Mark.

**Operator**

Mark Wiltamuth, Jefferies.

**Mark Wiltamuth - *Jefferies & Company - Analyst***

Just to clarify on the buyback, are you counting on executing the full $3 billion of the buyback? And, what share count should we be expecting for FY16?

**Jason Dubinsky - *Walgreen Company - Treasurer***

The $3 billion, just to reiterate, is effective today through the end of FY16. We aren't giving any specifics on the timing of that other than it is effective today, and we have factored that in to our adjusted earnings goals that we set forth in the press release.

**Mark Wiltamuth - *Jefferies & Company - Analyst***

So, it's not just an authorization, you plan to fully execute it at some point through that window?

**Jason Dubinsky - *Walgreen Company - Treasurer***

It's factored into our adjusted earnings goals that we set forth. Yes.

**Mark Wiltamuth - *Jefferies & Company - Analyst***

Just beyond this period where you're struggling through some reimbursement rate pressure, could you talk a little bit more about the longer-term EBIT growth goals for the combined business? What do you think a normal growth rate would be for each of the two major businesses — for Walgreens and Alliance Boots?

13

**Greg Wasson** - *Walgreen Company - President & CEO*

Jason?

**Jason Dubinsky** - *Walgreen Company - Treasurer*

Mar, I think the way to approach that is Greg had mentioned we're certainly in a period of reset here, but I think we would expect to get back to more historical trends that we've seen beyond into the future. Both on an organic basis that wouldn't include any strategic opportunities beyond that.

**Greg Wasson** - *Walgreen Company - President & CEO*

As I said, Mark, I think that the goal would be to get back to double-digit EPS growth. Certainly, that's not EBIT goals but double-digit EPS goal, growth going forward.

**Mark Wiltamuth** - *Jefferies & Company - Analyst*

How about just the core EBIT growth? How much of the business is going to be growing? Obviously, you've got some buyback and other factors factoring into the EPS.

**Jason Dubinsky** - *Walgreen Company - Treasurer*

Given the goals today, we're focused obviously on EBIT generation and growth, but we've gone to EPS goals because of not only EBIT growth but the other levers that we can pull. And, we're very focused on long-term goals of double-digit EPS growth.

**Mark Wiltamuth** - *Jefferies & Company - Analyst*

Okay. (multiple speakers) Any perspective on international and where you'll be growing there in geography growth and so forth?

**Greg Wasson** - *Walgreen Company - President & CEO*

Before we move on, I think Stefano had a comment there to the last question.

**Stefano Pessina** - *Alliance Boots - Executive Chairman*

I was saying, I believe it's very interesting to focus on the EPS because if you look at the deal in the business in Europe for instance [mogenaybe], you will see that the EBIT growth has slowed down. But, if you look at the numbers in terms of earnings, you will see that the earnings have stepped up because of course we have different levers to work on. We said two years ago when we presented the business that we would focus on earnings, which we have done, and in earnings, we have strong double-digit growth.

Now, on EBIT, as the market is changing as I was saying before, we are re-adopting — in Europe, for instance, we are trying to compensate the pressure that we have on the retail business. Creating new product, putting our product on the market in order to compensate with the mix and keep the margin more or less intact. On the [all-selling] business, we are thinking of a stronger structure and which we do every seven or eight years because the market changes, and we have to adapt our organization to the changes of the market, reducing the costs.

In reality, this year and next year, will be an era of transition where we continue to grow the profit — the earnings quite substantially even the EBIT more modestly. But, in the future years, of course, we will have the benefit of all the restructuring and all the innovation that we have been working to, and this is not something that we have started now. It's something we started last year.

**Mark Wiltamuth** - *Jefferies & Company - Analyst*

Okay. Thank you.

14

**Operator**

Thank you. Steven Valiquette, UBS.

**Steven Valiquette - *UBS - Analyst***

Thanks. Good morning. I guess I'm curious with all the moving parts in relation to the FY16 EPS guidance of $4.25 to $4.60, can you tell us whether step two of the AB transaction is accretive or dilutive to the EPS that may have been reported by WAG on a standalone basis for FY16. If you did not pull the trigger on step two, but maybe you still did the share buybacks and some of the other cost-cutting initiatives. Bottom line, is step two accretive or dilutive to WAG's standalone EPS for FY16 just based on your own math? Thanks.

**Greg Wasson - *Walgreen Company - President & CEO***

Yes, it is accretive, Steve.

**Steven Valiquette - *UBS - Analyst***

Okay. And, I guess the other quick thought here is, you've laid out this pretty good strategy for three years through FY17. It seems like FY17 could be a pretty good year of strong EPS growth. I was just curious, why not give some FY17 EPS guidance and targets? And, why so much emphasis on FY16?

**Greg Wasson - *Walgreen Company - President & CEO***

It's a good suggestion. We wanted to make sure that we were comparing apples to apples, and since we had pulled our 2016 goals, we wanted to make sure we got out there with what we thought our EPS target would be and tie it to the last goals. We do feel — Stefano just said that we have opportunity to grow this Company in FY17 and beyond. But, we wanted to make sure that we were comparing apples to apples.

**Steven Valiquette - *UBS - Analyst***

Okay. Got it. Thanks.

**Operator**

Edward Kelly, Credit Suisse.

**Edward Kelly - *Credit Suisse - Analyst***

Good morning. A lot of the story here also has been the thought process behind the ability to improve front end business at Walgreens. Can you talk a little bit about what is the implied EBIT growth of the front-end business? If we're talking the overall business ex-synergies — sorry, ex-cost saves around flattish for EBIT, what is it implying for the front end over that time period through 2016, and then, when can we expect some of these initiatives to really begin to drive any real growth there?

**Greg Wasson - *Walgreen Company - President & CEO***

Ed, we haven't given that. I do believe that as I said there is real opportunity in the front of our store. If you think about what Stefano was talking about earlier on the Boots model over the past years as the pharmacy became more pressured and the opportunity that they had and what they were able to drive out of the front end of the business. Their operating margins are significantly higher than what ours are, and it's primarily as a result of that front-end business. We do think that there is opportunity to drive operating margin out of our front-end business. I feel confident with what we've been doing so far — the proof points we've seem that there's opportunity there. We haven't broken it out, but I do believe, as I've said, that if we look across the pond to the Boots model, we have similar opportunities at the front-end of our store.

**Stefano Pessina - *Alliance Boots - Executive Chairman***

15

I can assure you that after the merger we will have a step-up in the margins of the front of the store. You will start to see it growing from next year on. Not this year, next year at the time of the merger, you will see it. We have clear plans for it.

**Operator**

Thank you. Ross Muken, ISI Group.

**Ross Muken - *ISI Group - Analyst***

Good morning. As you were formulating the plan, obviously adding a new CFO to the mix. So, it's a complication. In terms of what he brings to the table that will help you in terms of execution? And, maybe hash out some of these longer-term drivers which you have laid out today. What attracted you to his skill set, and how do feel like it will take him to get up to speed and then ultimately have some input on achieving the goals you've laid out today?

**Greg Wasson - *Walgreen Company - President & CEO***

Having spent time with Tim just in the last few days, I can assure you Tim will come up to speed quickly. What attracted me to Tim was the fact that he has some incredible experience, not only in large mergers but in cost-focused —. In past opportunities, real financial discipline that he is bringing to the team. I really do believe that Tim is going to add a lot. I think he'll come up to speed quickly. I'm looking forward to having him at my side, specifically on calls like these. And, to help us make sure that we're making good, sound financial decisions and forecasting going forward.

**Ross Muken - *ISI Group - Analyst***

If you look at the pro forma management structure, it's obviously pretty balanced. But, from an operational perspective, I think Jeff Berkowitz, who has done a great job, is the only surviving member on the WAG side, other than obviously you, Greg. As you think about taking some of the AB folks and integrating them in the WAG business now, more than just Alex. How much time do you think it will take for them to have a true imprint on the business and have the changes flow through the rest of the organization?

**Greg Wasson - *Walgreen Company - President & CEO***

I think that they already are having an impact. I think Alex has done a phenomenal job in the short period of time he's been in. The reason — one of the reasons that I'm really excited about Alex leading the Walgreen business is because we do have the potential in the front end of our stores that I believe has been untapped.

I think no one better than someone who has completed that journey or led that process with Boots as Stefano described over the last decade than Alec to help us accelerate and achieve the opportunity that we believe our front end of our store has. We are going to continue to bring people back and forth as Richard Ashworth, one of our key pharmacy leaders, is working with Simon Roberts in pharmacy and healthcare with Boots. And, we'll continue to find more opportunities to do just that.

**Ross Muken - *ISI Group - Analyst***

Great, thank you very much.

**Greg Wasson - *Walgreen Company - President & CEO***

Thank you, Ross. On behalf of Walgreens Boots Alliance, I want to thank you for joining us today. We look forward to speaking to all of you soon

**Operator**

Ladies and gentlemen, thank you for participating in today's conference. This does conclude today's program. You may all disconnect. Have a great day, everyone.

*Walgreens*

**Walgreens Board of Directors Exercises Option to Complete Second Step of Strategic Partnership with Alliance Boots and Fully Combine Both Companies, Creating First Global Pharmacy-Led, Health and Wellbeing Enterprise**

DEERFIELD, Ill., August 06, 2014 - Walgreens (NYSE: WAG) (Nasdaq: WAG) today said it has exercised its option to complete the second step of its strategic transaction with Alliance Boots GmbH ahead of the original option period, which was between February and August 2015. The transaction, subject to shareholder and various regulatory approvals, would fully combine the two companies to form the first global pharmacy-led, health and wellbeing enterprise.

This action follows the launch of the companies' long-term strategic partnership in June 2012, when Walgreens acquired a 45 percent equity ownership in Alliance Boots, with the option to proceed to a full combination by acquiring the remaining 55 percent of Alliance Boots in three years' time (Step 2). Walgreens expects to close the transaction in the first quarter of calendar 2015.

Walgreens also announced the following decisions related to moving forward with Step 2:

- A new holding company to be formed in connection with the transaction will be named Walgreens Boots Alliance, Inc., and will include four divisions: Walgreen Co. (the largest drugstore chain in the United States); Boots (the U.K. and Republic of Ireland's leading pharmacy-led health and beauty retailer); Pharmaceutical Wholesale and International Retail (including Alliance Healthcare, Europe's largest pharmaceutical wholesaler); and Global Brands. In addition, the combined company is establishing a cross-divisional global pharmacy market access group.
- Upon closing, the combined enterprise will blend senior management from both companies including Walgreens President, CEO and board member Greg Wasson who will be president and CEO of Walgreens Boots Alliance, and Stefano Pessina, executive chairman of Alliance Boots, who will be executive vice chairman of the combined company responsible for strategy and M&A reporting to Wasson, and chairman of a new strategy committee of the board of directors.
- Jim Skinner will serve as the non-executive chairman of the board of directors for the combined company.
- The Walgreens Boots Alliance holding company will be headquartered in the Chicago area, while Walgreens operations will remain headquartered in Deerfield, Ill. Boots operations also will remain headquartered at its current location in Nottingham, U.K.
- The company is outlining a new three-year "Next Chapter" plan through fiscal 2017 that sets strategic goals for the combined company. The plan reflects significant value-creating opportunities for the combined enterprise to drive long-term shareholder value.
- In conjunction with its strategic plan, the company is establishing a new adjusted earnings per share goal for fiscal 2016 of $4.25-$4.60.
- The adjusted EPS goal includes accelerated cost reduction initiatives that target $1 billion in savings by the end of fiscal 2017 to establish an efficient global enterprise.
- Walgreens board of directors also authorized a new capital allocation policy that includes a $3 billion share repurchase program through the end of fiscal 2016. In addition, the board declared a 7.1 percent quarterly dividend increase to 33.75 cents per share.

Walgreens Boots Alliance combines two leading companies with iconic brands, complementary geographic footprints, shared values and a heritage of trusted health care services through pharmaceutical wholesaling and community pharmacy care, dating back more than 100 years each.

Combining the companies will create a new global leader in pharmacy-led health and wellbeing retail with more than 11,000* stores in 10* countries and an unparalleled portfolio of retail and business brands, as well as increasingly global health and beauty product brands. The full combination also will establish the world's largest pharmaceutical wholesale and distribution network with more than 370* distribution centers delivering to more than 180,000* pharmacies, doctors, health centers and hospitals in 20* countries. Walgreens Boots Alliance will be the world's largest purchaser of prescription drugs and many other health and wellbeing products. The combined size, scale and expertise will help Walgreens and Alliance Boots expand the supply, and address the rising cost, of prescription drugs in America and worldwide.

"We are excited to move forward with the next important step in becoming a new kind of global health care leader," said Wasson. "Expanding globally with Alliance Boots will make quality health care more affordable and accessible to communities here in America and around the world. In addition, Stefano and I are pleased with the comprehensive plan we've announced today as part of Step 2. These elements will provide additional shareholder value creation, both in the near and long term. I congratulate our teams for getting us to this point and together we have a bright future."

Pessina said, "The expected creation of the new enterprise will represent the most significant milestone in the history of Alliance Boots and, importantly, a very positive step for the health care industry as a whole. Together with Walgreens, we have already made good progress over the past two years and I strongly believe that the merger will bring significant growth opportunities for both mature and emerging markets. Today's announcement reflects the great track record and accomplishments of our people to date and I am convinced that their skills, expertise and commitment will continue to make a positive contribution in the years to come. This combination is a true partnership, further evidenced by the composition of the future management team of Walgreens Boots Alliance."

Under the terms of the revised agreement announced today, the period during which Walgreens is permitted to exercise its option to acquire the remaining 55 percent of Alliance Boots that it does not currently own, in exchange for £3,133 million in cash (equivalent to approximately $5.29 billion at a current $1.69=£1 exchange rate) payable in British pounds sterling, and approximately 144.3 million shares of common stock of Walgreens, has been accelerated to begin on Aug. 5, 2014 and end on Feb. 5, 2015. Pursuant to the agreement, Walgreens exercised the option through an affiliate on Aug. 5.

### Blended Management Team

Leading Walgreens Boots Alliance will be a top management team led by Wasson and consisting of senior executives from both companies. In addition to Wasson's and Pessina's roles, the following appointments are being announced:

- Ornella Barra, chief executive, Wholesale and Brands of Alliance Boots, will become executive vice president of Walgreens Boots Alliance and president and chief executive of global wholesale and international retail.
- Jeff Berkowitz, president of Walgreens Boots Alliance Development GmbH, will serve as executive vice president of Walgreens Boots Alliance and president of pharma and global market access, which will include responsibility for specialty pharmacy.
- Alex Gourlay, Walgreens president of customer experience and daily living, will become executive vice president of Walgreens Boots Alliance and president of Walgreens.
- Tim McLevish, previously announced as Walgreens executive vice president and chief financial officer, will serve in that role in a global capacity for Walgreens Boots Alliance.
- Ken Murphy, managing director, Health & Beauty International and Brands of Alliance Boots, will serve as executive vice president of Walgreens Boots Alliance and president of global

brands.
- Simon Roberts, managing director, Health & Beauty, UK and the Republic of Ireland of Alliance Boots, will serve as executive vice president of Walgreens Boots Alliance and president of Boots.
- Tom Sabatino, Walgreens chief administrative officer and general counsel, will serve as executive vice president and global chief legal and administrative officer of Walgreens Boots Alliance.
- Tim Theriault, chief information, innovation and improvement officer at Walgreens, will assume the role of executive vice president and global chief information officer of Walgreens Boots Alliance.
- Kathleen Wilson-Thompson, Walgreens chief human resources officer, will become executive vice president and global chief human resources officer of Walgreens Boots Alliance.

### Domicile of Walgreens Boots Alliance Enterprise

The fully combined Walgreens Boots Alliance global enterprise will be domiciled in the United States and headquartered in the Chicago area. Walgreens operations will remain headquartered in Deerfield, Ill., and Boots operations will remain headquartered at its current location in Nottingham, U.K.

In connection with moving forward with the option exercise, and given the potentially significant business, financial, legal and competitive implications, Walgreens management and the board of directors thoroughly evaluated the possibility of combining Walgreens and Alliance Boots under a foreign parent company in an "inversion" transaction. The original option transaction would not qualify for an inversion under the current tax inversion rules. The company and board of directors, including a special committee of independent directors, and with the benefit of leading advisors in the fields of tax policy and inversions, undertook an extensive analysis to explore the feasibility of a restructured inversion transaction that would provide the company with the customary level of confidence needed to withstand IRS review and scrutiny. As part of this process, the company considered a wide range of issues, including the potential financial benefits (and their sustainability) and the technical viability of a restructured inversion transaction under current U.S. law. The company also was mindful of the ongoing public reaction to a potential inversion and Walgreens unique role as an iconic American consumer retail company with a major portion of its revenues derived from government-funded reimbursement programs.

"In line with our fiduciary duty to the company and our shareholders, we undertook an extensive and rigorous analysis with a team of leading experts to determine the most optimal – and sustainable – course of action," said Wasson. "We took into account all factors, including that we could not arrive at a structure that provided the company and our board with the requisite level of confidence that a transaction of this significance would need to withstand extensive IRS review and scrutiny. As a result the company concluded it was not in the best long-term interest of our shareholders to attempt to re-domicile outside the U.S. The board did, however, believe accelerating the option to exercise Step 2 was in the best interest of our shareholders, and with this decision, we are now moving forward on an accelerated basis to create the global leader in pharmacy-led health and wellbeing."

### Three-Year "Next Chapter" Plan and Financial Goals

With the full combination, Walgreens Boots Alliance will be positioned for a new era of profitable growth and is aggressively pursuing future opportunities to drive sustainable shareholder value over the long term. To do so, the company is launching a new three-year "Next Chapter" plan that will maximize the scope and scale of the new combined company. Through the plan, core business performance will be accelerated by providing:

- A differentiated retail experience that transforms the retail model for health and wellness and changes the way women shop for beauty
- Integrated pharmacy and health care that advance the role of pharmacists and provide access to innovative health care services
- Global pharmaceutical services that reinvent the pharmaceutical value chain and deliver a seamless specialty pharmacy model

With the plan, the combined company is establishing goals for fiscal 2016 including revenue of between $126 billion and $130 billion and adjusted earnings per share of $4.25 to $4.60. In addition, the combined company anticipates exceeding the previously established $1 billion synergy goal.

The company's continuing focus on improving core performance in the near-term at both Walgreens and Alliance Boots also remains a critical component of the "Next Chapter" plan. "As we launch our global plan, we are more focused than ever on what it will take to compete and succeed on the world stage," said Wasson. "We are uniquely positioned to be a leader and a champion for accessible, affordable health care, and that means continuing to innovate, to find new ways to be as efficient as possible, and more agile and nimble as we compete in the worldwide market. We also are encouraged by the improving performance of our daily living business and the further potential of our expanded beauty and own brands portfolio to drive margin expansion."

## Cost Reduction Initiative

As part of the combined company's goal to establish an efficient global platform, the management team is accelerating a multi-faceted cost-reduction initiative across the enterprise. The $1 billion, three-year plan includes corporate, field and store-level cost reductions. The company is making significant progress in an effort that is already under way in order to begin realizing incremental benefits in fiscal 2015. Additional details will be provided in coming quarters as the company recognizes certain costs associated with these initiatives. These cost savings are additive to the synergies discussed above.

"Walgreens has demonstrated a strong focus on cost control as adjusted SG&A growth has slowed significantly from historical trends," said Wasson. "We have made this impact by driving efficiencies across the enterprise, and we are continuing to focus on that. Earlier this year, we announced enterprise optimization initiatives to further accelerate these efforts, which we've executed this fiscal year through strategic closures of certain distribution centers and stores, exiting certain businesses and driving cost reduction programs at our headquarters and in the field. We also plan to expand these efforts as we leverage the expertise of both companies and move forward integrating Walgreens and Alliance Boots."

## Capital Allocation Policy

The board of directors has approved a new capital allocation policy for the combined enterprise. The policy is designed to ensure a balanced and disciplined approach to capital intended to drive business growth and generate strong returns, while returning cash to shareholders through dividends and share repurchases over the long term. The key elements of the new capital allocation policy include:

- Investing across core businesses at suitable returns to drive organic growth
- Pursuing strategic opportunities, including mergers and acquisitions, that are consistent with the company's strategy, meet its return requirements, are accretive and drive long-term growth
- Maintaining a strong balance sheet and financial flexibility with a commitment to solid investment grade credit ratings to govern future capital allocation.
- Returning cash to shareholders by targeting a 30-35 percent long-term dividend payout ratio and a new $3 billion share repurchase authorization through the end of fiscal 2016.

In addition, the board of directors of Walgreen Co. on Aug. 5, 2014 increased the quarterly dividend to 33.75 cents per share, a 7.1 percent increase over the year-ago quarterly dividend of 31.5 cents per share. The increased dividend is payable Sept. 12, 2014, to shareholders of record Aug. 21, 2014, and raises the annual rate from $1.26 per share to $1.35 per share. This marks the 39th consecutive year Walgreens has raised its dividend.

"This is a pivotal moment in Walgreens history as we venture ahead from the best corners in America to the four corners of the world," said Wasson. "In a changing global marketplace with new opportunities and challenges, we will serve our communities, our country and the world in ways we could never have imagined even a few years ago."

Walgreens financial advisors in connection with the second step of the Alliance Boots transaction are Goldman, Sachs & Co. and Lazard, and its legal advisors are Wachtell, Lipton, Rosen & Katz, and Allen Overy.

Walgreens will hold a one-hour conference call to discuss the Alliance Boots transaction and related matters beginning at 8 a.m. Eastern time today, Aug. 6. The conference call will be simulcast through Walgreens investor relations website at: http://investor.walgreens.com. A replay of the conference call will be archived on the website for 12 months after the call. A podcast also will be available on the investor relations website.

The replay also will be available from 11:30 a.m. Eastern time, Aug. 6 through Aug. 13, by calling 855-859-2056 within the U.S. and Canada, or 404-537-3406 outside the U.S. and Canada, using replay code 82609242.

*\* Note: Figures include Alliance Boots associates and joint ventures*

### About Walgreens

As the nation's largest drugstore chain with fiscal 2013 sales of $72 billion, Walgreens (www.walgreens.com) vision is to be the first choice in health and daily living for everyone in America, and beyond. Each day, in communities across America, more than 8 million customers interact with Walgreens using the most convenient, multichannel access to consumer goods and services and trusted, cost-effective pharmacy, health and wellness services and advice. Walgreens scope of pharmacy services includes retail, specialty, infusion, medical facility and mail service, along with online and mobile services. These services improve health outcomes and lower costs for payers including employers, managed care organizations, health systems, pharmacy benefit managers and the public sector. The company operates 8,192 drugstores in all 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Walgreens digital business includes Walgreens.com, drugstore.com, Beauty.com, SkinStore.com and VisionDirect.com. Take Care Health Systems is a Walgreens subsidiary that manages more than 400 in-store convenient care clinics throughout the country.

*Cautionary Note Regarding Forward-Looking Statements. Statements in this release that are not historical are forward-looking statements for purposes of applicable securities laws. Words such as "expect," "likely," "outlook," "forecast," "would," "could," "should," "can," "will," "project," "intend," "plan," "goal," "target," "continue," "sustain," "synergy," "on track," "believe," "seek," "estimate," "anticipate," "may," "possible," "assume," variations of such words and similar expressions are intended to identify such forward-looking statements. These forward-looking statements are not guarantees of future performance and involve risks, assumptions and uncertainties, including: the risks that one or more closing conditions to the transactions may not be satisfied or waived, on a timely basis or otherwise, including that a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the transactions or that the required approvals by the Company's shareholders may not be obtained; the risk of a material*

*adverse change that the Company or Alliance Boots or either of their respective businesses may suffer as a result of disruption or uncertainty relating to the transactions; risks associated with changes in economic and business conditions generally or in the markets in which we or Alliance Boots participate; risks associated with new business areas and activities; risks associated with acquisitions, joint ventures, strategic investments and divestitures, including those associated with cross-border transactions; risks associated with governance and control matters; risks associated with the Company's ability to timely arrange for and consummate financing for the contemplated transactions on acceptable terms; risks relating to the Company and Alliance Boots' ability to successfully integrate our operations, systems and employees, realize anticipated synergies and achieve anticipated financial results, tax and operating results in the amounts and at the times anticipated; the potential impact of announcement of the transactions or consummation of the transactions on relationships and terms, including with employees, vendors, payers, customers and competitors; the amounts and timing of costs and charges associated with our optimization initiatives; our ability to realize expected savings and benefits in the amounts and at the times anticipated; changes in management's assumptions; the risks associated with transitions in supply arrangements; risks that legal proceedings may be initiated related to the transactions; the amount of costs, fees, expenses and charges incurred by Walgreens and Alliance Boots related to the transactions; the ability to retain key personnel; changes in financial markets, interest rates and foreign currency exchange rates; the risks associated with international business operations; the risk of unexpected costs, liabilities or delays; changes in network participation and reimbursement and other terms; risks associated with the operation and growth of our customer loyalty program; risks associated with outcomes of legal and regulatory matters, and changes in legislation, regulations or interpretations thereof; and other factors described in Item 1A (Risk Factors) of our most recent Form 10-K and Form 10-Q, each of which is incorporated herein by reference, and in other documents that we file or furnish with the SEC. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, Walgreens does not undertake, and expressly disclaims, any duty or obligation to update publicly any forward-looking statement after the date of this release, whether as a result of new information, future events, changes in assumptions or otherwise.*

*Non-GAAP Financial Measures. This press release contains certain non-GAAP financial measures, as defined under SEC rules, that are not calculated or presented in accordance with generally accepted accounting principles in the United States (GAAP). These non-GAAP financial measures are presented supplementally because management evaluates the company's financial results both including and excluding the adjusted items and believes that the non-GAAP financial measures presented provide additional perspective and insights when analyzing the core operating performance of the Company's business from period to period and trends in the company's historical operating results. The company does not provide a non-GAAP reconciliation for non-GAAP estimates on a forward-looking basis where it is unable to provide a meaningful or accurate calculation or estimation of reconciling items and the information is not available without unreasonable effort. The supplemental non-GAAP financial measures presented should not be considered superior to, as a substitute for or as an alternative to, and should be considered in conjunction with, our financial measures determined in accordance with GAAP.*

**Important Information for Investors and Shareholders**

This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or

qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended. In connection with the proposed transactions between Walgreens and Alliance Boots, Walgreens Boots Alliance will file with the Securities and Exchange Commission (SEC) a registration statement on Form S-4 that will include a proxy statement of Walgreens that also constitutes a prospectus of Walgreens Boots Alliance. After the registration statement has been declared effective by the SEC, the definitive proxy statement/prospectus will be delivered to shareholders of Walgreens. **INVESTORS AND SECURITY HOLDERS OF WALGREENS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT/PROSPECTUS (INCLUDING ALL AMENDMENTS AND SUPPLEMENTS THERETO) AND OTHER DOCUMENTS RELATING TO THE TRANSACTIONS THAT WILL BE FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTIONS.** Investors and security holders will be able to obtain free copies of the registration statement and the definitive proxy statement/prospectus (when available) and other documents filed with the SEC by Walgreens or Walgreens Boots Alliance through the website maintained by the SEC at www.sec.gov. Copies of the documents filed with the SEC by Walgreens or Walgreens Boots Alliance will be available free of charge on Walgreens' internet website at www.walgreens.com under the heading "Investor Relations" and then under the heading "SEC Filings" or by contacting Walgreen's Investor Relations Department at (847) 315-2361.

### Participants in the Solicitation

Walgreens, Alliance Boots, Walgreens Boots Alliance and their respective directors, executive officers and certain other members of management and employees may be deemed to be participants in the solicitation of proxies from the holders of Walgreens common stock in respect of the proposed transactions. Information regarding the persons who are, under the rules of the SEC, participants in the solicitation of proxies in favor of the proposed transactions will be set forth in the proxy statement/prospectus when it is filed with the SEC. You can find information about Walgreens' directors and executive officers in Walgreens' Annual Report on Form 10-K for the year ended August 31, 2013 and definitive proxy statement filed with the SEC on November 25, 2013. You can obtain free copies of these documents, which are filed with the SEC, from Walgreens using the contact information above.


Photos/Multimedia Gallery Available:
http://www.businesswire.com/multimedia/home/20140806005191/en/

On Jun 25, 2014, at 3:14 AM, "Sabatino, Thomas" <thomas.sabatino@walgreens.com> wrote:

Sent from my iPhone

On Jun 24, 2014, at 7:07 PM, "Miquelon, Wade" <wade.miquelon@walgreens.com> wrote:

Wade

On Jun 24, 2014, at 1:05 PM, "Miquelon, Wade" <wade.miquelon@walgreens.com> wrote:

1) Greg, the problem with Walgreens is that Wade is giving you bad advice

2) You shouldn't be pulling the goals, you should be increasing the EBIT

3) Clearly you or at least Wade doesn't see the earnings power of this company

4) Stefano and his team clearly see the huge potential upside and have a track record of 30,000 percent return over 20 years

5) You may want to think about having them develop the goals and then announce them.   You can let them drive/support them, but clearly they get the potential and have the proven ability to get the results.

Wade... "how would you possibly know what advice I give Greg?".

'I have met with you... in fact last month"

Wade... "yes it is true, but I couldn't get a word in edge wise".

Greg... "look, we pulled the goal because we no longer think $9B in FIFO EBIT is reasonable.   We still believe our strategies and plans are the right ones and will create value, but when we no longer think a goal is reasonable we have an obligation to communicate as much".

1)  Wade, your problem is you are too conservative... you spend all of your time trying to say why you can't hit the bold targets and not enough saying that we will do it and then engineering the organization backwards to deliver it

Wade
1)  I can assure you no one thinks more about creating shareholder value in this company than I do.

Greg:

1) I'd be remiss if I didn't say that Wade was my key partner in AB and the chief architect of ABC for both us and AB

1) That's great but that doesn't matter now, it's about earnings power moving forward.

2) Wade, you do realize they are coming after you... guys like Barry Rosenstein and Keith Meister (he said both names specifically)

3) If you want to save your job you need to be articulating the tremendous earnings power of the company that others see. We see it, Alliance Boots sees it and as you know they have great bravado about articulating that as you know

4) You think that if you do an inversion and do some cap structure work that it will be a good story with strong EPS even if you miss the $9B. I'm here to tell you that this would be a disappointment. Failure to do an inversion at this point would be a catastrophe.

5) We believe that $7 EPS is the minimum true earnings power.. Maybe not in 16 but shortly afterword and it's your job to be communicating that. Clearly the AB guys get it.

6) If you don't start doing your job make no mistake about it, they (Rosenstein and Meister) will stop at nothing to get you out of the way including getting personal dirt on you and embarrassing you publicly... I wouldn't be surprised if that wheel is in motion. I'm just trying to be helpful to you if you wish to save your job.

7) Please know that we are here for you if we can be helpful. You can call us 24/7.

**WAG Team**
1) Thanks, we appreciate that.

## TRANSITION AND SEPARATION AGREEMENT

This Transition and Separation Agreement (the "*Agreement*") is entered into this 4th day of August, 2014 by and between Walgreen Co. (the "*Company*") and Wade D. Miquelon ("*Executive*").

WHEREAS, Executive currently serves the Company as its Executive Vice President-- Chief Financial Officer and President, International; and

WHEREAS, the Company and Executive desire to set forth herein their mutual agreement with respect to all matters relating to Executive's cessation of employment by the Company.

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, the adequacy and sufficiency of which are hereby acknowledged, the Company and Executive agree as follows:

**1. Separation.** Executive shall separate from his position as Executive Vice President—Chief Financial Officer and President, International, as well as any and all other officer, director and committee positions with the Company and its subsidiaries effective as of August [4], 2014 (the "*Transition Date*"), and thereafter shall transition into, and continue employment with the Company, in a non-executive position, until December 1, 2014 (the "*Termination Date*"), at which time his employment with the Company and its subsidiaries shall terminate. During the period beginning on the Transition Date and ending on the Termination Date, Executive shall report to the Chief Executive Officer of the Company and shall assist with such transitional duties and responsibilities as the Company shall request from time to time, including in connection with investor relations, transactions and other matters commensurate with his position and experience that arise from time to time. Executive's services after the Transition Date shall be at the time and location as requested by the Company and shall not exceed 20% of the average level of services performed by Executive over the 36-month period ending on the Transition Date. Subject to the foregoing limitation on services, Executive shall be available to the Company as needed through the Termination Date and will be subject to the same standards of conduct and performance applicable to all officers and employees of the Company. During the period of Executive's continued employment until the Termination Date, Executive shall continue to receive the salary and benefits that he is receiving immediately prior to the Transition Date. The Company may, in its sole discretion, accelerate the Termination Date for any reason, in which case (i) Executive's salary and benefits payable pursuant to this Section 1 shall cease and (ii) if the Company accelerates the Termination Date for a reason other than Cause, as defined in the Company's Executive Severance and Change in Control Plan (the "*Severance Plan*"), Executive shall continue to be entitled to the severance benefits set forth in Section 3 below. If the Company accelerates the Termination Date for Cause or if Executive resigns from his employment prior to the Termination Date, Executive shall not be entitled to the severance benefits set forth in Section 3 below.

2.    **Accrued Obligations and Post-Termination Benefits.**    As soon as administratively practicable after the Termination Date, Executive shall receive any portion of Executive's base salary that is accrued but unpaid as of the Termination Date, other than amounts that he has elected to defer, any accrued but unpaid vacation pay, any unreimbursed expenses for which proper documentation is provided, and any other vested amounts and benefits that are to be paid or provided to Executive by the Company under the Company's benefit plans (other than under the Severance Plan (which benefits shall be payable pursuant to Section 3 hereof) and other than any deferred compensation that is subject to (and not otherwise exempt from) the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*")), but which have not yet been paid or provided (as applicable). In addition, the Company shall provide for post-termination of employment nonqualified deferred compensation benefits and employee welfare benefits, other than severance benefits, pursuant to the terms of the respective plans and policies under which such post-termination of employment benefits and welfare benefits, if any, are provided, except as provided in Section 3(c) below.

3.    **Severance Benefits.**    In consideration for (i) Executive's General Release of claims, in accordance with Section 6 below, (ii) Executive's agreement to comply with the Restrictive Covenants referenced in Section 7 below and (iii) Executive's compliance with his duties and responsibilities pursuant to Section 1 above and his other obligations pursuant to the terms of this Agreement, the Company shall pay to Executive the following amounts:

(a)    a cash severance benefit in the gross amount of $3,200,000, which shall be paid as follows, with each monthly payment being made on the Company's regularly scheduled pay date for such month:

| Time of Payment | Amount |
|---|---|
| January 2015 | $1,453,333.31 |
| June 2015 | $13,333.40 |
| July 2015 | $133,333.33 |
| August 2015 | $133,333.33 |
| September 2015 | $133,333.33 |
| October 2015 | $133,333.33 |
| November 2015 | $133,333.33 |
| December 2015 | $133,333.33 |
| January 2016 | $133,333.33 |
| February 2016 | $133,333.33 |

| March 2016 | $133,333.33 |
|---|---|
| April 2016 | $133,333.33 |
| May 2016 | $133,333.33 |
| June 2016 | $133,333.33 |
| July 2016 | $133,333.33 |
| **Total** | $3,200,000 |

(b)     a cash payment in the gross amount of $1,185,000, which in part represents Executive's prorated 2015 target annual performance bonus, payable on the regular December 2014 monthly salaried payroll date; provided that Executive shall be entitled to such payment only if the Chief Executive Officer of the Company determines that Executive has performed his duties and responsibilities consistently with the Company's leadership competency model and cultural values, and in the best interests of the Company.

(c)     If Executive timely elects post-termination continuation coverage under Section 4980 of the Code ("**COBRA**") with respect to medical, vision, prescription and/or dental coverage, then the Company shall reimburse Executive (or pay the provider directly) for the premiums for such COBRA coverage for Executive and his eligible dependents for the period of such COBRA coverage to the extent such premiums exceed the premiums payable for similar employer-provided coverage by active employees. There shall be no reimbursement (or direct payment) of such premiums by the Company for any COBRA coverage after the 24-month anniversary of the Termination Date. Notwithstanding the foregoing, such reimbursement (or direct payment) shall cease if Executive becomes eligible for medical, vision, prescription or dental coverage, respectively, from a subsequent employer, or for Medicare.

(d)     All outstanding awards held by Executive that are settled in or measured by reference to the common stock of the Company ("**Equity Awards**") shall terminate as of the Termination Date, except as follows:

(i)     Executive's outstanding stock option granted on November 1, 2012 shall become vested and exercisable on the Termination Date with respect to 69,160 shares of Company common stock and shall remain exercisable for a period of 90 days after the Termination Date, and the remainder of such option shall be forfeited as of the Termination Date.

(ii)     Executive's outstanding stock option granted on November 1, 2013 shall become vested and exercisable on the Termination Date with respect to 29,487 shares of Company common stock and shall remain exercisable for a period of 90 days after the Termination Date, and the remainder of such option shall be forfeited as of the Termination Date.

(iii)    Executive's outstanding time-vested restricted stock units granted on August 15, 2011 shall become vested on the Termination Date with respect to 4,709 shares of Company common stock and the remainder of such award shall be forfeited as of the Termination Date.

(iv)    Executive's outstanding time-vested restricted stock units granted on November 1, 2012 shall become vested on the Termination Date with respect to 13,379 shares of Company common stock and the remainder of such award shall be forfeited as of the Termination Date.

(v)    Executive's outstanding time-vested restricted stock units granted on November 1, 2013 shall become vested on the Termination Date with respect to 5,006 shares of Company common stock and the remainder of such award shall be forfeited as of the Termination Date.

(vi)    Executive's outstanding performance share award granted on November 1, 2012 shall become vested on the Termination Date with respect to 6,745 shares of Company common stock and the remainder of such award shall be forfeited as of the Termination Date.

(vii)    Executive's outstanding performance share award granted on November 1, 2013 shall become vested on the Termination Date with respect to 6,599 shares of Company common stock and the remainder of such award shall be forfeited as of the Termination Date.

(e)    Executive's rights under this Agreement supersede and are in full satisfaction of any rights Executive may have had under the Severance Plan, and all of Executive's rights under the Severance Plan are hereby terminated; provided, however, that if a Change in Control, as defined in the Severance Plan, occurs prior to the Termination Date, then in lieu of the benefits described in Sections 3(a), 3(b) and 3(c) of the Agreement, but subject to all other terms and conditions of this Agreement, Executive shall receive severance benefits pursuant to the terms of Article V of the Severance Plan, as in effect on the Termination Date for the benefit of Executive Vice Presidents of the Company. In addition, Executive's rights under this Agreement supersede and are in full satisfaction of any rights Executive may have had under the Company's 2013 Omnibus Incentive Plan, as amended as of January 8, 2014, the Company's Executive Stock Option Plan and the Company's Long-Term Performance Incentive Plan (the "*Equity Plans*"), or the award agreements thereunder; provided, however, that if a Change in Control, as defined in the applicable Equity Plan, occurs prior to the Termination Date, Executive's outstanding awards under the Equity Plans shall become vested in accordance with the terms of the applicable Equity Plan and award agreement.

(f)    All incentive compensation paid to Executive pursuant to this Agreement or otherwise in connection with Executive's employment with the Company shall be subject to forfeiture, recovery by Company or other action pursuant to any clawback or recoupment policy which the Company may adopt from time to time to the extent the Board of Directors of the Company determines in good faith that the adoption and maintenance of such policy is necessary to comply with the Dodd-Frank Wall Street Reform and Consumer Protection Act and

implementing rules and regulations thereunder, or is otherwise required by the laws of the United States.

**4.     Tax Withholding.** The Company shall deduct from the amounts payable to Executive pursuant to this Agreement the amount of all required federal, state and local taxes required to be withheld pursuant to applicable law.

**5.     Section 409A.** This Agreement is intended to comply with the requirements of Section 409A of the Code, and shall be interpreted and construed consistently with such intent. The payments to Executive pursuant to this Agreement are also intended to be exempt from Section 409A of the Code to the maximum extent possible, under either the separation pay exemption pursuant to Treasury regulation §1.409A-1(b)(9)(iii) or as short-term deferrals pursuant to Treasury regulation §1.409A-1(b)(4), and for this purpose each payment shall constitute a "separately identified" amount within the meaning of Treasury Regulation §1.409A-2(b)(2). In the event the terms of this Agreement would subject Executive to taxes or penalties under Section 409A of the Code ("**409A Penalties**"), the Company and Executive shall cooperate diligently to amend the terms of this Agreement to avoid such 409A Penalties, to the extent possible; provided that in no event shall the Company be responsible for any 409A Penalties that arise in connection with any amounts payable under this Agreement. To the extent any amounts under this Agreement are payable by reference to Executive's "termination of employment," such term shall be deemed to refer to Executive's "separation from service," within the meaning of Section 409A of the Code. Notwithstanding any other provision in this Agreement, if Executive is a "specified employee," as defined in Section 409A of the Code, as of the date of Executive's separation from service, then to the extent any amount payable to the Executive (i) constitutes the payment of nonqualified deferred compensation, within the meaning of Section 409A of the Code, (ii) is payable upon the Executive's separation from service and (iii) under the terms of this Agreement would be payable prior to the six-month anniversary of the Executive's separation from service, such payment shall be delayed until the earlier to occur of (a) the first business day following the six-month anniversary of the separation from service and (b) the date of Executive's death. Any reimbursement or advancement payable to Executive pursuant to this Agreement or otherwise shall be conditioned on the submission by Executive of all expense reports reasonably required by the Company under any applicable expense reimbursement policy, and shall be paid to the Executive within 30 days following receipt of such expense reports, but in no event later than the last day of the calendar year following the calendar year in which Executive incurred the reimbursable expense. Any amount of expenses eligible for reimbursement, or in-kind benefit provided, during a calendar year shall not affect the amount of expenses eligible for reimbursement, or in-kind benefit to be provided, during any other calendar year. The right to any reimbursement or in-kind benefit pursuant to this Agreement or otherwise shall not be subject to liquidation or exchange for any other benefit.

**6.     General Release.** As a condition to Executive's receipt and retention of the consideration described in Section 3 above, he shall (a) execute the General Release and Waiver attached hereto as Exhibit A hereto (the "*General Release*") not later than 21 days after the date of this Agreement, and not revoke the General Release within the revocation period set forth in the General Release, and (b) execute the affirmation of the General Release attached hereto as Exhibit B hereto (the "*Affirmation*") not later than 21 days after the Termination Date, and not revoke the Affirmation within the revocation period set forth in the Affirmation.

7.     **Restrictive Covenants.**   Executive agrees that the terms of the various non-competition, non-solicitation and confidentiality agreements entered into in connection with the Equity Awards granted to Executive under the  Equity Plans (the "***Restrictive Covenants***") are valid and enforceable. With respect to such Restrictive Covenants, the Company and Executive acknowledge and agree that the businesses that shall be considered "Competing Business Lines," as defined therein, shall be limited to the entities set forth on a list provided by the Company to Employee concurrently with this Agreement.  The Company shall have the right to discontinue all amounts payable under this Agreement, to recover all payments made under this Agreement from the date of any breach by Executive, and to obtain injunctive relief should Executive breach any of the Restrictive Covenants.

8.     **Non-disparagement.**   Executive shall not, directly or indirectly, disclose, communicate, or publish in any format any libelous, defamatory, or disparaging information concerning the Company, its executives, officers, Board of Directors, its subsidiaries, affiliates, employees, operations, technology, proprietary or technical information, strategies or business whatsoever, or cause others to disclose, communicate, or publish any disparaging information concerning the same.  The Company agrees that no member of its executive management team, human resources department or investor relations department, shall, directly or indirectly, disclose, communicate, or publish in any format any libelous, defamatory, or disparaging information concerning Executive, or cause others to do so.  Notwithstanding anything to the contrary in this Section 8, nothing shall prohibit Executive or the Company from giving truthful testimony or evidence to a governmental entity, or if properly subpoenaed or otherwise required to do so under applicable law.

9.     **Company Property.**  As of the Transition Date, or such later date prior to the Termination Date as shall be specified by the Company, Executive shall, to the extent not previously returned or delivered: (a) return all equipment, records, files, documents, data, programs or other materials and property in Executive's possession, custody or control which relates or belongs to the Company or any one or more of its affiliates, including, without limitation, all, Confidential Information (defined below), computer equipment, access codes, messaging devices, credit cards, cell phones, keys and access cards; and (b) deliver all original and copies of confidential information, electronic data, notes, materials, records, plans, data or other documents, files or programs (whether stored in paper form, computer form, digital form, electronically or otherwise, on Company equipment or Executive's personal equipment) that relate or refer in any to (1) the Company or any one or more of its affiliates, its business or its employees, or (2) the Company's Confidential Information or similar information.  By signing this Agreement, Executive represents and warrants that Executive has not retained and has or shall timely return and deliver all the items described or referenced in subsections (a) or (b) above; and, that should Executive later discover additional items described or referenced in subsections (a) or (b) above, Executive shall promptly notify the Company and return/deliver such items to the Company. Confidential Information means information (1) disclosed to or known by Executive as a consequence of or through his employment with the Company or one of its affiliates; and (2) which relates to any aspect of the Company's or an affiliate's business, research, or development.  "***Confidential Information***" includes, but is not limited to, the Company's or an affiliate's trade secrets, proprietary information, business plans, marketing plans, financial information, employee performance, compensation and benefit information, cost and pricing information, identity and information pertaining to customers, suppliers and vendors,

and their purchasing history with the Company, any business or technical information, design, process, procedure, formula, improvement, or any portion or phase thereof, that is owned by or has, at the time of termination, been used by the Company, any information related to the development of products and production processes, any information concerning proposed new products and production processes, any information concerning marketing processes, market feasibility studies, cost data, profit plans, capital plans and proposed or existing marketing techniques or plans, financial information, including, without limitation, information set forth in internal records, files and ledgers, or incorporated in profit and loss statements, fiscal reports, business plans or other financial or business reports, and information provided to the Company or an affiliate by a third party under restrictions against disclosure or use by the Company or others. Nothing in this Section shall be construed, however, to require Executive to return to the Company any publicly available information or other information Executive obtained by reason of his ownership of Company stock or debt.

10. **Cooperation.** Executive agrees to cooperate with the Company in accordance with this Section 10:

(a) Through the Termination Date, Executive hereby agrees to provide his full cooperation, at the request of the Company, with the Company and its affiliates, subsidiaries, directors, officers, agents, representatives, employees, successors and assigns, in the transitioning of his job duties and responsibilities.

(b) During the period ending on the third anniversary of the Termination Date, Executive also agrees to be reasonably available to the Company or its representatives to briefly discuss matters relating to the responsibilities he held during his employment.

(c) At all times prior to, on or after the Termination Date, Executive shall cooperate with any and all investigations or other legal, equitable or business matters or proceedings which involve any matters for which Executive worked on or had responsibility during his employment with the Company. This includes but is not limited to testifying (and preparing to testify) as a witness in any proceeding or otherwise providing information or reasonable assistance to the Company in connection with any investigation, claim or suit, and cooperating with the Company regarding any investigation, litigation, claims or other disputed items involving the Company that relate to matters within the knowledge or responsibility of Executive. Specifically, Executive agrees (i) to meet with the Company's representatives, its counsel or other designees at reasonable times and places with respect to any items within the scope of this provision; (ii) to provide truthful testimony regarding same to any court, agency or other adjudicatory body; (iii) to provide the Company with immediate notice of contact or subpoena by any non-governmental adverse party, and (iv) to not voluntarily assist any such non-governmental adverse party or such non-governmental adverse party's representatives. Executive acknowledges and understands that his obligations of cooperation under this Section 10(c) are not limited in time and may include, but shall not be limited to, the need for or availability for testimony. Executive shall receive no additional compensation for time spent assisting the Company pursuant to this Section 10, but shall be reimbursed for reasonable travel and other business expenses incurred by Executive at the request of the Company.

(d)    The Company shall indemnify and hold harmless Executive from and against any losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorney's fees and disbursements), judgments, fines, settlements, penalties and other expenses actually and reasonably incurred by Executive in connection with any and all claims, demands, actions, suits, or proceedings, civil, criminal, administrative or investigative, in which Executive may be involved, or threatened to be involved, as a party or otherwise, by reason of the fact that Executive was employed by the Company or arising out of or incidental to the business of the Company, to the maximum extent provided under the terms of the Company's charter and by-laws or any other applicable documentation, in accordance with the terms and conditions set forth therein.

11.    **Consequences of Breach.** Executive agrees that the benefits provided pursuant to Section 3 of this Agreement are conditioned on his compliance with all of his commitments set forth in this Agreement, the Restrictive Covenants and the General Release. In the event of any breach of this Agreement, the Restrictive Covenants or the General Release by Executive, the Company shall provide notice of such breach to Executive to allow him an opportunity to cure such breach. In the event Executive fails to cure such breach within five days after notice of such breach, the Company shall be entitled to discontinue and recover all benefits paid or otherwise payable to Executive pursuant to Section 3 of this Agreement. In addition, Executive acknowledges that the provisions in the Restrictive Covenants are necessary to enable the Company to maintain its competitive position and any actual or threatened breach of the Restrictive Covenants will result in irreparable and continuing damage to the Company for which there will be no adequate remedy at law. In the event of any actual or threatened breach of the Restrictive Covenants, the Company shall be entitled to injunctive relief, including the right to a temporary restraining order, and other relief, including damages, as may be proper along with the Company's attorney's fees and court costs. The foregoing stipulated damages and remedies of the Company are in addition to, and not to the exclusion of, any other damages the Company may be able to prove.

12.    **Enforceability.** If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other provision of this Agreement, and all other provisions shall remain in full force and effect and such invalid or unenforceable provision shall be reformulated by such court to preserve the intent of the parties hereto.

13.    **Successors.** This Agreement shall inure to the benefit of and be enforceable by Executive and by Executive's personal or legal representatives, executors and administrators and by the Company and its successors and assigns. In the event of the death of Executive while any amounts are payable to Executive hereunder, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to Executive's estate.

14.    **Notices.** All notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given by a party hereto when delivered personally or by overnight courier that guarantees next day delivery or five days after deposit in the United States mail, postage prepaid to the following address of the other party hereto (or to such other address of such other party as shall be furnished in accordance herewith) if to the Company, to Walgreen Co., 108 Wilmot Road, Deerfield, IL 60015, Attention: General

Counsel, and if to Executive, to the last known address of Executive in the records of the Company, which Executive may update from time to time by way of the notice procedure set forth in this Section 14.

**15.     Entire Agreement.**    Except as otherwise specifically provided herein, this Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and with respect to Executive's employment with the Company, contains all the covenants, promises, representations, warranties, and agreements between the parties with respect to Executive's separation from the Company and its subsidiaries and all positions therewith, and supersedes all prior employment or severance or other agreements between Executive and the Company and its subsidiaries, whether written or oral, or any of its predecessors or affiliates. Except as otherwise provided herein, Executive acknowledges that no representation, inducement, promise, or agreement, oral or written, has been made by either party, or by anyone acting on behalf of either party, which is not embodied herein, and that no agreement, statement, or promise relating to Executive's separation from the Company and its subsidiaries that is not contained in this Agreement shall be valid or binding. Executive represents and acknowledges that in executing this Agreement, he does not rely, and has not relied, upon any representation(s) by the Company or its agents except as expressly contained in this Agreement. Any modification of this Agreement will be effective only if it is in writing and signed by both parties.

**16.     Waivers.**    No failure by either party hereto at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provision of this Agreement shall (i) be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time or (ii) preclude insistence upon strict compliance in the future.

**17.     Applicable Law.**    This Agreement is entered into under, and shall be governed for all purposes by, the laws of the State of Illinois without giving effect to any choice of law principles.

**18.     Counterparts.**    This Agreement may be executed in counterparts, each of which shall be deemed an original.

[Signature Page to Follow]

**WHEREFORE,** the Company and Executive, by their signatures below, evidence their agreement to the provisions stated above.

WALGREEN CO.

_____
Date: _____

EXECUTIVE

_____
Wade D. Miquelon

Date: _____

## EXHIBIT A

## GENERAL RELEASE AND WAIVER

1. I, Wade D. Miquelon, in consideration of and subject to the performance by Walgreen Co. (together with its Affiliates, as defined in the Severance Plan, the "Company Parties"), of its obligations under the Transition and Separation Agreement, dated August 4, 2014 (the "Separation Agreement"), do hereby release and forever discharge as of the date hereof the Company Parties and their respective affiliates, subsidiaries and direct or indirect parent entities and all present, former and future shareholders, directors, officers, agents, representatives, employees, successors and assigns of the Company and/or its respective affiliates, subsidiaries and direct or indirect parent entities (collectively, the "Released Parties") to the extent provided below (this "General Release"). The Released Parties are intended to be third-party beneficiaries of this General Release, and this General Release may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such Released Parties hereunder. Terms used herein but not otherwise defined shall have the meanings given to them in the Separation Agreement.

2. I understand that any payments or benefits paid or granted to me under Section 3 of the Separation Agreement represent, in part, consideration for signing this General Release and are not salary, wages or benefits to which I was already entitled. I understand and agree that I will not receive certain of the payments and benefits specified in the Separation Agreement unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter. Such payments and benefits will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Company or its Affiliates.

3. Except as provided in Sections 5, 6, and 12 below and except for the provisions of the Separation Agreement which expressly survive the termination of my employment with the Company, I knowingly and voluntarily (for myself, my heirs, executors, administrators and assigns) release and forever discharge the Company and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date that this General Release becomes effective and enforceable) and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties which I, my spouse, or any of my heirs, executors, administrators or assigns, may have, and which arise out of or are connected with my employment with, or my separation or termination from, the Company, including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for

A-1

costs, fees, or other expenses, including attorneys' fees incurred in these matters (all of the foregoing collectively referred to herein as the "Claims").

4.     I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by Section 3 above.

5.     I agree that this General Release does not waive or release any rights or claims that I may have which arise after the date I execute this General Release, including Claims under the Age Discrimination in Employment Act of 1967. I acknowledge and agree that my separation from employment with the Company shall not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

6.     I agree that I hereby waive all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever in respect of any Claims, including, without limitation, reinstatement, back pay, front pay, and any form of injunctive relief. Notwithstanding the above, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding; provided, however, that I disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding. Additionally, I am not waiving (i) any right to the Accrued Obligations, any severance benefits or other consideration to which I am entitled under the Separation Agreement, (ii) any claim relating to directors' and officers' liability insurance coverage or any right of indemnification under the Company's organizational documents or otherwise, (iii) my rights as an equity or security holder in the Company or its Affiliates, (iv) my rights under any equity awards that survive termination of employment in accordance with the terms of the Separation Agreement; or (v) my rights under any retirement plan that is "qualified" under Section 401(a) of the Internal Revenue Code of 1986.

7.     I hereby agree not to bring or participate in any class or collective action against the Company and/or the other Released Parties that asserts, in whole or in part, any claims that arose before I signed this General Release, whether or not such claims (if brought by me individually) are released by this General Release.

8.     In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. I expressly consent that this General Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state or local statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver I would not have become entitled to the benefits provided under the Separation Agreement. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, this General Release shall serve as a complete defense to such Claims to the maximum extent permitted by law. I further agree that I am not aware of any pending claim of the type described in Section 3 above as of the execution of this General Release.

A-2

9.   I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

10.   Any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any other insurance regulatory organization or any governmental entity.

11.   I represent that I am not aware of any claim by me other than the claims that are released by this General Release. I acknowledge that I may hereafter discover claims or facts in addition to or different than those which I now know or believe to exist with respect to the subject matter of the release set forth in Section 3 above and which, if known or suspected at the time of entering into this General Release, may have materially affected this General Release and my decision to enter into it.

12.   Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach by the Company or by any Released Party of the terms of the Separation Agreement after the date hereof.

13.   Whenever possible, each provision of this General Release shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

14.   BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

(a)   I HAVE READ IT CAREFULLY; AND I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963; THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

(b)   I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

(c)   I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

(d)   I HAVE HAD AT LEAST 21 DAYS FROM THE DATE OF MY RECEIPT OF THIS RELEASE TO CONSIDER IT, AND THE CHANGES MADE SINCE MY RECEIPT OF THIS RELEASE ARE NOT MATERIAL OR WERE MADE AT MY REQUEST AND WILL NOT RESTART THE REQUIRED 21-DAY PERIOD;

(e)     I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(f)     I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(g)     I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

SIGNED:                                    DATED:

_____                   _____
        Executive

EXHIBIT B

AFFIRMATION AND ADDITIONAL RELEASE
("AFFIRMATION")

By my signature below, I hereby re-execute and affirm the Transition and Separation Agreement, originally signed by me on August 4, 2014 (the "Agreement"), including, but not limited to, the General Release and Waiver of claims attached as Exhibit A to the Agreement (the "General Release"). Further, I hereby release and waive any and all claims described in the General Release that exist or may exist on or prior to the date I sign this Affirmation (including, without limitation, claims under the ADEA). I understand that I (a) may not sign this Affirmation until on or after my Termination Date and (b) must return a signed copy of this Affirmation to the Company within 21 days after my Termination Date.

Executive, by Executive's free and voluntary act of signing below, (i) acknowledges that he has been given a period of at least twenty-one (21) days to consider whether to agree to the terms contained herein, (ii) acknowledges that he has been advised in writing to consult with an attorney prior to executing this Affirmation, (iii) acknowledges that he understands that this Agreement specifically releases and waives all rights and claims Executive may have under the ADEA on or prior to the date on which Executive signs this Affirmation, and for valuable consideration to which he otherwise would not be entitled, and (iv) agrees to all of the terms of this Affirmation and the Agreement and intends to be legally bound thereby.

Furthermore, Executive acknowledges that the promises and benefits provided for in Section 3 of the Agreement will be delayed until the Agreement and this Affirmation become effective, enforceable and irrevocable. This Affirmation will become effective, enforceable and irrevocable on the eighth day after the date on which it is executed by Executive. During the seven-day period following the date on which Executive executes this Affirmation, Executive may revoke his agreement to accept the terms of this Affirmation by indicating his revocation in writing to the General Counsel of the Company. If Executive exercises his right to revoke this Affirmation, Executive shall not be eligible to receive and shall forfeit his right to receive any of the payments or benefits provided in the Agreement, and to the extent such payments or benefits have already been made, Executive agrees that he will immediately reimburse the Company for the amounts of such promises and benefits.

Terms not defined in this Affirmation shall have the same meaning as defined in the Agreement.

EXECUTIVE

_____

Wade D. Miquelon

Date: _____

B-1

Executive, by Executive's free and voluntary act of signing below, (i) acknowledges that he has been given a period of at least twenty-one (21) days to consider whether to agree to the terms contained herein, (ii) acknowledges that he has been advised in writing to consult with an attorney prior to executing this Affirmation, (iii) acknowledges that he understands that this Agreement specifically releases and waives all rights and claims Executive may have under the ADEA on or prior to the date on which Executive signs this Affirmation, and for valuable consideration to which he otherwise would not be entitled, and (iv) agrees to all of the terms of this Affirmation and the Agreement and intends to be legally bound thereby.

Furthermore, Executive acknowledges that the promises and benefits provided for in Section 3 of the Agreement will be delayed until the Agreement and this Affirmation become effective, enforceable and irrevocable. This Affirmation will become effective, enforceable and irrevocable on the eighth day after the date on which it is executed by Executive. During the seven-day period following the date on which Executive executes this Affirmation, Executive may revoke his agreement to accept the terms of this Affirmation by indicating his revocation in writing to the General Counsel of the Company. If Executive exercises his right to revoke this Affirmation, Executive shall not be eligible to receive and shall forfeit his right to receive any of the payments or benefits provided in the Agreement, and to the extent such payments or benefits have already been made, Executive agrees that he will immediately reimburse the Company for the amounts of such promises and benefits.

Terms not defined in this Affirmation shall have the same meaning as defined in the Agreement.

EXECUTIVE

_____
Wade D. Miquelon

Date _____

B-1

Wade

Thanks again for the help in bringing this home,

I will let you date as appropriate.

Jan... attached is a signed PDF's copy of my signature pages.

To: jan.reed@walgreens.com
Date: August 2, 2014 at 10:06 AM
Subject: Signature pages
From: Wade Miquelon wademiquelon@gmail.com

ME WITH RESPECT TO IT; AND

(g) I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

SIGNED: _____     DATED: _____
Executive

A-4

# EXHIBIT B

## AFFIRMATION AND ADDITIONAL RELEASE ("AFFIRMATION")

By my signature below, I hereby re-execute and affirm the Transition and Separation Agreement, originally signed by me on August 4, 2014 (the "Agreement"), including, but not limited to, the General Release and Waiver of claims attached as Exhibit A to the Agreement (the "General Release"). Further, I hereby release and waive any and all claims described in the General Release that exist or may exist on or prior to the date I sign this Affirmation (including, without limitation, claims under the ADEA). I understand that I (a) may not sign this Affirmation until on or after my Termination Date and (b) must return a signed copy of this Affirmation to the Company within 21 days after my Termination Date.

Date. _____

EXECUTIVE

Wade D. Miquelon

Date:

(e)     I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(f)     I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE

EX-10.1 2 d380523dex101.htm WALGREEN CO. EXECUTIVE SEVERANCE AND CHANGE IN CONTROL PLAN

**Exhibit 10.1**

### WALGREEN CO.
### EXECUTIVE SEVERANCE AND CHANGE IN CONTROL PLAN

#### EFFECTIVE JANUARY 1, 2013

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **RTICLE I**   Statement of Purpose and Effective Date | 1 |
| 1.01 Purpose | 1 |
| 1.02 Effective Date | 1 |
| **ARTICLE II**   Definitions | 1 |
| 2.01 "Accrued Annual Incentive" | 1 |
| 2.02 "Accrued Base Salary" | 1 |
| 2.03 "Accrued Obligations" | 1 |
| 2.04 "Affiliate" | 1 |
| 2.05 "Base Salary" | 2 |
| 2.06 "Board" | 2 |
| 2.07 "Cause" | 2 |
| 2.08 "CEO" | 2 |
| 2.09 "Change Date" | 2 |
| 2.10 "Change in Control" | 2 |
| 2.11 "Code" | 3 |
| 2.12 "Committee" | 3 |
| 2.13 "Company" | 3 |
| 2.14 "Disability" | 3 |
| 2.15 "Effective Date" | 3 |
| 2.16 "Employee" | 3 |
| 2.17 "Employer" | 3 |
| 2.18 "ERISA" | 3 |
| 2.19 "Exchange Act" | 3 |
| 2.20 "Good Reason" | 3 |
| 2.21 "Including" | 4 |
| 2.22 "Involuntary Termination" | 4 |
| 2.23 "Notice of Termination" | 4 |
| 2.24 "Participant" | 4 |
| 2.25 "Plan" | 4 |
| 2.26 "Plans" | 4 |
| 2.27 "Policies" | 4 |
| 2.28 "Post-Change Period" | 4 |
| 2.29 "Pro-rata Annual Incentive" | 5 |
| 2.30 "Retire" or "Retirement" | 5 |
| 2.31 "Section 409A Deferred Compensation" | 5 |
| 2.32 "Severance Multiple" and "Severance Period" | 5 |
| 2.33 "Target Annual Incentive" | 6 |
| 2.34 "Termination Date" | 6 |
| 2.35 "Termination of Employment" | 6 |
| 2.36 "Tier I Participant" | 6 |
| 2.37 "Tier II Participant" | 6 |

- i -

**ARTICLE III  Participation and Eligibility for Benefits**                                      7

   3.01 Eligibility                                                              7
   3.02 Participation                                                           7
   3.03 Eligibility for Benefits                                                7
   3.04 Termination of Participation                                            7

**ARTICLE IV  General Obligations of the Employer Upon Involuntary Termination**                7

   4.01 Involuntary Termination                                                 7
   4.02 Termination for Any Other Reason                                        9

**ARTICLE V  Obligations of the Employer on Involuntary Termination of Certain Participants in the Post-Change Period**                                                                              9

   5.01 Application.                                                            9
   5.02 Involuntary Termination in the Post-Change Period                       9
   5.03 Termination on or After the Change Date for Any Other Reason            10
   5.04 Limitation on Benefits                                                  10

**ARTICLE VI  Administration**                                                                  11

   6.01 The Company and Committee                                               11
   6.02 Delegation of Committee Authority.                                      12
   6.03 Advisors and Agents of the Committee                                    12
   6.04 Records and Reports of the Committee                                    12
   6.05 Limitation of Liability; Indemnification                                12
   6.06 Plan Expenses                                                           12
   6.07 Service in More than One Capacity                                       13

**RTICLE VII  Amendments; Termination**                                                         13

   7.01 Amendment or Termination of the Plan                                    13

**ARTICLE VIII  Claims Procedure**                                                              13

   8.01 Filing a Claim                                                          13
   8.02 Review of Claim Denial                                                  13

**ARTICLE IX  Release; No Mitigation; No Duplication of Benefits**                              14

   9.01 Release Required                                                        14
   9.02 No Mitigation                                                           14
   9.03 No Duplication of Benefits                                              14

**ARTICLE X  Miscellaneous**                                                                    14

   10.01 Participant Information                                                14
   10.02 Electronic Media                                                       14
   10.03 Notices                                                                15
   10.04 No Employment Contract                                                 15
   10.05 Headings                                                               15
   10.06 Construction                                                           15
   10.07 Joint and Several Liability                                            15
   10.08 Successors                                                             15
   10.09 Payments to Beneficiary                                                16
   10.10 Non-Alienation of Benefits                                             16
   10.11 Tax Matters                                                            16
   10.12 Governing Law                                                          17
   10.13 Severability                                                           17

- ii -

## ARTICLE I
### Statement of Purpose and Effective Date

1.01 **Purpose.** Walgreen Co., an Illinois corporation, hereby establishes the Walgreen Co. Executive Severance and Change in Control Plan (the "Plan"). The Plan is intended to encourage and motivate key employees to devote their full attention to the performance of their assigned duties without the distraction or concerns regarding their involuntary termination of employment. The Company believes that it is in the best interests of its key employees and the shareholders of the Company to provide financial assistance through severance payments and other benefits to eligible key employees who are involuntarily terminated. The Company formerly entered into individual employment contracts with certain employees providing for change of control and severance benefits for the above purposes. This Plan is intended to consolidate and replace (with the consent of the respective Participants where required) such individual employment contracts in order to provide uniform administration of change of control and severance benefits. With respect to each Participant, the Plan supersedes all plans, agreements, or other arrangements for severance benefits or for enhanced severance payments whether or not before, on or after a change in control. To the extent the Plan provides deferred compensation it is an unfunded plan primarily for the purposes of providing deferred compensation for a select group of management or highly compensated employees.

1.02 **Effective Date.** This Plan is effective as of January 1, 2013 (the "Effective Date").

## ARTICLE II
### Definitions

When used in this Plan, the terms specified below have the following meanings:

2.01 **"Accrued Annual Incentive"** means the amount of any annual incentive earned in a year ended before the Termination Date, but not yet paid to a Participant as of the Termination Date, other than amounts that he or she has elected to defer or that have been automatically deferred.

2.02 **"Accrued Base Salary"** means the amount of a Participant's Base Salary that is accrued but unpaid as of the Termination Date, other than amounts that he or she has elected to defer.

2.03 **"Accrued Obligations"** means, as of any date, the sum of a Participant's Accrued Base Salary, Accrued Annual Incentive, any accrued but unpaid vacation pay, unreimbursed expenses for which proper documentation is provided, and any other vested amounts and benefits that are to be paid or provided to the Participant by the Company under the Company's plans (other than this Plan and other than any Section 409A Deferred Compensation), but which have not yet been paid or provided (as applicable).

2.04 **"Affiliate"** means any person with whom the Company would be considered a single employer under Sections 414(b) and 414(c) of the Code and Treas. Reg. §1.409A-3(i)(5)(ii), except that in applying Sections 1563(a)(1), (2), and (3) of the Code for purposes of determining a controlled group of corporations under Section 414(b) of the Code, the language "at least 50 percent" shall be used instead of "at least 80 percent" in each place it appears in Sections 1563(a)(1), (2), and (3) of the Code, and in applying Treas. Reg. § 1.414(c)-(2) for purposes of determining a controlled group of trades or businesses under Section 414(c) of the Code, the language "at least 50 percent" shall be used instead of "at least 80 percent" in each place it appears in Treas. Reg. § 1.414(c)-(2). Notwithstanding the foregoing, where justified by legitimate business criteria as determined by the Committee in its sole discretion, "at least 20 percent" shall be substituted for "at least 50 percent" in the preceding sentence in determining whether a Participant has a Termination of Employment.

2.05 **"Base Salary"** means an Employee's annual rate of salary as of any date.

2.06 **"Board"** means the Board of Directors of the Company or, from and after the of a Change in Control that gives rise to a rviving corporation to the Company, the Board of Directors of such surviving corporation.

2.07 **"Cause"** means any one or more of the following, as determined by the Committee or its delegate in its sole discretion:

(a) a Participant's commission of a felony or any crime of moral turpitude;

(b) a Participant's dishonesty or material violation of standards of integrity in the course of fulfilling his or her employment duties to the Company or any Affiliate;

(c) a material violation of a material written policy of the Company or any Affiliate, violation of which would be grounds for immediate dismissal under applicable Company policy;

(d) willful and deliberate failure on the part of the Participant to perform his or her employment duties to the Company or any Affiliate in any material respect, after reasonable notice of such failure and an opportunity to correct it; or

(e) failure to comply in any material respect with the Foreign Corrupt Practices Act, the securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the Truth in Negotiations Act, or any rules or regulations thereunder.

2.08 **"CEO"** means the Chief Executive Officer of the Company.

2.09 **"Change Date"** means the first date on which a Change in Control occurs before the termination of the Plan.

2.10 **"Change in Control"** means an event an event that meets the conditions for a "change in the ownership of a corporation" or a "change in the effective control of a corporation" within the meaning of Section 409A of the Code and Treas. Reg. §1.409A-3(i)(v) through being one or more of the following:

(a) any one person, or more than one person acting as a group, acquires ownership of stock of the Company that, together with stock held by such person or group, constitutes more than fifty percent (50%) of the total fair market value or total voting power of the stock of the Company;

(b) any one person, or more than one person acting as a group, acquires (or has acquired during the twelve (12)-month period ending on the date of the most recent acquisition by such person or persons) ownership of stock of the Company that, constitutes thirty percent (30%) or more of the total fair market value or total voting power of the stock of the Company; or

- 2 -

(c) any one person, or more than one person acting as a group, acquires (or has acquired during the twelve (12) month period ending on date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than 40 percent of the total gross fair market value of all the assets of the Company immediately before such acquisition or acquisitions; or

(d) a majority of members of the Company's Board is replaced during any twelve (12)-month period by Directors whose appointment or election is not endorsed by a majority of the members of the Company's Board before the date of the appointment or election.

2.11 **"Code"** means the Internal Revenue Code of 1986, as amended. Reference to any provision of the Code or regulation thereunder, shall include any successor provision and any regulations and other applicable guidance or pronouncement of the Internal Revenue Service or the Department of the Treasury, and applicable case law relating to such Section of the Code.

2.12 **"Committee"** means the Compensation Committee of the Board. To the extent the Committee has delegated authority to another person or persons the term "Committee" shall refer to such other person or persons.

2.13 **"Company"** means Walgreen Co. and any successor thereto.

2.14 **"Disability"** means any medically determinable physical or mental impairment of a Participant that:

(i) has lasted for a continuous period of not less than (x) six months or (y) such longer period, if any, that is available to a Participant under his Employer's Policies relating to the continuation of employee status after the onset of disability,

(ii) can be expected to be permanent or of indefinite duration, and

(iii) renders the Participant unable to perform his duties with or without accommodation.

2.15 **"Effective Date"** is defined in Section 1.02.

2.16 **"Employee"** means an individual who is designated as an employee of an Employer on the records of such Employer.

2.17 **"Employer"** means the Company and an Affiliate any of whose Employees are Participants in the Plan. The term "Employer" includes any successor to the Company or an Employer.

2.18 **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended. Reference to any provision of ERISA shall also include any successor provision and regulations and others applicable guidance or pronouncement of a federal regulatory agency and applicable case law relating to such Section of ERISA.

2.19 **"Exchange Act"** means the Securities Exchange Act of 1934.

2.20 **"Good Reason"** means any one or more of the following actions or omissions occurring during the Post-Change Period and for which Notice of Termination is given during the Post-Change Period:

- 3 -

(i) a material reduction in the Participant's base compensation;

(ii) requiring the Participant to be based at any office or location more than 50 miles from the pre-Change Date location and also farther from the Participant's residence than the pre-Change Date location;

(iii) any material diminution in the Participant's authority, duties or responsibilities;

(iv) any material breach of this Plan by any Employer or the Committee;

provided that, in order for there to be a Termination of Employment by a Participant for Good Reason, the Participant must notify the Participant's Employer of the event constituting such Good Reason within 90 days of the occurrence of such event, by a Notice of Termination. The Employer must have failed to cure the event constituting Good Reason within 30 days following receipt of the Notice of Termination and the Participant must terminate employment within five days after the lapse of the cure period if no cure is effected. A delay in the delivery of such Notice of Termination or in the Termination of Employment after the lapse of the cure period shall waive the right of the Participant under this Plan to terminate employment for Good Reason.

2.21 **"Including"** means including without limitation.

2.22 **"Involuntary Termination"** means the Termination of Employment of a Participant (a) initiated by the Employer other than for Cause or Disability, and (b) for a reason other than death. During the Post-Change Period, a Termination of Employment initiated by the Participant for Good Reason shall also be an Involuntary Termination. For avoidance of doubt, a Participant shall not have an Involuntary Termination of Employment if he or she (i) voluntarily resigns; (ii) voluntarily Retires; (iii) has a Termination of Employment because of death or Disability; or (iv) on or before the Termination of Employment (other than a Termination of Employment during the Post-Change Period), is offered employment or re-employment with the Company or an Affiliate or any successor to all or a portion of the business of the Company or Affiliate on terms and conditions substantially similar to the terms and conditions of his or her employment before his or her Termination of Employment.

2.23 **"Notice of Termination"** means a written notice given in accordance with Section 10.03 that sets forth (i) the specific termination provision in this Plan relied on by the party giving such notice, (ii) in reasonable detail the specific facts and circumstances 'timed to provide a basis for such Termination of Employment, and (iii) if the Termination Date is other than the date of receipt of .h Notice of Termination (and is not determined under Section 2.33(a), (b), or (c)), the Termination Date.

2.24 **"Participant"** means an Employee who is selected to participate in the Plan and whose participation has not been terminated pursuant to Section 3.04.

2.25 **"Plan"** means this Walgreen Co. Executive Severance and Change in Control Plan as set forth herein and as from time to time amended.

2.26 **"Plans"** means plans, programs, or Policies of the Company or the Employer that employs a Participant.

2.27 **"Policies"** means policies, practices or procedures of the Company or the Employer that employs a Participant.

2.28 **"Post-Change Period"** means the period beginning on the Change Date and ending on the first anniversary of the Change Date.

- 4 -

2.29 **"Pro-rata Annual Incentive"** means, in respect of an Employer's fiscal year during which the Termination Date occurs, an amount equal to the product of (a) (i) in the case of a Termination Date before the Change Date, the actual annual incentive the Participant would have been paid if he or she remained employed on the payment date applicable to then-current employees, and (ii) in the case of a Termination Date on or after the Change Date, the Participant's Target Annual Incentive (determined as of the Termination Date) multiplied by (b) a fraction, the numerator of which equals the number of days from and including the first day of such fiscal year through and including the Termination Date, and the denominator of which equals 365.

2.30 **"Retire"** or **"Retirement"** means a voluntary Termination of Employment after attaining age 55 and having at least 10 years of service with the Company or any Employer.

2.31 **"Section 409A Deferred Compensation"** means a deferral of compensation that is subject to (and not otherwise exempt from) the requirements of Section 409A of the Code.

2.32 **"Severance Multiple"** and **"Severance Period"** mean :

(a) for a Tier I Participant, for a Termination Date occurring before the Change Date or after the Post-Change Period, and for a Tier II Participant, for a Termination Date occurring before, on or after the Change Date:

| Title/Benefit Indicator | Severance Multiple | Severance Period |
|---|---|---|
| CEO | 2.0x | 24 months |
| COO, EVP | 2.0x | 24 months |
| SVP | 1.0x | 12 months |
| Corporate VP | 1.0x | 12 months |
| Group VP, "grandfathered" MVP | 0.5x | 6 months |
| Divisional VPs (DVPs) | 0.5x | 6 months |
| Non-DVP directors in Benefit Indicator 516 | 0.5x | 6 months |

(b) for a Tier I Participant, for a Termination Date occurring during the Post-Change Period:

| Title/Benefit Indicator | Severance Multiple | Severance Period |
|---|---|---|
| CEO | 2.5x | 30 months |
| COO, EVP, | 2.5x | 30 months |
| SVP | 2.5x | 30 months |
| Corporate VP | 2.0x | 24 months |
| Group VP, "grandfathered" MVP | 2.0x | 24 months |
| Divisional VPs (DVPs) | 2.0x | 24 months |
| Non-DVP directors in Benefit Indicator 516 | 1.0x | 12 months |

(c) Notwithstanding the foregoing, if on the Termination Date the Company maintains generally applicable severance arrangements for a broad-based group of employees below benefit indicator level 516 with a formula that would provide severance benefits to an Participant in a greater amount than results from the application of the Severance Multiple shown above, the Severance Multiple (and Severance Period) shall be adjusted upward as necessary so that the amount paid to such Participant is not less than the amount that would be paid under such generally applicable severance arrangement. Such adjusted amount shall be paid at the time and in the form of payment in Section 4.01(a)(iii).

- 5 -

2.33 **"Target Annual Incentive"** , as of any date, means the amount equal to the product of a Participant's Base Salary multiplied by the percentage of such Base Salary to which such Participant would be entitled as an annual incentive, based on the terms in effect on such date under any annual incentive plans for the performance period for which the annual incentive is awarded if the performance )als established pursuant to such bonus plan were achieved at the 100% (target) level as of the end of the performance period, but disregarding any reduction in Target Annual Incentive that would constitute Good Reason.

2.34 **"Termination Date"** means the date of the receipt of the Notice of Termination by a Participant (if such Notice of Termination is given by the Company or the Participant's Employer) or by the Participant's Employer (if such Notice is given by the Participant), or any later date specified in the Notice of Termination but not more than 35 days after the giving of such Notice if the Notice of Termination is given by the Participant for Good Reason and not more than 15 days after the giving of such Notice of Termination in all other cases, on which an Employee has a Termination of Employment; provided, however, that:

(a) if the Participant's employment is terminated by reason of death, the Termination Date shall be the date of the Participant's death;

(b) If the Participant's employment is terminated by reason of Disability, the Termination Date shall be the date of Disability terminations of employment regularly applied by the Company's Human Resource function to terminations of employment for Disability; which as of the Effective Date is one year after the onset of the condition causing the Disability;

(c) if no Notice of Termination is given, the Termination Date shall be the last date on which the Participant is at work; and

(d) if the Notice of Termination is for a Termination by the Participant for Good Reason, the Termination Date shall be the 35th day after the giving of the Notice of Termination if the Employer has not cured the Good Reason.

2.35 **"Termination of Employment"** means in respect of a Participant, a termination of employment as determined by the Committee; provided, however, that with respect to payment of any Section 409A Deferred Compensation, "Termination of Employment" shall mean "separation from service" within the meaning of Section 409A of the Code.

2.36 **"Tier I Participant"** means, unless otherwise designated by the Committee before the Change Date, a Participant who, on the Termination Date, is classified in a band more senior than the direction band under the employment level categories regularly lied by the Company's Human Resource function (but disregarding any reduction to a lower employment level category after the Change Date that would constitute Good Reason) .

2.37 **"Tier II Participant"** means, unless otherwise designated by the Committee, a Participant who, on the Termination Date, is classified in the direction band under the employment level categories regularly applied by the Company's Human Resource function.

- 6 -

## ARTICLE III
### Participation and Eligibility for Benefits

3.01 **Eligibility**.

(a) An employee is eligible for participation in this Plan if the Employee is in benefit indicator level 516 or above (as determined under the customary practices of the Company's Human Resource function). The Committee in its discretion may designate selected Employees with a benefit indicator lower than 516 to be eligible to participate in this Plan by written notice to such Employee.

(b) Notwithstanding subsection (a), any individual who is (i) a party to an agreement ("Change in Control Employment Agreement") between the individual and an Employer that provides for payments upon Termination of Employment (either before or after a Change in Control) or (ii) entitled to Section 409A Deferred Compensation paid in installments as severance after a Change in Control pursuant to a broad-based severance plan; shall not be eligible to become a Participant until the next January 1 after he or she ceases to be covered by such Change in Control Employment Agreement or severance plan. Where Employee consent is required to terminate a Change in Control Employment Agreement, such consent shall be given (if at all) at such time and under such circumstances as the Committee may require in its discretion.

(c) The Committee shall maintain a list of Participants, as in effect from time to time.

(d) To become a Participant, an individual who has ever received a grant of restricted stock units or is otherwise required to agree to be subject to restrictive covenants shall agree to restrictive covenants in such form as the Company may require, whether or not the individual becomes eligible for benefits under Article IV or Article V.

3.02 **Participation**. Except as provided in Section 3.01(b), each Eligible Employee shall become Participant in the Plan on the first date (not earlier than the Effective Date) on which he or she is an eligible employee described in Section 3.01 and has signed an acknowledgement of coverage under this Plan and, if applicable, any restrictive covenants.

3.03 **Eligibility for Benefits** A Participant becomes eligible for benefits under the Plan if the Participant has an Involuntary Termination. A Tier I Participant also becomes eligible for benefits under the Plan if the Participant has a Termination of Employment Good Reason within one year after the Change Date.

3.04 **Termination of Participation**. If before the Termination Date a Participant is demoted below the level of benefit indicator 516 (disregarding in the case of a Tier I Participant any demotion after the Change Date that would constitute Good Reason), such Participant shall thereupon cease to be a Participant as of the date of demotion. If upon Termination of Employment the Participant has not become eligible for a benefit under Article IV, his or her status as a Participant shall cease upon the Termination Date. Any determination as to a termination of Participation under this Section 3.04 shall be made by the Committee (or by the independent members of the Board upon the recommendation of the Committee in the case of a determination regarding the CEO).

## ARTICLE IV
### General Obligations of the Employer Upon Involuntary Termination

4.01 **Involuntary Termination**. If a Participant has an Involuntary Termination, then unless Article V applies, the Employer's sole obligations to such Participant under the Plan shall be as follows:

- 7 -

(a) The Employer shall pay the Participant the following:

(i) all Accrued Obligations;

(ii) subject to Section 9.01, the Participant's Pro-rata Annual Incentive, reduced (but not below zero) by the amount of any Annual Incentive paid to the Participant with respect to the Employer's fiscal year during which the Termination Date occurs (for example, if the Annual Incentive is paid quarterly); the Pro-rata Annual Incentive shall be paid at the same time and in the same form as the Annual Incentives for such fiscal year are paid to ongoing employees; but no later than two and one-half months after the last day of the fiscal year following the fiscal year in which the Termination Date occurs;

(iii) subject to Section 9.01, an amount equal to the sum of Base Salary and the Target Annual Incentive, each determined as of the Termination Date, multiplied by the applicable Severance Multiple (the "Severance Payment"). The Severance Payment shall be paid in the form of salary continuation unless the Notice of Termination is given in the Post-Change Period, in which event the Severance Payment shall be paid in a single lump sum. The Severance Payment shall begin (or be made) no more than sixty days after the Termination Date, provided the applicable revocation period for the release required by Section 9.01 has expired at that time, and subject to Section 10.11(c) and Section 10.11(e). Severance Payments in the form of salary continuation payments shall be made in accordance with the Employer's regular payroll schedule beginning with the first regularly scheduled payroll date after the Termination Date; provided, however, that any Severance Payment or Payments (whether in the form of salary continuation or in a lump sum) that is or are delayed as required by Section 10.11(c) or Section 10.11(e) or to allow for the lapse of the applicable revocation period for the release required by Section 9.01 shall be cumulated without interest and paid on the first date on which payment is permitted under by Section 10.11(c) or Section 10.11(e) or after lapse of the applicable revocation period required by Section 9.01. The amount of each salary continuation payment shall be determined by dividing the Severance Payment by the number of regularly scheduled payroll periods in the Severance Period (determined without regard to any delays required by Section 10.11(c) or Section 10.11(e) or the applicable revocation period under Section 9.01.

(b) The Employer shall provide for Post-Termination of Employment nonqualified deferred compensation benefits, equity awards, and employee welfare benefits pursuant to the terms of the respective Plans and Policies under which such post-Termination of Employment benefits, awards and welfare benefits, if any, are provided, except as provided in (c) below.

(c) Subject to Section 9.01, if the Participant timely elects post-termination continuation coverage under Section 4980 of the Code ("COBRA") with respect to medical, vision, prescription and/or dental coverage, then the Employer shall reimburse the Participant (or pay the provider directly) for the premiums for such COBRA coverage for the Participant and his or her eligible dependents during the applicable Severance Period to the extent such premiums exceed the premiums payable for similar employer-provided coverage by active employees. There shall be no reimbursement (or direct payment) of such premiums by the Employer for any COBRA coverage extending beyond the end of the Severance Period. Notwithstanding the forgoing, such reimbursement (or direct payment) shall cease if the Participant becomes eligible for medical, vision, prescription or dental coverage, respectively, from a subsequent employer, or for Medicare.

- 8 -

4.02 **Termination for Any Other Reason**. If a Participant has a Termination of Employment for any reason other than as described in Section 4.01 (including termination by the Employer for Cause, termination by the Employee whether or not for Good Reason, termination by the Employer or the Employee for Disability, Retirement, or termination on account of death), then unless .rticle V applies, the Employer's sole obligations to such Participant under the Plan shall be to pay the Participant all Accrued Obligations determined as of the Termination Date.

## ARTICLE V.
### Obligations of the Employer on Involuntary Termination of
### Certain Participants in the Post-Change Period

5.01 **Application**. During the Post-Change Period a Tier I Participant shall be entitled to benefits under this Article V in lieu of benefits under Article IV .

5.02 **Involuntary Termination in the Post-Change Period**. If a Tier I Participant has an Involuntary Termination (including a Termination of Employment for Good Reason) for which a Notice of Termination is given during the Post-Change Period, then the Employer's sole obligations to such Participant under the Plan shall be as follows:

(a) The Employer shall pay the Participant the following in a single lump sum:

(i) all Accrued Obligations;

(ii) subject to Section 9.01, the Participant's Pro-rata Annual Incentive, reduced (but not below zero) by the amount of any Annual Incentive paid to the Participant with respect to the Employer's fiscal year during which the Termination Date occurs (for example, if the Annual Incentive is paid quarterly);

(iii) subject to Section 9.01, an amount equal to the sum of Base Salary and the Target Annual Incentive, each determined as of the Termination Date, multiplied by the applicable Severance Multiple ("Post-Change Severance Payment"); provided, however, that any reduction in the Participant's Base Salary or Target annual incentive that would qualify as Good Reason shall be disregarded for this purpose.

The amount described in Section 5.01(a)(ii) and the Post-Change Severance Payment shall be paid no more than sixty days after the Termination Date, provided the applicable revocation period required for the release under Section 9.01 has expired at that time; and subject to Section 10.11(c) and Section 10.11(e).

(b) Post-Termination of Employment non-qualified deferred compensation benefits, equity awards, and employee welfare benefits shall be provided pursuant to the terms of the respective Plans and Policies under which such post-Termination of Employment benefits, awards and welfare benefits, if any, are provided, except as provided in (c) below.

(c) Subject to Section 9.01, if the Participant timely elects post-termination continuation coverage under Section 4980 of the Code ("COBRA") with respect to medical, vision, prescription and/or dental coverage, then the Employer shall reimburse the Participant (or pay the provider directly) for the premiums for such COBRA coverage for the Participant and his or her eligible dependents during the applicable Severance Period to the extent such premiums exceed the premiums payable for similar employer-provided coverage by active employees. There shall be no reimbursement (or direct payment) of such

- 9 -

premiums by the Employer for any COBRA coverage extending beyond the end of the Severance Period. Notwithstanding the forgoing, such reimbursement (or direct payment) shall cease if the Participant becomes eligible for medical, vision, prescription or dental coverage, respectively, from a subsequent employer, or for Medicare.

5.03 **Termination on or After the Change Date for Any Other Reason**. If a Participant has a Termination of Employment for which a Notice of Termination is given during the Post-Change Period, for any reason other than as described in Section 5.02 (including termination by the Employer for Cause, termination by the Employee other than for Good Reason, termination by the Employer or the Employee for Disability, Retirement, or termination on account of death), then the Employer's sole obligation to the Participant under this Plan shall be to pay the Participant all Accrued Obligations determined as of the Termination Date.

5.04 **Limitation on Benefits**.

(a) In the event it shall be determined that any payment or distribution by an Employer to or for the benefit of the Participant (whether paid or payable or distributed or distributable pursuant to the terms of this Plan or otherwise) (a "Payment") would be nondeductible by the Employer for Federal income tax purposes because of Section 280G of the Code, then the aggregate present value of amounts payable or distributable to or for the benefit of the Participant pursuant to this Plan ("Plan Payments") shall be reduced to the Reduced Amount. The "Reduced Amount" shall be an amount expressed in present value which maximizes the aggregate present value of Plan Payments without causing any Payment to be nondeductible by the Employer because of Section 280G of the Code. Such reduction shall be applied before any reduction of any other payments that are not Plan Payments unless the plan or agreement calling for such payments expressly provides to the contrary making specific reference to this Plan. Anything to the contrary notwithstanding, if the Reduced Amount under the Plan is zero and it is determined further that any Payment that is not a Plan Payment would nevertheless be nondeductible by the Employer for Federal income tax purposes because of Section 280G of the Code, then the aggregate present value of Payments which are not Plan Payments shall also be reduced (but not below zero) to an amount expressed in present value which maximizes the aggregate present value of Payments without causing any Payment to be nondeductible by the Employer because of Section 280G of the Code. For purposes of this Section, present value shall be determined in accordance with Section 280G(d)(4) of the Code.

(b) The Committee shall select a firm of certified public accountants of national standing, (the "Accounting Firm"), which may be the firm regularly auditing the financial statements of the Company or the Employer. The Accounting Firm shall make all determinations required to be made under this Section and shall provide detailed supporting calculations to the Company, the Employer and the Employee within 30 days after the Termination Date or such earlier time as is requested by the Company, and provide an opinion to the Participant that he or she has substantial authority not to report any Excise Tax on his or her Federal income tax return with respect to any Payments. Any such determination by the Accounting Firm shall be binding upon the Company, the Employer and the Participant. The Accounting Firm shall determine which and how much of the Plan Payment or Payments, as the case may be, shall be eliminated or reduced consistent with the requirements of this Section, provided that, if the Accounting Firm does not make such determination within 30 days after the Termination Date the Company shall elect which and how much of the Plan Payment or Payments, as the case may be, shall be eliminated or reduced consistent with the requirements of this Section and shall notify the Participant promptly of such election. Within five business days thereafter, the Employer shall pay to or distribute to or for the benefit of the Participant such amounts as are then due to the Participant under this Plan.

- 10 -

(c) As a result of the uncertainty in the application of Section 280G of the Code at the time of the initial determination by the Accounting Firm or the Company hereunder, it is possible that Plan Payments or Payments, as the case may be, will have been made by the Employer which should not have been made ("Overpayment") or that additional Plan Payments or Payments, as the case may be, which will not have been made by the Employer could not have been made ("Underpayment"), in each case, consistent with the calculations required to be made hereunder. In the event that the Accounting Firm, based upon the assertion of a deficiency by the Internal Revenue Service against the Employee which the Accounting Firm believes has a high probability of success determines that an Overpayment has been made, promptly on notice and demand the Participant shall repay to the Employer any such Overpayment paid or distributed by the Employer to or for the benefit of the Participant together with interest at the applicable Federal rate provided for in Section 7872(f)(2) of the Code; provided, however, that no such amount shall be payable by the Participant to the Employer if and to the extent such payment would not either reduce the amount on which the Participant is subject to tax under Section 1 and Section 4999 of the Code or generate a refund of such taxes. In the event that the Accounting Firm, based upon controlling precedent or other substantial authority, determines that an Underpayment has occurred, any such Underpayment shall be promptly paid by the Employer to or for the benefit of the Participant together with interest at the applicable federal rate provided for in Section 7872(f)(2) of the Code.

## ARTICLE VI
### Administration

6.01 **The Company and Committee**.

(a) The Company shall have overall responsibility for the establishment, amendment and termination of the Plan. In carrying out its responsibilities hereunder, the Company shall act through the Committee (except with respect to the CEO, with respect to whom the Company shall act through the independent members of the Board). The Committee shall have, in its discretion, the responsibilities, duties, powers and authority, assigned to it in this Plan and any responsibilities, duties, powers and authority, under this Plan that are not specifically delegated to anyone else, including the following:

(i) to determine which individuals shall be selected as Tier I Participants, and Tier II Participants.

(ii) to decide on questions concerning the Plan and the eligibility of any Participant to participate in the Plan, including whether the Participant should remain (or become) a Participant;

(iii) to determine the nature and timing of any Termination of Employment or the existence of Good Reason;

(iv) subject to any limitations under the Plan or applicable law, to make and enforce such rules and regulations and prescribe the use of such forms as it shall deem necessary for the efficient administration of the Plan;

(v) to require any person to furnish such information as it may request as a condition to receiving any benefit under the Plan;

- 11 -

(vi) to compute or have computed the amount of benefits that shall be payable to any person in accordance with the provisions of the Plan;

(vii) to construe and interpret the Plan and correct defects, supply omissions and reconcile inconsistencies in the Plan;

(viii) to make all other decisions and determinations (including factual determinations) as the Committee may deem necessary or advisable in carrying out its duties and responsibilities or exercising its powers;

provided that if the CEO is a Participant, such duties, responsibilities and powers shall be exercised with respect to him or her by the independent members of the Board. Decisions of the Committee (or the independent members of the Board with respect to the CEO) shall be final, conclusive and binding on all persons interested in the Plan, including Participants, beneficiaries and other persons claiming rights from or through a Participant.

6.02 **Delegation of Committee Authority.** The Committee may delegate to officers or employees of the Company, or committees thereof, the authority, subject to such terms as the Committee shall determine, to perform such administrative functions and exercise such administrative powers and authority, as the Committee in its discretion may determine. Such delegation may be revoked at any time.

6.03 **Advisors and Agents of the Committee.** The Committee may (i) authorize one or more of its members or an agent to execute or deliver any instrument, and make any payment on its behalf and (ii) utilize and cause the Company to pay for the services of associates and engage accountants, agents, clerks, legal counsel, record keepers and professional consultants (any of whom may also be serving an Employer or another Affiliate of the Company) to assist in the administration of this Plan or to render advice with regard to any responsibility under this Plan.

6.04 **Records and Reports of the Committee.** The Committee or its delegate shall maintain records and accounts relating to the administration of the Plan.

6.05 **Limitation of Liability; Indemnification.** The members of the Board and the Committee shall have no liability with respect to any action or omission made by them in good faith nor from any action made in reliance on (i) the advice or opinion of any ccountant, legal counsel, medical adviser or other professional consultant or (ii) any resolutions of the Board certified by the secretary assistant secretary of the Company. Each member of the Board, the Committee, and each employee to whom are delegated duties, responsibilities and authority with respect to the Plan shall be indemnified, defended, and held harmless by the Company and the Employers and their respective successors against all claims, liabilities, fines and penalties and all expenses (including but not limited to attorneys fees) reasonably incurred by or imposed on such member or Participant that arise as a result of his actions or failure to act in connection with the operation and administration of the Plan, to the extent lawfully allowable and to the extent that such claim, liability, fine, penalty or expense is not paid for by liability insurance purchased by or paid for by the Company or an Employer. Notwithstanding the foregoing, the Company or an Employer shall not indemnify any person for any such amount incurred through any settlement or compromise of any action unless the Company or an Employer consent in writing to such settlement or compromise.

6.06 **Plan Expenses.** Expenses relating to the Plan before its termination shall be paid from the general assets of the Company or an Employer. Any individual who serves as a member of the Committee shall receive no additional compensation for such service.

- 12 -

6.07 **Service in More than One Capacity**. Any person or group of persons may serve the Plan in more than one capacity.

## ARTICLE VII
### Amendments; Termination

7.01 **Amendment or Termination of the Plan**. The Company by duly adopted resolution of the Board shall have the sole right to alter, amend or terminate this Plan in whole or in part at any time and to terminate the participation of any Employee; provided, however, that:

      (i) any such adverse amendment or termination shall be effective only as to those Participants, if any, who have consented to such amendment or termination or who have received from the Company at least 12 months' prior written notice ("Amendment Notice" or "Expiration Notice," respectively) of such adverse amendment or termination that sets forth the date of termination or amendment ("Amendment Date" or "Expiration Date"), and

      (ii) no such Amendment Notice or Expiration Notice shall be effective as to any Participant if a Change Date occurs before the Amendment or Expiration Date specified in the Amendment Notice or Expiration Notice.

Any purported Plan termination or amendment in violation of this Section 7.01 shall be void and of no effect.

## ARTICLE VIII
### Claims Procedure

8.01 **Filing a Claim**.

(a) No claim shall be required for benefit due under the Plan. Any individual eligible for benefits under this Plan who believes he or she is entitled to additional benefits or who desires to clarify his or her right to future benefits under the Plan ("Claimant") may submit his application for benefits ("Claim") to the Committee (or to such other person or persons as may be designated by the Committee) in writing in such form as is provided or approved by the Committee.

(b) When a Claim has been filed properly, it shall be evaluated and the Claimant shall be notified of the approval or the denial of the Claim within 90 days after the receipt of such Claim. A Claimant shall be given a written notice in which the Claimant shall be advised as to whether the Claim is granted or denied, in whole or in part. If a Claim is denied, in whole or in part, the notice shall contain (i) the specific reasons for the denial, (ii) references to pertinent provisions of this Plan on which the denial is based, (iii) a description of any additional material or information necessary to perfect the Claim and an explanation of why such material or information is necessary, and (iv) the Claimant's right to seek review of the denial.

8.02 **Review of Claim Denial**. If a Claim is denied, in whole or in part, or if a Claim is neither approved nor denied within the 90-day period specified Section 8.01(b), the Claimant shall have the right, within 60 days after receipt of such denial (or after such claim to deemed denied), (i) request that the Committee (or such other person or persons as shall be designated in writing by the Committee) review the denial or the failure to approve or deny the Claim, (ii) review pertinent documents, and (iii) submit issues and comments in writing. Within 60 days after a such request is received, the Committee shall complete its review and give the Claimant written notice of its

- 13 -

decision. The Committee shall include in its notice to Claimant the specific reasons for its decision and references to provisions of this Plan on which its decision is based. A Claimant shall have no right to seek review of a denial of benefits, or to bring any action in any ~ourt to enforce a Claim, before to his filing a Claim and exhausting his rights to review under Sections 8.01 and 8.02.

### ARTICLE IX Release; No Mitigation; No Duplication of Benefits

9.01 **Release Required**. Any and all amounts payable and benefits or additional rights provided pursuant to this Plan other than the Accrued Obligations and amounts provided under Section 4.01(b) shall only be payable if the Participant (or Participant's beneficiary in the event of Participant's death) timely delivers to the Employer and does not revoke a general waiver and release of claims in favor of the Company and related parties ("Company Parties") in substantially the form attached hereto as Exhibit A, and the revocation period related to such general waiver and release has expired. Such general waiver and release shall be executed and delivered (and the revocation period related thereto, if any, shall have lapsed without revocation having been made) within sixty (60) days following the Termination Date.

9.02 **No Mitigation**. No Participant shall have any duty to mitigate the amounts payable under this Plan by seeking or accepting new employment or self-employment following termination. Except as specifically otherwise provided in this Plan, all amounts payable pursuant to this Plan shall be paid without reduction regardless of any amounts of salary, compensation or other amounts that may be paid or payable to the Participant as the result of the Participant's employment by another employer or self-employment.

9.03 **No Duplication of Benefits**. Subject to Section 10.11(f), to the extent that a Participant shall have received severance payments or other severance benefits under any other Plan or agreement of the Company before receiving severance payments or other severance benefits pursuant to Article IV or Article V, the severance payments or other severance benefits under such other Plan or agreement shall reduce (but not below zero) the corresponding severance payments or other severance benefits to which such Participant shall be entitled under Article IV or Article V. To the extent that a Participant accepts payments made pursuant to Article IV or Article V, he shall be deemed to have waived his right to receive a corresponding amount of future severance payments or other severance benefits under any other Plan or agreement of the Company. Payments and benefits provided under the Plan shall be in lieu ~f any termination or severance payments or benefits for which the Participant may be eligible under any of the Plans or Policy of the .npany or an Affiliate or under the Worker Adjustment Retraining Notification Act of 1988 or any similar statute or regulation.

### ARTICLE X
### Miscellaneous

10.01 **Participant Information**. Each Participant shall notify the Committee of his home address and each change of home address. Each Participant shall also furnish the Committee with any other information and data that the Committee considers necessary for the proper administration of the Plan. The information provided by the Participant under this Section shall be binding on the Participant, his dependents and any beneficiary for all purposes of the Plan and the Committee shall be entitled to rely on any representations regarding personal facts made by a Participant, his dependents or beneficiary, unless such representations are known to be false.

10.02 **Electronic Media**. Under procedures authorized or approved by the Committee, any form for any notice, election, designation, or similar communication required or permitted to be given to or received from a Participant under this Plan may be communicated or made available to the Company or Participant in an electronic medium (including computer network, e-mail or voice

- 14 -

response system) and any such communication to or from a Participant or Beneficiary through such electronic media shall be fully effective under this Plan for such purposes as such procedures shall prescribe. Any record of such communication retrieved from such electronic medium under its normal storage and retrieval parameters shall be effective as a fully authentic executed writing for all purposes of this Plan absent manifest error in the storage or retrieval process.

10.03 **Notices.** All notices and other communications under this Plan shall be in writing and delivered by hand, by nationally recognized delivery service that promises overnight delivery, or by first-class registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

> If to Participant, at his most recent home address on
> file with the Company.
>
> If to the Company or any other Employer,
>
> Walgreen Co.
> 108 Wilmot Road
> Deerfield, Illinois 60015
> Attn.: General Counsel

or to such other address as either party shall have furnished to the other in writing. Notice and communications shall be effective the day of receipt if delivered by hand or electronically, the second business day after deposit with an overnight delivery service if so deposited, or the fifth business day after mailing in the case of first class registered or certified mail.

10.04 **No Employment Contract.** The existence of this Plan shall not confer any legal or other rights upon any Participant to employment or continuation of employment. Employees are employees at will. The Company and each Employer reserve the right to terminate any Participant with or without cause at any time, notwithstanding the provisions of this Plan.

10.05 **Headings.** The headings in this Plan are for convenience of reference and shall not be given substantive effect.

10.06 **Construction.** Any masculine pronoun shall also mean the corresponding female or neuter pronoun, as the context requires. The singular and plural forms of any term used in this Plan shall be interchangeable, as the context requires.

10.07 **Joint and Several Liability.** In the event that any Employer incurs any obligation to a Participant pursuant to this Plan, such Employer, the Company and each Affiliate, if any, of which such Employer is a subsidiary shall be jointly and severally liable with such Employer for such obligation.

10.08 **Successors.** This Plan shall inure to the benefit of and be binding upon the Company, each Employer and their respective successors and assigns. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of any Employer to assume expressly and agree to comply with this Plan in the same manner and to the same extent that the Employer would be required to comply with it if no such succession had taken place. Failure to require such assumption will be a material breach of this Plan. Any successor to the business or assets of any Employer that assumes or agrees to perform this Plan by operation of law, contract, or otherwise shall be jointly and severally liable with the Employer under this Plan as if such successor were the Employer.

- 15 -

10.09 **Payments to Beneficiary.** If a Participant dies after becoming entitled to payments under Section 4.01 or 5.02 but before receiving all amounts to which he is entitled under this Plan, then, subject to Section 9.01, such remaining amounts shall be paid in a lump sum to one or more beneficiaries designated in writing by the Participant for the purposes of this Plan and received by the ommittee before the Participant's death, which the Participant may change from time to time in the manner without the consent of any previously designated beneficiary, or if none is so designated, to the Participant's estate.

10.10 **Non-Alienation of Benefits.** Benefits payable under this Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution or levy of any kind, either voluntary or involuntary, before actually being received by the Participant, and any such attempt to dispose of any right to benefits payable under this Plan shall be void.

10.11 **Tax Matters.**

(a) An Employer may withhold from any amounts payable under this Plan or from any other amount due a Participant any federal, state, local and other income, employment and other taxes that are required to be withheld pursuant to any applicable law or regulation.

(b) The intent of the Employers is that payments and benefits under this Plan are exempt from or comply with Section 409A of the Code and, accordingly, to the maximum extent permitted, this Plan shall be interpreted in accordance with that intent. To the extent that any provision hereof is modified in order to comply with Section 409A of the Code, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to the Participant and the Employer of the applicable provision without violating the provisions of Section 409A of the Code. In no event whatsoever shall the Company or any Employer be liable for any additional tax, interest or penalty that may be imposed on a Participant or Employee by Section 409A of the Code or damages for failing to comply with Section 409A of the Code.

(c) If a Participant is deemed on the Termination Date to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then with regard to any payment or the provision of any benefit that is considered "nonqualified deferred compensation" under Section 409A of the Code payable on account of a "separation from service," then, to the extent required by Section 409A of the Code, such payment or benefit shall not be made or provided until the date which is the earlier of (i) the day after the expiration of the six (6)-month period measured from the date of such "separation from service" of the Employee, and (ii) the date of the Employee's death. Upon the expiration of the six-month delay period, all payments and benefits delayed pursuant to this provision (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Employee in a lump sum without interest, and all remaining payments and benefits due under this Plan shall be paid or provided in accordance with the normal payment dates specified for them herein.

(d) To the extent that reimbursements or other in-kind benefits under this Plan constitute "nonqualified deferred compensation" for purposes of Section 409A of the Code, (A) all expenses or other reimbursements hereunder shall be made on before to the last day of the taxable year following the taxable year in which such expenses were incurred by the Participant, (B) any right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (C) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

- 16 -

(e) For purposes of Section 409A of the Code, the Participant's right to receive installment payments pursuant to this Plan shall be treated as a right to receive a series of separate and distinct payments. Whenever this Plan specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Employer; provided that if the timing of the payment is contingent on the lapse or expiration of the revocation period for the release required under Section 9.01 and such revocation period could, as of the Termination Date, lapse either in the same year as the Termination Date or in the following year, the actual date of payment within the specified period shall be in such following year.

(f) Notwithstanding any other provision of this Plan to the contrary, in no event shall any payment or benefit under this Plan that constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Code be subject to offset by any other amount unless such offset would not trigger additional taxes and penalties under Section 409A of the Code.

10.12 **Governing Law.** The provisions of this Plan shall be governed, construed and administered in accordance with the laws of the State of Illinois, other than its laws respecting choice of law, except to the extent preempted by federal law.

10.13 **Severability.** If any one or more Articles, Sections or other portions of this Plan are declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not serve to invalidate any Article, Section or other portion not so declared to be unlawful or invalid; provided that if the release required under Section 10,01 is declared to be unlawful or unenforceable, then no payments shall be made the payment of which is subject to such release, and the Participant shall forthwith restore to the Employer any payments previously made that were subject to such release. Any Article, Section or other portion so declared to be unlawful or invalid shall be construed so as to effectuate the terms of such article, section or other portion to the fullest extent possible while remaining lawful and valid.

Dated: _____, 2012

WALGREEN CO.

By: _____

Title: _____

- 17 -

## EXHIBIT A
### GENERAL RELEASE AND WAIVER

1. I, _____, in consideration of and subject to the performance by Walgreen Co. (together with its Affiliates, the "Company Parties"), of its obligations under the Walgreen Co. Executive Severance and Change in Control Plan effective as of January 1, 2013, as amended from time to time before the date hereof (the "Plan"), do hereby release and forever discharge as of the date hereof the Company Parties and their respective affiliates, subsidiaries and direct or indirect parent entities and all present, former and future shareholders, directors, officers, agents, representatives, employees, successors and assigns of the Company and/or its respective affiliates, subsidiaries and direct or indirect parent entities (collectively, the "Released Parties") to the extent provided below (this "General Release"). The Released Parties are intended to be third-party beneficiaries of this General Release, and this General Release may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such Released Parties hereunder. Terms used herein but not otherwise defined shall have the meanings given to them in the Plan.

2. I understand that any payments or benefits paid or granted to me under Section 4.01 or 5.02 of the Plan (other than the Accrued Obligations) represent, in part, consideration for signing this General Release and are not salary, wages or benefits to which I was already entitled. I understand and agree that I will not receive certain of the payments and benefits specified in the Plan unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter. Such payments and benefits will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Company or its Affiliates.

3. Except as provided in paragraphs 5, 10, and 12 below and except for the provisions of the Plan which expressly survive the termination of my employment with the Company, I knowingly and voluntarily (for myself, my heirs, executors, administrators and assigns) release and forever discharge the Company and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date that this General Release becomes effective and enforceable) and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties which I, my spouse, or any of my heirs, executors, ninistrators or assigns, may have, which arise out of or are connected with my employment with, or my separation or termination ᵣₒm, the Company, including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters (all of the foregoing collectively referred to herein as the "Claims").

4. I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 10.13(a) above.

A-1

5. I agree that this General Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967 which arise after the date I execute this General Release. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of the Plan shall not serve as the basis for any claim or action including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

6. I agree that I hereby waive all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever in respect of any Claim, including, without limitation, reinstatement, back pay, front pay, and any form of injunctive relief. Notwithstanding the above, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding; provided, however, that I disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding. Additionally, I am not waiving (i) any right to the Accrued Obligations or any severance benefits to which I am entitled under the Plan, (ii) any claim relating to directors' and officers' liability insurance coverage or any right of indemnification under the Company's organizational documents or otherwise, (iii) my rights as an equity or security holder in the Company or its Affiliates, (iv) my rights under any equity awards that survive termination of employment; or (v) my rights under any retirement plan that is "qualified" under Section 401(a) of the Internal Revenue Code of 1986.

7. In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. I expressly consent that this General Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state or local statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver I would not have become a Participant in the Plan. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, this General Release shall serve as a complete defense to such Claims to the maximum extent permitted by law. I further agree that I am not aware of any pending claim of the type described in paragraph 10.13(a) above as of the execution of this General Release.

8. I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

9. I agree that this General Release and the Plan are confidential and agree not to disclose any information regarding the terms of this General Release or the Plan, except to my immediate family and any tax, legal or other counsel that I have consulted regarding the meaning or effect hereof or to a successor employer respecting the terms of any restrictive covenants to which I may be subject, or as required by law, and I will instruct each of the foregoing not to further disclose the same to anyone.

10. Any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any other insurance regulatory organization or any governmental entity.

A-2

11. I represent that I am not aware of any claim by me other than the claims that are released by this General Release. I acknowledge that I may hereafter discover claims or facts in addition to or different than those which I now know or believe to exist 'th respect to the subject matter of the release set forth in paragraph 3 above and which, if known or suspected at the time of entering ..ito this General Release, may have materially affected this General Release and my decision to enter into it.

12. Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach by the Company or by any Released Party of the Plan after the date hereof.

13. Whenever possible, each provision of this General Release shall be interpreted in, such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

14. BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

(a) I HAVE READ IT CAREFULLY; AND I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963, THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

(b) I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

(c) I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

(d) I HAVE HAD AT LEAST [21][45] DAYS FROM THE DATE OF MY RECEIPT OF THIS RELEASE TO CONSIDER IT, AND THE CHANGES MADE SINCE MY RECEIPT OF THIS RELEASE ARE NOT MATERIAL OR WERE MADE AT MY REQUEST AND WILL NOT RESTART THE REQUIRED [21][45]-DAY PERIOD;

(e) I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(f) I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(g) I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

SIGNED: _____     DATED: _____
                Participant.

A-3

*Walgreens*

## Walgreens Appoints Timothy R. McLevish to Succeed Wade Miquelon as Executive Vice President and Chief Financial Officer

DEERFIELD, Ill., August 04, 2014 - Walgreens (NYSE:WAG) (NASDAQ:WAG) today announced the appointment of Timothy McLevish as Walgreens executive vice president and chief financial officer. He will report to president and chief executive officer Greg Wasson, effective immediately, and lead all of Walgreens finance functions as the company prepares to move forward with the proposed second step of its strategic partnership with Alliance Boots.

McLevish comes to Walgreens from Kraft Foods Group, Inc., one of North America's largest consumer packaged food and beverage companies, where he most recently served as executive vice president and chief financial officer. Prior to Kraft, he served in chief financial officer roles for Ingersoll-Rand, the diversified industrial company, and Mead Corporation, a forestry products company. McLevish also served in a leadership role at Zellerbach Paper Company, where he was vice president and general manager. He is a graduate of the University of Minnesota with a bachelor's degree in accounting and economics, and also earned a master's degree in business administration from Harvard University.

"We are pleased to welcome Tim to lead our financial operations into the next chapter of Walgreens ongoing transformation as we continue to accelerate our strategic growth drivers, expand globally with Alliance Boots and prepare to embark on our journey to create the first global pharmacy-led, health and wellbeing enterprise," said Greg Wasson, Walgreens president and chief executive officer. "With Tim on our senior management team, Walgreens and Alliance Boots will benefit not only from his deep and rich experience in the consumer products market, but also from his experience in bringing together companies to ensure efficient, effective and profitable growth and value creation."

"It is a privilege to join such an admirable company, especially at this exciting and pivotal time as Walgreens expands to become a global enterprise," McLevish said. "I look forward to helping Greg and the team achieve the company's important mission and carry out their remarkable vision to expand health and wellbeing across America and around the world for the benefit of customers, patients, health care partners and shareholders."

McLevish succeeds Wade D. Miquelon, executive vice president, chief financial officer and president of international for Walgreens, who will continue as an advisor to assist the company with the transition as it considers the exercise of Step 2 of its strategic partnership with Alliance Boots. Miquelon also will move forward to pursue several new opportunities outside of the company.

"Wade's remarkable leadership, strategic vision and expertise played a critical role in helping Walgreens transition and transform from a 20th century American drugstore chain into a 21st century global health and wellbeing enterprise, setting the stage for a new generation of growth and value creation for all," Wasson said. "Wade has been a strong contributor as together we charted and pursued a bold new course for Walgreens globally. We know Wade can't resist a new challenge, so we thank him and wish him the very best as he moves forward with the next chapter of his outstanding career."

"It's been one of the greatest privileges and pleasures of my career to help Greg and the team to bring this iconic American company to the brink of becoming a fully global health and wellbeing enterprise to serve the world," Miquelon said. "This truly has been an incredible journey and chance to serve. Now that we are preparing to move forward with bringing together these two iconic brands,

it's the right time for me to transition to new challenges and new opportunities. I know Tim will bring tremendous experience and insight to this exceptional company and continue to grow and develop an outstanding finance and accounting organization."

Miquelon joined Walgreens in June 2008 as senior vice president and chief financial officer, and was promoted to executive vice president in 2009. In 2012, following his leadership in establishing Walgreens strategic partnership with Alliance Boots in June of that year, Miquelon assumed an expanded and global leadership role as executive vice president, chief financial officer and president, international, and joined the board of Alliance Boots. As he continued to lead Walgreens finance functions as chief financial officer, Miquelon also served as Wasson's senior leader in collaborating with the Alliance Boots management team to execute the new global strategic partnership.

Among many other achievements at Walgreens, Miquelon played a central role in launching and advancing the Walgreens-Alliance Boots strategic partnership. In March 2013, Miquelon also led the establishment of the Walgreens-Alliance Boots strategic, long-term relationship with AmerisourceBergen of Valley Forge, Penn., to streamline the distribution of pharmaceuticals and leverage global supply chain efficiencies.

### About Walgreens

As the nation's largest drugstore chain with fiscal 2013 sales of $72 billion, Walgreens ( www.walgreens.com) vision is to be the first choice in health and daily living for everyone in America, and beyond. Each day, in communities across America, more than 8 million customers interact with Walgreens using the most convenient, multichannel access to consumer goods and services and trusted, cost-effective pharmacy, health and wellness services and advice. Walgreens scope of pharmacy services includes retail, specialty, infusion, medical facility and mail service, along with online and mobile services. These services improve health outcomes and lower costs for payers including employers, managed care organizations, health systems, pharmacy benefit managers and the public sector. The company operates 8,215 drugstores in all 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Walgreens digital business includes Walgreens.com, drugstore.com, Beauty.com, SkinStore.com and VisionDirect.com. Take Care Health Systems is a Walgreens subsidiary that manages more than 400 in-store convenient care clinics throughout the country.

Photos/Multimedia Gallery Available:
http://www.businesswire.com/multimedia/home/20140804005277/en/

Mike, as I am still a paid consultant for Walgreens thru dec 1, they have kindly asked that any correspondence I have via your questions be in writing. I need to thoughtfully respect that request

On Aug 13, 2014, at 10:49 AM, "Siconolfi, Michael" <Michael.Siconolfi@wsj.com> wrote:

Wade – I left you a v/m on your cell. Pls call me soonest: 212 416 3190 – Thanks, Mike

Michael Siconolfi
Senior Editor
THE WALL STREET JOURNAL
212 416 3190
michael.siconolfi@wsj.com

**From:** Miquelon, Wade [mailto:wade.miquelon@walgreens.com]
**Sent:** Tuesday, August 12, 2014 1:40 PM
**To:** Siconolfi, Michael
**Subject:** Re: WSJ article

Mike, I'm in a meeting til circa 3 but will try to call you after.    Wade

On Aug 12, 2014, at 12:27 PM, "Siconolfi, Michael" <Michael.Siconolfi@wsj.com> wrote:

Wade

I've left messages on your work and cell phones. We are preparing an article on what's gone down at Walgreen involving you and the missed projection et al. A buddy of mine here, Tim Martin,,has spoken highly of you. It's important that we talk as soon as possible today. I'm at 212 416 3190. Many thanks.

Best, Mike

Michael Siconolfi
Senior Editor
THE WALL STREET JOURNAL
212 416 3190
michael.siconolfi@wsj.com   –

Begin forwarded message:

From: "Miquelon, Wade" <wade.miquelon@walgreens.com>
Date: August 12, 2014 at 1:47:04 PM EDT
To: "Greener, Chuck" <chuck.greener@walgreens.com>
Cc: "Wasson, Greg" <greg.wasson@walgreens.com>, "Sabatino, Thomas" <thomas.sabatino@walgreens.com>, "Wilson-Thompson, Kathleen" <kathleen.wilson-thompson@walgreens.com>
Subject: Re: Wsj

I'm in a meeting in ny til 3 but I think it's that "for professional and personal reasons I decided to pursue other interests some time ago and the company has been nothing less than supportive." Over and out.

Can I find out what was said exactly?

Wade

On Aug 12, 2014, at 1:43 PM, "Greener, Chuck" <chuck.greener@walgreens.com> wrote:

Wade,

Before you call back, let's discuss what you intend say. Thanks,

Chuck

On 8/12/14 12:39 PM, "Miquelon, Wade" <wade.miquelon@walgreens.com> wrote:

Wall Street journal just left a message.

They said they are running a story about "what went down as they have heard Greg and Stefano telling the street that the change was due to bad forecasting".

This is unfortunate.   I will call them back so to at least have a basic quote clarifying things in a productive way.

I've been getting lots of calls since last weeks road show and it's been disturbing to put it mildly.

Call if any concerns,

Wade

**From:** <Miquelon>, Wade <wade.miquelon@walgreens.com>
**Date:** Tuesday, August 12, 2014 3:50 PM
**To:** Chuck Greener <chuck.greener@walgreens.com>
**Subject:** Re: WSJ

Thanks Chuck. I'm just weary of reading half truths. I'd like to move on. I'm sure Kermit doesn't deserve much of what he is getting either. Thanks for the help. Wade

On Aug 12, 2014, at 4:43 PM, "Greener, Chuck" <chuck.greener@walgreens.com> wrote:

Wade,

He has said nothing about being terminated. He only said that you and Kermit had left the company, but will let you know if he says otherwise for any reason. Thanks,

Chuck

Sent from my iPad

On Aug 12, 2014, at 3:37 PM, "Miquelon, Wade" <wade.miquelon@walgreens.com> wrote:

Ps. If asked if I was terminated I would expect the company to say no and that I was offered a President role in May, but declined.

That's what I will say if asked and it's important to my future livelihood.

I can of course provide the documentation to support.

I took enough blows last week, but now I'm at the point where I need to defend myself and the truth.

Thanks for the help here,

Wade.

On Aug 12, 2014, at 3:54 PM, "Greener, Chuck" <chuck.greener@walgreens.com> wrote:

Wade,

Here's the email we were going to send Mike, if you're okay with it. Thanks,

Chuck
--------------------------------------------------------

"Mike, I understand you've reached out to Wade about your story. Because he's traveling, he's asked me to see if there is a specific question you wanted him to address. Then I can follow up on that with him for you.

Thanks,

Michael

Mike, as I am still a paid consultant for Walgreens thru dec 1, they have kindly asked that any correspondence I have via your questions be in writing. I need to thoughtfully respect that request

On Aug 13, 2014, at 10:49 AM, "Siconolfi, Michael" <Michael.Siconolfi@wsj.com> wrote:

Wade – I left you a v/m on your cell. Pls call me soonest: 212 416 3190 – Thanks, Mike

Michael Siconolfi
Senior Editor
THE WALL STREET JOURNAL.
212 416 3190
michael.siconolfi@wsj.com

**From:** Miquelon, Wade [mailto:wade.miquelon@walgreens.com]
**Sent:** Tuesday, August 12, 2014 1:40 PM
**To:** Siconolfi, Michael
**Subject:** Re: WSJ article

Mike, I'm in a meeting til circa 3 but will try to call you after.   Wade

On Aug 12, 2014, at 12:27 PM, "Siconolfi, Michael" <Michael.Siconolfi@wsj.com>
wrote:

> Wade
>
> I've left messages on your work and cell phones. We are preparing an
> article on what's gone down at Walgreen involving you and the missed
> projection et al. A buddy of mine here, Tim Martin, has spoken highly of
> you. It's important that we talk as soon as possible today. I'm at 212 416
> 3190. Many thanks.
>
> Best, Mike
>
> Michael Siconolfi
> Senior Editor
> THE WALL STREET JOURNAL.
> 212 416 3190
> michael.siconolfi@wsj.com

From: "Miquelon, Wade" <wade.miquelon@walgreens.com>
Date: August 13, 2014 at 1:18:22 PM CDT
To: "Siconolfi, Michael" <Michael.Siconolfi@wsj.com>
Subject: Re: WSJ article

You bet.   If you need further clarification and support of any of the stated facts below lmk.   Maybe we can get a cup of coffee on one of my
many trips to NY.       Wade

On Aug 13, 2014, at 1:10 PM, "Siconolfi, Michael" <Michael.Siconolfi@wsj.com> wrote

> Thanks Wade. I'll reflect your comments in our article, and appreciate the input. -- Best, Mike
>
> Michael Siconolfi
> Senior Editor
> THE WALL STREET JOURNAL.
> 212 416 3190
> michael.siconolfi@wsj.com
>
>
> **From:** Miquelon, Wade [mailto:wade.miquelon@walgreens.com]
> **Sent:** Wednesday, August 13, 2014 1:46 PM
> **To:** Siconolfi, Michael
> **Subject:** Re: WSJ article
>
> Mike,
>
> Thank you for obliging my in writing request.  Everything below us not only true, but can be
> substantiated with documentation.   All the best and if you need further support or clarification on
> my answers I will provide it for you.  I'm appreciative that you are seeking a factual story and have
> reached out with that objective.   I have had an amicable partnership with Walgreens and I know
> that they respect the partnership as well
>
>
> Wade
>
> On Aug 13, 2014, at 12:02 PM, "Siconolfi, Michael" <Michael.Siconolfi@wsj.com> wrote:
>
>> Wade – I understand. I'd much rather have a conversation about this, but here are
>> some issues on which we'd appreciate your input soonest:
>>
>> --at an April board meeting, you forecast $8.5 billion in fiscal 2016 pharmacy-unit EBIT,
>> based partly on long-term contracts with insurers and others to sell prescription drugs
>> under plans that include Medicare Part D. In July, you cut that forecast to $7.4 billion,
>> stunning the board and senior Walgreen executives. Please address this disconnect and
>> how it happened.

--please address why inflation in the price of some generic drugs wasn't reflected in the April forecast

I cannot comment on any of the specific private board meeting discussions, but can only say that all senior leaders are constantly updated on all relevant financial matters and in turn apprise all board members transparently and expeditiously on all material and relevant matters.

--please address why there wasn't better communication and coordination between the finance group and Kermit Crawford's department

The finance organization works well across all aspects of the company and that is inclusive of Kermit's department. In fact, most finance resources are imbedded in the various business units and functions as a member of their team.

--please address exactly when you discovered the discrepancy, and what you did in the wake of that

I will not comment on company confidential matters.

--please address the contention by some senior Walgreen executives that there were lax financial controls in your group, that the April forecast was "inadequate" and reflected a "weak" finance unit, and that your group and the pharmacy unit "weren't talking to each other"

I am proud to have led an outstanding FA team. During this 6 year time span, Walgreens TSR (118 percent) outpaced all key competitors and a major indices. Further, free cash flow more than tripled and market cap roughly doubled. I would put this Finance team and these financial results up against any in this space.

--please address why you didn't provide financial projections to some directors, including Stefano Pessina

It has always been and continues to be the policy at Walgreens to provide ALL directors with fully transparent and timely information and there have been no exceptions to this policy during my tenure

convicted of a DUI or any crime. Still, I am grateful for the company's benefit in me during that time and it is unfortunate that this remains a topic for some despite I've move way beyond that period of my life.

> --please address why you're receiving severance of $3.2 million and a performance
> bonus of nearly $1.2 million after your forced departure

It was not a forced departure. I was in fact offered in April what was a promotion to a President role in the to be newly merged company which while I was very grateful for, is not what I aspire to long term both professionally and personally. Under, the terms of my employment agreement, any change to the scope and nature of my role triggers the diminution clause. My departure was amicable, but given the merger announcement and related proxy that will trigger a fund raise, we all believe making my intentions known sooner than later and getting a successor on board for the announcement and subsequent debt raise was critical.

--please specify what specific consulting you're providing as part of your separation agreement

My consulting agreement simply has me as a paid advisor to the CEO thru December 1, 2014. I am at the CEO and my successors disposal as they see fit.

Again, it's always better to have a conversation about these things, but I'm sensitive to your request that this be in writing.

Thanks and best,
Mike

Michael Siconolfi
Senior Editor
THE WALL STREET JOURNAL.
212 416 3190
michael.siconolfi@wsj.com

**From:** Miquelon, Wade [mailto:wade.miquelon@walgreens.com]
**Sent:** Wednesday, August 13, 2014 12:25 PM
**To:** Siconolfi, Michael
**Subject:** Re: WSJ article

Mike, I sent you a text as per below.

Wade
--------