**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE WALGREEN CO. STOCKHOLDER LITIGATION | Civil No. 1:14-cv-9786 |
| ―――――――――――――――― | Hon. Joan B. Gottschall |
| JOHN BERLAU, | **November 20, 2015 Hearing Date** |
| Objector. | |

**OBJECTION TO PROPOSED SETTLEMENT AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, AND NOTICE OF INTENTION TO APPEAR AT SETTLEMENT HEARING**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... II

TABLE OF AUTHORITIES .................................................................................... III

INTRODUCTION ....................................................................................................... 1

I.  Objector John Berlau is a member of the class and intends to appear through counsel at the fairness hearing. ................................................................................................. 3

II.  The court owes a fiduciary duty to the unnamed class members. .................................. 4

III.  Shareholder class action strike suits are rapidly proliferating, despite their harmfulness to shareholders and defendant corporations alike. ............................................. 5

    A. Instead of conferring any substantial benefit to class members, disclosure-only settlements actively harm class members. ...................................................................... 6

    B. This case presents a classic example of a strike suit that serves no one but plaintiffs' counsel. . ..................................................................................................... 7

IV.  Rule 23(e) fairness and Rule 23(a)(4) adequacy cannot be satisfied because the action leaves shareholder class members worse off: investors are paying for class counsel's attorneys' fees in exchange for immaterial supplemental disclosures. .................................... 8

    A. The Supplemental Disclosures are immaterial because the additional language would not be important in a shareholder's decision to vote. ................................... 10

        1.  Rosenstein's Nomination and Support Agreement. .................................... 11

        2.  SP Investors and KKR Investors' post-merger stock ownership. .......................... 13

        3.  Miquelon's defamation lawsuit. ................................................................ 16

        4.  Additional risks factors. ........................................................................... 19

        5.  Background of merger transaction. ........................................................... 20

        6.  Pessina's experience and expertise. ........................................................... 21

    B. The 97% vote in favor of the merger confirms that the Supplemental Disclosures were immaterial. ............................................................................................... 22

V.  If the court approves the Settlement, it should decrease attorneys' fee award to $1. .................. 22

CONCLUSION ........................................................................................................ 26

# TABLE OF AUTHORITIES

## **Cases**

*Acevedo v. Aeroflex Holding Corp.,*
    C.A. No. 7930-VCL (Del. Ch. Jul. 8, 2015) ................................................................ 24

*Ash v. LFE Corp.,*
    525 F.2d 215 (3d Cir. 1975). ....................................................................................... 15

*Beaumont v. Am. Can Co.,*
    797 F.2d 79 (2d Cir. N.Y. 1986) ................................................................................... 12

*City Trading Fund v. Nye,*
    2015 N.Y. Misc. LEXIS 11 (N.Y. Sup. Ct. Jan. 7, 2015). ............................................. 9

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC,*
    662 F.3d 913 (7th Cir. 2011) ..................................................................................... 8, 9

*Crawford v. Equifax Payment Servs., Inc.,*
    201 F. 3d 877 (7th Cir. 2000) ........................................................................................ 9

*Eubank v. Pella Corp.,*
    753 F.3d 718 (7th Cir. 2014). ...................................................................................... 23

*Felzen v. Andreas,*
    134 F.3d 873 (7th Cir. 1998) ......................................................................................... 6

*GAF Corp. v. Heyman,*
    724 F.2d 727 (2d Cir. 1983). .................................................................................. 16, 18

*Gen. Elec. Co. v. Cathcart,*
    980 F.2d 927 (3d Cir. Pa. 1992) .......................................................................... 16, 17, 18

*Gordon v. Verizon Commc'ns, Inc.,*
    2014 N.Y. Misc. LEXIS 5642 (NY Sup. Ct. Dec. 19, 2014) ........................................... 9

*Grok Lines, Inc. v. Paschall Truck Lines, Inc.,*
    2015 U.S. Dist. LEXIS 124812 (N.D. Ill. Sept. 18, 2015) ........................................... 23

*Himmel v. Bucyrus Int'l, Inc.,*
    2014 U.S. Dist. LEXIS 50481 (E.D. Wis. Apr. 11, 2014). ..................................... 2, 10

*In re Allied Healthcare S'holder Litig.*,
No. 652188/2011 (N.Y. Sup. Ct. Oct. 23, 2015) .................................................................1, 9, 24

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
No. 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006). ............. 25

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
No. 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 77926 (S.D.N.Y. Oct. 25, 2006). ............. 25

*In re Aqua Dots Prod. Liab. Litig.*,
654 F.3d 748 (7th Cir. 2011) .....................................................................................1, 8, 9, 22

*In re Citigroup Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013). ................................................................................ 25

*In re Dry Max Pampers Litig.*,
724 F.3d 713 (6th Cir. 2013). ..........................................................................................23-24

*In re HP Inkjet Printer Litig.*,
716 F.3d 1173 (9th Cir. 2013). ............................................................................................ 23

*In re Medicis Pharma. Corp. S'holders Litig.*,
C.A. No. 7857-CS (Del. Ch. Feb. 26, 2014). ...................................................................2, 20

*In re Riverbed Tech. Inc.*,
Consol. C.A. No. 10484-VCG, 2015 WL 5458041 (Del. Ch. Sept. 17, 2015). ....................... 24

*In re Sauer-Danfoss*,
65 A.3d 1116 (Del. Ch. 2011). ............................................................................................ 24

*In re Transatlantic Holdings Inc. S'holders Litig.*,
C.A. No. 6574-CS, 2013 Del. Ch. LEXIS 90 (Del. Ch. Mar. 8, 2013) ................................. 8, 22

*JMB Realty Corp. v. Associated Madison Cos.*,
1980 U.S. Dist. LEXIS 14477 (N.D. Ill. Oct. 8, 1980). ........................................................ 16

*Kahn v. Wien*,
842 F. Supp. 667 (E.D.N.Y. 1994) ....................................................................................... 15

*Kaplan v. Rand*,
192 F.3d 60 (2d Cir. 1999) ................................................................................................ 24

*Kas v. Fin. Gen. Bankshares, Inc.*,
  796 F.2d 508 (D.C. Cir. 1986). ................................................................. 20-21

*Kaufman v. Cooper Comps., Inc.*,
  719 F. Supp. 174 (S.D.N.Y. 1989). ........................................................ 12, 20

*Kennecott Copper Corp. v. Curtiss-Wright Corp.*,
  584 F.2d 1195 (2nd Cir. 1978). ................................................................... 16

*Krauth v. Exec. Telecard, Ltd.*,
  890 F. Supp. 269 (S.D.N.Y. 1995). ............................................................ 14

*Marks v. Lainoff*,
  466 F. Supp. 301 (S.D.N.Y. 1979). ............................................................ 14

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*,
  834 F.2d 677 (7th Cir. 1987). ...................................................................... 4

*Masters v. Avanir Pharms., Inc.*,
  996 F. Supp. 2d 872 (C.D. Cal. 2014) ........................................................ 14

*Mendell v. Greenberg*,
  927 F.2d 667 (2d Cir. 1990). ................................................................. 21-22

*Miquelon v. Walgreen Co.*,
  Case No. 2014 CH 16825 (Cook County, IL Chancery Div. June 29, 2015) .................... 18, 19

*Mirfasihi v. Fleet Mortg. Corp.*,
  356 F.3d 781 (7th Cir. 2004)("*Mirfasihi I*") ................................................. 4

*Mirfasihi v. Fleet Mortg. Corp.*,
  450 F.3d 745 (7th Cir. 2006)("*Mirfasihi II*") ................................................ 4

*Pearson v. NBTY*,
  772 F.3d 778 (2014) ......................................................................... 23, 25

*Philadelphia v. Fleming Cos.*,
  264 F.3d 1245 (10th Cir. 2001) ............................................................ 17, 18

*Prettner v. Aston*,
  339 F. Supp. 273 (D. Del. 1972). ............................................................. 18

*Redman v. RadioShack*,
  2014 U.S. App. LEXIS 18181 (7th Cir. Sept. 19, 2014) ........................................ 23

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ..................................................................4

*Robert F. Booth Trust v. Crowley*,
    687 F.3d 314 (7th Cir. 2012) ............................................................ 1, 8

*Rodman v. Grant Found.*,
    608 F.2d 64 (2d Cir. 1979) .................................................................. 14

*Sec. & Exch. Com. v. Texas International Co.*,
    498 F. Supp. 1231 (N.D. Ill. 1980) ..................................................... 19

*Shamrock Holdings, Inc. v. Polaroid Corp.*,
    709 F. Supp. 1311 (D. Del. 1989) ....................................................... 14

*Silber v. Mahon*,
    957 F.2d 697 (9th Cir. 1992) .................................................................4

*Skeen v. Jo-Ann Stores, Inc.*,
    750 A.2d 1170 (Del. 2000) .................................................................. 10

*Thorogood v. Sears, Roebuck and Co.*,
    627 F.3d 289 (7th Cir. 2010) .................................................................8

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ................................................................10, 17, 22

*Werner v. Werner*,
    267 F.3d 288 (3d Cir. Pa. 2001) ......................................................... 15

*Wieglos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) .............................................................. 10

## Rules and Statutes

Fed. R. Civ. Proc. 23(a)(4) ......................................................................... 1, 8

Fed. R. Civ. Proc. 23(e) ............................................................................... 8

Fed. R. Civ. Proc. 23(h) ............................................................................. 22

Notes of Advisory Committee on 2003 Amendments to Fed. R. Civ. Proc. 23(h) ........................22-23

17 C.F.R. § 229.103 ................................................................................... 17

17 C.F.R. § 240.14a-101 .................................................................................................. 17

**Other Authorities**

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c)
(2010) ......................................................................................................................... 4

Fisch, Jill E., Sean J. Griffith & Steven M. Davidoff Solomon,
*Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a
Proposal for Reform*, 93 TEX. L. REV. 557 (2015). ................................................. 5, 8, 22

Fukumura, Koji F. & Peter M. Adams,
*Update on Corporate Governance Litigation: M&A and Proxy Strike Suits, available at*
http://www.americanbar.org/content/dam/aba/administrative/litigation/materials
/2013_corporate_counselcleseminar/7_2_update_on_corporate_governance.authch
eckdam.pdf .................................................................................................................. 6

Griffith, Sean J.,
*Correcting Corporate Benefit: How to Fix Shareholder Litigation By Shifting the Doctrine on
Fees*, 56 B.C. L. REV. 1 (2015). ................................................................................. 5

Haims, Joel C. & James J. Beha, II,
*Recent Decisions Show Courts Closely Scrutinizing Fee Awards in M&A Litigation Settlements*
1 (2013), *available at* http://media.mofo.com/files/Uploads/Images/130418-In-the-
courts.pdf .................................................................................................................... 5

Jeffries, Browning,
*The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company
Deals*, 11 BERKELEY L.J. 55 (2014). ......................................................................... 5, 6

Koumrian, Olga,
Cornerstone Research, *Shareholder Litigation Involving Mergers and Acquisitions: Review of
2013 M&A Litigation, available at*
https://www.cornerstone.com/GetAttachment/73882c85-ea7b-4b3c-a75f-
40830eab34b6/-Shareholder-Litigation-Involving-M-and-A-2013-Filings.pdf ........................ 5

Woolner, Ann, Phil Milford & Rodney Yap,
*Merger Suits Often Mean Cash for Lawyers, Zero for Investors*, BLOOMBERG (February 16,
2012, 12:59 PM CST), *available at* http://www.bloomberg.com/news/2012-02-
16/lawyers-cash-in-while-investor-clients-get-nothing-in-merger-lawsuit-deals.html ............... 7

## INTRODUCTION

This case is a classic example of a strike suit. On November 24, 2014, defendant Walgreens filed a proxy statement ("Proxy Statement") regarding a merger and reorganization that would be put to a vote at a special meeting of shareholders on December 29, 2014. Less than two weeks after the Proxy Statement was filed, plaintiffs filed this action alleging omissions in the Proxy Statement. And two weeks after that, the parties reached a settlement in principle. Pressured with maintaining the December 29, 2014 special meeting, defendants agreed to an extortionate settlement with plaintiffs that provided only immaterial supplemental disclosures, which Walgreens included in its 8–K filed December 24, 2014 ("Supplemental Disclosures").

This type of disclosure-only settlement is often termed a "merger tax" and tolerated as "the cost of doing business." Courts are becoming increasingly impatient with these disclosure-only settlements that confer no real benefit, however, because they are actually harming shareholders. "These settlements are all too often entered into because the corporate officers are faced with the dilemma of protracted costly litigation versus a quick, relatively cheap settlement that releases the corporate officers and compensates class counsel with someone else's money (the shareholders)." *In re Allied Healthcare S'holder Litig.*, No. 652188/2011, at 6 (N.Y. Sup. Ct. Oct. 23, 2015) (rejecting disclosure-only settlement because supplemental disclosures were insignificant) (attached hereto at Exh. 1).

The Seventh Circuit has held that attorneys that bring a class action solely for their own benefit at the expense of the class fail to meet the adequacy requirements of Rule 23(a)(4). *See In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) (Easterbrook, J.). The appropriate remedy when a shareholder suit will make shareholders worse off is to dismiss the case. *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012) (Easterbrook, J.). Like in *Robert F. Booth Trust*, the settlement here cannot be certified because it makes the shareholders worse off. Plaintiffs seek approval of the disclosure-only settlement that pays class counsel fees and expenses of $370,000. Corporate assets will be used to pay for class counsel's fees (and the defense of this action). Accordingly, to justify

bringing this action—and the resulting cost to shareholders—the Supplemental Disclosures must actually be material. The Supplemental Disclosures, however, comprise 746 words that are trivial additions which mostly rehash information and Board recommendations that are *already* contained in the Proxy Statement:

    1) the additional information regarding Rosenstein's Nomination and Support Agreement merely indicates that Walgreens' preliminary discussions were confidential, which is self-evident and expected in such negotiations;

    2) the SP Investors and KKR Investors' post-merger stock ownership is a superfluous computation of information *already* contained in the Proxy;

    3) Miquelon's defamation lawsuit fails to meet the materiality threshold because it does not involve at least $1 billion in damages (10% of Walgreens' current assets) and because it is unrelated to the merger transaction;

    4) Inclusion of additional risk factors, background transaction information and Mr. Pessina's experience repeats and rehashes the Board's recommendations *already* contained in the Proxy.

The Supplemental Disclosures are immaterial because they would have no negative impact on a shareholder's decision to vote for the merger. *See In re Medicis Pharma. Corp. S'holders Litig.*, C.A. No. 7857-CS, at 22 (Del. Ch. Feb. 26, 2014) (Transcript) (attached hereto at Exh. 2) (holding that disclosure is only material if it "contradicts, not reinforces, management's recommendation").[1] Indeed, the shareholder's vote at the December 29 special meeting confirms as much because 97% voted in favor of the merger. Because the Supplemental Disclosures are immaterial, the shareholder representative brought this strike suit solely to benefit the attorneys, the class cannot be certified and the case should be dismissed. Or, if the settlement in this case is approved, the class counsel's fees should be reduced to $1, an amount commesurate with the actual value of the Supplemental Disclosures.

## BACKGROUND

On August 2, 2012, defendant Walgreens completed the acquisition of 45% of the issued

---

[1] "[B]ecause of the similarity of the materiality standards, Delaware cases involving materiality for purposes of the duty of disclosure are helpful for considering materiality under § 14(a) and vice versa." *Himmel v. Bucyrus Int'l, Inc.*, 2014 U.S. Dist. LEXIS 50481, *40 (E.D. Wis. Apr. 11, 2014).

and outstanding share capital of Alliance Boots in exchange for cash and Walgreens shares ("Step 1 Acquisition"). *See* Stipulation of Settlement ("Settlement"), Dkt. 25-1 at 2. The Step 1 Acquisition was made pursuant to a Purchase and Option Agreement that gave Walgreens the option to purchase the remaining shares of Alliance Boots. *See id.* at 2-3. On August 6, 2014, Walgreens announced that it would exercise the option to purchase the remaining 55% ("Step 2 Acquisition"). *See id.* at 2. On November 24, 2014, Walgreens filed a definitive proxy statement on Schedule 14A ("Proxy Statement") with the SEC soliciting shareholder approval for a corporate reorganization and Step 2 Acquisition. *See id.* at 3. The Proxy Statement announced that the vote on the reorganization would be held at a special meeting of Walgreens shareholders on December 29, 2014. *See id.* Plaintiffs filed suit less than two weeks later—on December 5, 2014. *See* Complaint, Dkt. 1.

Under the specter of the impending shareholder vote on December 29, plaintiffs and defendants immediately engaged in negotiations regarding a potential settlement. *See* Settlement, Dkt. 25-1 at 4. The parties reached an agreement in principle on December 23, less than a week before the shareholder vote. *Id.* The agreement provided that the defendants would file with the SEC a Form 8-K that would contain agreed-upon Supplemental Disclosures concerning the reorganization and Step 2 Acquisition. *Id.* The defendants immediately filed the Supplemental Disclosures on December 24, in time for the shareholder vote on December 29, where the Walgreens shareholders ultimately approved both the reorganization and the Step 2 Acquisition. *Id.* The only consideration provided to the plaintiffs in exchange for the full settlement and release of all Settled Claims (including unknown claims), was the filing of the Supplemental Disclosures that defendants filed in a Form 8-K with the SEC on December 24, 2014. *See id.* at 12, Section 2.1. The Settlement provides that Walgreens will pay class counsel fees and expenses up to $370,000, as approved by the Court. *See id.* at 14-15.

I.    **Objector John Berlau is a member of the class and intends to appear through counsel at the fairness hearing.**

As documented in the accompanying Declaration of John Berlau ("Berlau Decl.," attached hereto at Exh. 3), Objector Berlau is a member of the class. Mr. Berlau's mailing address is 1899 L

Street, NW, 12th Floor, Washington, D.C. 20036. *See* Berlau Decl. ¶ 2. As reflected by the attached brokerage statement, Mr. Berlau held shares of Walgreen Co. common stock between August 5, 2014 and December 31, 2014. *See* Berlau Decl. ¶ 3; Brokerage Statement (attached at Exhibit A to Berlau Decl.). Objector Berlau is thus a class member.

Objector Berlau intends to appear through his counsel at the final approval hearing in the above-captioned matter scheduled for November 20, 2015 at 10:00 a.m. Objector Berlau wishes to discuss matters raised in this Objection and reserves the right to make use of all documents entered on to the docket by any settling party or objector. Objector Berlau also reserves the right to cross-examine any witnesses who testify at the hearing in support of final approval or class counsel's request for fees.

## II. The court owes a fiduciary duty to the unnamed class members.

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.05(c) (2010). The burden of proving settlement fairness rests with the moving party. *Id.* A district court must act as a "fiduciary of the class," for the rights and interests of absent class members. *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) ("*Mirfasihi II*") (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002)). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) ("*Mirfasihi I*"). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mahon*, 957 F.2d 697, 701 (9th Cir. 1992). Further, like the Settlement in this case, settlements negotiated prior to formal class certification require "a more careful scrutiny of the fairness." *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 681 (7th Cir. 1987).

III.  **Shareholder class action strike suits are rapidly proliferating, despite their harmfulness to shareholders and defendant corporations alike.**

Shareholder class action suits challenging corporate mergers have proliferated in recent years, and have become almost a certainty in response to proposed mergers; scholars have estimated the likelihood of a shareholder suit following a corporate merger to exceed 90%. *See* Jill E. Fisch, Sean J. Griffith & Steven M. Davidoff Solomon*, Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform,* 93 TEX. L. REV. 557, 557 (2015); Olga Koumrian, Cornerstone Research, *Shareholder Litigation Involving Mergers and Acquisitions: Review of 2013 M&A Litigation*[2] ("In 2013, 94% of M&A deals were challenged by shareholders."); *see also* Sean J. Griffith, *Correcting Corporate Benefit: How to Fix Shareholder Litigation By Shifting the Doctrine on Fees*, 56 B.C. L. REV. 1, 1 (2015) (stating that "virtually ever merger transaction is challenged"). But the ubiquity of these suits should not be confused with their utility or merit.

"The primary abuse involving shareholder class action suits and representative derivative litigation is the initiation of strike suits—meritless claims filed for their nuisance value—by entrepreneurial plaintiffs' attorneys." Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company Deals*, 11 BERKELEY L.J. 55 (2014). Strike suits such as the one in this case are not only are devoid of value to class members, but they affirmatively harm corporate shareholders by driving up the cost of the merger transactions. Joel C. Haims & James J. Beha, II, *Recent Decisions Show Courts Closely Scrutinizing Fee Awards in M&A Litigation Settlements* 1 (2013)[3] (observing that the majority of such shareholder class and derivative suits that quickly follow almost every significant merger announcement settle quickly, and the payment of attorneys' fees "effectively becomes a tax on M&A transactions") (internal citation omitted). Nevertheless, defendant corporations almost always choose to settle these suits quickly. The defendants' dilemma has been aptly summarized as follows:

---

[2]  *Available at* https://www.cornerstone.com/GetAttachment/73882c85-ea7b-4b3c-a75f-40830eab34b6/-Shareholder-Litigation-Involving-M-and-A-2013-Filings.pdf.

[3]  *Available at* http://media.mofo.com/files/Uploads/Images/130418-In-the-courts.pdf.

> Few would argue that the quantity of M&A litigation is anything other than
> excessive, and it is no secret why: these strike suits are extremely profitable for
> plaintiffs' counsel. Given the large stakes and often compressed timeline, M&A class
> actions place defendant-companies on the horns of a dilemma. Should they quickly
> settle the lawsuit(s), usually by agreeing to provide certain—typically immaterial—
> supplemental disclosures, and pay a relatively modest award of attorneys' fees to
> plaintiffs' counsel? Or should they vigorously defend the lawsuit(s), risking a possible
> injunction, delay (or even derailment) of the merger transaction, and a larger
> payment of fees to plaintiffs' counsel? Because most defendant companies are risk
> averse, particularly in this setting, the vast majority of these strike suits settle, settle
> quickly, and settle on a disclosure-only basis.

Koji F. Fukumura and Peter M. Adams, *Update on Corporate Governance Litigation: M&A and Proxy Strike Suits.*[4] *See also Felzen v. Andreas*, 134 F.3d 873, 876 (7th Cir. 1998) (citing literature on shareholder derivative suits). Because corporate defendants feel pressure to minimize the costs—both monetary and reputational—arising from protracted litigation, they are persuaded to work swiftly with plaintiffs to settle even meritless claims at the bargain price of attorneys' fees and costs. Jeffries, *supra*, at 58 ("Because the litigation threatens the consummation of the deal if not resolved quickly and because corporations may view the settlement amount as a drop in the bucket compared to the overall transaction amount, defendants are motivated to settle even meritless claims."). Such extortion by plaintiffs' counsel should not be countenanced. Because the push-back will not come from defendants who are eager to minimize reputational and monetary damage, it must come from the courts.

A. **Instead of conferring any substantial benefit to class members, disclosure-only settlements actively harm class members.**

Many disclosure-only settlements like the one in this case yield nothing more for class members than wholly immaterial supplemental disclosures in a merger proxy, and should therefore be rejected. Such settlements are actively harmful to shareholders. Jeffries, *supra*, 59 ("Not only do these settlements often provide no benefit to shareholders, they actually harm shareholders directly by requiring the class to release all future claims relating to the underlying transaction and indirectly

---

[4] *Available at*
http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/2013_corporate_counse
lcleseminar/7_2_update_on_corporate_governance.authcheckdam.pdf

by reducing some of the economic benefit of the transaction that would have flowed to the shareholders."). Courts should further reject these proposed class action settlements because the only monetary relief deriving from the settlement comes in the form of attorneys' fees and expenses for the plaintiffs' counsel who file strike suits solely in their self-interest, at the shareholder's expense. *See* Griffith, *supra*, at 24 ("The overcompensation on both sides of shareholder litigation is only the most visible sign of the crisis. . . The less visible but potentially more sinister aspect of the current system is the systematic undercompensation of the plaintiff class."); *see also* Ann Woolner, Phil Milford & Rodney Yap, *Merger Suits Often Mean Cash for Lawyers, Zero for Investors*, Bloomberg (February 16, 2012, 12:59 PM CST)[5] (noting that 70% of Delaware investor class action suits following mergers and acquisitions in 2010 and 2011 made money only for the plaintiffs' lawyers and not their clients).

> **B.      This case presents a classic example of a strike suit that serves no one but plaintiffs' counsel.**

This case presents a classic example of a strike suit that serves no one but plaintiffs' counsel, and should therefore be rejected. Specifically, this case presents a hallmark of the typical merger strike suit: the almost immediate and transparent filing of a complaint following a merger announcement.   Woolner, et al., *supra* (noting that some lawyers sue the day after a merger announcement, while for the cases in the Woolner study, the median interval was eight days). In this case, plaintiffs filed suit less than two weeks after Walgreens filed a definitive proxy statement with the SEC. *Compare* Proxy Statement *with* Complaint, Dkt. 1. Under the specter of the impending shareholder vote on December 29, plaintiffs and defendants immediately engaged in negotiations regarding a potential settlement. *See* Settlement, Dkt. 25-1 at 4. The parties reached an agreement in principle on December 23, less than a week before the shareholder vote. *Id.* Contrary to the parties' assertions, however, the Settlement does not confer a "substantial benefit" on the shareholders, but rather makes the shareholders worse off by footing the bill for immaterial disclosures.

---

[5] *Available at* http://www.bloomberg.com/news/2012-02-16/lawyers-cash-in-while-investor-clients-get-nothing-in-merger-lawsuit-deals.html.

**IV.** **Rule 23(e) fairness and Rule 23(a)(4) adequacy cannot be satisfied because the action leaves shareholder class members worse off: investors are paying for class counsel's attorneys' fees in exchange for immaterial supplemental disclosures.**

Plaintiffs cannot satisfy the adequacy requirement of Rule 23(a)(4) and the Settlement fails Rule 23(e) fairness because the only purpose of this strike suit is to line class counsel's pockets. The Seventh Circuit has consistently warned against class action settlements designed to make class counsel the primary beneficiary. *See Thorogood v. Sears, Roebuck and Co.*, 627 F.3d 289, 293-94 (7th Cir. 2010) (warning of risk of settlements treating class counsel better than the class); *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (counsel must show the district court that "they would prosecute the case in the interest of the class … rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts.").

In *In re Aqua Dots Prod. Liability Litigation*, the Seventh Circuit held that such self-serving litigation could not be certified as a class action. 654 F.3d at 752. There, plaintiffs sought relief that was *already* available to the consumer class members. *Id.* Judge Easterbrook explained that the class representatives could not fairly and adequately protect the interests of the class under Rule 23(a)(4) when plaintiffs were proposing that "high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that is already on offer." *Id.*; *see* Fisch, et al., *supra*, at 568 (disclosure-only settlements with illusory benefits "raise questions about the adequacy with which the class has been represented, suggesting that the court should deny class certification") (citing Transcript of Teleconference at 10–11, *In re Transatlantic Holdings Inc. S'holders Litig.*, C.A. No. 6574-CS, 2013 Del. Ch. LEXIS 90 (Del. Ch. Mar. 8, 2013)).

And in *Robert F. Booth Trust v. Crowley*, the Seventh Circuit struck down a derivative action observing that "[t]he only goal of this suit appears to be fees for the plaintiffs' lawyers." 687 F.3d 314, 319 (7th Cir. 2012). Judge Easterbrook noted that it was "odd" for plaintiffs to bring antitrust allegations against the corporation when it was the *corporation* that benefitted from the alleged antitrust misconduct; "self-appointed investors may be poor champions of corporate interests and

thus injure fellow shareholders." *Id.* at 317, 318. Dismissal was appropriate because it was "impossible to see how the investors could gain from it." *Id.* at 319; *cf. Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) (rejecting settlement providing only injunctive relief and *cy pres*).

Courts are increasingly reaching similar results in cases involving disclosure-only settlements. In *Gordon v. Verizon Communications, Inc.*, the court rejected a disclosure-only class action settlement because, as in this case, "the Supplemental Disclosures that are included in the Settlement [] are so trivial or obviously redundant as to add nothing of material value from a disclosure standpoint." 2014 N.Y. Misc. LEXIS 5642, at *7 (NY Sup. Ct. Dec. 19, 2014). "Merely providing additional information—unless the additional information offers a contrary perspective on what has previously been disclosed—does not constitute material disclosure." *Id.* at *6. The court concluded that if it approved settlement based on the trivial disclosures, "it would be an enabler of an unwarranted divestiture of shareholder rights by virtue of plaintiff's release, as well as a misuse of corporate assets were plaintiff's legal fees to be awarded." *Id.* at *21 (citing *Creative Montessori Learning Centers*, 662 F.3d at 918); *see also* Exh. 1, *In re Allied Healthcare S'holder Litig.*, 652188/2011, slip. op. (rejecting disclosure-only settlement because supplemental disclosures were insignificant); *In re Aruba Networks, Inc. S'holder Litig.*, C.A. No. 10765-VCL, at 73 (Del. Ch. Oct. 9, 2015) (Transcript) (attached hereto at Exh. 4) (finding class representatives inadequate and dismissing case where disclosure-only settlement appeared to be "harvesting-of-a-fee opportunity"); *City Trading Fund v. Nye*, 2015 N.Y. Misc. LEXIS 11, *63-*64 (N.Y. Sup. Ct. Jan. 7, 2015) (rejecting settlement because although "mergers taxes may simply be a reality, an inevitable cost of doing business, … this court sees no reason to countenance frivolous litigation").

Like *Aqua Dots* and *Crowley*, and the other recent cases rejecting disclosure-only settlements, the class cannot be certified and/or this action should be dismissed because the shareholder class members in this case are worse off than if the case had never been filed. As this Settlement demonstrates, the representative parties were looking out not for the interests of the class, but

instead for the interests of their attorneys at the expense of the class. Because plaintiffs brought this litigation, corporate assets have been depleted to pay defense attorneys and, pursuant to the Settlement, the plaintiffs' attorneys. To justify bringing this action and paying class counsel for this disclosure-only Settlement, the Supplemental Disclosures required by the Settlement must actually be material. They are not.

> **A.      The Supplemental Disclosures are immaterial because the additional language would not be important in a shareholder's decision to vote.**

 In the context of Rule 14a-9, which governs disclosure in proxy statements, the Supreme Court held that an "omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in [making her decision]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* Describing materiality, the Seventh Circuit explained: "[r]easonable investors do not want to know everything that could go wrong, without regard to probabilities; that would clutter registration documents and obscure important information. Issuers must winnow things to produce manageable, informative filings." *Wieglos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989); *TSC Indus.*, 426 U.S. at 449 n.10 (noting "the SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability"). Further, "[o]mitted facts are not material simply because they might be helpful." *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).[6]

     The Settlement provided for Supplemental Disclosures that were included in Walgreen Co.'s 8-K dated December 24, 2014. *See* Exhibit A to Settlement Agreement ("Supplemental

---

[6] *Himmel*, 2014 U.S. Dist. LEXIS 50481, * 40 ("[B]ecause of the similarity of the materiality standards, Delaware cases involving materiality for purposes of the duty of disclosure are helpful for considering materiality under § 14(a) and vice versa.").

Disclosures"), Dkt. 25-2; Walgreen Co. (Form 8-K) (Dec. 24, 2014).[7] The Supplemental Disclosures totaled 1,218 words, most of which was duplicative. After duplicative language is removed, the additional disclosures total just 746 words (excluding duplicative language). None of it is material.

### 1. Rosenstein's Nomination and Support Agreement.

The first addition explains that there were preliminary discussions leading up to the Nomination and Support Agreement regarding Barry Rosenstein's appointment to the Board. Details of the Nomination and Support Agreement were disclosed in the Proxy Statement and the additional information provides no material information:

| Proxy Statement at 45. | Supplemental Disclosures, Dkt. 25-2 at 7, 9. |
|---|---|
| **Nomination and Support Agreement**<br>On September 5, 2014, Walgreens and JANA entered into the Nomination and Support Agreement pursuant to which, among other things, on September 5, 2014, Barry Rosenstein of JANA was appointed to the Board. In addition, Walgreens agreed to nominate Mr. Rosenstein for election to the Board at the 2015 annual meeting of shareholders of Walgreens (or, upon completion of the Reorg Merger, of Walgreens Boots Alliance), subject to the terms and conditions set forth in the Nomination and Support Agreement. Under the Nomination and Support Agreement, among other things, until the later of (a) forty-five days prior to the advance notice deadline for the 2016 annual meeting of shareholders and (b) fifteen days after Mr. Rosenstein or another JANA designee is no longer a member of the Board, JANA has agreed to, and to cause its affiliates and controlled associates to, vote all shares owned beneficially or of record, and that they are entitled to vote, in favor of all incumbent directors nominated by the Board and in accordance with the Board's recommendation on any other proposals or business that comes before any shareholders meeting, including the Transactions, other than certain specified matters. The Standstill Period is subject to early termination in the event of an uncured material breach of the | Prior to the appointment of Mr. Rosenstein to the Board, Mr. Rosenstein and senior management of Walgreens had engaged in preliminary discussions during which Mr. Rosenstein expressed his views regarding Walgreens and its strategic direction and prospects. In connection with these preliminary discussions, on August 5, 2014, Walgreens entered into a confidentiality agreement with JANA. Thereafter, senior management of Walgreens engaged in further discussions with Mr. Rosenstein and extended the term of the original confidentiality agreement with JANA. Also during this period, representatives of Walgreens and Wachtell Lipton negotiated the terms of the Nomination and Support Agreement with representatives of JANA. In connection with these discussions, and following further consultation with management and Walgreens' financial and legal advisors, the Walgreens Board determined that Mr. Rosenstein would |

---

[7] *Available at* http://www.sec.gov/Archives/edgar/data/104207/000119312514453165/d842199d8k.htm.

| | |
|---|---|
| Nomination and Support Agreement by Walgreens, and will be extended if we voluntarily agree to nominate Mr. Rosenstein at the 2016 annual meeting of shareholders, and any successive annual meeting of shareholders, and Mr. Rosenstein agrees to serve as a director nominee. As of November 17, 2014, JANA and its affiliates and controlled associates beneficially owned approximately 1.5% of the outstanding shares of Walgreens common stock. | be a valuable addition to the Board, and Walgreens and JANA entered into the Nomination and Support Agreement on September 5, 2014. |

The Supplemental Disclosures regarding the Nomination and Support Agreement merely indicate that: (1) Walgreens and JANA had confidential prelminary discussions; and (2) Walgreens thought Rosenstein would be a "valuable addition." *See* Supplemental Disclosures, Dkt. 25-2 at 9. Companies do not need to describe each step of their negotiations. "[I]f companies were forced to disclose all preliminary negotiations, proxy statements would become longer and more obtuse than they already are." *Beaumont v. Am. Can Co.*, 797 F.2d 79, 85 (2d Cir. N.Y. 1986). In *Beaumont*, the Second Circuit affirmed dismissal of the complaint because only the "actual terms of the proposed merger, not the preliminary terms subsequently amended" must be disclosed. *Id.* "To read the requirements of the Proxy Rules to require a round by round synopsis of the negotiations goes too far. The Proxy Rules are intended to require disclosure of facts that a reasonable investor would consider significant." *Kaufman v. Cooper Comps., Inc.*, 719 F. Supp. 174, 183 (S.D.N.Y. 1989) (holding that defendant did not have to describe each step of negotiations regarding position of preferred shareholders).

That the Board found Rosenstein to be a valuable addition is implicit in their appointment of Rosenstein. And the fact that they had confidential preliminary discussions with JANA—which is anticipated for such negotiations—is insignificant and reveals nothing regarding the *terms* of the Nomination and Support Agreement which were already disclosed in the Proxy Statement. *See* Proxy Statement at 45. This information would not have changed an investor's vote because these additions do not provide additional details regarding the terms of the Nomination and Support Agreement, but instead are obvious, expected consequences of those negotiations.

### 2. SP Investors and KKR Investors' post-merger stock ownership.

The next addition describes the post-merger ownership of Walgreens Boots Alliance common stock for the SP Investors and KKR Investors. Prior to the Step 2 Acquisition, Walgreens owned 45% of Boots Alliance. *See* Proxy Statement at 9. Walgreens purchased the remaining 55% of Boots Alliance from the principal Seller AB Acquisitions (owned by SP Investors and KKR Investors). *Id.* at 12. Walgreens purchased the 55% of Boots Alliance from AB Acquisitions for £3.133 billion in cash and 144,333,468 shares of Walgreens Boots Alliance common stock. *See* Proxy at 10. Prior to Step 2, the SP Investors and KKR Investors owned 7% and 0.7% of Walgreens common stock, respectively. *See* Proxy Statement at 30. How the 144 million shares would be allocated among the AB Acquisitions investors (SP Investors and KKR Investors) is unknown. *See* Proxy at 30-31. The Supplemental Disclosures adds language *speculating* how those shares would be allocated: (The additional language from the Supplemental Disclosures are bold and underlined.)

> Currently, the SP Investors collectively own approximately 7.7% of the outstanding shares of Walgreens common stock and the KKR Investors collectively own approximately 0.7% of the outstanding shares of Walgreens common stock. While the final allocation between cash and shares to be received by each of the SP Investors, the KKR Investors, and other investors in AB Acquisitions (the "Other Investors") has not yet been determined, **and will be determined by the Sellers, the SP Investors, the KKR Investors and the Other Investors, and not by Walgreens or Walgreens Boots Alliance**, the beneficial ownership of each of the SP Investors, the KKR Investors and the Other Investors is expected to significantly increase following completion of the Step 2 Acquisition. **Assuming that the SP Investors and the KKR Investors each receive shares of Walgreens Boots Alliance (or Walgreens, as applicable) based on their current pro rata ownership of AB Acquisitions, and after giving effect to the MEP Restructuring described elsewhere in this proxy statement/prospectus, the SP Investors are expected to hold approximately 11.3% of the pro forma total outstanding shares of the combined company and the KKR Investors are expected to hold approximately 4.6% of the pro forma total outstanding shares of the combined company (in each case, based on the number of shares of Walgreens common stock outstanding as of November 17, 2014, assuming completion of the Step 2 Acquisition and the issuance of 144,333,468 shares as of that date) and assuming, for purposes of calculating the interests of the MEP, a share price of $72.32**. …

*See* Supplemental Disclosures, Dkt. 25-2 at 7, 8, 11.

While the Proxy Statement did not identify the post-merger common stock ownership for SP Investors and KKR Investors, neither do the Supplemental Disclosures. The additional language merely guesses what the ownership percentage would be "*assuming*" distribution is based on current pro rata ownership. *Id.* Such conjecture is not only immaterial, but discouraged by the proxy rules. "It is well established that 'Section 14 carries with it no formal requirement that predictions be made as to future behavior, and indeed, they are discouraged.'" *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269, 288-89 (S.D.N.Y. 1995) (quoting *Marks v. Lainoff*, 466 F. Supp. 301, 302-03 n.1 (S.D.N.Y. 1979)); *see also Rodman v. Grant Foundation*, 608 F.2d 64, 72 (2d Cir. 1979) (noting that there is no duty to include "speculative financial predictions" in a proxy). Companies "are not required to disclose speculative projections; to do so risks affirmatively misleading investors." *Masters v. Avanir Pharms., Inc.*, 996 F. Supp. 2d 872, 883 (C.D. Cal. 2014) (rejecting motion to enjoin vote in shareholder class action because alleged omissions were immaterial including speculative projections regarding future amounts to be received by executive officers). "This principle is grounded in the concern that it might be just as misleading to investors to disclose contingent plans as it might be to fail to disclose such plans." *Shamrock Holdings, Inc. v. Polaroid Corp.*, 709 F. Supp. 1311, 1327 (D. Del. 1989).

Indeed, the additional language regarding the post-merger ownership is immaterial because the information necessary to make such speculation was *readily available* in the Proxy Statement. The Proxy Statement explains that "the SP Investors will be entitled to receive approximately 34.1% of the Step 2 Acquisition consideration and the KKR Investors will be entitled to receive approximately 30.1% of the Step 2 Acquisition consideration." *See* Proxy Statement at 86. Investors could easily estimate that the SP Investors and the KKR Investors would each receive about 1/3 of the 13.2% of shares going to the Sellers. *See* Proxy Statement at 2 (Walgreens common stock shares "are estimated to hold approximately 86.8% of the pro forma total outstanding shares of the combined company"). Indeed, investors could also calculate the *exact* percentage speculated in the Supplemental Disclosures using information available in the Proxy Statement:

| | SP Investors | KKR Investors |
|---|---|---|
| Step 2 consideration (*See* Proxy Statement at 86.) | 49,217,713 Walgreens Boots Alliance (34.1% of 144,333,468 shares) | 43,444,374 Walgreens Boots Alliance (30.1% of 144,333,468 shares) |
| Pre-merger (*See* Proxy Statement at 43-44.) | 72,803,205 Walgreens common stock (7.7% of 945,496,180 outstanding) | 6,618,473 Walgreens common stock (0.7% of 945,496,180 outstanding) |
| Post-merger total shares | 72,803,205 + 49,217,713 = 122,020,918 Walgreens Boots Alliance | 6,618,473 + 43,444,374 = 50,062,847 Walgreens Boots Alliance |
| % of oustanding shares of new company (*See* Proxy Statement at 180.) | 122,020,918/1,089,829,648 = **11.2%** | 50,062,847/1,089,829,648 = **4.6%** |

Courts have consistently held that omissions are not material if the shareholders could have made their own calculations from the information available. *See Werner v. Werner*, 267 F.3d 288, 300 (3d Cir. Pa. 2001) (finding omission immaterial because shareholders could compute the extent to which management benefitted from deleting the right of first refusal); *Ash v. LFE Corp.*, 525 F.2d 215, 219 (3d Cir. 1975) (finding omission of exact difference between old and new pension levels in proxy was not material when proxy supplied shareholders with information necessary to perform the calculation themselves); *Kahn v. Wien*, 842 F. Supp. 667, 675 (E.D.N.Y. 1994) (finding no material omission when attached financial statements contained information "from which the reasonable investor could perform the simple mathematical calculations necessary to determine the present and future values of the proposed transaction to both parties"). Because the shareholders could have calculated the SP Investors and KKR Investors' estimated ownership from information available in the Proxy Statement, the Supplemental Disclosures are immaterial.

Finally, in addition to post-merger ownership, the Supplemental Disclosures include language describing that the allocation of the Step 2 consideration will be performed by the SP Investors and KKR Investors and not Walgreens. *See* Supplemental Disclosures, Dkt. 25-2 at 7, 8, 11. This additional language is insignificant (and self-evident) given that the Proxy provides great

detail on how the *Sellers* (not Walgreens) can and cannot allocate the Step 2 consideration. *See* Proxy Statement at 15, 31, 35, 87, 204, 208, 209, B-1-48, B-1-18. Language indicating that the Sellers determine allocation is superfluous and therefore, immaterial. *JMB Realty Corp. v. Associated Madison Cos.*, 1980 U.S. Dist. LEXIS 14477, at *19 (N.D. Ill. Oct. 8, 1980) (finding omitted language as "superfluous" and describing plaintiffs' allegations as "'nit-picking' which is not sufficient to state a claim under Section 14(a)"), citing *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195 (2nd Cir. 1978).

### 3. Miquelon's defamation lawsuit.

The Supplemental Disclosures include a description of a lawsuit ("*Miquelon* Action") brought by former Chief Financial Officer Wade D. Miquelon:

> On August 4, 2014, Wade D. Miquelon resigned his position as Walgreens Executive Vice President, Chief Financial Officer and President, International. On that date, Mr. Miquelon also entered into a Transition and Separation Agreement with Walgreens. On October 16, 2014, Mr. Miquelon filed a lawsuit against Walgreens in Illinois state court captioned Miquelon v. Walgreen Co., No. 14-ch-16825, Cook County, Illinois Circuit Court (the "Lawsuit"). The Lawsuit alleges, among other things, that, shortly after Mr. Miquelon's termination, certain Walgreens executives met with investors and made disparaging and defamatory comments about Mr. Miquelon. The Lawsuit asserts claims against Walgreens for Declaratory Judgment, Breach of the Transition and Separation Agreement, Defamation Per Se, and Tortious Interference with Prospective Economic Advantage, and seeks damages and injunctive relief. Walgreens believes these claims are without merit and intends to vigorously defend these claims.

*See* Supplemental Disclosures, Dkt. 25-2 at 10.

"Although not determinative, Schedule 14A is persuasive authority as to the required scope of disclosure in proxy materials, as the regulation provides 'us with the [SEC's] expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest.'" *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 937 (3d Cir. Pa. 1992) (quoting *GAF Corp. v. Heyman*, 724 F.2d 727, 739 (2d Cir. 1983)). In *General Electric*, the Third Circuit explained:

Regulation S-K, 17 C.F.R. § 229.10 *et seq.*, collects standard instructions for filing numerous forms required under the Securities Act of 1933 and the Securities Exchange Act of 1934, including registration statements, prospectuses, annual reports, and proxy statements. While 17 C.F.R. § 229.103 (Item 103), dealing with legal proceedings, does require the disclosure of nonroutine pending litigation against the company, the degree to which the standard instructions apply to proxy statements in particular is governed by Schedule 14A, 17 C.F.R. § 240.14a-101, which makes no mention of litigation concerning the company. Instead, **Schedule 14A mandates the reporting of only criminal proceedings or pending lawsuits brought against the directors themselves.** Thus, the *only* portion of Item 103 incorporated into Schedule 14A is Instruction 4, which concerns the disclosure of *pending* litigation in which a nominee for the board has an interest adverse to that of the corporation. Schedule 14A, Item 7(a), 17 C.F.R. § 240.14a-101 (incorporating Instruction 4 to Item 103 of Regulation S-K, 17 C.F.R. § 229.103). *See also In re Sears, Roebuck and Co. Securities Litig.*, 792 F. Supp. 977, 980-81 (E.D. Pa. 1992) (Section 14(a) did not require disclosure of derivative suit against directors and company in connection with restructuring plan because directors were not adverse parties to the company).

980 F.2d at 936 (emphasis added) (footnote omitted). *General Electric* involved Item 7(a) of Schedule 14A regarding election of directors. *See* 17 C.F.R. § 240.14a-101, Item 7(a). Proxy statements relating to mergers (Items 14 and 15), however, only incorporate § 229.103 with respect to registered investment companies. *See* 17 C.F.R. § 240.14a-101, Item 14(7)(d)(3). The SEC's limited (and inapplicable) incorporation of § 229.103 for proxy statements regarding mergers strongly suggests that the SEC deems such disclosures less important. *See TSC Indus.*, 426 U.S. at 449 n.10 (noting "the SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability"); *see also Philadelphia v. Fleming Cos.*,, 264 F.3d 1245, 1266 (10th Cir. 2001) (relying on an SEC disclosure regulation as a "guidepost" for the court's materiality determination). Even if Item § 229.103 were specifically incorporated in Schedule 14A relating to mergers, however, § 229.103 supports a finding that the *Miquelon* Action was immaterial.

17 C.F.R. 229.103 requires disclosure of material pending litigation, and specifcially excludes a "proceeding that involves primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis." 17 C.F.R. 229.103, Instruction 2 (emphasis added). In *City of*

*Philadelphia v. Fleming Cos.*, the Tenth Circuit affirmed dismissal of a class action complaint that alleged omission of information regarding pending lawsuit in SEC filings, finding that "[p]laintiffs fail[ed] to allege that [defendant] was required by federal regulation to disclose the [] Litigation because the initial damages claim exceeded the 10% of current assets **materiality threshold** of § 229.103." 264 F.3d at 1266 (emphasis added); *see also Prettner v. Aston*, 339 F. Supp. 273, 290 (D. Del. 1972) (finding that materiality was not "close case" in light of current assets of $56 million and contingent liability less than $1 million). Here, the *Miquelon* Action seeks an injunction preventing Walgreens from disparaging or defaming Miquelon and damages that exceed $50,000. *See* Miquelon Complaint, Dkt. 1-1 at 53. Miquelon claims to have lost lucrative, high-level executive positions and his current and future income is damaged. *See id.* at 51-52. Although his total damages are not specified, Miquelon's alleged personal damages could not possibly approach the $1.2 billion materiality threshold. *See* Proxy Statement at 96 (current assets of Walgreens as of Aug. 31, 2014 total $12,242,000,000).

More important, a shareholder who reviewed the description of the *Miquelon* Action in the Supplemental Disclosures would quickly dismiss the lawsuit as immaterial because it has no bearing on the merger. That the company allegedly made disparaging remarks about the former CFO would be irrelevant to a shareholder's consideration of the merger because it doesn't concern the "operation of the company as a whole." *Gen. Elec.*, 980 F.2d at 937 (finding litigation immaterial and distinguishing cases where litigation was material in merger proxy statements because litigation concerned company's overall operation); *cf. GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir. 1983) ("Whether [the litigation] would be considered important in deciding how to vote would then depend on the issues involved in the proxy contest itself."). From the description contained in the Supplemental Disclosures, the *Miquelon* Action appears to be no more than a former-disgruntled-employee lawsuit with no relation to the soundness of the merger transaction; such lawsuit would have no impact on a shareholder's vote. (Indeed, Cook County Circuit Judge Franklin Valderrama granted motions by Walgreens to dismiss seven of the nine counts alleged in Miquelon's defamation

litigation. *See Miquelon v. Walgreen Co.,* Case No. 2014 CH 16825 (Cook County, IL Chancery Div. June 29, 2015) (attached hereto at Exh. 5).) Accordingly, additional language regarding the defamation litigation is immaterial.

### 4. Additional risks factors.

The Proxy Statement includes lengthy and comprehensive information regarding risk factors of the merger. *See* Proxy Statement at 26-39; 57-58. The additional risk factors included in the Supplemental Disclosures only repeat *verbatim* the risk factors already identified in the Proxy:

| Proxy Statement Risk Factors | Risk Factors included in Supplemental Disclosures, Dkt. 25-2 at 10. |
|---|---|
| • The processes and initiatives needed to achieve these potential benefits are complex, costly and time-consuming, and **Walgreens has not previously completed a transaction comparable in size or scope**. *See* Proxy Statement at 28. | • the fact that **Walgreens has not previously completed a transaction comparable in size or scope**; |
| • Achieving the expected benefits of the Alliance Boots transaction, including the Step 2 Acquisition, is subject to a number of significant challenges and uncertainties, including, without limitation, whether **unique corporate cultures will work collaboratively in an efficient and effective manner**, the **coordination of geographically separate organizations**, …. *See* Proxy Statement at 28. | • the potential challenges and uncertainties surrounding whether Walgreens' and Alliance Boots' **unique corporate cultures will work collaboratively in an efficient and effective manner**; <br><br> • the potential challenges and uncertainties related to the **coordination of geographically separate organizations**; |
| • The Step 2 Acquisition will increase our **exposure to certain joint ventures and investments of Alliance Boots over which we would not have sole control**. Some of these companies may operate in **sectors that differ from our or Alliance Boots' current operations** and have different risks. *See* Proxy Statement at 30. | • the risk that the Transactions will increase Walgreens' **exposure to certain joint ventures and investments of Alliance Boots over which Walgreens may not have sole control** and may operate in **sectors that differ from Walgreens' or Alliance Boots' current operations**. |

The duplicative language is immaterial. *See Sec. & Exch. Com. v. Texas Int'l Co.,* 498 F. Supp. 1231, 1249 (N.D. Ill. 1980) (finding omission immaterial because superfluous mathematical

computation was "little more than a drafting comment"). Further, a disclosure that only reinforces the view already advocated by a board of directors is immaterial; to alter the total mix, a disclosure achieved by plaintiffs "should be in a way that contradicts, not reinforces, management's recommendation." Exh. 2, *In re Medicis Pharma. Corp. S'holders Litig.*, C.A. No. 7857-CS, at 22. Language that parrots the recommendations of the Board is immaterial.

### 5. Background of merger transaction.

The Supplemental Disclosures add the following additional language (bolded and underlined) to the section describing the transaction background:

> On July 30, 2014, the Walgreens Board again met to discuss the timing, structure and other aspects of the potential Step 2 Acquisition. Present at the meeting were Messrs. Wasson, Miquelon and Sabatino, **who, along with Mr. Vainisi, and with the support of Walgreens' outside advisors at Wachtell Lipton and Goldman Sachs, led the negotiation process with the Sellers on behalf of Walgreens with respect to the terms of the Amendment, the acceleration of the option exercise period and the structure of the combined company,** and other members of the Walgreens management team, as well as representatives of Wachtell Lipton, Goldman Sachs and Lazard, also engaged as financial advisor to Walgreens.
> …
> At the conclusion of the meeting, the Walgreens Board (excluding Messrs. Pessina and Murphy, **who, as a result of their interest in the proposed transaction, recused themselves from the Board's decision to exercise the Call Option**) unanimously approved the amendment to the Purchase and Option Agreement and the exercise of the Call Option and recommended that the Walgreens shareholders approve the Share Issuance and Reorganization.

Supplemental Disclosures, Dkt. 25-2 at 9-10. Pages 47-54 of the Proxy Statement provide detailed background of the transactions including identification of the Company representatives and outside advisors involved in the numerous meetings in July 2014. *First*, the additional language regarding Mr. Vainisi, Wachtell Lipton and Goldman Sachs is immaterial as they were involved throughout negotiations; the additional language does not represent a unique development in negotiations. *See Kaufman*, 719 F. Supp. at 183 (holding that proxy rules did not require "round by round synopsis of the negotiations"). *Second*, the description of Pessina and Murphy's recusal is not material because "defendants need not label or editorialize on the disclosed facts, at least where the potential conflict

would be obvious to any reasonable shareholder." *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 517 (D.C. Cir. 1986). These minor additional details would have no impact on a shareholder's vote in light of the total mix of information available to the shareholders.

### 6. Pessina's experience and expertise.

The Supplemental Disclosures include a paragraph regarding Mr. Pessina's experience to be added to Walgreen's 8-K filed December 10, 2014, *available at* http://www.sec.gov/Archives/edgar/data/104207/000119312514439128/d836811d8k.htm. As an initital matter, the 8-K (dated Dec. 10, 2014) was filed *after* plaintiffs filed this case and thus, any alleged omissions are not the subject of this action. More important, the Supplemental Disclosures do not add any material information to the 8-K:

| 8-K dated December 10, 2014 | Supplemental Disclosures, Dkt. 25-2 at 12. |
| --- | --- |
| Mr. Pessina, age 73, has extensive leadership experience and knowledge of Walgreens and Alliance Boots. Mr. Pessina has been a director of Walgreens since 2012 and has served as Executive Chairman of Alliance Boots since July 2007, having previously served as its Executive Deputy Chairman. Mr. Pessina previously served as Alliance Boots' Executive Deputy Chairman. Prior to the merger of Alliance UniChem and Boots plc, Mr. Pessina was Executive Deputy Chairman of Alliance UniChem, previously having been its Chief Executive for three years through December 2004. Mr. Pessina was appointed to the Alliance UniChem Board in 1997 when UniChem merged with Alliance Santé, the Franco-Italian pharmaceutical wholesale group which he established in Italy in 1977. Mr. Pessina also serves on the Board of Directors of Galenica AG, a publicly-traded Swiss healthcare group, and a number of private companies. | Mr. Pessina was selected to serve as Acting Chief Executive Officer as of the Transition Time based on a number of factors considered by the Board of Walgreens. These included Mr. Pessina's considerable knowledge of the industries in which both Walgreens and Alliance Boots operate, his familiarity with both Walgreens' and Alliance Boots' respective businesses and leadership teams and his international experience and background in managing global businesses. |

The previously disclosed facts relating to Mr. Pessina's experience and expertise were sufficient. It was unnecessary to include the additional language summarizing his experience or the Board's motivation for its decision. *Cf. Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1990) ("A

proxy statement need not disclose the underlying motivations of a director or major shareholder *so long as* all the objective material facts relating to the transaction are disclosed."). These additions are trivial and would have no impact on a shareholder's vote.

**B.    The 97% vote in favor of the merger confirms that the Supplemental Disclosures were immaterial.**

The immateriality of the Supplemental Disclosures is demonstrated by the 97% shareholders' vote in favor of the merger transaction. The Supreme Court held that an "omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in [making her decision]." *TSC Indus.*, 426 U.S. at 449. "Because the purpose of merger disclosure is to inform shareholder voting, it is reasonable to view supplemental disclosure as meaningful if it changes the way reasonable shareholders vote." *See* Fisch et al., *supra*, at 575. Thus, "for supplemental disclosures to be meaningful, they must have a negative impact on shareholder voting in favor of the merger" so that "disclosure-only settlements should reduce shareholder votes in favor of the deal." *Id.* The Walgreens shareholder's voting on the merger did not experience such a negative impact. After the Supplemental Disclosures were provided, 97% of the shareholders voted in favor of the merger transaction and only 2.2% against. *See* Walgreen Co. (Form 8-K) (Dec. 29, 2014)[8]; *cf. In re Transatlantic Holdings Inc. S'holders Litig.*, 2013 Del. Ch. LEXIS 90, at *3-*9 (refusing to approve settlement where disclosures had no utility as confirmed by 99.85% vote in favor of transaction). The overwhelming vote in favor of the merger confirms that the Supplemental Disclosures had no impact on the merger vote.

**V.    If the court approves the Settlement, it should decrease attorneys' fee award to $1.**

As described above, the Court should deny class certification pursuant to *Aqua Dots* and/or dismiss the action pursuant to *Crowley*. *See* Section IV. But if the Court approves the Settlement, it should decrease any fee award to $1 because the Settlement has achieved nothing for the shareholders. The "fundamental focus" in awarding fees under Rule 23(h) "is on the result *actually*

---

[8] *Available at* http://www.sec.gov/Archives/edgar/data/104207/000119312514455578/d843053d8k.htm.

*achieved* for class members." Notes of Advisory Committee on 2003 Amendments to Rule 23(h) (emphasis added); *accord Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("[I]n determining the reasonableness of the attorneys' fee agreed to in a proposed settlement, the central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation."); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182 (9th Cir. 2013) ("Plaintiffs attorneys' don't get paid simply for working; they get paid for obtaining results."). The Seventh Circuit has described the "acute conflict of interest between class counsel, whose pecuniary interest is in their fees, and class members, whose pecuniary interest is in the award to the class:"

> We thus have "remarked the incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judges approve a settlement involving a meager recovery for the class but generous compensation for the lawyers — the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests." *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014).

*Pearson v. NBTY*, 772 F.3d 778, 787 (2014). A class action settlement may not confer preferential treatment upon class counsel to the detriment of class members. *Id.* Like *Pearson*, this settlement is a "selfish deal" that "disserves" the class. *Id.*

Here, the Settlement's only consideration provides meaningless Supplemental Disclosures. Under Seventh Circuit law, attorneys' fees cannot be awarded for injunctive relief that has no value. *See Pearson*, 772 F.3d at 785-86 (affirming that injunctive relief had zero value); *see also Grok Lines, Inc. v. Paschall Truck Lines, Inc.*, 2015 U.S. Dist. LEXIS 124812 (N.D. Ill. Sept. 18, 2015) ("The proposed settlement can only be characterized as disproportionately benefiting counsel at the expense of class members, who gain little to nothing, the proposed injunctive relief having little or no value."). In *Pearson,* the court examined at length the proposed labeling changes, which it found were "substantively empty" and "purely cosmetic changes in wording." 772 F.3d at 785; *see also In re Dry Max Pampers Litig.* ("*Pampers*"), 724 F.3d 713, 718 (6th Cir. 2013) (finding that class counsel's fees

could not be justified by the illusory relief of valueless labeling changes). As detailed above, the Supplemental Disclosures here involve cosmetic rehashing of the Proxy Statement that are substantively empty, s*ee* Section IV.A, and thus, cannot justify an award of attorneys' fees. *See In re Sauer-Danfoss*, 65 A.3d 1116, 1128 (Del. Ch. 2011) ("Remedying an immaterial omission through supplemental disclosure does not benefit stockholders and will not support a fee award."); *cf. Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999) (refusing to award fees in derivative action where relief was illusory because plaintiffs are "entitled to counsel fees upon a settlement of the action only when the non-monetary, therapeutic benefits obtained are substantial in nature").

In the disclosure-only context, courts have backlashed against the "merger tax" of class counsel fees in settlements providing trivial disclosures. Most recently, in *In re Allied Healthcare Shareholder Litigation*, the judge rejected the proposed settlement, observing that "a culture has developed that results in cases of relatively worthless settlements (derivative actions are rarely tried to a verdict) that discontinue the action (with releases) resulting in the corporate defendants not opposing an agreed upon legal fee to class counsel." Exh. 1, No. 652188/2011, slip. op., at 4. The "practice of compensating class counsel no matter how meaningless the result is, creates the impression with most objective observers that these actions are brought merely for the purpose of generating legal fees. … The willingness to rubber stamp class action settlements reflects poorly on the profession and on those courts that, from time to time, have approved these settlements." *Id.*at 5; *see also In re Riverbed Tech. Inc.*, Consol. C.A. No. 10484-VCG, 2015 WL 5458041, *7 (Del. Ch. Sept. 17, 2015) (attached hereto at Exh. 6) (decreasing fee request because additional disclosures provided minor tangible benefit); *Acevedo v. Aeroflex Holding Corp.*, C.A. No. 7930-VCL (Del. Ch. Jul. 8, 2015) (Transcript) (attached hereto at Exh. 7).

The relief negotiated by counsel for the class that purportedly benefits the class amounts to 746 words worth of additional disclosure. These superficial disclosures were meaningless. And yet, class counsel requests fees of $365,336 (or $490 per word of additional disclosure). Indeed, the $490 per word rewards minimal work because the parties reached a settlement in principle just two weeks

after the case was filed.

Class counsel's collective lodestar is $292,978.75 (528 hours). *See* Memo in Support of Unopposed Motion for an Award of Attorneys' Fees ("Fee Request"), Dkt. 45-1 at 10. The lodestar excludes time after July 2, 2015, when the parties submitted their motion for preliminary approval of the settlement. *Id.* at 10. But the lodestar should also exclude any time after December 23, 2014, when the parties reached an agreement in principle. *See* Settlement, Dkt. 25-2 at 4. The hours class counsel churned after that time (to run up the lodestar to justify the excessive fee) should be discounted. *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 392 (S.D.N.Y. 2013) (discounting $7.5 million of lodestar for time spent after the parties reached an agreement in principle); *see also In re AOL Time Warner, Inc. Securities & "ERISA" Litigation*, No. 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 78101, at *73 (S.D.N.Y. Sept. 28, 2006) (R&R of Special Master), *adopted*, 2006 U.S. Dist. LEXIS 77926 (S.D.N.Y. Oct. 25, 2006) (reducing lodestar by 5,000 associate hours for document review performed after signing a memorandum of understanding and before execution of settlement agreement). Indeed, the requested $692 blended rate, *see* Fee Request at 10, is excessive given that the bulk of the work performed after the rapidly-reached settlement in principle was confirmatory discovery, *see* Settlement at 4-5. *See Pearson*, 772 F.3d at 781 (finding $538 average blended rate "excessive" because "most of the legal work was routine pretrial preparation" and was "further indication … that class counsel sought and were awarded excessive compensation").

In short, the additional disclosures were non-material, were of no import or effect, and cannot justify the releases exchanged for and the attorneys' fees incurred in obtaining them.

Finally, while this Objection was being finalized for filing on the morning of November 5, 2015, Objector Berlau notified his counsel, Melissa A. Holyoak, that he had received his Notice regarding this class action settlement in the mail the evening prior, November 4, 2015, less than one business day from the time he would have to overnight an objection to counsel. *See* Preliminary Approval Order, Dkt. 30 ¶ 10 (settling parties must "receive[]" objections by November 6, 2015). Because of the short time frame, Objector Berlau was unable to provide a supplemental declaration

regarding his receipt of the Notice for this Objection, but he will file one with the Court as soon as possible. As the attached declaration of Theodore H. Frank indicates, the timing of this Notice reflects a systematic problem where the Notice Plan was designed to prevent notice to individual shareholders to depress the number of objections. *See* Declaration of Theodore H. Frank (attached hereto at Exh. 8) ¶¶ 15-16. This Objection would not have been made if Objector Berlau had relied solely on the Notice received last night. *See id.* ¶¶ 3-5. Therefore, Objector Berlau objects to the Notice Plan as violating Rule 23 and federal constitutional requirements.

## CONCLUSION

The Court should deny approval of the Settlement and dismiss the action, or, in the alternative, if the Court approves the Settlement, the Court should award attorneys' fees of $1.


Dated: November 5, 2015.          /s/ Melissa A. Holyoak
                                  Melissa A. Holyoak, (DC Bar No. 487759)
                                  COMPETITIVE ENTERPRISE INSTITUTE
                                  CENTER FOR CLASS ACTION FAIRNESS
                                  1899 L Street, NW, 12th Floor
                                  Washington, DC 20036
                                  Phone: (573) 823-5377
                                  Email: melissaholyoak@gmail.com

                                  *Attorney for Objector John Berlau*

**Certificate of Service**

The undersigned certifies she electronically filed the foregoing Objection and Notice of Intention to Appear via the ECF system for the Northern District of Illinois, thus effecting service on all attorneys registered for electronic filing. Additionally she caused to be served via overnight courier a copy of this Objection and Notice of Intention to Appear upon the following:

| | |
|---|---|
| James Ducayet<br>Kristen Seeger<br>SIDLEY AUSTIN LLP<br>One South Dearborn<br>Chicago, IL 60603<br><br>Stephen DiPrima<br>Benjamin Klein<br>WACHTELL, LIPTON, ROSEN & KATZ<br>51 West 52nd Street<br>New York, NY 10019 | Gustavo F. Bruckner<br>POMERANTZ LLP<br>600 Third Avenue, 20th Floor<br>New York, New York 10016 |

Additionally, she caused to be mailed a courtesy copy of the foregoing via overnight courier addressed to:

Hon. Joan B. Gottschall
United States District Court for the Northern District of Illinois
Everett McKinley Dirksen United States Courthouse
Room 2332A
219 South Dearborn Street
Chicago, IL 60604

Dated: November 5, 2015.

/s/ Melissa A. Holyoak