1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3
    JAMES HAYS, on behalf of himself    )  Docket No. 14 C 9786
4   and all others similarly situated   )
    shareholders of Walgreen Company,   )
5                                       )
                          Plaintiff,    )
6                                       )
                vs.                     )
7                                       )
    WALGREEN COMPANY, et al.,           )  Chicago, Illinois
8                                       )  July 8, 2015
                          Defendants.   )  9:30 o'clock a.m.
9
            TRANSCRIPT OF PROCEEDINGS - STATUS AND MOTION
10            BEFORE THE HONORABLE JOAN B. GOTTSCHALL

11  APPEARANCES:

12  For the Plaintiff:      FRIEDMAN OSTER AND TEJTEL PLLC
                            BY:  MR. JEREMY FRIEDMAN
13                               MR. SPENCER OSTER
                            240 E. 79th St., Suite A
14                          New York, New York  10075

15                          POMERANTZ LLP
                            BY:  MR. MARK B. GOLDSTEIN
16                          10 S. LaSalle St, Suite 3505
                            Chicago, Illinois  60603
17
    For the Defendants:     SIDLEY AUSTIN LLP
18                          BY:  MR. JAMES W. DUCAYET
                                 MS. ELIZABETH AUSTIN
19                          One S. Dearborn Street
                            Chicago, Illinois  60603
20
    Court Reporter:         MS. JOENE HANHARDT
21                          Official Court Reporter
                            219 S. Dearborn Street, Suite 1744-A
22                          Chicago, Illinois  60604
                            (312) 435-6874
23
             * * * * * * * * * * * * * * * * * *
24
                    PROCEEDINGS RECORDED BY
25                  MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED BY COMPUTER

         1           THE CLERK:  Case No. 9:  14 C 9786, Hays vs. Walgreen

         2     Company.

         3           THE COURT:  Good morning.

         4           MR. FRIEDMAN:  Good morning, your Honor.

         5           MR. DUCAYET:  Good morning, your Honor.

         6           THE COURT REPORTER:  Would you please state your names

         7     for the record?

         8           MR. FRIEDMAN:  Good morning, your Honor, Jeremy

         9     Friedman from Friedman Oster on behalf of the plaintiff in this

        10     matter.

        11           MR. GOLDSTEIN:  Mark Goldstein on behalf of the

        12     plaintiffs.

        13           MR. DUCAYET:  Your Honor, Jim Ducayet and Liz Austin

        14     here on behalf of the defendants.

        15           MR. OSTER:  And Spencer Oster for the plaintiff.

        16           THE COURT:  Okay.

        17           This is a non-monetary settlement, correct?

        18           MR. FRIEDMAN:  That is correct, your Honor.

        19           And before I get started, let me just hand up a binder

        20     with a couple few documents that I think would be helpful as we

        21     go through that.

        22           They have been filed, as well.

        23           THE COURT:  Okay.

        24           (Document tendered.)

        25           MR. FRIEDMAN:  So, today the parties are here asking

1   the Court to do three things.

2          THE COURT:  Right.

3          MR. FRIEDMAN:  The first one, to preliminarily approve

4   the settlement; the second, to certify the proposed settlement

5   class; and, the third, to approve the form of notice.

6          I thought it would be helpful, because this is the

7   first time we have appeared before the Court on more of a

8   motion -- like a substantive motion -- in this case, to give a

9   brief summary of the litigation and the proposed settlement.

10          THE COURT:  Sure.  That would be helpful.

11          MR. FRIEDMAN:  Okay.  Great.

12          So, back in August of 2012, Walgreen entered into a

13   deal where it acquired half of its European competitor -- a

14   pharmacy competitor -- Alliance Boots.  And in connection with

15   that deal, Walgreen received an option to acquire the remainder

16   of Alliance Boots at a later date in 2015.

17          Then fast forward to August of 2014, where Walgreen

18   publicly announced that it was accelerating its option to

19   acquire the remainder of Alliance Boots and undertaking a

20   corporate reorganization, where the company would shift its

21   state of incorporation from Illinois to Delaware.

22          And for simplicity today, I am going to refer to the

23   acquisition of the second part of Alliance Boots as the Second

24   Step Acquisition, and the corporate reorganization as the

25   Reorganization, just to kind of speed things up and make it

1   more simple.

2           The period that surrounded the announcement of this

3   deal was one of significant turmoil at Walmart.  A couple of

4   days prior to that announcement, in August, the company's CFO

5   had abruptly resigned from the company and there were activist

6   investors who were agitating for change at Walmart.

7           Walgreen's former CEO didn't ride off quietly into

8   sunset.  In August, he logged in a defamation complaint against

9   the company, accusing its now former CEO and the largest

10  stockholder of Alliance Boots of defaming him during a series

11  of meetings with other large Walgreen stockholders.  And kind

12  of -- in short, the former CFO was alleging that the former CEO

13  and Alliance Boots' largest stockholder had said disparaging

14  things, and it was allegedly to cover up or obscure certain

15  misconduct that had been engaged in by certain directors and

16  officers of the company.

17          Despite these serious allegations from Walgreen's

18  former CFO, and the fact that Stefano Pessina, Alliance Boots'

19  largest stockholder and a director of Walgreen's, was going to

20  be getting significantly more power as a result of the Second

21  Step Acquisition of this company, the proxy statement that was

22  filed in connection with this deal, and the stockholder vote on

23  this deal, did not even mention the lawsuit or the substance of

24  it or any of the CFO's former allegations.

25          The proxy materials also failed to disclose a litany

1   of other information that we believe would have -- was material

2   to the vote and would have -- been useful for the stockholders

3   to get.  This information included Mr. Pessina's expected

4   ownership stake at the completion of the deal, an explanation

5   and -- a more full explanation as to why the Step Two

6   Acquisition was accelerated, the risks associated with the

7   deal, and certain information about meetings between Walgreen

8   management and directors and activist investors, including JANA

9   Partners.

10          In early December of 2014, plaintiffs in this case

11  brought their action and it was alleging disclosure violations

12  and disclosure deficiencies in connection with the proxy

13  materials.

14          The plaintiffs in this case stood ready to file their

15  TRO motion seeking to enjoin the deal in this matter; but, at

16  the same time, the parties also began negotiations and engaged

17  in several rounds of negotiations about supplemental

18  disclosures to resolve this action.

19          After these multiple rounds of negotiations, the party

20  reached a preliminary resolution where defendants agreed to and

21  have already provided what we believe to be valuable

22  disclosures, including the existence and substance of  the

23  former CFO's complaint, Mr. Pessina's expected ownership upon

24  consummation of the deal, why Mr. Pessina was selected to be

25  the CEO of the combined company, information relating to Mr.

1    Pessina's recusal during the process because of a potential

2    conflict of interest, risks associated with the Step Two deal

3    and certain meetings between Walgreen management and the

4    activist investors, including JANA.

5          In sum, we think these supplemental disclosures

6    provided value to the stockholders and allowed them to cast an

7    informed vote on the deal.

8          For the Court's convenience, I handed up a binder at

9    the outset that includes an AK as, I believe, Exhibit 1, that

10   includes the supplemental disclosures that I summarized.

11          I don't want to kind of read from them wholesale.  So,

12   I figured it would be helpful to hand that up.

13          THE COURT:  So, do I need to read these?  I have read

14   all of the materials that you filed.

15          MR. FRIEDMAN:  No.  There they are summarized in all

16   all of the filings.

17          THE COURT:  Okay.

18          MR. FRIEDMAN:  But just to make sure you had them, I

19   handed this up, just to --

20          THE COURT:  Sure.

21          MR. FRIEDMAN:  So, the first issue that we are asking

22   the Court to address is whether to preliminarily approve the

23   settlement.  And as the Court knows from the Federal Rules of

24   Civil Procedure, the standard for final approval of a

25   settlement is fair, reasonable and adequate.  And we believe

1    the settlement meets that standard.

2         But here, today, the Court doesn't even need to get

3    there.  The question for preliminary approval is whether the

4    settlement is within the range of possible approval.

5         In light of the fact that the proposed settlement, we

6    believe, meets the higher standard of fair, reasonable and

7    adequate, so almost by definition it would meet the lower

8    standard, within the possible range.

9         And to kind of summarize why we think it is within the

10    range, here plaintiffs brought rifle-shot claims.  We weren't

11    alleging that the deal itself was unfair or that Walgreen was

12    overpaying to acquire Alliance Boots.  It was merely that there

13    were disclosure deficiencies in the proxy materials and those

14    were depriving stockholders of an informed vote.

15         Unless your Honor has any questions on preliminary

16    approval, I would move on to class cert.

17         THE COURT:  Yes.  How much time do you think you

18    are going to need?  I am actually squeezed a little bit this

19    morning.

20         MR. FRIEDMAN:  Oh, yes.  I would say three minutes.

21         THE COURT:  Go ahead.

22         MR. FRIEDMAN:  I mean, I can -- unless your Honor has

23    any -- if you have already read the materials --

24         THE COURT:  I have actually read everything.

25         MR. FRIEDMAN:  Okay.

1          THE COURT:  And I am, like, ready.  Okay?

2          MR. FRIEDMAN:  Okay.

3          THE COURT:  I have read everything that you filed.

4          I certainly have not read what you handed up to me

5    this morning.

6          My only concern really -- I have a couple of modest

7    concerns.

8          First of all, as usual, Redmond vs. Radio Shack in

9    this Circuit gives me some issue.  And let me quote from the

10   decision.

11         Judge Posner says, "Analysis is more complex," and we

12   are talking about -- we are looking at trying to assess the

13   value of the attorneys' fees against the value of the

14   settlement.  Okay?  And he says, "Analysis is more complex.

15   When the principal benefits are non-monetary is when equitable

16   relief is awarded rather than damages.  A value must be

17   attached to the relief obtained by the class as part of a

18   determination of an appropriate attorneys' fee for class

19   counsel.  But a rough estimate may be permissible, especially

20   when, as in civil cases, much of the value of the equitable

21   relief may be non-monetizable."

22         So, here is what I think.  I think that the question

23   of the amount of attorneys' fees you are requesting, I think

24   they are quite -- given what I see in most cases, quite --

25   modest.  Okay?

1    The only thing about the attorneys' fees -- somehow

2  you want us to come up with some number for this relief.  And I

3  am not sure in this case it even makes sense to try to do it.

4  I think given the rather reasonable amount of attorneys' fees,

5  maybe we can dispense with that.

6    I do not know.  If anybody appeals, we will find out.

7    But they would have to object, I guess.  And I cannot

8  foresee any objections.  I just do not see how we would do it

9  in this case.

10   The only other thing that I am concerned about is some

11 language Redmond that suggests that before the objection date,

12 we have to give the class enough information about fees, so

13 that they can actually make a meaningful objection to the

14 amount of fees.  And I think in this case, they have to

15 probably -- they would have to have some idea of how much each

16 law firm or each lawyer was billing.

17   I think you have given me --

18   MR. FRIEDMAN:  Yes.

19   THE COURT:  You have given me a pretty good sense of

20 -- I like the way you have divided it down into types of work.

21   Let me ask you one question, though.

22   MR. FRIEDMAN:  Sure.

23   THE COURT:  The New York firm billing rates appear to

24 me to be quite -- because I have not been in practice for a

25 long time, but I think they are a lot more significant than

1  what Chicago lawyers normally charge.  Am I --

2      MR. FRIEDMAN:  Yes, I think that -- I don't have the

3  rates right in front of me, but I think that is a fair

4  statement.

5      THE COURT:  My guess is, if this is what --

6      Who is a New York lawyer here?

7      MR. FRIEDMAN:  I am a New York lawyer.

8      THE COURT:  Do you actually ever bill these amounts or

9  do you do so much class action work, that it is just a --

10     MR. FRIEDMAN:  Personally, I -- my practice is all

11 class actions.

12     THE COURT:  How do I make sure that that is a

13 reasonable billing rate?  Because I think that is one of the

14 things that the Seventh Circuit is a little bit obsessive

15 about.

16     MR. FRIEDMAN:  I can look to see what is comparable --

17 I mean, my defense counsel probably wouldn't like this; but, I

18 mean, I think they are comparable with what our adversaries in

19 the case are charging, and I think comparable with what the

20 market is for --

21     THE COURT:  Okay.  I may need something like that down

22 the road.  I do not know that I need it now.

23     MR. FRIEDMAN:  Okay.

24     THE COURT:  But other than that, everything looks okay

25 to me.

1          MR. FRIEDMAN:  Okay.

2          THE COURT:  And, as I say, I do not really understand

3   how I would -- yes?

4          MR. DUCAYET:  Your Honor, there is just one part of

5   the notice program that I wanted to draw your attention to.

6          THE COURT:  Yes.

7          MR. DUCAYET:  Just to make sure that --

8          THE COURT:  And that is attached to this somewhere,

9   right?

10         Let me get the notice in front of me before --

11         MR. FRIEDMAN:  Yes.  The notice is also in the small

12  binder, if you just want to check it.

13         THE COURT:  Oh, the notice is in the small binder?

14         MR. FRIEDMAN:  Well, it is included in the filings;

15  but, also, for your convenience, it is either Exhibit No. 2 or

16  Exhibit 3.

17         THE COURT:  Well, let me try to find it.  Okay?

18  Because I know I looked at it.

19         There were two notices attached, right?

20         MR. DUCAYET:  There are, your Honor.  And that is why

21  I wanted to draw your attention to this --

22         THE COURT:  Please.

23         MR. DUCAYET:  -- just to make sure we are all on the

24  same page here.

25         THE COURT:  Please.

1          MR. DUCAYET:  We are proposing, with the agreement of

2     plaintiffs, to do a postcard notice in the first instance.  And

3     we believe under the circumstances, given the nature of the

4     relief here, that that is appropriate.

5          We have got a lot of shareholders; and, frankly, the

6     cost of delivering a long form notice to --

7          THE COURT:  Right.

8          MR. DUCAYET:  -- nearly have a million, you know,

9     shareholders, would be quite expensive.

10          THE COURT:  Right.

11          MR. DUCAYET:  And, so, what we have proposed to do is

12     to have a postcard that contains all of the salient

13     information; includes a link to a Web site that will

14     conclude -- include -- that long form notice.

15          THE COURT:  Right.

16          MR. DUCAYET:  But, you know, I know your Honor has

17     dealt with postcard notices before and I just wanted to raise

18     that now, just to make sure your Honor was aware of that.

19          THE COURT:  I think in the context of this case, it

20     probably makes a lot of sense, as long as the postcard -- where

21     is the postcard notice?

22          MR. DUCAYET:  So, the -- well, so, the postcard is

23     described as the summary notice.

24          THE COURT:  So --

25          MR. DUCAYET:  And what is on there, it is not in the

1  form of a postcard, but it will formatted so that it --

2          THE COURT:  Right.  But does it have a number?  I

3  mean, I have some exhibit numbers here.

4          MR. GOLDSTEIN:  In the small binder, I believe it is

5  No. 2.

6          THE COURT:  In the small binder?

7          MR. GOLDSTEIN:  Yes.

8          It also was filed and I just -- that was for your

9  reference.

10          MR. FRIEDMAN:  That exhibit will have the text.  It

11  should be two pages.  It will have the text of what will appear

12  on the postcard.

13          THE COURT:  Wait.  It is this thing (indicating)?  You

14  are going to put that on a postcard?

15          MR. FRIEDMAN:  Yes, I would be condensed, but --

16          THE COURT:  Will it be readable?

17          MR. DUCAYET:  Your Honor, we will make sure it is

18  readable, yes.

19          THE COURT:  I do not know how all of this goes on a

20  postcard.

21          MR. FRIEDMAN:  It's a big postcard.

22          No, we will make sure that it is very legible.

23          THE COURT:  Okay.

24          These -- this is two pages of text?

25          MR. DUCAYET:  Yes, your Honor.

THE COURT: And it is going to go on a postcard and it is going to be readable?

MR. DUCAYET: Yes, your Honor. We are working with our notice administrator --

THE COURT: Okay.

MR. DUCAYET: -- to create a form that includes that information. We will do it in a way that it is legible, it is understandable and that it will be clear that you can link to a Web site.

THE COURT: And there is no problem -- there is no problem -- getting names and addresses in this case, right?

MR. DUCAYET: No, that is not the issue, your Honor.

Well, with one exception, your Honor. We have a shareholder list. Many shareholders hold through banks and brokers.

THE COURT: Right.

MR. DUCAYET: And, so, we are going to make it in notice to them and, then, ask them to identify their beneficial owners.

But with that exception, your Honor, there is no issue about the identity of the shareholders.

THE COURT: Okay.

MR. DUCAYET: It is just a number.

THE COURT: All right.

So, the postcard notice, if it is on a postcard, I do

1   not see a problem with that as long as it is legible.

2           MR. DUCAYET:  Right.

3           THE COURT:  And, then, what is attached as Exhibit 3

4   is the regular form notice?

5           MR. DUCAYET:  Yes, your Honor.

6           THE COURT:  It is going to go on the Web site?

7           MR. DUCAYET:  Correct.

8           THE COURT:  Okay.

9           And that I have read and that looks okay.

10          So, what I am doing today is if I preliminarily

11  approve the class action settlement and class certification, I

12  am also certifying the class, which looks okay; I am approving

13  both the postcard notice and the notice that is going to be

14  posted on the Web site.

15          MR. DUCAYET:  Right.

16          THE COURT:  And I think that is okay, as long as the

17  postcard is legible.

18          And am I doing anything else?

19          MR. DUCAYET:  And, then, your Honor, we would be

20  asking for you to set a date for a final fairness hearing.

21          THE COURT:  Yes.  Okay.

22          So, I will grant this motion for preliminary approval.

23          And what kind of a date do you need?

24          MR. DUCAYET:  So, your Honor, because we have got

25  notification obligations under CAFA, we need at least 90 days

1  from the date that that CAFA notice goes out.  We are going to

2  try to get that out notice today.

3         THE COURT:  Okay.

4         MR. DUCAYET:  Could we build in a little bit of a

5  buffer, you know, and get us 90 days from, say, sometime next

6  week?  You know, that should --

7         THE COURT:  So, we are looking for a date, what, in

8  early November?  Is that what you are thinking of?

9         MS. AUSTIN:  Yes, October 8th would be 90 days from

10 this Friday.

11        THE CLERK:  October the 7th is 90 days.

12        MR. DUCAYET:  Yes, why don't we build in a hundred

13 days, your Honor, just to give us enough time to get that

14 notice out.

15        THE COURT:  So, mid-October?

16        MR. DUCAYET:  Mid-October would be good.

17        THE COURT:  Okay.

18        THE CLERK:  November 6th.

19        MR. DUCAYET:  November 6th is fine.

20        MR. FRIEDMAN:  That should work.

21        THE COURT:  Okay.

22        November?

23        THE CLERK:  Yes, November 6th.

24        THE COURT:  Do you want October or do you want

25 November?

1          MR. DUCAYET:  November 6th is fine, your Honor.

2          THE COURT:  Okay.

3          And is there anything else we need to do today?

4          MR. FRIEDMAN:  That is all.

5          MR. DUCAYET:  No, your Honor.

6          THE COURT:  Okay.

7          I will grant the motion for preliminary approval and I

8    will see you in early November.

9          MR. DUCAYET:  Thanks very much for your patience

10   today.

11         MR. FRIEDMAN:  Thank you, your Honor.

12         MR. GOLDSTEIN:  Thank you.

13         THE COURT:  Thank you.

14                      *   *   *   *   *

15   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

16

17   /s/ Joene Hanhardt              November 18, 2015
     Official Court Reporter

18

19

20

21

22

23

24

25