In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-3799

IN RE: WALGREEN CO. STOCKHOLDER LITIGATION (*HAYS*, *et al.* v. *WALGREEN CO.*, *et al.*)

APPEAL OF: JOHN BERLAU, Objector.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 9786 — **Joan B. Gottschall**, *Judge*.

ARGUED JUNE 2, 2016 — DECIDED AUGUST 10, 2016

Before POSNER and SYKES, *Circuit Judges*, and YANDLE, *District Judge*.[*]

POSNER, *Circuit Judge*. In merger litigation the terms "strike suit" and "deal litigation" refer disapprovingly to cases in which a large public company announces an agreement that requires shareholder approval to acquire another

---

[*] Of the Southern District of Illinois, sitting by designation. Judge Yandle dissents from the panel's decision. Her dissent will be issued separately in due course.

large company, and a suit, often a class action, is filed on behalf of shareholders of one of the companies for the sole purpose of obtaining fees for the plaintiffs' counsel. Often the suit asks primarily or even exclusively for disclosure of details of the proposed transaction that could, in principle at least, affect shareholder approval of the transaction. But almost all such suits are designed to end—and very quickly too—in a settlement in which class counsel receive fees and the shareholders receive additional disclosures concerning the proposed transaction. The disclosures may be largely or even entirely worthless to the shareholders, in which event even a modest award of attorneys' fees ($370,000 in this case) is excessive and the settlement should therefore be disapproved by the district judge. In this case, however, the district judge approved the settlement, including a narrow release of claims and the fee for the plaintiff's lawyers that the company had agreed not to oppose. A shareholder named Berlau, having objected unsuccessfully to the settlement in the district court, has appealed.

In 2012 Walgreen Co. (usually referred to as "Walgreens") acquired a 45 percent equity stake in a Swiss company named Alliance Boots GmbH, plus an option to acquire the rest of Alliance's equity, beginning in February 2015, for a mixture of cash and Walgreens stock. In 2014 the two companies altered the deal to allow the option to be exercised earlier. Walgreens announced its intent to purchase the remainder of Alliance Boots and then engineer a reorganization whereby Walgreens (having swallowed Alliance Boots) would become a wholly owned subsidiary of a new Delaware corporation to be called Walgreens Boots Alliance, Inc. Within two weeks after Walgreens filed a proxy statement seeking shareholder approval of the reorganization,

the inevitable class action was filed, and 18 days later—less than a week before the shareholder vote—the parties agreed to settle the suit.

The suit sought additional disclosures to the shareholders, disclosures alleged to be likely to affect the shareholder vote. The settlement required Walgreens to issue several of the disclosures to the shareholders—that was the entire benefit of the settlement to the class—and released the company from liability for the other disclosure-related claims made in the suit. It also authorized class counsel to ask the district judge to award them $370,000 in attorneys' fees, without opposition from Walgreens.

The disclosures agreed to in the settlement (the parties call these the supplemental disclosures, as shall we) represented only a trivial addition to the extensive disclosures already made in the proxy statement: fewer than 800 new words—resulting in less than a 1 percent increase—spread over six disclosures.

The supplemental disclosure deemed most significant by class counsel concerned the nomination to the board of directors of Walgreens of Barry Rosenstein, who was involved in a hedge fund that had a 1.5 percent interest in Walgreens stock. The disclosure states that before his nomination he had "engaged in preliminary discussions [with Walgreens] during which [he had] expressed his views regarding Walgreens and its strategic direction and prospects," that Walgreens had entered into a confidentiality agreement with Rosenstein's firm, and that there had been further consultations ending in Walgreens' concluding "that Mr. Rosenstein would be a valuable addition to the Board" of Walgreens Boots Alliance.

The new disclosure was worthless because it was and is obvious that Walgreens would not nominate a person for election to its board of directors without discussing with the prospective nominee the company's strategic direction and prospects. The only new thing to be gleaned from the disclosure related to the timing of the conversations. Rosenstein had been nominated on September 5, 2014, and the disclosure indicated that there had been conversations stretching back at least a month. But even without that revelation, the shareholders would have assumed that Rosenstein's appointment to the board had not happened overnight, and the disclosure revealed no further details about the period or content of the pre-nomination consultations.

A second supplemental disclosure concerned the allocation of stock in Walgreens Boots Alliance to two investment groups, SP Investors and KKR Investors, after the merger. The disclosure estimated that SP Investors would have about 11.3 percent of the shares and KKR Investors about 4.6 percent. But as these estimates could be derived by simple arithmetic from data in the proxy statement, the disclosure added nothing. See, e.g., *Werner v. Werner*, 267 F.3d 288, 299–300 (3d Cir. 2001).

Supplemental disclosure number three: in 2014, shortly before Walgreens and Alliance decided to merge, Walgreens' executive vice president and chief financial officer and president of its international division, Wade D. Miquelon, had resigned from the company and sued it for defamation. The proxy statement did not mention Miquelon's resignation or his suit; the supplemental disclosure listed the claims made in his suit and said that Walgreens had denied them. There was no suggestion that the suit (seven of the

nine counts of which were dismissed in 2015) could have had a significant impact on the formation or operation of Walgreens Boots Alliance, or that it was even related to the formation of the new company.

Supplemental disclosure number four: The proxy statement included a bullet-point list of risk factors that the Walgreens board had considered in deciding whether to merge with Alliance Boots. The supplemental disclosure added four to the list—but all were based on language found in the proxy statement. The additional disclosure provided no new information to shareholders.

Supplemental disclosure five: The proxy statement noted that Stefano Pessina, who was designated to become CEO of Walgreens Boots Alliance and had interests in Alliance Boots resulting from his affiliation with SP Investors had, along with one other member of Walgreens' board, not voted on whether to approve the merger. The supplemental disclosure explained that "as a result of their interest in the proposed transaction" the two had recused themselves from the Board's decision to exercise Walgreens' option to buy the rest of Alliance Boots. The supplemental disclosure merely stated the reason they'd not voted, and there is nothing to suggest that the disclosure of that reason could have upended the merger. And their recusal from voting on the reorganization because of their financial interest in it had been highlighted elsewhere in the proxy statement. Class counsel argues that the disclosure revealed that the two board members also had not participated in discussions leading up to the shareholder vote, but the disclosure does not say that.

Supplemental disclosure number six, the last supplemental disclosure, also concerns Pessina. According to a

public filing, he had been appointed acting CEO of the new entity because of his "extensive leadership experience and knowledge of Walgreens and Alliance Boots." The statement went on to list previous positions he'd held, and boards he'd sat on. The supplemental disclosure embroidered the enumeration of Pessina's qualifications by remarking that among the "factors" that the board had considered were his "considerable knowledge of the industries in which both Walgreens and Alliance Boots operate, his familiarity with both … businesses and leadership teams and his international experience and background in managing global businesses." This was frosting on the cake—the cake consisting of the detailed enumeration in the public filing of his business history. And to be told that the board considered "a number of factors" was to be told nothing.

The reorganization that ratified Walgreens Boots Alliance was approved by 97 percent of the Walgreens shareholders who voted. It is inconceivable that the six disclosures added by the settlement agreement either reduced support for the merger by frightening the shareholders or increased that support by giving the shareholders a sense that now they knew everything. This conclusion is supported by recent empirical work which shows that there is little reason to believe that disclosure-only settlements *ever* affect shareholder voting. Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, "Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform," 93 *Tex. L. Rev.* 557, 561, 582–91 (2015). The value of the disclosures in this case appears to have been nil. The $370,000 paid class counsel—pennies to Walgreens, amounting to 0.039 cents per share at the time of the merger—bought nothing of value for the shareholders, though it spared the

new company having to defend itself against a meritless suit to void the shareholder vote.

In deciding whether to approve a class settlement, a court must consider whether the agreement benefits class members. See *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 882 (7th Cir. 2000). Disclosures are meaningful only if they can be expected to affect the votes of a nontrivial fraction of the shareholders, implying that shareholders found the disclosures informative. As explained by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. … What th[is] standard … contemplate[s] is a showing of a substantial likelihood that, under all the circumstances, *the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder*." *Id.* (emphasis added). Cf. Thomas Hazen, 2 *Law of Securities Regulation* § 9:19 (7th ed. 2016). The supplemental disclosures in this case did not do that; they contained no new information that a reasonable investor would have found significant. It is not to be believed that had it not been for those disclosures, not 97 percent of the shareholders would have voted for the reorganization but 100 percent or 99 percent or 98 percent.

In *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014), we "remarked the incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers—the deal that promotes the self-interest of both class counsel and the defend-

ant and is therefore optimal from the standpoint of their private interests." Except that in this case the benefit for the class was not meager; it was nonexistent. The type of class action illustrated by this case—the class action that yields fees for class counsel and nothing for the class—is no better than a racket. It must end. No class action settlement that yields zero benefits for the class should be approved, and a class action that seeks only worthless benefits for the class should be dismissed out of hand. See, e.g., *Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 319 (7th Cir. 2012).

The district judge approved the settlement agreement—but with misgivings. She remarked that "in the future, especially if there are issues like this [financial issues concerning a $15 billion transaction], hearing from someone who's not a lawyer who could explain to me that it [she meant the supplemental disclosures] mattered would have been very, very helpful." She could of course have appointed her own expert to explain the significance (or rather lack thereof) of the supplemental disclosures, see Fed. R. Evid. 706, and she should have done that given her doubts about the lawyers' explanations.

She went on to say that she'd "been persuaded that at least the following supplemental disclosures *may have* mattered to a reasonable investor" (emphasis added). "May have" is not good enough. Possibility is not actuality or even probability. The question the judge had to answer was not whether the disclosures may have mattered, but whether they *would* be *likely* to matter to a reasonable investor. She did list the supplemental disclosures that she thought "may have mattered," but it was a bare list, devoid of meaningful explanation of why they may have mattered (let alone why

they did matter)—with just one exception. Regarding the supplemental disclosure concerning Miquelon's lawsuit, the judge said that although "somewhat skeptical" of its importance she had been convinced by class counsel that "it isn't a frivolous point and may well have alerted investors to issues they would have otherwise ignored about turmoil in the company." But keeping in mind the size of the transaction to which the disclosures were supposed to pertain, a bare assumption that Miquelon's lawsuit would cause or signal "turmoil" that would deter the stockholders from voting for the creation of Walgreens Boots Alliance was too farfetched to be credited on the basis of the lawyers' self-interested say so, with no inquiry into the likely effect of the suit on the transaction.

The district judge was handicapped by lack of guidance for judging the significance of the disclosures to which the parties had agreed in order to settle the class action at nominal cost to the defendant (because class counsel's fees were small potatoes to the giant new company and the disclosures irrelevant to the shareholders and thus incapable of preventing the reorganization) and sweet fees for class counsel, who devoted less than a month to the litigation, a month's activity that produced no value.

Delaware's Court of Chancery sees many more cases involving large transactions by public companies than the federal courts of our circuit do, and so we should heed the recent retraction by a judge of that court of the court's "willingness in the past to approve disclosure settlements of marginal value and to routinely grant broad releases to defendants and six-figure fees to plaintiffs' counsel in the process." The result has been to "cause[] deal litigation to explode in

the United States beyond the realm of reason. In just the past decade, the percentage of transactions of $100 million or more that have triggered stockholder litigation in this country has more than doubled, from 39.3% in 2005 to a peak of 94.9% in 2014." *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884, 894 (Del. Ch. 2016).

And so *Trulia* adopted a clearer standard for the approval of such settlements, *id*. at 898–99 (footnotes omitted, emphasis added), which we endorse, and apply in this case:

> Returning to the historically trodden but suboptimal path of seeking to resolve disclosure claims in deal litigation through a Court-approved settlement, practitioners should expect that the Court will continue to be increasingly vigilant in applying its independent judgment to its case-by-case assessment of the reasonableness of the "give" and "get" of such settlements in light of the concerns discussed above. To be more specific, practitioners should expect that disclosure settlements are likely to be met with continued disfavor in the future unless the supplemental disclosures address a *plainly material misrepresentation or omission*, and the subject matter of the proposed release is narrowly circumscribed to encompass nothing more than disclosure claims and fiduciary duty claims concerning the sale process, if the record shows that such claims have been investigated sufficiently. In using the term "plainly material," I mean that it should not be a close call that the supplemental information

>is material as that term is defined under Delaware law. Where the supplemental information is not plainly material, it may be appropriate for the Court to appoint an *amicus curiae* to assist the Court in its evaluation of the alleged benefits of the supplemental disclosures, given the challenges posed by the non-adversarial nature of the typical disclosure settlement hearing.

We've italicized the key term in the quoted passage: the misrepresentation or omission that the supplemental disclosures correct must be "plainly material," cf. *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 616–17 (7th Cir. 2012), as they were not in this case. If immaterial their correction does nothing for the shareholders. And we add that it's not enough that the disclosures address the misrepresentation or omissions: they must correct them. Neither requirement was satisfied in this case.

A class "representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain [no benefit] … is not adequately protecting the class members' interests." *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748, 752 (7th Cir. 2011). Courts also have "a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class, and if at any time the trial court realizes that class counsel should be disqualified, the court is required to take appropriate action." *In re Revlon, Inc. Shareholders Litigation*, 990 A.2d 940, 955 (Del. Ch. 2010) (quoting 4 *Newberg on Class Actions* § 13:22, at 417 (2002)).

The oddity of this case is the absence of *any* indication that members of the class have an interest in challenging the reorganization that has created Walgreens Boots Alliance. The only concrete interest suggested by this litigation is an interest in attorneys' fees, which of course accrue solely to class counsel and not to any class members. Certainly class counsel, if one may judge from their performance in this litigation, can't be trusted to represent the interests of the class. Because the settlement can't be approved, we reverse the district court's judgment. And since class counsel has failed to represent the class fairly and adequately, as required by Federal Rule of Civil Procedure 23(g)(1)(B) and (g)(4), the district court on remand should give serious consideration to either appointing new class counsel, cf. Fed. R. Civ. P. 23(g)(1), or dismissing the suit. Cf. *Robert F. Booth Trust v. Crowley*, *supra*, 687 F.3d at 319.

REVERSED AND REMANDED, WITH DIRECTIONS.



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit